1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                     AT SEATTLE

4
UNITED STATES OF AMERICA,     )  Cause No. 06-5504RBL
5                             )
           Plaintiff,         )  Seattle, Washington
6                             )  October 27, 2008
      vs.                     )  Volume I
7                             )
CHARLES NOLON BUSH,           )
8                             )
           Defendant.         )
9                             )
_____)
10

11
     _____
12                          TRIAL
              VERBATIM REPORT OF PROCEEDINGS
13        BEFORE THE HONORABLE RONALD B. LEIGHTON
                 UNITED STATES DISTRICT JUDGE
14   _____

15
     APPEARANCES:
16
      For the Plaintiff:      Arlen Storm
17                            Tyler Letey

18

19    For the Defendant:      Paula Olson

20
      Reported by:            Nichole Rhynard, CCR, RMR, CRR
21                            Federal Court Reporter
                              206.370.8504
22                            nichole_rhynard@wawd.uscourts.gov

23

24   Proceedings recorded by mechanical stenography, transcript
     Produced by Reporter on computer.
25

1                           EXAMINATION INDEX

2     EXAMINATION OF:                                          PAGE
      ROBERT MANSUETO
3     DIRECT EXAMINATION          BY MR. STORM                  27
      VOIR DIRE EXAMINATION       BY MS. OLSON                  41
4     DIRECT EXAMINATION          BY MR. STORM                  41

5

6

7                            EXHIBIT INDEX

      EXHIBITS ADMITTED                                        PAGE
8       10004                                                  29
        2052                                                   32
9       2053, 2054                                             36
        2055                                                   37
10      2056                                                   38
        2060                                                   41

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S
  _____
2

3        MR. STORM:  Please the Court, Counsel, members of the

4  jury.  This is a case about deception.  The deception that

5  Nolon Bush used to take $35 million from 400 people between

6  1998 and 2002.  That's because in 1998, Nolon Bush started a

7  Ponzi scheme.  He started promoting mid-term notes, a

8  fictitious financial instrument.  He told people that if they

9  gave him money to place in these mid-term notes, he would

10 take it and he would give it to one of two people, Carolyn

11 Mintus, who ran an outfit called Mintus, Inc., or Larry

12 Wilcoxson, who ran IFR, and they would put it into this

13 private merchant bank where it would make the investor

14 fabulously wealthy.

15     He told them that their money would be absolutely safe if

16 they invested with him.  He told them that he would keep

17 their money in a trust.  He told them that while it was in

18 that trust it would be insured by a letter of credit for $100

19 million.  He told them when he accumulated the million

20 dollars he would move their money over to one of these other

21 two individuals, Mintus or Wilcoxson, who would put it into

22 the merchant bank, Bank of New York, where it would start

23 making them wealthy.  And he told them that in the Bank of

24 New York there would be more insurance in addition to the

25 letter of credit for $100 million.  He told them that their

1  money would never leave the bank in this process; could not
2  be more safe.   He told them that they were guaranteed an
3  absolute 8 percent to 9 percent rate of interest on their
4  principal.   But he told them that in reality he would more
5  likely get -- they would more likely get 25 percent every
6  four to six weeks.   And that that would compound over the
7  course of the year or years.
8       He told them that there were low administrative fees.   And
9  he identified specifically what those administrative fees
10 were in the paperwork that he provided to potential
11 investors.   $500, $1,000, and typically they were waived or
12 deferred administrative fees.
13      He sent the investors who gave him their money to go into
14 his trust to go into the private merchant bank and to make
15 them wealthy and never leave the bank.   He sent them account
16 statements showing that what he said was working.   He sent
17 them account statements that said they were making 25 percent
18 every four to six weeks.   Not only that, for those people who
19 wanted to be paid as the money was generated, he cut them
20 checks and sent them checks or wires for that 25 percent
21 every four to six weeks.
22      And predictably they were thrilled.   They recruited their
23 friends, they recruited their family members, they recruited
24 their church members, the guys at work, the women at work,
25 they raided their 401(k) accounts themselves because they saw

1    the money that can be made through this.  They took out their

2    home equity and gave it to him.  And in truth, in fact, it

3    was a giant house of cards called a Ponzi scheme.  There were

4    no profits coming in.  The checks that he cut to the

5    investors who wanted to be paid immediately, those came from

6    other investors.  Instead of delivering all of their

7    investments to Mintus or Wilcoxson, he delivered one-third.

8    And instead of leaving their money in the bank, he took out

9    the other two-thirds and he spent it.  One-third went to the

10   investors who wanted to be paid immediately, and despite his

11   assertions of low administrative fees, the other third went

12   to spend any way he wanted.  It went for overhead, it went

13   everywhere that he went.  He spent it, he took it and spent

14   it and it's gone.

15       If you go across the Narrows Bridge and take a right and

16   head north you'll find the town of Port Orchard.  And not too

17   far from the town of Port Orchard you'll find View Park Golf

18   Estate.  View Park Golf Estate is wonderful.  It's a 20-acre

19   property.  In the middle of that 20-acre property there's a

20   very large house with beautiful views of Puget Sound and the

21   Seattle skyline.  There is a golf course, private golf course

22   that surrounds the property and not in the traditional sense

23   of people living on the communal private golf course, this

24   golf course is within the 20-acre confines of that property.

25   In the back of house there are tennis courts.  If you go down

1   across Puget Sound to Safeco Field to the sixth floor you'll

2   find Suite 48, the luxury suite called the Lou Gehrig suite.

3   Another fabulous place in the Seattle area.

4       It's from those two locations that Nolon Bush recruited

5   perspective investors.  And he wined and dined these people

6   and told them about the safety of his program.  From View

7   Park Estate they look down on Puget Sound, from the Lou

8   Gehrig suite they look down and saw on the wall of the

9   stadium a banner.  A banner for his charity called From the

10  Heart Foundation.  It was run by his partner, Marilyn March.

11  And seeing that he was not only wealthy at View Park, but he

12  was trustworthy because he ran a charity, they opened their

13  wallets to him.

14      During this trial you're going to hear from the

15  inhabitants of that world.  You're going to hear from staff

16  members at View Park.  You're going to hear from Pete Harold,

17  his chef, who made Nolon and Marilyn dinner every night

18  before he left for the day.  Put it in the fridge.  You're

19  going to hear from Mary Ann Houkli, the masseuse, who came

20  every Friday and gave Nolon Bush and Marilyn a 90-minute

21  massage as well as other staff members and how she was paying

22  with an envelope full -- stuffed full of $700 in cash.  Week

23  after week of investors' money.  You're going to hear from

24  Jesse Munch, the bodyguard for Nolon Bush, although he would

25  like to be called a bodyguard, the bodyguard for Nolon Bush.

1    You're going to hear from Dr. Joe Ladley, who sold the
2    house to Nolon Bush.  And was hired as one of four or five
3    full-time groundskeepers for the estate.  You're going to
4    hear from Lorelei Tarsiuk, Mr. Bush's administrative
5    assistant.  The one that was paid $125,000 a year of investor
6    money that was wired by Bush off to secret offshore bank
7    account.  And you're going to hear from Tammy Stuckey,
8    Mr. Bush's other administrative assistant, who was paid
9    $1,000 a week stuffed into an envelope in cash of investor
10   money.
11       And you're not just going to hear from those people, staff
12   at View Park, you're going to hear from staff members in
13   Mr. Bush's Nevis office.  You're going to hear from the two
14   managers, James Simha and Suzi Ripley.
15       You're also going to hear from financial planners, a
16   financial planner who promoted this plan for Mr. Bush,
17   Vicki Webster.  And you're going to hear from the investors
18   themselves and they're going to tell you their experiences
19   with Mr. Bush.
20       And finally, you're going to hear from the people who
21   ended up with those investors' money.  You're going to hear
22   from the art dealers where Mr. Bush and Marilyn March
23   shopped.  The car dealers where they bought their cars.
24   You're going to hear from real estate dealers who sold them
25   their real estate.  You're going to hear of all the multiple

1    people, including the CEO of Tully's who ended up with the

2    investors' money who aren't part of the Bank of New York.

3        And you're going to hear about these instruments; these

4    midterm note instruments.  You're going to hear that they're

5    not real.  They don't exist in the real world.  And as

6    someone said when we started today, if it sounds too good to

7    be true, it is.  These instruments with no risk 25 percent

8    every four to six weeks are too good to be true.

9        What happened in this case?  Well, what you're going to

10    hear from the witnesses who come in here is that when this

11    started out in 1998, Nolon Bush and Marilyn March were broke.

12    They were living in a basement condo in Des Moines and they

13    had no sign of wealth.  They were selling multilevel

14    marketing products.  They sold a diet cookie.  They sold a

15    plan where if you brought in enough people below you you got

16    an eagle coin, and it's a gold coin, and if you brought in

17    more people you got more eagle gold coins.  And they sold

18    other multilevel marketing products.  But they weren't making

19    any money on these products.  And so what they did together

20    they started Hulaman Management Services and From the Heart

21    charity.  March ran From the Heart, Nolon ran Hulaman

22    Management Services.  And they worked taking people's money

23    hand in glove.

24        By 1999, Nolon Bush had recruited and sold these mid-term

25    notes to some people.  And in early 1999, things hadn't

1  started to take off yet, but they were close.   Success was

2  near.   He hired Tammy Stuckey to come to his house, to the

3  condo, 1100-square-foot condo, to work at the card table in

4  the dining room creating account statements for the people

5  who had invested.   And he hired around that time Vicki

6  Webster to start promoting the plan.   She had originally been

7  an investor and he said why don't you tell people about my

8  plan, we'll give you five percent of what you bring in.   When

9  these account statements go out people start getting excited

10 when they see that they're making tremendous profits, they

11 see they're getting rich and they start to bring in others.

12 Not only the promoters and the financial planners that they

13 recruited, but everyone starts bringing people to Nolon Bush.

14 They are beating down his door to get this safe, lucrative

15 product that doesn't exist.

16     People like Robert Mansueto, David Velander, Donald

17 Fisher, and Judith Allison, all of whom you're going to hear

18 from in this trial.   And you're going to hear that by

19 September 31st, 1999, he had, Nolon Bush had taken in

20 $9,500,000 approximately and that he had delivered only 30

21 percent of that money to Wilcoxson and Mintus, the midterm

22 note providers.   Despite his assertions that the

23 administrative fees were minimal, despite his assertions that

24 money would never leave the bank, one-third goes to these

25 providers.

1       Two-thirds he spends.   You see from this chart the red is
2   the amount he's spending.   The blue is the amount being
3   provided.   And the red is out of the bank.   How does he spend
4   that money?  Well, the condo in Des Moines will no longer do.
5   He buys View Park Golf Estates for $1.9 million of investor
6   money, puts down $300,000 of investor money as down payment.
7   He signs a mortgage agreeing to pay $10,000 a month of
8   investor money for the mortgage payment.   He leases Suite 48,
9   the Lou Gehrig suite at the Mariners at Safeco Field for
10  $125,000 a year of investor money.   He hires staff, the chef,
11  the masseuse, Lorelei Tarsiuk, the new administrative
12  assistant.   And he buys an ex-wife a condominium in Tennessee
13  and puts down an $80,000 payment of investor money.   Buys a
14  new Dodge Durango for $37,000 of investor money.   He buys
15  expensive, tasteful artwork -- a bronze statue called Morning
16  Glory, $11,397.   A bronze statue called Blue Heron, $6,000.
17      He does something else now that he's hired Tammy Stuckey.
18  You're going to hear that he tells Tammy Stuckey to get the
19  contracts, the memorandums, letters of standing that he's
20  sending to investors and take out the word "invest" and put
21  in the word "loan."  And despite that change you're going to
22  hear that he continues to tell new investors the exact same
23  thing.   The money won't leave the bank, it's absolutely safe,
24  it's going to mid-term notes, that's the purpose I want it.
25  Low administrative fees.   He's telling them the same thing.

1   He's changed the semantics of the paperwork not to clear up

2   any understanding, but to create a loophole and verbally

3   continues to continue the deception of these investors.

4       You're going to hear about Nigel Scott Grant who goes by

5   Scott Grant.  He's an attorney in Coronado, California.  He

6   helped Nolon Bush buy View Park Golf Estates, in fact, his

7   signature is on the contract.  He has an office in Nevis,

8   Charleston-Nevis.  And Nolon Bush and Nigel Scott Grant,

9   along with Scott Grant's son, Nicholas,

10  Nicholas Grant St. James, decide to move the banking part of

11  Bush's Ponzi scheme to the country of Nevis in the Caribbean.

12  They set up bank accounts.  They set up LLCs in the name of

13  Global Funding and Global Dominion, and other LLCs and

14  banking accounts for those LLCs in Nevis.  And Scott Grant

15  does something else between August and October, in the three

16  times that he travels to View Park.  Scott Grant loads up all

17  the investor files and he takes them to his law office in

18  Coronado.  And Tammy Stuckey and Lorelei Tarsiuk, the two

19  administrative assistants for Bush, travel down to his law

20  office to organize them for Scott Grant.  They change the

21  name to Global Dominion Financial Services from Hulaman

22  Management Services.  In Nevis, Nicholas Grant St. James

23  operates Global Dominion Financial Services.  Scott Grant

24  operates his share of the Coronado, his law office, and

25  Nolon Bush continues to operate the promotion part of View

1   Park and from the Mariners's Safeco Field.

2       While they are moving the evidence of this Ponzi scheme to

3   Nevis and to Coronado they are being extremely secretive

4   about their conduct.  Nolon Bush is repeatedly hiring

5   Richard Cox, who you're going to hear from, a domestic

6   international consultant, to travel from Oregon to View Park

7   to check for listening devices, to check for bugs.  And

8   Nolon Bush hires Richard Cox to fly down to Grant's office in

9   Coronado to check for listening devices, to make sure nobody

10  is bugged in that office.  You're going to hear that

11  Nolon Bush gets Enigmas, which is a device made in Israel

12  which will scramble communications over wires.  And he puts

13  those Enigmas up in View Park and other places.  You may hear

14  that they won't speak about sensitive matters over the

15  telephone.  And you're going to hear they use super shredders

16  to destroy their e-mails.  And, you're going to hear that

17  there's very good reason for all this secrecy.  Because

18  between August and October, when they're moving everything

19  abroad into Coronado, other things are happening.

20      You're going to hear that on August 13th there's a search

21  warrant by the FBI on Larry Wilcoxson's house and mailbox and

22  business.  He's one of the midterm note providers.  And

23  you're going to hear that on August 27th, two weeks later,

24  there's a search warrant in New York on Carolyn Mintus's

25  residence where she's staying in a very fancy hotel in New

1    York City and living there in the St. Regis.

2        And, you're going to hear that it strikes even closer to

3    home for Nolon Bush.  Because the Department of Financial

4    Institutions, Washington State sends Nolon Bush a letter.

5    And in that letter they say, We think you're selling

6    securities you ought not to be.

7        And they say, We think you're doing this through

8    Cornerstone and Hulaman.  And there's a gentleman named Glen

9    Stole who responds.  And Glen is not -- he's not a lawyer.

10   He's not licensed to practice law, but he has a little shop

11   called Newleys at Law.  He takes that letter that was sent to

12   Nolon Bush and he responds.  And he denies that Bush has any

13   association with Hulaman or Cornerstone and says he's not

14   selling securities and he sends a CC copy of that letter to

15   Nolon Bush.  And, in fact, Glen Stowe set up both Hulaman and

16   Cornerstone on July 19, 1999 for Nolon Bush.  So law

17   enforcement is reigning down all around him.  At the same

18   time he's moving things abroad and at the same time he's

19   going through exceptional measures spending thousands of

20   dollars to conceal his conduct.

21       You're going to hear that he said to Vicki Webster, one of

22   his promoters, "The feds have shut down Larry Wilcoxson."

23   And she responded by doing some research and finding out that

24   there was a similar problem, that Carolyn Mintus had similar

25   problems on the Internet she learned this.  And she went to

1    Nolon Bush and she said, "Mintus has similar problems, I've

2    seen it."  You're going to hear that Nolon Bush's response to

3    her was, "Don't believe everything you read.  Keep selling."

4        Which is what he did.  From Global -- from View Park he

5    continued to sell to people you're going to hear from, Cody

6    Bly, Greg McCormick, Dorothy Hostetler, William Miertschin,

7    Raymond Donohue, John Morris.  And things at this point are

8    more profitable even than ever.

9        By May 1999, from October of 1999 to May of 1999, he's

10   taken in $20 million.  And delivered only 29 percent of that

11   money to anything that can be called an investment.

12       Around this point somewhere he's decided to no longer call

13   it a high-yield midterm investment.  He has this meeting in

14   Tijuana around February of 2000.  Says it's going to be other

15   things now.  But he doesn't even send money to those

16   investments, 29 percent.  That's it.  71 percent he spends.

17   About one-third he spends on keeping people happy, paying

18   their dividends because there are no real profits and the

19   other third he spends how he wants.  How did he want?  And

20   how did he get it?  Counts 18 through 32 of the indictment

21   allege wire transfers.  The reason for that is nearly the

22   moment he gets set up in Nevis he starts wiring money back to

23   his personal accounts in Washington State.  About a little

24   over $2 million is wired back to Washington State from Nevis

25   of investor money that was to never leave the bank.

1    What did he do with it?  He spent $1,600,000 of investor

2    money remodeling View Park Golf Estates on what's called a

3    rolling remodel.  And that is, there's no finish, there's no

4    start, and there's no end.  There's just remodel.  Michael

5    O'Neill from Michael O'Neill Interiors was in charge of it.

6    He just showed up for work and asked Marilyn, who was in

7    charge of the remodel, What are we remodeling today?  And

8    they went at that for day after day after day after month

9    after month burning investor money.  $20,000 for a Ford

10   pickup.  This year $131,000 to the Seattle Mariners for Suite

11   48.  $67,000 for Seahawks tickets.  And more bronze statues,

12   Caves of Horses, Thunder Ridge; those two were 12,000 total.

13   The bronze statue called Promises to Keep, $3,990, and

14   Aviator for $4,465.

15   And he buys a new Harley-Davidson motorcycle for $24,000,

16   $20,000 of which was investor money, in cash.  And he agrees

17   with the Mariners to give them some money for their Refuse to

18   Abuse campaign, $200,000 was the contract.  Doesn't pay all

19   of it upfront.  That gives him some benefits to help him

20   proceed.  He gives him a banner that goes on the wall of the

21   field that says From the Heart.  So potential investors

22   sitting in the Lou Gehrig suite and his suite and also

23   occasionally bouncing down to the Diamond Club suites behind

24   home base sees on the wall Nolon Bush's charity banner.

25   What else does that money get him?  It gets him a T-shirt

1   night.   Investor goes to the Mariners and gets a T-shirt with

2   From the Heart Foundation logo on it.   And he gets Marilyn

3   March the first pitch of the ball game.   With investor money.

4       By May he's phasing out GDFS, Global Dominion Financial

5   Services is going away.   Except it can't go away immediately

6   because there are a lot of mad people who have lost their

7   money.

8       So he leaves the office open in Nevis and Suzi Ripley mans

9   the telephone and tells people, I'm sorry, I'm sorry, I'm

10  sorry.   While Nolon Bush goes on to something new.   And he

11  tells -- Nolon Bush tells people in July of 2000, Look, if

12  you just leave your money there -- leave your money in the

13  investments, by March 2001, March 15th of 2001, I'll give you

14  150 percent bonus.   Stop bugging me.   And he rolls those

15  investors.

16      And in March, of course, of 2001, what happens?   Give him

17  a little more time.   He suspended it again.   And then in

18  September of 2001, the doors to GDFS in Nevis are closed.

19  And GDFS goes away.   Seems like it might be the end of this

20  case.   But it's not.

21      Two weeks after announcing in July of 2001 or 2000 -- two

22  weeks after announcing this 150 percent bonus for the GDFS

23  people who will just leave their money alone inside GDFS that

24  isn't there, Nolon Bush signs a contract.   To build a city in

25  Mexico, a luxury resort in Mexico.   He signs a contract

1   committing to fund this luxury resort to the tune of $800
2   million that he doesn't have.  And what does he do?  Starts
3   promoting to investors that they should invest in Cabo San
4   Quintin, which is his luxury resort.  You may hear from
5   David Franke and Starla Ryan, who were the investors in Cabo
6   San Quintin.
7       You're also going to hear now he's operating under the
8   name of Cornerstone, which he earlier denied through
9   Glen Stole that he was involved in that.  But you're going to
10  hear under Cornerstone Institute he takes in about $5 million
11  and delivers about 34 percent to Cabo San Quintin and spends
12  the rest.
13      What does he spend it on?  He spends it on a Cadillac,
14  $24,000 of investor money.  Lots and lots and lots of
15  thousand, multi-thousand dollar payments to Richard Cox at
16  Domestic International to keep checking for bugs.  And you
17  remember I said that you're going to see the founder and CEO
18  of Tully's Coffee, Nolon Bush meets with the founder, CEO of
19  Tully's Coffee and tries to sell him a Mexican project, he
20  wants nothing to do with it.  And he sells Nolon Bush
21  $250,000 in Tully's stock at the end of this whole scheme
22  that Nolon Bush buys with investor money.
23      January 23rd, 2002.  Count 1 of the indictment.
24  Nolon Bush calls an old investor, Starla Ryan.  And he says,
25  Mexico -- I just want to let you know Mexico is going great.

1    The investment is going great.  Want to invest some more and

2    she does.  $40,000.  Nolon Bush takes every penny of that

3    $40,000 and spends it to pay his bills, not one penny goes to

4    the Mexico project.

5        March 7th, 2002, his partners in the Mexico project evict

6    him because he's not paying his $800 million.  In fact, he's

7    paid a very small amount of that obligation.  June 2002,

8    Dr. Ladley forecloses on View Park.  And takes it back

9    because Nolon Bush is not paying on it.

10       July 15th, 2002, Nolon Bush gets on an airplane, crosses

11   the Atlantic, lands in Paris, France, crosses Europe to

12   Warsaw, Poland, and doesn't come back.  That might be the end

13   of the story.  But it's not, actually.  From Warsaw, Poland

14   coupling in his stay there, he picks up the phone and calls

15   an old investor, Bill Miertschin.  He says, Bill, I'm working

16   on the next big thing.  I'm going get all your money back,

17   all $35 million that I owe.  I'm going to get it all back.

18   Can you give me a dime and invest a little more?

19   Bill Miertschin this time says no.

20       Nolon Bush told investors their money would never leave

21   the bank.  He told them it would be held in trust.  He told

22   them that their administrative fees would be minimal, leading

23   them to believe everything else would be invested.  Despite

24   all these promises, he did not keep them.  He spent

25   two-thirds of their money on his house, his staff, his cars,

1    his luxury suites.  He deceived the investors, he sold them

2    securities, he used the mail, he used the wires, and he

3    transferred money that had been made illegally.

4        At the conclusion of this trial we'll ask you to find

5    Nolon Bush guilty of securities fraud, wire fraud, and mail

6    fraud, and money laundering.

7        Thank you.

8        THE COURT:   Thank you.

9        Now, ladies and gentlemen, I would ask you to kindly

10   direct your attention to Ms. Olson who will deliver the

11   opening statement on behalf of Mr. Bush.

12       MS. OLSON:   Thank you, Your Honor.   Mr. Bush, may it

13   please counsel, ladies and gentlemen.   Thank you very much

14   for your time, your willingness to commit your time to

15   hearing this case and to hearing about Nolon Bush and the

16   other side of the story.

17       I want -- before I begin I want to emphasize to you that

18   what Mr. Storm has just told you is not evidence.   It's what

19   he believes happened.   It's what other people told him

20   happened.   He wasn't there at any of these events.   He wasn't

21   present during any of these conversations.   He doesn't really

22   know the whole story.   He only knows what he has been told.

23   And he doesn't know what Nolon Bush intended and what he was

24   trying to really accomplish.   And the same for me.   What I am

25   telling you is not evidence either.   It's what I understand

1   from Nolon Bush to have occurred.

2        The evidence that you want to consider is what comes from

3   the witness stand.  It's what people tell you.  Nolon and I

4   have every confidence in you that you will listen to those

5   witnesses and you will determine what is believable and what

6   is credible.  And you will figure out what happened and what

7   did not happen and why things happened and why they didn't

8   happen.  And we believe that you will give that evidence fair

9   consideration and fair treatment.

10       The government has spun quite a story for you.  But there

11  is another side to this story.  And it is very different.  I

12  am not going to spend my time with you now to give you the

13  other version of every single thing that happened.  You will

14  hear that throughout the case.  And at the end of the case I

15  will be able to wrap things up for you in a little better

16  fashion.  But this is not the time for that now.  I am going

17  to give you a little snapshot of what I believe the evidence

18  is going to show for Nolon Bush's side of the story.

19       But in the meantime, ladies and gentlemen, we ask that you

20  keep an open mind and that you remember you must hear all of

21  the evidence.  Nolon Bush has denied his guilt.  He sits here

22  an innocent man.  It is one of the most wonderful things

23  about our system of government that if the government or the

24  state believes that one of us may have committed a crime,

25  Nolon has committed a crime, he is innocent until he is found

1    guilty.  He goes to trial.  It is until a jury such as

2    yourselves finds him guilty.  And he must be found guilty

3    beyond a reasonable doubt.  The government has to prove that

4    Nolon is guilty beyond a reasonable doubt for every single

5    one of the parts, the elements of each and every crime that

6    he's charging Nolon with.  That is a huge responsibility for

7    the government and a very high burden.

8        Judge Leighton at the end of the case will give you an

9    instruction that better defines beyond a reasonable doubt.

10   But just the terms themselves -- and I'm sure you've all

11   heard it before -- give you some guidance as to what that

12   actually means.  And it is not how much evidence is

13   presented.  It is how convincing and compelling that evidence

14   is.  More is not necessarily better and more does not mean

15   necessarily guilt.

16       Nolon again, as I said, has another side.  And he is

17   innocent.  According to our system of laws, he doesn't have

18   to do anything.  It is up to the government throughout the

19   entire case to prove their burden.  Nolon can just sit here.

20   Listen to the witnesses.  He may or may not present witnesses

21   to you.  He doesn't have to.  He may or may not testify.  He

22   has a constitutional right that does not require him to get

23   up and testify.

24       But when you hear those witnesses we're asking you to

25   watch what they do.  Watch how they testify.  And much of

1    Nolon's story is going to be told through cross-examination
2    of those witnesses.  So when it is my turn to ask them
3    questions I'd ask you to pay as close attention on
4    cross-examination than direct examination because that is
5    where Mr. Bush's story may be best told.
6        Let me tell you a little about his side of the story.
7    First of all, it is very simple.  The government has the very
8    complex view of what occurred between 1998 and 2002.  For
9    Nolon Bush it is very simple.  He's 68 years of age.  He is
10   not married.  The evidence will show that he has been married
11   in the past and has two adult children.  He has worked in
12   sales jobs and has been a motivational speaker.
13       But what is absolutely most important to Nolon Bush is
14   that he is a deeply religious man.  He committed himself to
15   Jesus Christ in 1975 and has continued to dedicate his life
16   to the service of Jesus Christ here on earth.  His beliefs
17   are based in fundamental Christianity.  And he believes in
18   the teachings of the Kingdom of Heaven, which is a religious
19   society based in Oregon.  They have a local church here in
20   Edmonds, Washington, which is known as The Assembly of
21   Heaven.  You will hear more about these beliefs in this
22   respect.
23       Marilyn March Mr. Storm referred to as Nolon's partner.
24   And she was in the late 1990s.  She was another Christian who
25   also had very strong beliefs about serving God.  So they --

first of all, Nolon first became the director of Cornerstone
Institute.  Nolon believed that God called him to be the
director of the Cornerstone Institute.  And he incorporated
this religious society as what is called a corporation sole.
This is a type of corporation that the State of Washington
provides for.  That allows for religious societies to conduct
business to further their religious purposes.

The religious purpose for Nolon Bush was to raise money to
invest in charitable projects to help disadvantaged people.
The primary project -- or one of -- one of the primary
projects was the resort down in Mexico in San Quintin.  This
was going to be a very nice resort.  And it was going to be
very expensive.  And for Nolon -- and he was certainly not
the only person involved in this resort, as you will hear.
But for Nolon his purpose for getting involved in it was it
would provide jobs and services for Mexican people, very poor
Mexican people that lived in the area.  It would include --
it would give them jobs in terms of construction.  Jobs to
maintain the resort as it went on and provide other services
such as a small airport that they could use as well.  And it
was going to be a quite an elaborate complex.  But for
Nolon's participation it was only to help disadvantaged and
poor Mexican people.

The other major project was a retreat for abused women.
Women who had been victims of domestic violence.  And this is

1    the home in Port Orchard that Mr. Storm has spoken of.   This

2    wasn't a luxury hideaway for Mr. Bush and for Marilyn March.

3    And yes, it was being remodeled.   And it was being remodeled

4    quite well because they felt that people who had been abused

5    in domestic situations in their homes deserved a little bit

6    of luxury in their lives.   A place where they could go and

7    get a little bit of pampering and they could be healed.

8    That's where the money was supposed to go.

9        Nolon didn't do all of this by himself.   He had many

10    people helping him and advising him.   One person.   Glenn

11    Stole, who was a church lawyer and is involved in The

12    Assembly of Heaven religious society, he put the paperwork

13    together for him so that he could incorporate as a corporate

14    sole the Cornerstone Institute.   And he did other paperwork

15    and gave him other advice, too, which Nolon followed.

16        Another person that was very involved was a lawyer.   Nigel

17    Scott Grant.   Nolon is not a lawyer.   He trusted in what

18    Mr. Grant told him to do and gave him the legal advice that

19    he gave him.

20        Then there were many, many others.   And other people got

21    involved such as Vicki Webster, who Mr. Storm has spoken of,

22    and her husband.   They got carried away with this vision that

23    Nolon had.   And they did help in bringing people in.

24        The government has a lot of fancy investor terminology

25    here that Nolon does not recognize because what he was

1    thinking and what he had in mind and what he was trying to do
2    was to bring people in to lend their money to his corporation
3    sole in order to allow him to work on these projects.  Yes,
4    he told people I will give you a return on your money when I
5    repay it.  And -- but he only promised them his best efforts.
6    And you will see that on paperwork.  Best efforts.
7        A big part of Nolon's story is Carolyn Mintus.  Carolyn
8    Mintus was a woman in New York who convince Nolon that if he
9    will invest money with her she would be able to turn it into
10   millions of dollars.  He met with her.  He met with other
11   folks that were associated with her.  He became convinced
12   that what she was telling him was true.  And so yes, he sent
13   her money.  And he found out, much to his dismay, that she
14   was not on the level.  That she could not turn this money
15   into millions of dollars.  And as a result the plans that
16   Nolon had began to fall apart.  And they fell apart pretty
17   quickly.
18       And so Nolon had to change then and realize that he had to
19   make up for the losses that people were experiencing.  It
20   became a problem for him that was very overwhelming.  But he
21   worked hard to do it.  The government believes that the trip
22   to Poland was a means of escape.  So that what the evidence
23   is supposed show, tell you that the trip to Poland was
24   another opportunity that Nolon was working on to gain money
25   and repay the investors, repaying the people that loaned

1    money to his corporation sole was the most important thing to

2    Nolon Bush.  His corporation sole did not allow him to

3    defraud people or to take money on false pretenses.

4        The government must prove to you that Nolon Bush engaged

5    in these actions willfully, intentionally, and deliberately

6    with the goal of defrauding people.  Nolon believes that once

7    you've heard the entire story and you've heard the testimony

8    from the witnesses that you will come to the conclusion that

9    he did not.  He did not intentionally mean to defraud anyone.

10   He only intentionally wanted to help disadvantaged people.

11       We believe that the evidence will not show beyond a

12   reasonable doubt that Nolon Bush did any of these charge.

13   And at the end of case I will be back in front of you

14   wrapping up all of evidence that I believe that will support

15   this and at that time I will be asking you to return a

16   verdict of not guilty on all of those charges.  Thank you.

17           THE COURT:  Thank you.

18           Ladies and gentlemen, we're going to take our

19   midafternoon break at this time.  We'll be at recess for

20   about 15 minutes.  We're only going to go to about 3:30

21   today.  Our normal day will be 9:30 to noon, 1:30 to 4:30

22   with a midmorning break and a midafternoon break.

23       As you can see from the rotunda we're going to have a

24   large ceremony starting about 4:00.  All the judges who are

25   participating are going to use this courtroom for robing and

1    so forth.   So we're going to have to finish up our business

2    at 3:30 today to make an allowance for that.

3        So if you would remember the Court's admonition not to

4    discuss this matter.   Return to the jury room.   When you come

5    back we'll have notebooks and pens on your chair and we'll

6    begin taking evidence.

7                (Jury exits the courtroom.)

8                (Court in recess.)

9                THE COURT:   Ready to proceed?

10               (Jury enters the courtroom.)

11               THE COURT:   All right.  Please be seated.   Welcome

12    back, ladies and gentlemen.

13        Mr. Storm, would you call your first witness.

14               MR. STORM:   The government calls Robert Mansueto.

15               THE COURT:   Mr. Mansueto, if you would come forward

16    to the lectern there, the microphone there.   Raise your right

17    hand and be sworn, sir.

18                         ROBERT MANSUETO

19     The witness, after being duly sworn, testified as follows:

20               THE CLERK:   Please state your name and spell your

21    last name for the record.

22                      DIRECT EXAMINATION

23    BY MR. STORM:

24    Q   Dr. Mansueto, can you state your full name, please, and

25    spell your last name.

1  A   Yes, sir.  Robert Frank Mansueto, M-A-N-S-U-E-T-O.

2  Q   And how old are you?

3  A   56.

4  Q   And how far did you go to in school?

5  A   Became a dentist, a doctor of dentistry in 1976.

6  Q   What city do you live in?

7  A   Coronado, California, which is San Diego.

8  Q   Are you still practicing dentistry?

9  A   I am more in a teaching capacity.  Working with an implant

10 company.  Running training and teaching programs and sales

11 and marketing.

12 Q   Do you know who Nigel Scott Grant is?

13 A   Yes, sir, I do.

14 Q   What name does he go by?

15 A   Scott Grant.

16         THE COURT:  If you could speak directly into the

17 microphone?  Your voice is kind of low, so.

18         THE WITNESS:  Yes, sir.

19 BY MR. STORM:

20 Q   How did you get to know Scott Grant?

21 A   I met Scott at a social event in Coronado.  He was an

22 attorney.  And I became friends with him.  Ultimately, I

23 became his dentist also.

24 Q   And about when did you meet him?

25 A   1998 I would say.  Perhaps '99.

1  Q    And how far from your office in Coronado was his law

2  office?

3  A    About a block and a half.

4  Q    I will have you look at Exhibit No. 10004 in front of you,

5  please.

6  A    Okay.

7  Q    What is that exhibit generally?

8  A    This is the building where Scott Grant's law office was

9  located.

10  Q    Does that accurately depict it?

11  A    Yes.

12        MR. STORM:   Your Honor, I'd offer Exhibit No. 10004.

13        THE COURT:   Any objection?  Go ahead.   Take your

14  time.

15        MS. OLSON:   No, Judge.   Nothing.

16        THE COURT:   Exhibit No. 10004 admitted.

17            (Exhibit No. 10004 admitted.)

18  BY MR. STORM:

19  Q    Dr. Mansueto, you became Mr. Grant's dentist.   Did you

20  become -- did you get to know his family?

21  A    Yes, I did.

22  Q    And does that include his son?

23  A    Yes.

24  Q    What's his son's name?

25  A    Nicholas.   Nicholas -- different last name.   Nicholas St.

1   James-Grant.   I'm not sure which way.

2   Q   Hyphenated?

3   A   Yes.

4   Q   And through Scott Grant did you get to know Nolon Bush?

5   A   Yes, I did.

6   Q   How did that occur?

7   A   I met Nolon Bush at Scott Grant's office.   I was told that

8   he was coming and was asked to come there to meet him.

9   Q   And about when was that?

10  A   1999.

11  Q   And when you went to Scott Grant's office to meet with

12  Nolon Bush who else was present?

13  A   I recall a doctor, Larry Webster, a chiropractor, I

14  believe, from this area.   And Scott Grant and Nolon Bush.

15  Q   And what was the purpose of that meeting?

16  A   The purpose was to discuss an investment program that

17  Mr. Bush was presenting to us.

18  Q   And did you have a discussion at Scott Grant's office

19  about that investment program?

20  A   Yes.

21  Q   Did Mr. Bush speak?

22  A   Yes, he did.

23  Q   What did he say?

24  A   He talked about his relationships with a certain bank in

25  New York, The Bank of New York, and that he had the ability

1    to receive higher yields on funds invested if we could pool

2    large amounts of money and put it under his wing.

3    Q    He would be pooling your money in his possession?

4    A    Yes.

5    Q    Did he talk about the safety of that investment?

6    A    Yes, he did.

7    Q    What did he say?

8    A    He said that the investment was 100 percent safe.  That

9    the funds would never leave The Bank of New York.

10    Q    Did he say what the yields would be?

11    A    There were discussion of yields in the neighborhood of 5

12    to 8 percent per month but with guarantees of 8 percent a

13    year.

14    Q    Did this sound pretty good to you?

15    A    Yes, it did.

16    Q    And what was Larry Webster, Dr. Larry Webster's role in

17    this meeting?

18    A    I considered him an assistant to Mr. Bush.  And he acted

19    as a facilitator.

20    Q    Did you decide to invest?

21    A    Yes, I did.

22    Q    Let me have you look at Exhibit No. 2052, please.  What is

23    that exhibit?

24    A    This is basically a written overview of the investment

25    program.

1    Q    And how did you receive that exhibit?

2    A    To the best of my memory I believe I received it from

3    Mr. -- Dr. Larry Webster.

4    Q    And were you expecting something after the meeting ended

5    with Nolon Bush and Dr. Webster?

6    A    I was expecting some sort of written overview, yes.

7              MR. STORM:    Your Honor, I offer Exhibit No. 2052.

8              MS. OLSON:    No objection.

9              THE COURT:    Exhibit No. 2052 is admitted without

10   objection.

11                   (Exhibit No. 2052 admitted.)

12              MR. STORM:    Your Honor, request permission to publish

13   page 1?

14              THE COURT:    Once an exhibit is admitted you can

15   publish it on the document camera.

16              MR. STORM:    Thank you.

17   BY MR. STORM:

18   Q    Doctor, if I could have you look at page 1 of Exhibit No.

19   2052.

20   A    Yes.

21   Q    And that will be appearing on the screen in front of you.

22        Do you see that on the screen in front of you?

23   A    Yes.

24   Q    Can I have you read the caption starting with 8 percent?

25   A    After that?

1    Q    Yes.   Read the whole thing if you would.

2    A    Best efforts private placement program.   This letter --

3    recommended letter of intent and memorandum of understanding

4    comprises the application packet.

5    Q    I'm sorry.   Let me have you back up one more page.   I

6    think that's the page right there.   That's it.

7    A    The cover page?

8    Q    Yeah.   Look at computer screen.   Let me have you look at

9    the cover page and read that page to us.

10   A    8 percent per annum best efforts private placement

11   program.   This is a private program by invitation only.

12   Confidential.   Not for distribution.

13   Q    And is there a date down in the left-hand corner?

14   A    4/19/1999.

15   Q    Then if I could have you turn to page 2.   It starts out

16   Hulaman Management Services at the top.

17   A    Okay.

18   Q    And can you read the bullet points?   First read the

19   caption and then the bullet points that are on that page,

20   please.

21   A    Hulaman Management Services.   8 percent per annum, PA.

22   Best effort private placement program.   Minimum of 10,000

23   U.S. dollars required.   Funds are held in trust until one

24   million U.S. dollars total is reached.   While in trust the

25   funds are secured by one promissory note in the amount of the

1   principal plus a minimum fee percent per annum and, two,

2   divisible interest in a 100 million United States dollar

3   letter of credit.

4   Q   Go ahead.  Keep on.

5   A   "A potential return from this program above the 8 percent

6   per annum promissory note guaranteed is on a best efforts

7   basis.  This program is designed with a very high degree of

8   confidence of success to yield 25 percent every transaction

9   period payable in arrears and disbursed as per irrevocable

10  pay order and wishes of client.  Redeposit into a subsequent

11  $1 million United States silver trade is possible but not

12  required.  Both new and old funds will be used to reach the

13  $1 million minimum.  Upon request Hulaman can make available

14  to clients offshore IBCs and trusts.  In all cases the

15  starting point is letter of intent and memorandum of

16  understanding.  If this program is of interest to you please

17  complete letter of intent, memorandum of understanding, and

18  the escrow instructions.  Sincerely, Hulaman Management

19  Services."

20  Q   After receiving this package of investment materials, did

21  you read page 2 of Hulaman Management Services?

22  A   Yes, I did.

23  Q   And how did this sound?  Was it of interest to you?

24  A   Yes, it was.

25  Q   The fact that this money would be held in trust, was that

1   important to you?

2   A    Yes.

3   Q    And was safety important to you?

4   A    Absolutely.

5   Q    And did this cause you to believe that this was a safe

6   investment?

7   A    Yes.

8   Q    After you read through this material and talked to

9   Mr. Bush did you decide to invest?

10  A    Yes, I did.

11  Q    Let me have you look at Exhibits 2053 and 2054, please.

12  A    I have 2053 open.

13  Q    Take a look at 2054.

14  A    The first page is a fax cover page to me from Dr. Larry

15  Webster.

16  Q    And what's 2054?

17  A    And 2054 is banking coordinates describing a bank to

18  receive funds for the purpose of this investment.

19  Q    And were those two exhibits -- was the fax cover sheet

20  with the -- was 2053 attached to 2054 when you received it?

21  A    Yes.

22           MR. STORM:   Your Honor, offer Exhibits 2053 and 2054.

23           MS. OLSON:   No objection to either one.

24           THE COURT:   2053 and 2054 are both admitted without

25  objection.

1       (Exhibit Nos. 2053, 2054 admitted.)

2   BY MR. STORM:

3   Q    Dr. Mansueto, if I could have you look at 2054.   And look

4   up at the top at the date.

5   A    The date is May 26, 1999.

6   Q    And who is that letter to?

7   A    To me.

8   Q    As a Hulaman client?

9   A    Yes.

10  Q    And who is it from?

11  A    From Mr. C. Nolon Bush.

12  Q    What is it regarding?

13  A    Again it's describing and giving banking coordinates for

14  wiring of funds to this investment.

15  Q    And can you tell us what bank the funds were to be wired

16  to?  Can you read that for us, please?

17  A    Yes.   The U.S. Bank of Washington.

18  Q    And what's the account name for that bank at that bank?

19  A    I'm sorry?

20  Q    The account at the bank?

21  A    You want me to read the account number?

22  Q    That account name.

23  A    Oh, the account name is Hulaman Management Services escrow

24  account.

25  Q    And then read if you would the first paragraph of that

1  letter.

2  A    Underneath the instructions for the bank it says each

3  month HMS, or Hulaman Management Services, will instruct the

4  disbursement funds according to the client's instructions.

5  HMS will be calculating monthly accounting statements to the

6  participants per your request.   Thank you for the trust with

7  us.   We are looking forward to a long and professional

8  relationship.   Regards, C. Nolon Bush, overseer/director,

9  Hulaman Management Services.

10  Q    Did you use this May 26, 1991 letter to finalize your

11  investment?

12  A    Yes.

13  Q    Let me have you look at 2055.   And what is that document?

14  A    This is a copy of the wire transfer paperwork that I

15  received from my bank when I did a request to wire funds from

16  my bank to Mr. Bush's management account.

17  Q    Is it signed by you?

18  A    Yes, it is.

19          MR. STORM:   Your Honor, offer 2055.

20          MS. OLSON:   No objection.

21          THE COURT:   2055 is admitted without objection.

22                  (Exhibit No. 2055 admitted.)

23  BY MR. STORM:

24  Q    Dr. Mansueto, can you look at 2055.   Does it say on there

25  where your funds were wired to?

1    A    Hulaman Management Services.  U.S. Bank of Washington.

2    Q    How much money was wired?

3    A    $10,000.

4    Q    And in addition to this $10,000 wiring to Hulaman

5    Management Services did you make a second investment?

6    A    Yes, I did.

7    Q    Let me have you look at Exhibit No. 2056, please.

8    Generally, what is that?

9    A    A short cover letter from me adding another $15,000 to my

10   account with Hulaman and a copy of a bank check that I sent.

11             MR. STORM:  Your Honor, offer 2056.

12             MS. OLSON:  No objection.

13             THE COURT:  2056 is admitted without objection.

14                  (Exhibit No. 2056 admitted.)

15   BY MR. STORM:

16   Q    And let me have you look at the check attached to that

17   cover letter.  How much is that check made for?

18   A    $15,000.

19   Q    And what's the date on that check?

20   A    7/9/1999.

21   Q    Dr. Mansueto, what is Healthcare Professional Credit

22   Union?

23   A    It was an entity that Mr. Grant set up.  It was my idea to

24   have a credit union for doctors and health care

25   professionals.  At the time I was attempting to start

1    financial planning and pension planning for doctors.  And one

2    of the thoughts I had for that was to have a credit union for

3    that purpose.  So Mr. Grant set up that entity with Mr. Bush.

4    Q    Did he do it exactly like you had proposed?

5    A    Not exactly, no.

6    Q    What did he do differently?

7    A    Well, ultimately it ended up in an offshore jurisdiction,

8    which my initial thought was to have a credit union, a

9    domestic credit union, a physical facility for the purposes

10   that credit unions do.  Receive funds.  Make loans to their

11   members, etcetera.  Mr. Grant did something different than

12   what I had originally proposed as my idea.

13   Q    What did the purpose of Healthcare Professional Credit

14   Union become?

15   A    Ultimately, it turned out to be a conduit for funds to go

16   to Mr. Bush's account, management services account.

17   Q    For what purpose?

18   A    Well, the purpose initially was explained to us and

19   represented to go to The Bank of New York and sit there in a

20   safe, secure account.

21   Q    Did you refer doctors once it was set up, medical

22   personnel to the Healthcare Professional Credit Union?

23   A    I did.

24   Q    And after you invested did you receive with -- with Nolon

25   Bush did you receive a dividend?

1    A    Yes, I did.

2    Q    Let me have you look at Exhibit No. 2060, please.

3    Generally, what is that document?  What are those documents?

4    A    Page 1 is a fax cover page from Hulaman Management

5    Services.   Page 2 is a statement from Hulaman Management

6    Services showing dollar amounts.

7    Q    Let me stop you there.

8              MR. STORM:   Your Honor, I offer Exhibit No. 2060.

9              THE COURT:   Counsel?

10             MS. OLSON:   Your Honor, unless I missed something did

11   the witness identify the second page of that exhibit?

12             THE COURT:   He hasn't.  It's a two-page document.

13       Mr. Storm, you want to ask him about the second page?

14             MR. STORM:   Yes, Your Honor.

15   BY MR. STORM:

16   Q    Dr. Mansueto, what is the second page generally to that

17   document?

18   A    The second page is basically a statement that shows the

19   amounts of deposits and dividends that were credited.

20   Q    And is it from Hulaman Management Services?

21   A    Yes, it is.

22             THE COURT:   Ms. Olson?

23             MS. OLSON:   Your Honor, may I inquire?

24             THE COURT:   You may.

25                            VOIR DIRE EXAMINATION

1    BY MS. OLSON:

2    Q    Can you identify whose handwriting it is on the top of the

3    second page?

4    A    Yes, ma'am.   That's mine.

5    Q    So D.B. are your initials?

6    A    Dr. Bob.

7    Q    Thank you.

8            MS. OLSON:   No objection, Your Honor.

9            THE COURT:   Exhibit No. 2060 is admitted without

10    objection.

11                    (Exhibit No. 2060 admitted.)

12                         DIRECT EXAMINATION

13    BY MR. STORM:

14    Q    Dr. Mansueto, if I could have you look at the top line of

15    that statement.   Do you see where it says 6/9/99 open

16    account?

17    A    Yes.

18    Q    Does that accurately reflect your initial investment?

19    A    Yes.

20    Q    And under the administrative fee of $3,000 it shows

21    nothing has been taken out of your $10,000 investment; is

22    that correct?

23    A    Correct.

24    Q    Do you know why?

25    A    It was deferred.

1   Q    And what happened on June 15, 1999?

2   A    On June 15th there was a credit on paper here on the

3   statement of $2,500.

4   Q    And is that roughly a 25 percent dividend?

5   A    Yes, it would be.

6   Q    Does that dividend have any relationship to the next line

7   on July 12, 1999?

8   A    Only in that after that dividend I went ahead and invested

9   another $15,000.

10  Q    And was that because you saw this program working?

11  A    It appeared to be.

12  Q    Then finally the $3,000 -- $3,125 addition on July 28,

13  1999, is that the check you just discussed with us?

14  A    Yes.  It shows up as a dividend in one column and also as

15  a subtraction or a distribution that was made to me via --

16  which came via check.

17  Q    On June 15, 1999 if you had known -- where it says $2,500

18  addition, dividend addition, if you had known that in fact

19  Hulaman Management Services had not received any money

20  whatsoever as of that time from any investment in The Bank of

21  New York would you still have invested another $15,000?

22  A    Is your question if I had known the $2,500 --

23  Q    Wasn't real?

24  A    -- wasn't real would I have invested any more?  No.

25  Absolutely not.

1         THE COURT:   Mr. Storm, we're going to take our

2    evening break now.

3         As I indicated, ladies and gentlemen, we're going to

4    recess at 3:30 today for other matters.   You're going to get

5    to go home tonight.   Your family is going to ask you about

6    what you're doing.   And you can tell them that you've been

7    picked, as I've said.   You can tell them that you're going to

8    be here for about three weeks.   We'll probably not have court

9    on Fridays.   That's usually when I do sentencings.   So Friday

10   probably will be yours.   But if we fall behind, we'll make

11   some adjustments.

12        Remember the Court's admonition not to discuss this matter

13   with your family.   Don't do any research.   Turn your

14   attention away from any news about this case.   It's

15   absolutely vital that you make your decision based on what

16   you hear in the courtroom.   Don't let anybody talk to you

17   about this matter.   If anybody does, let me know as soon as

18   possible.

19        Have a great evening.   Be back here at 9:30 ready to go to

20   work.   See you tomorrow.

21             (Jury exits the courtroom.)

22        THE COURT:   All right.   Please be seated.   Anything

23   we need to take up before we break for the evening?

24        MR. STORM:   Not from the government.

25        MS. OLSON:   Not from the defense, Your Honor.

1          THE COURT:  All right.  You can leave your stuff

2     here.  The judges are going to be here putting their robes

3     on.  But beyond that we won't pry into your materials or

4     anything.  You may want to put them to the side and not leave

5     them open.  But other than that, you can keep them here.  And

6     over the course of the trial we can give you a room to keep

7     things if you want.  We've got some conference rooms

8     available where you can store witnesses and store documents.

9          Okay.  Have a nice evening.  We'll see you tomorrow.

10    Court will be in recess.

11                         (Court in recess.)

12

13                    *    *    *    *    *

14                    C E R T I F I C A T E

15

16      I, Nichole Rhynard, Federal Official Court Reporter,

17    certify that the foregoing is a correct transcript from the

18    record of proceedings in the above-entitled matter.

19

20    /S/  Nichole Rhynard, CCR, CRR, RMR

21

22

23

24

25