1              UNITED STATES DISTRICT COURT

2             WESTERN DISTRICT OF WASHINGTON

3                      AT SEATTLE

4
UNITED STATES OF AMERICA,      )   Cause No. 06-5504RBL
5                              )
            Plaintiff,         )   Seattle, Washington
6                              )   October 30, 2008
        vs.                    )   Volume IV
7                              )
CHARLES NOLON BUSH,            )
8                              )
            Defendant.         )
9                              )
_____)

10

11

_____
12                          TRIAL
               VERBATIM REPORT OF PROCEEDINGS
13        BEFORE THE HONORABLE RONALD B. LEIGHTON
               UNITED STATES DISTRICT JUDGE
14 _____

15
      APPEARANCES:
16
       For the Plaintiff:      Arlen Storm
17                             Tyler Letey

18

19     For the Defendant:      Paula Olson

20
       Reported by:            Nichole Rhynard, CCR, RMR, CRR
21                             Federal Court Reporter
                               206.370.8504
22                             nichole_rhynard@wawd.uscourts.gov

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.
25

```
1                        EXAMINATION INDEX
```

```
2    EXAMINATION OF:                                   PAGE
     WILLIAM MIERTSCHIN
3    DIRECT EXAMINATION        BY MR. STORM              5
     CROSS-EXAMINATION         BY MS. OLSON             15
4    RAYMOND DONOHUE
     DIRECT EXAMINATION        BY MR. LETEY             21
5    CROSS-EXAMINATION         BY MS. OLSON             31
     JOHN MORRIS
6    DIRECT EXAMINATION        BY MR. LETEY             38
     VOIR DIRE EXAMINATION     BY MS. OLSON             41
7    DIRECT EXAMINATION        BY MR. LETEY             41
     (continued)
8    CROSS-EXAMINATION         BY MS. OLSON             48
     DAVID VELANDER
9    DIRECT EXAMINATION        BY MR. STORM             52
     CROSS-EXAMINATION         BY MS. OLSON             79
10   KEN MARSHALL
     DIRECT EXAMINATION        BY MR. LETEY             93
11   VOIR DIRE EXAMINATION     BY MS. OLSON            105
     DIRECT EXAMINATION        BY MR. LETEY            107
12   (continued)
     CROSS-EXAMINATION         BY MS. OLSON            109
13   EDWARD WALLACE
     DIRECT EXAMINATION        BY MR. STORM            111
14   CROSS-EXAMINATION         BY MS. OLSON            115
     REDIRECT EXAMINATION      BY MR. STORM            117
15   ROBERT SHAW
     DIRECT EXAMINATION        BY MR. LETEY            119
16   CROSS-EXAMINATION         BY MS. OLSON            128
     MARK MUELLER
17   DIRECT EXAMINATION        BY MR. LETEY            132
     MICHAEL O'NEILL
18   DIRECT EXAMINATION        BY MR. STORM            140
     CROSS-EXAMINATION         BY MS. OLSON            149
19   MARIANNE HAUKLI
     DIRECT EXAMINATION        BY MR. STORM            152
20   CROSS-EXAMINATION         BY MS. OLSON            157
```

```
21


22

```

```
23                        EXHIBIT INDEX
```
```
     EXHIBITS ADMITTED                                PAGE
24      4059                                            7
        4060                                           11
25      4061                                           12
        4065                                           25
```

| 1 | 4066 | 26 |
| | 4067 | 26 |
| 2 | 4068 | 27 |
| | 4069 | 27 |
| 3 | 4071 | 28 |
| | 4072 | 29 |
| 4 | 4073, 4074, 4075, 4076 | 31 |
| | 4082, 4084 | 41 |
| 5 | 4077 | 45 |
| | 4078 | 46 |
| 6 | 4079 | 47 |
| | 4080 | 47 |
| 7 | 2001 | 56 |
| | 2002 | 57 |
| 8 | 2003 | 60 |
| | 2004 | 64 |
| 9 | 2005 | 66 |
| | 2016 | 67 |
| 10 | 2024 | 69 |
| | 2029 | 73 |
| 11 | 2030 | 74 |
| | 2031 | 76 |
| 12 | 2032 | 76 |
| | 2033 | 78 |
| 13 | 4086 | 98 |
| | 4087 | 99 |
| 14 | 4089 | 106 |
| | 4088 | 107 |
| 15 | 13003 | 112 |
| | 12012 | 121 |
| 16 | 12013 | 122 |
| | 12017 | 123 |
| 17 | 12018 | 124 |
| | 12009 | 124 |
| 18 | 12010, 12011 | 125 |
| | 12014 | 126 |
| 19 | 12006 | 134 |
| | 12007 | 135 |
| 20 | 13004 | 136 |
| | 13005 | 137 |
| 21 | 13006 | 137 |
| | 13007 | 138 |
| 22 | 13008 | 139 |
| | 13009 | 139 |
| 23 | 13016 through 13027 | 145 |

24

25

1                    P R O C E E D I N G S
    _____

2

3          THE COURT:   Please be seated.   Good morning.

4    Anything we need to take up before the jury comes back?

5          MR. STORM:   Your Honor, there is one thing.   In our

6    trial brief we had a motion in limine to speak to Scott

7    Grant's staff -- in our trial brief we had a motion in limine

8    to speak to Scott Grant's staff and we indicated that we were

9    going to raise that today.   Ms. Olson and I have talked and

10   we mutually agreed to postpone that motion until Monday.

11         THE COURT:   Okay.   All right.

12         MS. OLSON:   Your Honor, I just want to update the

13   Court on my production of the conversation in camera and also

14   the e-mails.   We're very close.   We got the CDs mixed up.   As

15   soon as we locate them, we'll produce them today.

16         THE COURT:   Okay.   Thank you.

17      Let me also alert you all that we're going to break at

18   3:45 today.   I have a doctor's appointment.   We're just going

19   to have to break at 3:45.   I will tell the jury that.

20      Anything else?

21         MR. STORM:   No, Your Honor.

22         MS. OLSON:   No, Your Honor.

23         THE COURT:   All right.   Let's bring the jury in.

24         (Jury enters the courtroom.)

25         THE COURT:   Please be seated.   Welcome back, ladies

1    and gentlemen.

2        Mr. Storm, you may continue.

3                        WILLIAM MIERTSCHIN

4        The witness, after being duly sworn, testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. STORM:

7    Q    Mr. Miertschin, yesterday when we broke you were looking

8    at Exhibit 4058.  Can you go ahead and look at that exhibit

9    again?  And can you remind us -- and it should also be on the

10   screen in front of you.  Can you remind us where you received

11   that exhibit?

12   A    I received it at Mr. Bush's house in Port Orchard.

13   Q    And can you walk us through at this time the four sessions

14   of the quadrant -- did Mr. Bush explain the quadrant to you?

15   A    Yes, he did.

16   Q    Can you explain it to us as he explained it to you?

17   A    I will try.

18        The From the Heart Foundation was a nonprofit foundation

19   that he had set up through his corporation sole where he had

20   taken his -- he had divested himself of his personal assets

21   and basically taken a vow of poverty to set up a corporate

22   sole or corporation sole.  And he was doing that for

23   humanitarian purposes.  To be able to administer the From the

24   Heart Foundation to build hospitals and other humanitarian

25   projects primarily in Latin America and Mexico.  And he did

1    that through the Cornerstone Institute.

2        The way that this was funded was through the investment

3    portfolio, which is basically the investor's money which was

4    put into a bank instrument trading program.  And the profits

5    from that program were shared between the investors and the

6    foundation.

7        The technology section down to the bottom left is the bank

8    that they were trading through in the West Indies.  And they

9    were doing the trading primarily in New York.  And it allowed

10   them also to go to Europe to trade instruments.

11       And then the fourth quadrant is the international law

12   firm.  That was Scott Grant and -- or Grant & Associates.

13   Scott Grant.  And I believe Mr. Schoenberg, if I remember

14   correctly, was a CPA who assisted him.  That allowed you to

15   establish the LLCs.  And they made certain that all of the

16   LLCs, all of the trading, all of the disbursements of funds

17   were in compliance with both international and U.S. law.

18   Q   Okay.  Let me also have you look at 4059, please.

19   A   Yes, sir.

20   Q   And what is that exhibit?

21   A   That is a document that I was given at the same meeting

22   which was representative of the minimum amount that we could

23   expect to get.

24           MR. STORM:   Your Honor, offer Exhibit No. 4059.

25           MS. OLSON:   No objection.

1          THE COURT:   Exhibit No. 4059 is admitted.

2                (Exhibit No. 4059 admitted.)

3     BY MR. STORM:

4     Q   Mr. Miertschin, can you also explain this document to us,

5     please?

6     A   Well, this explains that with an investment of $100,000,

7     that it would enter the trading cycle.  And it would net to

8     the investor almost $600,000 in a year.  And in the second

9     year it would go to about 3 and a half million.  That's

10    because of compounding in that the profits were added to the

11    principal.  And every time the principal is increased, of

12    course the profits are increased.

13    Q   And that's if you only get 25 percent -- 16 percent

14    instead of the full 25 percent; is that correct?

15    A   That is correct.  Also, we were told it could trade as

16    much as four times a month.  Or I was told.

17    Q   By who?

18    A   By -- at the same meeting with Mr. Sours and Mr. Bush.

19    And I was told it could trade as many times as four or five

20    times a month with each term or trade net as much as 9

21    percent.  So actually these numbers could be even more

22    dramatic.

23    Q   And you put $105,000 into the program.  So after two years

24    you should be walking out with 3 and a half million?

25    A   As a minimum, yes, sir.

1    Q    After your meeting with Mr. Bush and Mr. Sours and

2    Ms. Nelson in Port Orchard, did you have another meeting with

3    Mr. Bush?

4    A    Yes, I did.

5    Q    Where did that take place?

6    A    In the Miami area.  I believe it was actually technically

7    Miami Beach.

8    Q    And how much later was it after your mid February meeting

9    in Port Orchard?

10   A    About a week to ten days.

11   Q    Did you go there to meet with Nolon Bush?

12   A    Actually, I went there on other business near the Miami

13   area.  And since he had stayed in contact we me after I met

14   with him at Port Orchard, he told us he was going to an

15   international investment conference in that area.  And he and

16   Scott Grant were both going to be there and invited me and

17   one of my partners in the LLC to join him because my partner

18   wanted to meet him.  That's Ivan Webb.

19   Q    Okay.  And where did you meet?

20   A    We met at the Fountain Blue Hotel in Miami Beach.  That's

21   where Mr. Bush and Mr. Grant were staying.

22   Q    And did you have dinner?

23   A    We had dinner together with them in the dining room at the

24   hotel.  Yes.

25   Q    What did you discuss at dinner?

1    A    We discussed the program and how it was being enhanced by

2    the trading with the -- through this Liberty Bank and the

3    banks in New York.  They were very excited and very positive

4    about the situation.

5    Q    And I should have broken that down a little bit.  What did

6    Mr. Bush discuss?

7    A    He discussed the trading program and the fact of what he

8    was doing was making it even better than what he had

9    represented in Port Orchard.  That the outlook was much

10   brighter.

11   Q    Were you excited about the program at that point?

12   A    Yes.

13   Q    Did things work out for you?  Did you start getting

14   dividends?

15   A    I never received -- we have never received one penny.

16   Q    And did you make any attempts to get paid?

17   A    Yes, sir.

18   Q    How did you make those attempts?

19   A    First by phone call and later in writing.

20   Q    Who did you call?

21   A    I called up here to his offices in Port Orchard.

22   Q    And when did you start making those calls roughly?

23   A    May/June.

24   Q    Of?

25   A    Of 2000.

1   Q    And who did you talk to?

2   A    At first I talked to Lorelei Tarsiuk, or whatever her last

3   name is.  His assistant.  I talked to Mr. Bush a couple of

4   times.  I talked to Brian Sours numerous times.

5   Q    What did Mr. Bush tell you when you called?

6   A    That there were some delays but everything was fine.  He

7   was going to New York to personally administer some of the

8   trades.

9   Q    Did anything happen?

10  A    Well --

11  Q    Did you get --

12  A    -- more rhetoric.  As far as financially did anything

13  happen?  No.

14  Q    Did you continue to makes call?

15  A    Surely.  Yes, sir.

16  Q    And nothing?

17  A    It became more and more difficult to get a hold of anybody

18  or to get any calls returned.  They were never good about

19  returning calls.

20  Q    What about the website?

21  A    There were delays in it coming up.  And they had all sorts

22  of excuses for that.  And -- oh, I might say also I did call

23  Scott Grant.  And he was also very difficult to get a hold

24  of.  And he did not return calls.

25       The website finally came up and it showed an account with

1  our principal in it.

2  Q   Let me have you look at Exhibit No. 4060, please.

3  A   Yes, sir.

4  Q   Generally, what is that document?

5  A   It is from Global Dominion Financial Services in the West

6  Indies.  It's from Nicholas Grant-St. James, manager of that

7  entity.

8  Q   Let me have you stop right there.

9         MR. STORM:   Your Honor, offer Exhibit No. 4060.

10        MS. OLSON:   No objection.

11        THE COURT:   4060 is admitted.

12               (Exhibit No. 4060 admitted.)

13  BY MR. STORM:

14  Q   Mr. Miertschin, can you read the contents of that letter

15  to us, please?

16  A   On the 27th of November, year 2000.  Global Financial

17  Solutions to Charles Killway.  Meet.  And it says regarding

18  new terms.  Attention Charles:  This letter is to validate in

19  writing an offer to your clients to receive 150 percent

20  return on each account remaining until March 15, 2001,

21  payable on request after March 15, 2001 as posted on their

22  own live GDFS statement.  The LLC clients may choose to

23  accept this offer or elect to receive their principal plus 10

24  percent payable on or about the 15th of December, 2000.  No

25  later than December 31, 2000.  If no confirmation in writing

1    requesting early payout of principal plus 10 percent is

2    received by December 10, 2000, then it will be assumed that

3    the clients have accepted the new terms of 150 percent rate

4    of return maturing and available on March 15, 2001.  The

5    following is a list of your clients that qualify for the new

6    terms.  Please contact in writing if any choose not to accept

7    these terms.

8    Q    Okay.  Let me stop you there.

9         There is a list of accounts down there with numbers next

10   to them.  Is your account listed on there?

11   A    Yes, sir.  It is.  It's the second one.  It's one that

12   ends in 0102 in amount of $105,077.

13   Q    Which option did you choose?  The 10 percent now or the

14   150 percent later?

15   A    Well, I was no longer a true believer.  I chose the 10

16   percent now and wanted my money back.

17   Q    Let me have you look at Exhibit No. 4061, please.  Just in

18   general what is that exhibit?

19   A    It's a letter from my LLC on December the 8th to Nicholas

20   Grant-St. James.

21   Q    Let me stop you.

22        MR. STORM:  Your Honor, offer Exhibit 4061.

23        MS. OLSON:  No objection.

24        THE COURT:  4061 is admitted.

25                    (Exhibit No. 4061 admitted.)

1    BY MR. STORM:

2    Q    And I am not going to have you read the full letter.    But

3    if you just could read the first paragraph where you're

4    responding to the offer.

5    A    All right.    This was faxed in to him responding to the

6    offer.    It says here, Mr. Grant-St. James:    Pursuant to your

7    letter of November 27th, 2000 to Charles Killway of Global

8    Financial Solutions this letter serves as official notice

9    that Blue Star Investment elects the option to receive its

10   principal plus 10 percent payable on or about the 15th of

11   December of 2000, no later than December 31, 2000.

12   Q    And did you get your money by December 31, 2000?

13   A    No, sir.

14   Q    Did you after sending this letter hear from Nolon Bush

15   again?

16   A    Yes, sir.    Several times.

17   Q    And did you hear from him within the last couple of years?

18   Two, three years?

19   A    Probably three or four years ago.    I don't remember when

20   the last time was.

21   Q    What happened?

22   A    He had a cellphone and he told me he was in Europe.

23   Q    But he called you?

24   A    He called me.

25   Q    And you had a conversation with him.    He told you he was

1    in Europe?

2    A    Yes, sir.

3    Q    Did he say where?

4    A    I believe he said he was in Poland.

5    Q    And what did he say to you?

6    A    That he was working on new programs and that he had made

7    arrangements that would recoup our investment and would --

8    they were even more dynamic.  And he was going to make more

9    and more money and make everyone whole.

10    Q    It was more dynamic?

11    A    Yes.

12    Q    Okay.  What kind of program was it?  Did he say?

13    A    Similar financial instrument.  Trading program.  This time

14    in Europe.

15    Q    And he wanted a new investment?

16    A    Yes.

17    Q    What was your response?

18    A    I said there is no performance on the first one.  You give

19    us our money back and some kind of profit.  We will talk

20    about it.

21    Q    And were you really interested in investing again if you

22    got your money back?

23    A    No, sir.

24    Q    Why did you say that to him?

25    A    Because I was chasing my money.  I wanted my money back.

1    Q    Did you have more than one conversation about this issue?

2    A    Numerous conversations.

3    Q    Still trying to get your money back?

4    A    Yes, sir.

5    Q    Did you get it back?

6    A    No, sir.  Never a penny.

7    Q    And four years you say have gone by and nothing?

8    A    Approximately, yes.

9    Q    Mr. Miertschin, is Nolon Bush in the courtroom today?

10   A    Yes, sir.

11   Q    Can you point to him and describe what he's wearing,

12   please?

13   A    He's the gentleman sitting over here wearing glasses with

14   white hair and a dark suit.

15        THE COURT:  Let the record reflect that the witness

16   did identify Mr. Bush.

17        MR. STORM:  I have no further questions.

18        THE COURT:  Ms. Olson.

19                        CROSS-EXAMINATION

20   BY MS. OLSON:

21   Q    Good morning, Mr. Miertschin.

22   A    Good morning.

23   Q    Before you got financially involved in this program did

24   you do any independent investigation about it?

25   A    I did some.

1    Q    What did you do?

2    A    I discussed it with Mr. Peterman who had -- who had

3    introduced me to Mr. Killway.  He gave me some documents and

4    some references.  I investigated some on the Internet.  I

5    read those documents.  I read a brochure that was compiled

6    that was given to me by Mr. Killway.

7    Q    And are those materials that you reviewed, are they part

8    of the exhibits that have -- you've been working with in your

9    testimony today and yesterday?

10   A    They are not in this testimony.  They're not documents

11   that are in -- on the record.  They are documents that I have

12   provided to various enforcement entities.

13   Q    So after you did your major inquiries you felt that this

14   was a safe and appropriate investment?

15   A    Bob Peterman is a very close friend of mine.  We have done

16   some business before this and since.  And he his family were

17   participating.  I felt confident in relying somewhat on his

18   judgment as well as my own.

19   Q    Mr. Miertschin, let me have you look again at Exhibit No.

20   4058, please.

21   A    I don't believe I have it.  I have 9.

22        Okay.  It's on the screen.  Thank you.

23   Q    It's the quadrant that you were looking at with Mr. Storm.

24        Mr. Miertschin, do you know who drafted this document?

25   A    I know who gave it to me and that's Mr. Bush.  I don't

1    know who drafted it.

2    Q    Okay.  He didn't indicate that he drafted it himself?

3    A    No.  Since he gave it to me and explained it, I assumed he

4    had a part in creating and drafting it.  I do not know that.

5    Q    Did he explain to you what a corporation sole was?

6    A    He did.  He tried to, yes.

7    Q    And what did you understand from his explanation?

8    A    I understood that it's something that's very difficult to

9    get.  It was originally set up as a religious charitable

10   entity whereby it is, as I said before, I think more like

11   taking a vow of poverty in that corporation, the principals

12   don't get the money.  That it goes to -- it's a legal entity

13   to allow you to do that.  To direct things to charities.

14   Q    To charities?

15   A    Yes, ma'am.

16   Q    Did you feel more comfortable about your investment

17   knowing that it was going to be doing some charitable work?

18   A    I didn't feel like my investment was doing charitable

19   work.  I felt like the profits from the investment that were

20   shared with the charitable entities, that those profits would

21   do good things, yes.

22   Q    And your investment would have a part in creating the

23   profits, right?

24   A    Our investment was for profit for us.  But it also had as

25   a side benefit that the other people deriving profits would

1    do good.   Yes, ma'am.

2    Q    Let me have you look at Exhibit No. 4059.

3    A    Yes.

4    Q    When you were discussing this chart with Mr. Bush did you

5    understand that this was going to be the compounding for the

6    entire program as opposed to individuals or individual

7    investments?

8    A    It was represented to me that since my investment was

9    approximately $100,000, that this is what the profit that my

10   $100,000 would yield to our entity.   That was my

11   understanding.

12   Q    So you understood it to be for investment -- per

13   investment as opposed to the entire program?

14   A    I'm not sure I understand what you mean about the entire

15   program.

16   Q    Well, the entire, you know, investment.   The Hulaman

17   Management Services, Cornerstone program you were involved in

18   as opposed to an individual investment.

19   A    I understood that this was representative of my individual

20   account approximately.   Obviously, it's slightly more than

21   that.   That this was mine.   Not anything to do with any pole.

22   This was to me or better.

23   Q    Thank you.

24       Now, you discussed another meeting that you had or a

25   follow-up meeting with Bush and Mr. Grant in Miami?

1    A    Yes, ma'am.

2    Q    And you indicated that Mr. Bush explained to you that the

3    program was working and it was doing better.  Is that

4    essentially what you said?

5    A    Essentially, that's correct.

6    Q    Could you tell us what reasons Mr. Bush gave you for why

7    he believed it was doing better?

8    A    Because the way they were redoing their relationship with

9    the banks, that they were -- and because of the increased

10   investments, they were able to get larger and better terms.

11   And it was going to be more dramatic than it had been in the

12   past.  And that was beginning -- I think there's a date on

13   there around the 1st of March.

14   Q    Of 2000?

15   A    Yes, ma'am.

16   Q    Did Mr. Grant add more information to that?

17   A    He pretty much just echoed what Mr. Bush was saying.

18   Q    May I have you look at Exhibit No. 4061, please?

19   A    Yes.

20   Q    In the third paragraph of -- third paragraph of that

21   exhibit there is reference to a meeting, to having a

22   follow-up meeting?

23   A    Yes.

24   Q    Was there a follow-up meeting?

25   A    Only that I talked to Mr. Killway.  I was not able to talk

1    to Mr. Grant-St. James.

2    Q    How much dealing did you have with Nicholas St. James?

3    A    Very little.

4    Q    Would you describe what dealings you did have?

5    A    Well, I never met him in person.  I talked to him on the

6    phone maybe once or twice.  Mostly I talked with his I guess

7    assistant or other gentleman in Nevis.  Mr. St. James was

8    very difficult to get a hold of, as they all were, and very

9    poor about returning any calls or any messages.

10   Q    Did you get a sense of what his job was?  His role?

11   A    Well, I understood that he was the manager in the Virgin

12   Islands.

13   Q    In Nevis?

14   A    In Nevis, yes.

15        MS. OLSON:   Thank you.  I have no further questions.

16        MR. STORM:   I have no further questions, Your Honor.

17        THE COURT:   Mr. Miertschin, you are excused.   Thank

18   you, very much.

19        MR. LETEY:   Your Honor, the government calls Raymond

20   Donohue.

21        THE COURT:   Mr. Donohue, if you would come forward to

22   the lectern.  Stand before the microphone there.  Raise your

23   right hand and be sworn.

24                        RAYMOND DONOHUE

25    The witness, after being duly sworn, testified as follows:

```
 1                         DIRECT EXAMINATION

 2   BY MR. LETEY:

 3   Q    Mr. Donohue, please state your full name and spell your

 4   last name for the record.

 5   A    My name is Raymond L. Donohue.   D-O-N-A-H-U-E.

 6   Q    And how old are you?

 7   A    62.

 8   Q    Where do you live?

 9   A    I live in Gig Harbor.

10   Q    And how far did you go in school?

11   A    I have a Juris Doctorate degree in law.

12   Q    And what do you do for a living?

13   A    I'm an environmental consultant.

14   Q    And how long have you done that?

15   A    25 years.

16   Q    Who are Chris and Mike Fletcher?

17   A    Chris and Mike Fletcher were members of our church that

18   came to us, my wife and myself, in January of 2000 and

19   introduced us to GDFS and the investments in question.

20   Q    What did the Fletchers tell you about the investment?

21   A    The Fletchers told us essentially that they had made some

22   money on this investment and that they had waited some time

23   before they introduced this to other members of our church.

24   Q    Did they explain what the investment was in?

25   A    They didn't explain how the investment was construed
```

1  because we were supposed to go to a meeting up at SeaTac

2  Airport and it would be explained to us.

3  Q   Did the Fletchers give you any indication what type of

4  return you could get on the investment?

5  A   The indication of return that was in writing was 9 percent

6  plus profit sharing.  And Mike explained that he was

7  receiving approximately 25 percent on his investment.

8  Q   25 percent per year?

9  A   It was shorter than that.  I think it was in 90-day

10 increments.

11 Q   Was there any type of guarantee in the investments that he

12 explained?

13 A   When it was explained to my wife and myself the paperwork

14 guaranteed principal 9 percent return plus profit sharing,

15 which I wasn't really interested in, and the opportunity to

16 retrieve your money after a -- I believe it was a 90-day

17 notification.

18 Q   Where did the Fletchers say the money would go?

19 A   The Fletchers said that the money would go to a trust and

20 that the money would eventually go to Nevis where the trusts

21 were all set up and then invested by Larry Webster -- I'm

22 sorry.  Not invested by Larry Webster but directed by this

23 Hulaman Trust thing.

24 Q   And was there a timeframe on how long the investment

25 lasted?

1   A    The investment -- you had the opportunity to invest for 13

2   months.    After 13 months or 90 days, whichever occurred

3   first, you could either request your money back.    At the end

4   of 13 months you had the opportunity to roll it over again.

5   Q    Did the Fletchers explain any urgency in the investment?

6   A    There was an urgency which was explained by both Webster

7   and the Fletchers that if we didn't invest $25,000 the night

8   that he proposed this it would go to 100,000.    And we weren't

9   capable of investing that kind of money.    So the urgency was

10  get in now at 25- and then you weren't subjected to $100,000

11  minimum.

12  Q    Based upon what the Fletchers said is this something you

13  were interested in?

14  A    It was something that we were interested in.

15  Q    And why is that?

16  A    Well, if I have a guaranteed principal, the ability to get

17  my money back in 90 days if I'm not satisfied and 9 percent

18  interest guaranteed, to me based upon Gary Hobbs, other

19  people in our church and the return that the Fletchers got, I

20  felt it was at least a reasonable expectation that I could

21  make 9 percent.

22  Q    Did the Fletchers put you in touch with Larry Webster?

23  A    Yes.    We were put in touch with Larry Webster that night

24  and got the -- got the paperwork started to establish the

25  trust and also to establish the wiring instructions as to

1   where this money was supposed to go.

2   Q   Could you please turn to Exhibit No. 4062?  Could you

3   briefly describe that?

4   A   These were the -- these were the instructions from Larry

5   Webster to us.  My wife and I.

6   Q   That's sufficient.

7           MR. LETEY:  We offer Exhibit No. 4062.

8           MS. OLSON:  No objection.

9           THE COURT:  4062 is admitted.

10              (Exhibit No. 4062 admitted.)

11  BY MR. LETEY:

12  Q   When did you get this paperwork?  First page.

13  A   1/26.  January 26, 2000.  About 5:00.

14  Q   Could you turn to the fifth page?  Start with appointment

15  of Global Dominion Financial Services.  Is that your

16  signature?

17  A   Yes, sir.

18  Q   Could you turn to the last page?  What is that?  Could you

19  explain it?

20  A   This is the FedEx airbill that we sent all of these

21  instructions to Nevis as we were directed by Larry Webster.

22  Q   And when is this dated?

23  A   The 27th of January, 2000.

24  Q   Would you please turn to Exhibit No. 4065?

25  A   Yes, sir.

1   Q    Could you briefly describe this?

2   A    This is a funds transfer from our bank in Gig Harbor to

3   Bank of Crozier.

4        MR. LETEY:   Your Honor, we offer Exhibit No. 4065.

5        MS. OLSON:   No objection.

6        THE COURT:   4065 is admitted.

7              (Exhibit No. 4065 admitted.)

8   BY MR. LETEY:

9   Q    And going back to what you had started.   This is a wire

10  transfer?

11  A    Yes, sir.

12  Q    And is that your signature at the bottom?

13  A    It is.

14  Q    And how much is this wire transfer for?

15  A    This one's for $1,387 with -- including the service fee.

16  Q    Is there -- is it an even 1,387 or is that --

17  A    1,387.50.   I'm sorry.

18  Q    And when is this dated?   Just down towards the bottom

19  there.

20  A    1/27/2000.

21  Q    And what was this wire for?

22  A    This amount was to set up the -- this was the charge that

23  we were -- this was what we were being charged in order, I

24  believe, to set up the trust.

25  Q    Would you turn to Exhibit No. 4066?   Could you just

1    quickly identify this?

2    A   This is another wire transfer notification form.

3            MR. LETEY:   Your Honor, we offer Exhibit No. 4066.

4            MS. OLSON:   No objection.

5            THE COURT:   4066 is admitted.

6                    (Exhibit No. 4066 admitted.)

7    BY MR. LETEY:

8    Q   And what is this for?

9    A   This was the evidence of the application fees on the wire

10   transfer notification form of the $1,375.

11   Q   Now can you turn to Exhibit No. 4067 and just briefly

12   describe that?

13   A   This is the wire transfer instructions on the 25,092 plus

14   the $12.50 for 25,104.50 --

15   Q   Let me stop you there.

16           MR. LETEY:   Your Honor, we offer Exhibit No. 4067.

17           MS. OLSON:   No objection.

18           THE COURT:   4067 is admitted.

19                    (Exhibit No. 4067 admitted.)

20   BY MR. LETEY:

21   Q   And how much is this for?

22   A   25,104.50.

23   Q   And what is this for?

24   A   This was the amount that was supposed to be the investment

25   portion.

1    Q    And when is it dated?

2    A    31 January 2000.

3    Q    And is that your signature?

4    A    Yes, sir.

5    Q    And 4068?

6    A    This is the wire transfer notification form of the same

7    25,000 previously alluded to.

8            MR. LETEY:    Your Honor, we offer Exhibit No. 4068.

9            MS. OLSON:    No objection.

10            THE COURT:    4068 is admitted.

11                  (Exhibit No. 4068 admitted.)

12    BY MR. LETEY:

13    Q    Could you turn to Exhibit No. 4069 and just quickly

14    describe that?

15    A    This is a notification that we got that the paperwork was

16    submitted -- that the previously referred to paperwork was

17    submitted to the Global Dominion Financial Services.

18            MR. LETEY:    Your Honor, we offer Exhibit No. 4069.

19            MS. OLSON:    No objection.

20            THE COURT:    4069 is admitted.

21                  (Exhibit No. 4069 admitted.)

22    BY MR. LETEY:

23    Q    And could you turn to the third page of that?

24    A    The Hulaman Trust Credit Union shares certificate.

25    Q    How much did it say the principal amount is?

1    A    Principal amount is 25,067.

2    Q    And what is the interest rate?

3    A    9 percent.

4    Q    And the term?

5    A    13 months.

6    Q    Could you turn to Exhibit No. 4071 and just quickly

7    describe that?

8    A    This is what was produced on the Internet.

9    Q    For your account?

10   A    Pardon me?

11   Q    Was that for your account?

12   A    Yes.

13          MR. LETEY:    Your Honor, we offer Exhibit No. 4071.

14          MS. OLSON:    No objection.

15          THE COURT:    4071 is admitted.

16                (Exhibit No. 4071 admitted.)

17   BY MR. LETEY:

18   Q    And when is this dated?  It's the number at the bottom if

19   you look the screen.  Your computer screen.

20   A    10/27/2000.

21   Q    And how much does it show is -- what is the balance in the

22   holding account at this point?

23   A    25,067.

24   Q    Please turn to Exhibit No. 4072.  Could you just briefly

25   describe this exhibit?

1    A    This is my e-mail to IFS Nevis -- I'm sorry.  Coming back

2    from Nevis acknowledging the receipt of my e-mail requesting

3    to leave the program rather than to wait until March 15th.

4    Q    Let me stop you there.

5              MR. LETEY:   Your Honor, we offer Exhibit No. 4072.

6              MS. OLSON:   No objection.

7              THE COURT:   Exhibit 4072 is admitted.

8                   (Exhibit No. 4072 admitted.)

9    BY MR. LETEY:

10   Q    So as you were saying this -- is this a response to your

11   e-mail?

12   A    Correct.

13   Q    Could you read the portion of your e-mail -- could you

14   read starting at -- that entire paragraph starting at the

15   second sentence?

16   A    I'm sorry?

17   Q    On the part that you -- that you authored beginning the

18   full paragraph halfway down the page.  And it starts with "We

19   see."

20   A    Okay.

21   Q    Go ahead and start reading there.

22   A    All right.

23        We see there has been a change in our account.  Moneys are

24   now shown deposited in a share certificate.  One from a

25   holding account.  Although the increase may look good, we

1   informed you that we wish our money returned.  Not invested.

2   Is this part of the process?  Please advise.  We do not wish

3   to wait until March 15, 2001, but would prefer to have our

4   initial investment plus 10 percent to be paid directly to us.

5   We appreciate your help.

6   Q    And when is that e-mail dated?

7   A    10/9/2000.  I mean, sorry, 11/9/2000.

8   Q    At the top of the page, is that the response that you

9   received?

10  A    Yes.

11  Q    Could you read that response?

12  A    Acknowledging the receipt of your e-mail requesting to

13  still leave the program rather than wait until March 15.

14  Your original request for a full withdrawal was received on

15  August 29, 2000.  The end of the 90-day notification period

16  will be November 27, 2000.  Please forward the wire transfer

17  details for your receiving bank account.

18  Q    Did you forward your wire transfer details?

19  A    We did.

20  Q    And did you receive the return of your funds?

21  A    No, not one dime.

22  Q    Please turn to Exhibit No. 4073 as well as 4074 and 4075

23  and 4076.

24  A    74, 75, and 76?  73, 74, 75, and 76?  All right.

25  Q    What are those exhibits?

 1   A   These are illusory figures put on --

 2           MS. OLSON:   Move to strike.

 3           THE COURT:   Motion to strike granted.

 4           THE WITNESS:   These are figures that were posted on

 5   the Internet.

 6   BY MR. LETEY:

 7   Q   For your account?

 8   A   Yes.

 9           MR. LETEY:   Your Honor, we offer Exhibit Nos. 4073,

10   4074, 4075, and 4076.

11           MS. OLSON:   No objection.

12           THE COURT:   4073 through 4076 are admitted.

13           (Exhibit Nos. 4073, 4074, 4075, 4076 admitted.)

14   BY MR. LETEY:

15   Q   On Exhibit No. 4076 could you read the balance in your

16   account at that time?

17   A   The balance as represented is $69,717.59.

18   Q   And when is this dated?

19   A   Dated 9/26/01.

20           MR. LETEY:   I have no more questions, Your Honor.

21           THE COURT:   Ms. Olson?

22                        CROSS-EXAMINATION

23   BY MS. OLSON:

24   Q   Mr. Donohue, do you understand the term due diligence?

25   A   Yes.

1  Q    In terms of what a person should do before they invest

2  money?

3  A    I have a general idea.

4  Q    Would you share with us what your idea is about it?  About

5  that term?

6  A    First thing I look at is who is representing the product.

7  Whatever product it is, who is representing it.  What kind of

8  credibility do they have?  In this particular case it was a

9  member of my church.

10 Q    Before you go on to explain -- well, let me ask you this.

11 Is that -- what you just said in the beginning, your first

12 part of your answer, is that your understanding of due

13 diligence?  Is there anything more?

14 A    Yeah, there's more.

15 Q    Why don't we focus first on what your understanding of the

16 term is and then I'm going to ask you to share with us how

17 you carried out due diligence.  Does that make sense?

18 A    All right.

19 Q    So first share with us what your understanding of that

20 term is.

21 A    Due diligence is the -- is the proposed investment, did

22 does it have merit?  Does it have a reasonable expectation of

23 profit?  Does it represent a tangible asset that is currently

24 used throughout the world?  Does it have substance?  Is it

25 backed by anybody?  What type of an investment is it?  Who

1   represents it?  What are they selling you?  All of those

2   factors go into a due diligence inspection.

3   Q   Now tell us what you did to carry out due diligence before

4   you invested.

5   A   Okay.  In this particular case I have a brother in Christ

6   who is telling me that he and his wife have invested in this

7   thing for over a year.  Mike Fletcher represented to me that

8   they had received substantial returns on their investment.

9   Other people in our church had received some returns.  Okay.

10      Number two, Mike Fletcher was not capable of exactly

11  describing how the money was invested.  That was supposed to

12  be done up at the airport about a week later.

13      The other thing is, is that I think going through the

14  paperwork looked at least reasonable.  The presentation was

15  reasonable.  It was something I had never experienced before.

16  It was totally new to me.  I didn't know exactly how this was

17  done.  I wasn't -- I wasn't comfortable about the profit

18  sharing aspect of it.  But when somebody tells you that

19  you're -- you have the ability to get out, you have the

20  ability to secure your principal and you're going to get 9

21  percent, that to me was sufficient.

22  Q   You made mention of the meeting at the airport?

23  A   Right.

24  Q   Did you go to that meeting?

25  A   I did.

1    Q    And what -- first of all, who -- was it a group meeting?

2    Or what kind of a meeting was it?

3    A    It was a group meeting.

4    Q    And what type of a group was it?

5    A    It was just -- as far as I know it was a presentation to

6    potential or investors to try to explain how this thing was

7    supposed to work.

8    Q    Was Nolon Bush at that meeting?

9    A    I don't know.

10   Q    Do you know if you've ever met Nolon Bush?

11   A    I have never met.

12   Q    So the person that you dealt with through processing your

13   investment was Larry Webster; is that right?

14   A    No.  I never met Larry Webster.  I tried to but he

15   wouldn't show up.  So I couldn't meet him.  The only person I

16   came in physical contact with was Mike Fletcher.

17   Q    Okay.  So when you were filling out the paperwork and

18   wiring your money, you were doing this over the telephone

19   with Larry Webster?

20   A    Well, Larry Webster faxed down the paperwork to my office.

21   And then we filled it out according to his instructions.  And

22   then we acquiesced to the instructions that were made in

23   order to fulfill our side of the obligation.

24   Q    Okay.  Let me go back again to that meeting at the

25   airport.  Do you remember when that was?

1    A    No.

2    Q    In terms of the time period of your meeting with the

3    Fletchers?

4    A    After.

5    Q    Within a week?  A month?

6    A    Within a month.

7    Q    Within a month?

8    A    I think.

9    Q    It was after you had invested?

10   A    Correct.

11   Q    Did that meeting answer more of your questions about the

12   program you were involved in?

13   A    That meeting at the airport was to me after we had been --

14   after we had been sucked into this investment, all right?  My

15   money was gone.  It didn't make any difference what those

16   people said.  All I was looking at was the paperwork that

17   said you're a guaranteed interest, you're guaranteed

18   principal, and you're going to get a minimum of 9 percent.

19   That was all I was interested in, okay?  Something else

20   happened.  There was more money.  That's wonderful.  But that

21   isn't why I got into this thing.  9 percent was good enough

22   for me.

23   Q    So I understand from your direct testimony that when you

24   met with the Fletchers originally, heard about the

25   investment, made the decision to invest, you had to do it

1    that night?

2    A    That's correct.

3    Q    Did that sense of urgency raise a red flag to you?

4    A    Well, no, it didn't raise a flag.  I mean I've been around

5    long enough to know that investment postures change.  It's

6    not uncommon that if -- people can change the investment

7    strategy any time they want to, all right?  If you're the

8    offeror of an investment and you wish to change the terms and

9    conditions of your offeror, that's perfectly legitimate.  And

10   I felt that Mike was telling me the truth in that if it did

11   change and it was paying 9 percent I didn't -- I couldn't

12   afford $100,000 in anything, all right?  So I felt he was

13   telling me the truth.

14   Q    I guess my question isn't so much whether Mr. Fletcher was

15   accurate in the information he was giving.  My question is

16   more towards the sense of -- and I understand that -- let me

17   ask you this.

18       So the investment at the level of $25,000 that you heard

19   about that night, that was kind of a do or forget it kind of

20   an opportunity; is that right?

21   A    Absolutely.

22   Q    Because you couldn't go in at the higher level?

23   A    No.

24   Q    And so then I go back to my question of did that sense

25   that you had to jump on it that night or be foreclosed, that

1   did not give you any concerns?

2   A    No.

3   Q    Was the plan that the money was going to be sent out of

4   the country to Nevis, did that raise any concerns to you?

5   A    Based upon the documentation that was given to me, having

6   control of the LLC, having control of the investments, having

7   the ability to redirect that money back to myself, it didn't

8   raise -- because of those representations, that didn't scare

9   me.  No.

10  Q    All right.  And you made reference several times in your

11  testimony to "we."  And I'm assuming "we" is you is your

12  wife?

13  A    Yes.

14          MS. OLSON:  Thank you.  I have no further questions.

15          MR. LETEY:  No more questions, Your Honor.

16          THE COURT:  Mr. Donohue, you are excused.  Thank you,

17  very much.

18          THE WITNESS:  Thank you.

19          MR. LETEY:  Your Honor, our next witness is John

20  Morris.

21          THE COURT:  Mr. Morris, if you would come forward to

22  the lectern.  Stand at the microphone there.  Raise your

23  right hand and be sworn, sir.

24                          JOHN MORRIS

25   The witness, after being duly sworn, testified as follows:

1          THE COURT:  Please be seated at the witness stand

2    immediately to my left.  Please keep the volume of your voice

3    up so people can hear you.  And speak slowly enough so the

4    court reporter can keep up with you.

5          THE WITNESS:  Yes, sir.

6                        DIRECT EXAMINATION

7    BY MR. LETEY:

8    Q    Mr. Morris, please state your full name and spell your

9    last name.

10   A    John Spencer Morris.  My last name is spelled M-O-R-R-I-S.

11   Q    And a little bit of background.  How old are you?

12   A    42.

13   Q    And where do you live?

14   A    I live in Austin, Texas.

15   Q    And how far did you go in school?

16   A    Through college.

17   Q    Where did you go to college?

18   A    University of Virginia.

19   Q    What do you do for living?

20   A    I'm a real estate investor.

21   Q    And how long have you done that?

22   A    Three years.

23   Q    Who is Phil Weyrick?

24   A    Phil Weyrick was a friend of mine that I knew when I lived

25   in Minneapolis.  He was a musician that I knew.

1    Q    Did Mr. Weyrick tell you about an investment opportunity?

2    A    Yes.

3    Q    And based upon what he told you was that something you

4    were interested in?

5    A    Yes.  I wanted to know more.

6    Q    Did he put you in touch with Larry Webster?

7    A    Yes, he did.

8    Q    And at some point did you begin recording your telephone

9    conversations with Larry Webster?

10   A    Yeah.  I decided to record it because it was so over my

11   head that I wanted to be able to listen to it again and

12   understand what he was saying.

13   Q    To replay the conversation?

14   A    Uh-huh (affirmative).

15   Q    That first time you recorded a phone call of Mr. Webster

16   did you have someone else on the phone with you?

17   A    Yeah.  I had a very close friend of mine.  John

18   Burlington.

19   Q    Could you look at Exhibit No. 4082?  And also look at

20   4084.  Keep them separate.

21   A    I will.

22   Q    Is Exhibit No. 4082 and the first part of 4084 the

23   recording that you made of that conversation?

24   A    Yes, they are.

25   Q    And how do you know that that is the recording?

1    A    It's my handwriting.  I remember it.

2    Q    And have you listened to those tapes since then?

3    A    I have.

4    Q    And does Exhibit 4082 and the beginning of 4084 contain an

5    accurate recording of the conversation you had with Larry

6    Webster?

7    A    Yes, they do.

8    Q    And did you record a second conversation with Mr. Webster?

9    A    There are two that I recorded.

10   Q    And was anybody else on that call?

11   A    No.  Just me.

12   Q    Is the second part of 4084 the recording that you made of

13   that conversation?

14   A    I'm pretty sure.

15   Q    Pretty sure?

16   A    I'm pretty sure, yeah, right now.

17   Q    Have you listened to it already?

18   A    Yes, I have.

19   Q    And does the second part contain an accurate recording of

20   the conversation you had with Mr. Larry Webster?

21   A    Yes, it is.

22        MR. LETEY:  Your Honor, we offer Exhibit No. 4082 and

23   4084.

24        MS. OLSON:  Your Honor, may I inquire?

25        THE COURT:  You may.

```
 1                    VOIR DIRE EXAMINATION
 2   BY MS. OLSON:
 3   Q   Mr. Morris, 4084 I am still looking at.  Is that the
 4   second half of your conversation that originated in 4082?  Is
 5   that right?
 6   A   I believe it's the second half of the first call and all
 7   of the second call.
 8   Q   All right.  Thank you.
 9           MS. OLSON:  We have no objection.
10           THE COURT:  4082 and 4084 are admitted.
11               (Exhibit Nos. 4082, 4084 admitted.)
12               DIRECT EXAMINATION (continued)
13   BY MR. LETEY:
14   Q   And could you please look at Exhibit No. 4083?
15   A   Okay.
16   Q   And is that an accurate transcript of excerpts of the
17   recording?
18   A   Yes.  Word for word.
19   Q   And how do you know?
20   A   I listened to it since I've been in town.
21   Q   And could you please look at 4085?
22   A   Okay.
23   Q   Is this an accurate -- is this an accurate transcript of
24   4084?
25   A   Yes, it is.
```

1    Q    And how do you know?

2    A    I listened to this one as well.

3         MR. LETEY:   Your Honor, we're not offering 4083 or

4    4085 but we would like to share a copy of the excerpts with

5    the jury.

6         THE COURT:   All right.   What we're going to do -- are

7    you going to play the tapes?

8         MR. LETEY:   Correct.

9         THE COURT:   We'll take our midmorning break now.   You

10   can set up.   Ms. Boring will put a copy of the transcripts on

11   each juror's seat.   We'll take our break.   And when we return

12   we'll let you play it.

13        MR. LETEY:   All right.

14        THE COURT:   Ladies and gentlemen, remember the

15   Court's admonition not to discuss this matter amongst

16   yourselves.   If you would return to the jury room.   We'll be

17   back with you in a few moments.

18        (Jury exits the courtroom.)

19        THE COURT:   All right.   Please be seated.   Anything

20   we need to take up at this time?

21        MR. LETEY:   No, Your Honor.

22        MS. OLSON:   No, Your Honor.

23        THE COURT:   Court will be at recess.

24        (Court in recess.)

25        THE COURT:   Please be seated.   Anything we need to

1    take up before the jury comes back?

2              MR. LETEY:   Not from the government, Your Honor.

3              MS. OLSON:   No, Your Honor.

4              THE COURT:   The transcripts are on the chairs?

5              THE CLERK:   Yes.

6              THE COURT:   All right.   We're ready to go.

7              (Jury enters the courtroom.)

8              THE COURT:   All right.   Please be seated.   A couple

9    of housekeeping notes.   We're going to break at five minutes

10   to 12:00.   I've got a conference call with other judges.   So

11   we're going to break at five to 12:00.   And then we're going

12   to also break at the end of the day at 3:45.   There will be

13   no court tomorrow.   I've got sentencings all day.   So that

14   will be an off day for you all for your planning purposes.

15      All right.   Ladies and gentlemen, you're about to listen

16   to a tape-recording that has been received into evidence.

17   Please listen to the tape carefully.   You've been given a

18   transcript of the recording to help you identify speakers and

19   as a guide to help you listen to the tape.   But bear in mind

20   that it is the tape-recording itself that is the evidence.

21   Not the transcript.   And if you hear something different than

22   what appears in the transcript, what you heard is

23   controlling.   After the tape has been played the transcript

24   will be retrieved.

25      Counsel.

1        MS. OLSON:  Before you play the tape would you give

2   us the date of the conversation?

3   BY MR. LETEY:

4   Q   Do you know when the conversation occurred?

5   A   I couldn't tell you the exact date.

6   Q   A rough estimate?

7        MS. OLSON:  Any close period of time?  What year

8   possibly?

9        THE WITNESS:  It was definitely in March of 2000.

10       MS. OLSON:  March of 2000.  Thank you.

11   And the second conversation, was that shortly after the

12   first one?

13       THE WITNESS:  Uh-huh (affirmative).  Within days.

14       MS. OLSON:  Thank you.

15       MR. LETEY:  Your Honor, request permission to play

16   the tape.

17       THE COURT:  Go ahead.

18       (Audio played.)

19       THE COURT:  If you would pass your transcripts into

20   the aisle here and we'll let -- thank you.

21   BY MR. LETEY:

22   Q   So based upon your calls you had with Mr. Webster were you

23   still interested in investing?

24   A   I can't say I understood it but I was interested.

25   Q   And how much did you invest?

1    A    A friend of mine and I total together put in 25,000.

2    Q    How much of that was yours?

3    A    Fifteen.

4    Q    Can you turn to Exhibit No. 4077?  Could you just briefly

5    describe what this is?

6    A    This is basically the instructions and -- of where to send

7    the money.  I think this also is an assignment of our LLC

8    name.

9    Q    I'll just stop you there.

10            MR. LETEY:   Your Honor, we offer Exhibit No. 4077.

11            MS. OLSON:   No objection.

12            THE COURT:   4077 is admitted.

13                (Exhibit No. 4077 admitted.)

14    BY MR. LETEY:

15    Q    And who did you receive this from?

16    A    From Dr. Larry Webster.

17    Q    Okay.  And on the first page can you show me what the date

18    is?

19    A    February 22, 2000.

20    Q    So did you receive this after the phone calls we've just

21    listened to?

22    A    Yes.

23    Q    Okay.  So it's dated March 2000.  So it could have been

24    before February 22?

25    A    Yeah.  It would have been in early February.

1    Q    Early February?

2    A    For the tape-recording.

3    Q    Could you turn to Exhibit No. 4078?  And what is this?

4    A    This is the wire transfer instructions that I gave to

5    Wells Fargo.

6         MR. LETEY:  Your Honor, we our Exhibit No. 4078.

7         MS. OLSON:  4078?

8         MR. LETEY:  Yes.

9         MS. OLSON:  No objection.

10        THE COURT:  4078 is admitted.

11             (Exhibit No. 4078 admitted.)

12   BY MR. LETEY:

13   Q    And how much does this instruct -- the amount?

14   A    The amount on this was $3,400.

15   Q    And what's that for?

16   A    This was to set up the LLC.

17   Q    And did you have to have an LLC?

18   A    Yes.

19   Q    And why is that?

20   A    Just what was I was told.  I'm not really sure.

21   Q    If you'd turn to Exhibit No. 4079.  And just briefly what

22   is this?

23   A    This is the wire transfer that would go into that account.

24   Into the LLC account.

25        MR. LETEY:  Your Honor, we offer Exhibit 4079.

1        MS. OLSON:   No objection.

2        THE COURT:   4079 is admitted.

3              (Exhibit No. 4079 admitted.)

4   BY MR. LETEY:

5   Q   And how much is this for?

6   A   25,000.

7   Q   Can you turn to Exhibit 4088 -- or 4080?  Sorry.  Can you

8   just briefly identify this?

9   A   This is a receipt of our funds and confirmation of our LLC

10  being set up.

11        MR. LETEY:   Your Honor, we offer Exhibit No. 4080.

12        MS. OLSON:   No objection.

13        THE COURT:   4080 is admitted.

14              (Exhibit No. 4080 admitted.)

15  BY MR. LETEY:

16  Q   Would you turn to the third page of this exhibit?  How

17  much does it say the principal amount is?

18  A   Principal amount is 24,990.

19  Q   And what is the interest rate?

20  A   It says 9 percent plus profit sharing.

21  Q   And the term?

22  A   13 months.

23  Q   Did you receive this after you invested?

24  A   Yes.

25  Q   And how much of your investment have you received back?

1    A    Nothing.

2         MR. LETEY:   I have no more questions, Your Honor.

3         THE COURT:   Ms. Olson?

4                        CROSS-EXAMINATION

5    BY MS. OLSON:

6    Q    Mr. Morris, I'd like to ask you some questions about your

7    conversations with Larry Webster.   First of all, you had a

8    friend on the telephone as well?

9    A    Uh-huh (affirmative).

10   Q    And did I understand you to say that your friend knew more

11   about investments and dealing with money than you did?

12   A    Yeah.   My friend was a hedge fund manager.

13   Q    And from the transcripts it sounds like he was asking a

14   lot of questions?

15   A    Uh-huh (affirmative).

16   Q    The more technical questions?

17   A    Uh-huh (affirmative).

18   Q    When you got off the phone with him did you and he have a

19   conversation?

20   A    Uh-huh (affirmative).

21   Q    About what you heard?

22   A    Yes.

23   Q    And what kinds of questions did you ask him about what you

24   heard?

25   A    Oh, I just asked him his opinion.

1   Q   And did he have one?

2   A   He thought it was pretty preposterous.  And he said you do

3   what you want but I don't recommend it.

4   Q   So he didn't recommend that you get involved?

5   A   Huh-uh (negative).

6   Q   So why did you get involved?

7   A   I guess because I am a pretty trusting person.  And, you

8   know, I felt -- I felt like I was being told the truth.  And

9   I was willing to, you know, take a risk on that.  But I

10  didn't know I was being lied to.

11  Q   You didn't realize you were being lied to?

12  A   Huh-uh (negative).

13  Q   So you've come now to believe that you were?

14  A   Pretty obvious.

15  Q   So I guess I'm not quite understanding why you disregarded

16  your friend's advice and went ahead with investing?

17  A   Well, you know, I'm a big boy.  I make my own decisions.

18  And my friend and I were interested in making money and being

19  wealthy.  And we'd been told by several people that this was

20  a great investment and people were doing really well at it.

21  We didn't risk a lot.  But I mean it was a lot to my friend

22  that invested with me.  But, you know, obviously, we got to

23  watch our investment grow on the Internet.  And then we got

24  to learn that it was all a scam.  And I haven't seen a dime

25  since.

1    Q    So you -- so part of your motivation was to make money and

2    to make money fairly quickly?

3    A    Uh-huh (affirmative).

4    Q    Now, you had a friend, another friend, not the same friend

5    that was on the conversation with you, true?

6    A    Uh-huh (affirmative).

7    Q    That pooled money with you?

8    A    Yes.

9    Q    The two of you did it together?

10   A    Yes.

11   Q    So was all the information that he received about this

12   program, did he get that from you?

13   A    Yeah.  He looked to me for, you know, the information that

14   I gathered.  And we talked about it and then we decided to

15   take the risk together.

16   Q    Now, I understand from your direct testimony that you

17   really didn't understand the program very well.  Let me make

18   sure we all heard that.

19        I understood from your direct testimony that you really

20   didn't understand it very well; is that true?

21   A    Well, I mean, I guess I had never heard of, you know,

22   federal trading programs like this.

23   Q    So when you explained it to your friend was he satisfied

24   with your explanation even though you were having a hard time

25   understanding all the concepts?

1    A    I mean, I don't think either of us, you know, felt that we

2    understood it at all or, you know, had a knowledge of exactly

3    how this is going to happen.   How -- you know, whether it

4    really works or not or if it's legitimate.   But, you know, we

5    were both willing to check it out.

6    Q    You were going to go for it?

7    A    Uh-huh (affirmative).

8    Q    Did you ever meet Nolon Bush?

9    A    No, I did not.

10    Q    All of your dealings with your involvement here was with

11    Larry Webster?

12    A    Correct.

13              MS. OLSON:   Thank you.   I have no further questions.

14              MR. LETEY:   I have no questions, Your Honor.

15              THE COURT:   Mr. Morris, you're excused.   Thank you,

16    very much, sir.

17              THE WITNESS:   Thank you.

18              MR. STORM:   Your Honor, the government calls David

19    Velander.

20              THE COURT:   Mr. Velander, if you'd come forward to

21    the lectern and wait there for just a second.   And if you

22    would raise your right hand and be sworn.

23                        DAVID VELANDER

24      The witness, after being duly sworn, testified as follows:

25              THE COURT:   Please be seated at the witness stand

1  immediately to my left.  Please keep the volume of your voice

2  up so the people in the courtroom can hear you.  Please speak

3  slowly enough so the court reporter can keep up with you.

4                        DIRECT EXAMINATION

5  BY MR. STORM:

6  Q    Mr. Velander, can you state your full name and spell your

7  last name for the record, please.

8  A    David A. Velander.  V-E-L-A-N-D-E-R.

9  Q    And how old are you?

10 A    61.

11 Q    What city do you live in?

12 A    Presently Louisville, Kentucky.

13 Q    What kind of work do you do?

14 A    I'm an attorney.

15 Q    And what kind of practice do you have?

16 A    A general business practice.  I represent a lot of

17 contractors.  I do a lot of construction law.

18 Q    What is World Contractual Services?

19 A    That was a group that I found out about through a series

20 of seminars out of Salt Lake City that proposed to help

21 people set up trust structures.

22 Q    And when did you find out about World Contractual

23 Services?

24 A    Either '98 or 19 -- late '98 or early '99.  I'm not sure

25 which.  It's been a long time.

1    Q    And who is Ann Romney?

2    A    Ann Romney?

3    Q    Maryann Romney?

4    A    There's a lady named Maryann Romney who was associated

5    with World Contractual Services.  And I met her at some

6    point.

7    Q    Did she tell you about an investment opportunity?

8    A    Yes.  I had a telephone conversation with her one day.

9    And she said that they had come across an investment

10   opportunity which they thought I might be interested and gave

11   me the name and telephone number of Mr. Bush.

12   Q    Did you call Mr. Bush?

13   A    I did.

14   Q    And approximately when was that?

15   A    Early 1999.  Maybe February or March of 1999.  Something

16   like that.

17   Q    Tell us about your telephone conversation with Mr. Bush.

18   A    Mr. Bush told me that he had a humanitarian effort going.

19   Something called Hulaman, which I never heard that word

20   before.  H-U-L-A-M-A-N.  Hulaman.  I think it was Management

21   Services.  I'm not exactly sure the rest of it.  Or Hulaman

22   Trust.  Something like that.  And that the investment

23   opportunity was if I would put money with him, that he would

24   pay me a good return on the money.  And the return would be

25   50 -- he was able to invest it with someone else.  And he

1   would -- the total investment between the two of us would be

2   a return of 50 percent a month.  And that he would split that

3   with me and I would get 25 percent a month.

4   Q    And then he would get 25 percent?

5   A    He or Hulaman would keep the other 25 percent of the

6   profit off the investment.

7   Q    Did he say where Hulaman's 25 percent would go off the

8   profit?

9   A    No.  Not at that point.  Just to charitable works.

10  Q    Did he tell you what the investment opportunity was in?

11  A    He described it to me.  And what I understood was it was

12  something called mid-term notes.  By that I understood it to

13  be that particularly banks in Europe would trade large blocks

14  of commercial paperwork or promissory notes.  One bank would

15  aggregate a bunch of these notes and sell them to another

16  bank at a slight discount.  And because there was so much

17  money involved, a slight percentage discount would mean

18  actually a lot of money.  And the investor was able to

19  participate in that.  And even though our investment was

20  relatively small compared to the whole transaction, the

21  return on our investment was pretty big because of the

22  leverage permitted by the folks he referred to as traders.

23  The people who actually did these trades for the banks.

24  Q    Did he talk to you about the safety of the program?

25  A    Yes.  I understood that none of these transactions would

1    even begin until there was both a buyer for the notes and a

2    seller of the notes so that the actual principal that I put

3    with him would never be at risk.  In other words, we didn't

4    buy the notes themselves.  We just were a part transaction

5    which would never take place until it was a instantaneous buy

6    and sell of the notes.  That's the way I understood it.

7    Q    Did he say who would place the money with -- in this

8    buy-and-sell situation, what that person was called?

9    A    No.  Well, they referred to the person as a trader.  No

10   names were spoken of at that point.

11   Q    Did this -- after talking to Mr. Bush did this plan

12   interest you?

13   A    Yes, it did.  And, consequently, I invested some money

14   with him.

15   Q    And did you receive some paperwork?

16   A    Yes.

17   Q    Let me have you look at Exhibit No. 2001, please.

18   A    All right.

19   Q    Just in general what is that?

20   A    Well, the first page says Hulaman Management Services.

21   That appears to be a transmittal sheet from someone named

22   Tammy.  And he sent me a document.  It's titled International

23   Trust and Fiduciary Agreement.  At the top of that it says

24   Hulaman Trust and it has my name on it.

25   Q    Let me stop you there.

1      Is that the paperwork you received after you sent money to

2    Mr. Bush?

3    A    Yes.

4              MR. STORM:    Your Honor, offer Exhibit No. 2001.

5              MS. OLSON:    No objection.

6              THE COURT:    2001 is admitted.

7                       (Exhibit No. 2001 admitted.)

8    BY MR. STORM:

9    Q    Mr. Velander, let me have you turn if you would to the

10   seventh page of that document.    It's printed on the bottom

11   6 of 9.    And it's on the computer screen in front of you.

12   A    Okay.  I see it.  Yes.    And I have the document here also.

13   Q    Okay.  If you take a look at the line that says March 29,

14   '99?

15   A    Yes.

16   Q    Does that accurately reflect the date of your investment?

17   A    I believe so, yes.

18   Q    And how much does it say there that you invested?

19   A    $100,000.

20   Q    Is that accurate?

21   A    Yes.

22   Q    And does it also say -- identify set administrative fees?

23   A    Well, it says $3,000 in brackets and then 1,000 after

24   that.    Deferred 60 days.    2000 until the end of the 12th

25   month.

1   Q    And who signed that document?

2   A    My signature is on there.  And it appears to me to be

3   Mr. Bush's, although I didn't see him sign it.

4   Q    Let me have you look also if you would at 2002.

5   A    All right.

6   Q    And what is that document?

7   A    It appears to be an account statement confirming what I

8   just spoke about there.  The $100,000 investment.

9   Q    Let me stop you there.

10            MR. STORM:  Your Honor, offer Exhibit No. 2002.

11            MS. OLSON:  No objection.

12            THE COURT:  2002 is admitted.

13                 (Exhibit No. 2002 admitted.)

14   BY MR. STORM:

15   Q    Mr. Velander, on that document does it reflect your

16   initial investment of 100,000?

17   A    Yes, it does, on the same date we spoke of earlier.  March

18   29, 1999.

19   Q    Okay.  And does it show that you have not been charged any

20   administrative fee by the balance which does not reflect the

21   3,000?

22   A    Yes.  It shows subtraction.  But the right-hand column,

23   which I understood to be a running balance, shows no

24   deduction.

25   Q    And does it show that you've earned a dividend?

1   A   Yes.   On about the fourth line down there is dated April

2   30, '99.   Under additions it's $25,000.

3   Q   And did you request that your dividends be given to you as

4   they were earned?

5   A   Yes.   There is one page earlier there that reflects

6   that in the 2000 -- I'm sorry.   2001 I think it is.   If you

7   look on page 5 of 9, interest to be paid 100 percent.   I

8   understood that to mean I would receive that.

9   Q   Let's take a look at that.

10  A   Okay.

11  Q   And if we could have that enlarged a little bit.

12      Is it the 100 percent on the far right-hand side of the

13  matrix that reflects your request to have that money

14  delivered to you?

15  A   Yes.

16  Q   Okay.   Let me have you look back at 2002.

17  A   All right.

18  Q   And down at the last line it says May 3, 1999?

19  A   Yes, I see that.

20  Q   There is a subtraction amount.   How much is that?

21  A   $25,000.

22  Q   And did you in fact receive $25,000?

23  A   Yes, I did.

24  Q   Okay.   Let me talk to you about that.

25      After you made this investment and this account statement

1  was issued did you have a meeting with Nolon Bush?

2  A    Yes.  I met him.  It wasn't set up as a meeting between me

3  and Mr. Bush.  But I met him, yes, after that.

4  Q    And where was that?

5  A    It was in Coeur d'Alene, Idaho.

6  Q    Why were you in Coeur d'Alene, Idaho?

7  A    World Contractual Services that we spoke of a moment ago

8  was having a seminar there.  And I think maybe he was a

9  speaker at the seminar, although I'm not sure of that.  But I

10  did meet him there.

11  Q    Okay.  And what happened when you met him?

12  A    After we were introduced he gave me a check in the amount

13  of $25,000.

14  Q    And what did he say?

15  A    Here is your first proceeds.  Something to that effect.  I

16  don't know if those were his exact words.  But I understood

17  that to be the profits from that -- the first $100,000 I

18  invested.  The first 25 percent proceeds.

19  Q    Were you feeling pretty good at that point about your

20  investment?

21  A    Yes.  It was about a month after I had sent him the money.

22  And he had been true to his word at that point as far as I

23  was concerned.

24  Q    Let me have you look at Exhibit No. 2003, please.

25  A    All right.  I see it.

1   Q    And what is that?

2   A    It appears to be a check to me in the amount of $25,000.

3   Q    From Nolon Bush?

4   A    Well, on the upper left-hand side it says official check

5   remitter.   Hulaman Management Services.

6            MR. STORM:   Your Honor, offer Exhibit 2003.

7            MS. OLSON:   No objection.

8            THE COURT:   2003 is admitted.

9                    (Exhibit No. 2003 admitted.)

10  BY MR. STORM:

11  Q    Mr. Velander, is this the check you received from Nolon

12  Bush in Idaho?

13  A    Yes.   It appears to be a copy of that check.

14  Q    And what's the date on the check?

15  A    Let's see.   May 6, 1999.

16  Q    And you just indicated who it was from.   Can you read that

17  again?

18  A    I'm sorry?  I didn't understand your question.

19  Q    Can you tell us who that check is from, please?

20  A    The remitter is Hulaman Management Services.

21  Q    Okay.   Did you, while you were in Idaho, socialize with

22  Mr. Bush?

23  A    Yes.   After the seminar there was a social event that

24  evening at -- I don't know the name of the -- there was a

25  country club there.   I think it's Coeur d'Alene Country Club,

1    although I'm not sure of that.  One of the other folks who

2    knew Mr. Bush's mother lived out there.  And we had -- there

3    was a cocktail hour at her house and then we went to the

4    country club to eat dinner.

5    Q    Let me clarify one thing.  Mr. Bush's mother or --

6    A    No.

7    Q    Okay.

8    A    And the other fellow that was also involved in the

9    transaction as I understood it, I met him.  His name was Rick

10   something.  I don't remember his last name.

11   Q    Does Felton sound familiar?

12   A    Felton, yes.  That's right.  Rick Felton.  It was his

13   mother that had the place out at the country club.  Not Mr.

14   Bush's mother.

15   Q    So you went to Rick Felton's mom's house?

16   A    Correct.

17   Q    And did you talk to Nolon Bush there?

18   A    Yes.

19   Q    What did you discuss?

20   A    Several things.  The initial investment here.  And it was

21   at that time he told me that there was another investment.

22   What he referred to as level two -- consequently, I referred

23   to it same way -- that was better than the first one in that

24   the returns would be greater.  He told me that he was going

25   to -- he was able to put some money together with another

1   person to give to a trader in New York.

2       So I understood that although it was the same type of

3   trade, this was a different trader than perhaps he had been

4   dealing with before.   And if I wanted to put money with him

5   that again he would split the proceeds with me on that.   I

6   would receive 50 percent per month and Hulaman Trust or Nolon

7   Bush would receive the other 50 percent.

8   Q   When you say split proceeds you're talking about profits?

9   A   Yes.   The profits.   Not the principal invested.   Just the

10  profits from the trades.

11  Q   So 100 percent of your money would go into the trading

12  program?

13  A   Correct.

14  Q   And then you would split the profits that came out?

15  A   Correct.

16  Q   50 percent a month?

17  A   Correct.

18  Q   That probably sounded pretty good to you?

19  A   Correct.

20  Q   And did the fact that you had just received $25,000 and

21  probably had it still in your pocket lead you to believe that

22  this was legitimate?

23  A   At that point Mr. Bush had done what he told me he would

24  do.   And I had confidence that he would do that in the future

25  at that point.

1  Q   Did you decide to invest in this level two program?

2  A   Yes.

3  Q   And did you tell other people about it?

4  A   Yes.

5  Q   Who did you tell?

6  A   Family and friends.

7  Q   Quite a few people?

8  A   Yes.  There were -- I don't remember the exact number but

9  there were several.

10 Q   And did you reach a partnership agreement with some of

11 those people?

12 A   Yes.  I told them that if they wanted to put some money

13 together with me we would invest it with Mr. Bush and then we

14 would split the proceeds depending on who it was.  The

15 percentage was dependent on that.  Not principal.  Only the

16 profits.

17 Q   The profits?

18 A   Yes.

19 Q   And let me have you look at Exhibit No. 2004, please.

20 A   All right.

21 Q   Before I ask you about 2004, did you start an LLC for this

22 venture?

23 A   Yes.

24 Q   And what was the name of that LLC?

25 A   Legal Ops LLC.

1   Q    What is 2004?

2   A    It's a letter from me to Mr. Bush dated May 18, 1999.  The

3   subject is money that I wired to Mr. Bush for this level two

4   program.  You see the re: line says 50 percent per month

5   program.

6   Q    Okay.  Let me stop you right there.

7        MR. STORM:  Your Honor, offer Exhibit No. 2004.

8        MS. OLSON:  No objection.

9        THE COURT:  2004 is admitted.

10            (Exhibit No. 2004 admitted.)

11  BY MR. STORM:

12  Q    And can you just read the first sentence of that letter,

13  please?

14  A    The first sentence says the bank wired $316,000 this

15  morning.

16  Q    And who is that letter to?

17  A    Tammy.

18  Q    Who is Tammy?

19  A    I don't know except it's a person who worked in Mr. Bush's

20  office.  The directive was to his office and him and Hulaman

21  Management Services.  Attention Tammy.

22  Q    And what's the date on the letter?

23  A    May 18, 1999.

24  Q    Are you notifying Mr. Bush of your first investment in

25  this level two program?

1    A    Yes.

2    Q    Is the safety mechanism in this program according to

3    Mr. Bush similar to what it was in level one?

4    A    Yes.  Similar.  But slightly different in that -- the way

5    he explained it to me was the money would be put with this

6    trader in New York.  In a bank account in New York.  By New

7    York I mean New York City.  The trader -- it would take two

8    signatures to cash a check on the account.  One signature

9    would be the trader.  One signature would be Mr. Bush's

10    signature.  The amount of money that he had in the investment

11    deal, he would have a check in his possession.  A physical

12    check for that amount already signed by the trader so that if

13    he decided he wanted out of the trade at any time all he had

14    to do was sign the check and deposit it in his bank account

15    and that got the money back.

16    Q    Did he say at that time who the trader was?

17    A    No.

18    Q    Let me have you look at Exhibit No. 2005.  What is that

19    document?

20    A    That's a similar document to the one we looked at before.

21    2001 I think.  It's an international trust and fiduciary

22    agreement.  Except this one is in favor of Legal Ops LLC

23    instead of my name.

24         MR. STORM:    Your Honor, offer 2005.

25         MS. OLSON:    No objection.

1        THE COURT:    2005 is admitted.

2                (Exhibit No. 2005 admitted.)

3    BY MR. STORM:

4    Q    And, Mr. Velander, let me have you look at the same page

5    on this document.    Page 6 of 9.

6    A    All right.

7    Q    Does that confirm two receipts of cash by Mr. Bush of

8    investments by you?

9    A    Yes.    5/20/1999 initial funds $316,000.    5/21, the next

10   day, '99 additional funds $89,000.    It was the same amounts

11   we just had in that letter we looked at.

12   Q    And is there also a fixed administrative fee for this

13   investment?

14   A    Well, this one says $500 again in brackets.

15   Q    And who signed this document?

16   A    That's my signature at the bottom as chief manager of

17   Legal Ops.    And I believe it to be Mr. Bush's signature,

18   although again I did not see him sign it.

19   Q    And what's the date on this document?    What's this

20   document dated?

21   A    That page is -- the date on that particular page is the

22   21st day of May 1999.

23   Q    Let me have you look at Exhibit No. 2016, please.

24   A    I have it.

25   Q    What is that document?

1    A    That's the account statement that confirms receipt of the

2    moneys that we've talked about.

3            MR. STORM:   Your Honor, offer Exhibit No. 2016.

4            MS. OLSON:   No objection.

5            THE COURT:   2016 is admitted.

6                (Exhibit No. 2016 admitted.)

7    BY MR. STORM:

8    Q    Mr. Velander, as of June 7, '99 what was your account

9    balance?

10   A    In this particular account, the Legal Ops account, it was

11   $405,000 even.

12   Q    Without going through every investment or every payment

13   that you received would it be fair to say that you made a

14   number of additional additions to this and received a number

15   of payments from it?

16   A    Yes, that's correct.

17   Q    Did you go to a meeting for World Contractual Services in

18   the Bahamas?

19   A    Yes.

20   Q    And approximately when was that?

21   A    I'm not sure.  It was in that same year --

22   Q    '99?

23   A    -- I believe.  1999.

24   Q    Okay.

25   A    I'm pretty sure of that.

1    Q    And did you meet Mr. Bush there?

2    A    He was there, yes.   We had lunch together there.

3    Q    What did you discuss?

4    A    The main topic of the discussion at that lunch meeting was

5    a project Mr. Bush represented to me that he was -- that the

6    charitable trust or foundation was going forward with in

7    Mexico.   The plan was to build a city.   A resort type city

8    town in Mexico and to help raise the standard of living for

9    folks that lived in that area.

10    Q    Is that something you were investing in?

11    A    No.

12    Q    Is that -- where was the money coming from that he was

13    building that city in Mexico?

14    A    My understanding was that the money was coming from the

15    profits of the trades.   His half of the profits of the trade.

16    Q    Did he tell you at that time who the trader was?

17    A    He told me that it was -- he told me it was a person named

18    Carolyn.   That's all I knew at that point.

19    Q    Now, is there a point where this program stopped working?

20    A    Yes.

21    Q    Let me have you look at -- and when it stopped working or

22    started working poorly did you begin notifying Mr. Bush of

23    this fact?

24    A    Yes.

25    Q    And did you repeatedly notify him that it was not working

1    the way he had said it would?

2    A    Yes.

3    Q    Let me have you look at Exhibit No. 2024, please.

4    A    All right.

5    Q    And what is that document?

6    A    That's a letter.  A copy of a letter from me to Mr. Bush

7    dated September 2, 1999.

8            MR. STORM:    Your Honor, offer Exhibit No. 2024.

9            MS. OLSON:    No objection.

10           THE COURT:    2024 is admitted.

11               (Exhibit No. 2024 admitted.)

12   BY MR. STORM:

13   Q    Mr. Velander, can you -- to bring us up to date on your

14   account can you read this letter to Mr. Bush?

15   A    Sure.  It says, Dear Nolon:  Diana -- that's my wife --

16   and I will arrive in Seattle on September 8 at 11:35 a.m. on

17   Northwest Flight 7.  I understand you will have someone pick

18   us up so we have not made rental car arrangements.  We have

19   reservations at the Doubletree Hotel.

20       Second paragraph says the amount due Legal Ops LLC from

21   the above program -- let me digress.  The reference line says

22   50 percent per month program, etcetera.  So that's the second

23   program we were talking about.

24       The amount due to Legal Ops LLC from the above program for

25   the second half of August is $227,500.  I'm sure you are

1   aware we wired an additional $175,000 last week bringing

2   totally invested in this program to $1,085,000 even.  I look

3   forward to meeting with you, etcetera.

4   Q   What's the date on that letter?

5   A   September 2, 1999.

6   Q   Did you go to Seattle?

7   A   I did.

8   Q   And did you meet with Mr. Bush?

9   A   I did.

10   Q   And where did you meet him?

11   A   I met him at what I understood to be his house.

12   Q   And what kind of house is that?

13   A   Well, it was a nice house.  It was on I don't know how

14   many acres.  A couple acres at least.  It had a nine hole

15   golf course.  A circular around the house.  Par 3 golf

16   course.  Start, let's say, the 9:00 position if you're

17   looking at circle.  Play the first hole.  Then go on to the

18   second, etcetera.  It went around his property.  It circled

19   the house itself.  The house itself consisted of a separate

20   garage, I believe.  And then there was sort of a business

21   area.  There was meeting room in a kitchen facility right

22   there with the business facility.  Then separate from that

23   over towards the water was the living quarters over on that

24   side.  I think that's east.  But I'm not from this area so I

25   don't know.

1    Q    Did you have conversations with Mr. Bush at the house?

2    A    Yes.

3    Q    What did you talk about?

4    A    Well, we talked about the program.  How they were working.

5    That sort of thing.

6    Q    What did he say?

7    A    I didn't get any indication that they were not working.  I

8    don't remember exactly what he said.

9    Q    But things were fine?

10   A    As far as I knew things were fine.

11   Q    Did you feel comforted being in such a grand house?

12   A    Yes.  I felt like things were going as planned.  Although

13   we hadn't been paid exactly as promised, but I felt pretty

14   good about it at that point.

15   Q    Did you go to a ball game?

16   A    Yes.  We went to baseball game.  The Seattle -- I don't

17   remember the name of the team.

18   Q    Mariners?

19   A    Mariners.  Okay.

20   Q    And did you go -- where did you go when you -- when you

21   went to the ball game where did you watch the game from?

22   A    There was one of the these luxury suites.  Whatever you

23   want to call it.  You know the ones that ring around the

24   stadium up there?  I guess it's called a luxury suite.  And

25   on the door plate there was -- I think it's that Hulaman

1    something.  I don't know whether it was Hulaman Trust or

2    Hulaman Management Services.

3    Q    When you looked down at the wall of the field did you see

4    any banners that stuck out?  Any signs?

5    A    I don't recall.

6            THE COURT:  Mr. Storm, we're going to take our noon

7    recess at this time.

8        Ladies and gentlemen, we'll be in recess until 1:30.

9    Please have a nice lunch and be back here ready to go to work

10   at 1:30.

11           (Jury exits the courtroom.)

12           THE COURT:  Please be seated.  Anything we need to

13   take up at this time?

14           MS. OLSON:  No, Your Honor.

15           MR. STORM:  No, Your Honor.

16           THE COURT:  Court will be in recess until 1:30.

17           (Court in recess.)

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2

3          THE COURT:  Please be seated.  Ready to proceed?

4          MR. STORM:  We are, Your Honor.

5          THE COURT:  Mr. Velander, if you would like to resume

6   the stand.  You're still under oath.

7          (Jury enters the courtroom.)

8          THE COURT:  All right.  Please be seated.

9      Mr. Storm, you may continue, sir.

10  BY MR. STORM:

11  Q   Mr. Velander, can I have you look at Exhibit No. 2029,

12  please?

13  A   All right.  I see it.

14  Q   Just in general what is that?

15  A   That's a letter from me to Nolon Bush dated January 3rd,

16  2000.

17          MR. STORM:  Your Honor, offer Exhibit No. 2029.

18          MS. OLSON:  No objection.

19          THE COURT:  Just a second.

20      All right.  2029 is admitted.

21              (Exhibit No. 2029 admitted.)

22  BY MR. STORM:

23  Q   Mr. Velander, can I have you just -- first, you said it

24  was January 3, 2000?

25  A   Correct.

1  Q   And who is it to?

2  A   To Nolon Bush.

3  Q   Hulaman Management Services?

4  A   Yes.  Hulaman Management Services.  Fax number so and so.

5  Q   Can you read the first two sentences of that letter,

6  please?

7  A   Dear Nolon:  To update the figures on the above program

8  through December 31, 1999, the total due was $2,894,375.  We

9  have received $325,000, leaving a balance of $2,569.375.

10  Q   So is it my understanding from the first sentence that

11  Mr. Bush was $2,894,000 behind on his payments to you?

12  A   Yes, that's correct.

13  Q   And he made one payment of 325.  And then the remainder --

14  the last figure of 2,569,000 is what is remaining due?

15  A   Correct.

16  Q   Let me have you look at Exhibit No. 2030, please.

17  A   All right.

18  Q   And generally what is that?

19  A   That is another letter from me to Nolon Bush dated January

20  21, 2000.

21           MR. STORM:  Your Honor, offer Exhibit No. 2030.

22           MS. OLSON:  No objection.

23           THE COURT:  2030 is admitted.

24                  (Exhibit No. 2030 admitted.)

25  BY MR. STORM:

1    Q    Mr. Velander, can you read that letter?

2    A    Sure.   This references the 1M program, which is the level

3    two program that we were talking about earlier.

4         Dear Nolon:   To update the figures on the above program

5    through January 15, 2000, the total due was 2,865,625.

6    That's dollars.

7         Next paragraph.   I need the $50,000 to take out the

8    investor we discussed.   Lorelei told me in an e-mail that it

9    would be next week before that money is sent to me.   Is it

10   possible to send it today so I can get him taken care of?

11   Hope you had a good trip.   Please call me when you get this.

12   Q    So again you're notifying Mr. Bush that he's behind on his

13   payments to you?

14   A    That's correct.   And you can tell from the letter we had

15   telephone conversations frequently, too.

16   Q    Let me have you look at 2031, please.

17   A    All right, sir.

18   Q    And generally what is that?

19   A    It's a letter from me to Nolon Bush dated February 3rd of

20   2000.   It references the same program.   The 1M program.

21        Dear Nolon:   To update the figures on the above program

22   through January 31, 2000, the total due was $3,161,875.   I

23   hope to speak with you tomorrow or on the weekend.   See you

24   next week.   Signed by me.

25   Q    A couple more.   2032.

1    A    I'm sorry?

2    Q    Would you look at 2032, please?

3              THE COURT:    Let's offer 2031.

4              MR. STORM:    Okay.    Thank you.    I apologize.

5              THE COURT:    That's all right.

6              MR. STORM:    Offer 2031.

7              MS. OLSON:    No objection.

8              THE COURT:    2031 is admitted.

9              MR. STORM:    Thank you.

10                  (Exhibit No. 2031 admitted.)

11   BY MR. STORM:

12   Q    Mr. Velander, if you can look at 2032 and just tell me in

13   general what that is?

14   A    That's another letter from me to Nolon Bush about the same

15   program.

16   Q    Let me stop you there.

17             MR. STORM:    Your Honor, offer Exhibit No. 2032.

18             MS. OLSON:    No objection.

19             THE COURT:    2032 is admitted.

20                  (Exhibit No. 2032 admitted.)

21   BY MR. STORM:

22   Q    Mr. Velander, can you also read that letter?

23   A    Dear Nolon:    To update the figures on the above program

24   through February 29, 2000, the total profit due is $3,665,875

25   assuming no compounding.    The principal balance is $1,010,000

1   even.  Having not heard from you I assume the bank has not

2   come through again.

3       I am being inundated with requests for return of

4   investment.  Therefore, please consider this letter a request

5   for the immediate, underlined, return of the $1,010,000.  I

6   assume you will pay the profits as promised in the very near

7   future with payments also for the time the profits remained

8   unpaid.  I would appreciate a call when you get this so we

9   can discuss the whole matter.  Signed by me.

10  Q   At the end of the first paragraph you say I assume the

11  bank did not come through again.  Was that an ongoing

12  problem?

13  A   Yes.  That reflects our telephone conversations.  I would

14  talk with Mr. Bush about what was going on and in general I'd

15  be told that the bank had done what I understood it was going

16  to do.

17  Q   And in this second paragraph you've asked for a return of

18  your principal investment.  Is that the first time you had

19  asked for that?

20  A   I believe it's the first time I asked for a return of the

21  entire principal investment.  You recall a letter or two back

22  I asked for a portion of the principal to be returned.  I

23  believe this is the first time I asked for the whole thing to

24  be return principal-wise.

25  Q   Why did you ask for the full principal to be returned to

1   you?

2   A   Things were not going as they had been represented to me

3   that they would.  We were not getting paid twice a month.

4   Although we had been paid some, a long time had passed since

5   we had been paid.  We wanted our principal back.

6   Q   Let me have you look at 2033, finally.  And generally what

7   is that document?

8   A   That's a letter from me to Nolon Bush dated June 20, 2000.

9           MR. STORM:  Your Honor, offer 2033.

10          MS. OLSON:  No objection.

11          THE COURT:  2033 is admitted.

12              (Exhibit No. 2033 admitted.)

13  BY MR. STORM:

14  Q   Mr. Velander, can I have you read that letter also for us?

15  A   Yes.  The reference again is to the 1M program.  Same

16  program we've been discussing here.

17      Dear Nolon:  I hope your recovery is well underway.  As

18  you know from our previous conversations we are in a

19  situation here in Tennessee which requires that our principal

20  be returned.  I first made that request on March 2, 2000.  We

21  have reduced the amount to $890,000 (principal) but have not

22  received anything in some time.  Please, please help me get

23  this cleared up for the benefit of us all.  I would really

24  appreciate it if you could find five minutes to call me and

25  let me know what is going on.  I need to communicate with the

1    others.   So I need to have some information to give them.

2    Signed by me.

3    Q    Did you get your $890,000 in principal back?

4    A    No.

5    Q    Mr. Velander, is Nolon Bush in court today?

6    A    Yes.

7    Q    Can you point to him and describe what he's wearing,

8    please?

9    A    He's sitting at the defense table over there.   The

10   white-haired gentleman.

11          THE COURT:   Let the record reflect that Mr. Velander

12   identified Mr. Bush.

13          MR. STORM:   Thank you.

14                          CROSS-EXAMINATION

15   BY MS. OLSON:

16   Q    Good afternoon, Mr. Velander.

17   A    Good afternoon.

18   Q    Let's start with can I have you look again at Exhibit No.

19   2033, please?

20   A    All right.

21   Q    The first sentence of that first paragraph you read says,

22   "I hope your recovery is well underway?"

23   A    Yes, ma'am.

24   Q    What does that refer to?

25   A    I believe -- I understood that Mr. Bush had been involved

1    in a motorcycle accident and I was telling him I hope he

2    recovers from that.

3    Q    Was he injured?

4    A    I don't know.  As far as I know.  That was my

5    understanding.  I didn't see any of that.  But that was my

6    understanding, yes.

7    Q    And how did you learn that?

8    A    I don't recall.

9    Q    You don't remember who told you about that?

10   A    No, ma'am.

11   Q    Okay.  And so were you -- well, let me ask you this.  The

12   date of the previous letter was March 2, 2002.  That is

13   Exhibit No. 2032?

14   A    Yes, ma'am.

15   Q    So there was a period of two or three months that took

16   place between that letter and the June 20th letter?

17   A    Yes.  It appears to be about three and a half months.

18   Q    Do you recall sending other letters in that period?

19   A    I don't remember at this point, ma'am.  It was a long time

20   ago.

21   Q    I understand that.

22        So it's possible that the delay might have been attributed

23   in part to Mr. Bush's motorcycle accident?  Is that possible?

24   A    I guess so.  I don't know.

25   Q    Okay.

1     Now, Mr. Velander, as I understand it you got introduced

2  to this investment program through World Contractual

3  Services?

4  A   Actually, a lady name Maryann Romney is the one who put me

5  together with Mr. Bush.  Yes.  She worked for World

6  Contractual Services.  So yes.  That's right.

7  Q   All right.  And so I thought that Ms. Romney had put you

8  in touch with World Contractual Services?

9  A   No ma'am.  She put me in touch with Mr. Bush.

10  Q   Okay.  How did you get involved with World Contractual

11  Services?

12  A   I found out about them in a seminar I went to.

13  Q   And describe a little bit about what World Contractual

14  Services is.

15  A   I don't know what it still is.

16  Q   Actually, I should ask you that question.  So does it

17  still exist?

18  A   I have no idea.

19  Q   Okay.  You're not involved in it anymore?

20  A   No.

21  Q   Were you a member of it at one time?

22  A   No.

23  Q   So what was your association?

24  A   I considered using their program to help folks set up

25  trusts for asset protection.

1  Q    Were they -- did they have an investment program as well?

2  A    Not that I recall.

3  Q    Was it a financial service?  I'm just trying to get a

4  handle on exactly what it was.

5  A    The service offered by World Contractual Services?

6  Q    Yes.

7  A    They would set up trust structures for folks under the

8  terms of which people would put all their personal assets

9  into trusts, thereby trying to insulate them from future

10  potential creditors.

11  Q    Okay.  And would they manage the trusts as well?

12  A    They meaning World Contractual Services?

13  Q    Yes.  If the client or the trustor wanted that type of

14  service, did they provide that as well?

15  A    Yes.  They would serve as trustee of some of these trusts.

16  Individuals in the company, I think.  I don't think the

17  company itself was the trustee.  I think individuals may have

18  been.  But I don't know.  I don't remember.

19  Q    I'm not holding you to your -- the precise details.  I'm

20  just trying to get some kind of a grasp on that.

21  A    Sure.  Yes, ma'am.

22  Q    And Ms. Romney works for World Contractual Services?

23  A    I believe that's correct, yes.

24  Q    And how did she find out about the investment program that

25  Nolon Bush was offering?

1    A    I have no idea.

2    Q    You're not sure how that --

3    A    No.

4    Q    Was she an investor with -- or did she participate with

5    Mr. Bush?

6    A    I don't know.

7    Q    But from your conversation with Ms. Romney, that motivated

8    you then to meet with Nolon Bush?

9    A    Motivated me to call him.  Yes, ma'am.

10   Q    To call him?

11   A    Yes, ma'am.

12   Q    And what was it about -- can you recall what was it about

13   what she told you that made you interested in what Nolon was

14   offering?

15   A    Not in the exact words but --

16   Q    Just a sense --

17   A    -- I sort of remember the gist of what she told me.  That

18   she and -- and I don't know whether it was she personally or

19   others involved with World Contractual Services had -- were

20   involved with Mr. Bush and were happy with the results.

21   Q    Was there -- and this is probably my final question about

22   World Contractual Services.  Was that -- there was nothing

23   illegal about their services?  Is that --

24   A    As far as I know, no.

25   Q    So then you spoke with Mr. Bush over the phone?  That was

1    your first contact with him?

2    A    Yes, ma'am.

3    Q    And as I understand it he explained to you his

4    humanitarian efforts?

5    A    Yes, ma'am.

6    Q    And what he was doing in that regard?

7    A    Yes, ma'am.

8    Q    And that he had an investment program --

9    A    Yes, ma'am.

10    Q    -- of some sort?

11    A    Correct.

12    Q    And do I understand correctly that the investment program

13    and his charitable work were tied together?

14    A    Yes.  What I understood was the proceeds of the investment

15    program were funding the humanitarian program.  Yes, ma'am.

16    Q    After you talked to Nolon Bush the first time did you ask

17    him to send you any materials to look at?

18    A    No.

19    Q    Did you do any independent investigation after you spoke

20    with him?

21    A    Yes.  I don't remember exactly what I did.  I talked to

22    some other folks about -- I think I probably talked to

23    Ms. Romney again to see if maybe I could get some references

24    of folks who had dealt with Mr. Bush.  I don't remember today

25    whether I spoke with other people who had invested with

1    Mr. Bush or not.   That's what I generally would have done.

2    Q   I would imagine, and you probably being an attorney might

3    have something of what is in my mind, and that is I'm

4    wondering about what you did in terms of due diligence?

5    A   Well, that's what I did.   I tried to talk with other

6    folks.   And I think I did that, although I don't remember for

7    sure and I don't remember whom.   But I was interested in

8    finding out a little bit more before I invested.

9    Q   And just so the jury understands that we're all talking

10   about the same thing, due diligence -- explain to the jury

11   what you understand due diligence to mean.

12   A   Well, basically checking the facts to determine whether

13   what's being represented is accurate.

14   Q   And that's something --

15   A   In that context that's what I would regard as due

16   diligence.

17   Q   And that's something that a person should do before they

18   engage in an investment?

19   A   I guess that's up to the individual.   Yes, ma'am.

20   Q   Okay.   But I mean that's generally how the term is --

21   where it's linked to or how it's used; is that a fair

22   statement?

23   A   I don't know.   I don't know if I can answer that yes or no

24   in that context.   My experience with due diligence generally

25   has to do with one company buying another.   That sort of

1   thing.  Determining what are the assets and liabilities of

2   the company.  Are there any outstanding lawsuits?  That sort

3   of thing.  Again are the representations by the selling

4   company accurate?  Can we rely on the financial statements of

5   the company?  That's what I regard as due diligence.

6   Q    And I think that's what I'm thinking about in terms of

7   just a little bit different situation --

8   A    Yes, ma'am.  I would agree with that.

9   Q    Okay.  So but you don't remember exactly what you did back

10   then?

11   A    No, ma'am.  I don't.

12   Q    Okay.  Did you ask Mr. Bush for references?

13   A    I don't remember.

14   Q    And then as I understand it after you talked to him on the

15   telephone then you had a meeting with him?

16   A    Well, that's true.  Not before I sent him money.  But I

17   did meet with him later on several times.

18   Q    I was going to clarify that as well --

19   A    I'm sorry.

20   Q    No.  No.  It's all right.

21       If you met with him before or after you invested?

22   A    Yes, ma'am.  After.

23   Q    After?  Okay.

24       Now, my notes say that the first time that you met

25   Mr. Bush was in Coeur d'Alene, Idaho?

1    A    Correct.

2    Q    Does that sound right?

3    A    Yes, ma'am.  That's my memory.  Yes, ma'am.

4    Q    And do I understand right that that was at a World

5    Contractual Services meeting?

6    A    I don't know if it was sponsored by World Contractual

7    Services or some other entity.  But I do know that

8    representatives of the World Contractual Services were there.

9    I don't know for sure whether it was a World Contractual

10    Services meeting or they were just there as a presenter.  I

11    just don't remember that.

12    Q    Okay.  Was Mr. Bush the one that was putting -- that put

13    together the meeting or was he a presenter like World

14    Contractual Services might have been?

15    A    I don't know the answer to your question.  I'm not sure.

16    I don't think he -- I can give my opinion if that's what you

17    want.  But I don't know the facts.

18    Q    We can only ask -- I can only ask you for what your best

19    recollection is.

20    A    I don't know the answer to either one of those questions.

21    Q    All right.  But then you went on and you had a social

22    event with Nolon Bush and Rick Felton.  And your wife, of

23    course, was there as well?

24    A    No, ma'am.  My wife was not there.

25    Q    She wasn't at that meeting?

1  A    No, ma'am.

2  Q    Okay.  And it was through that -- your contacts with

3  Mr. Bush at Coeur d'Alene, Idaho that you decided to increase

4  your investment; is that right?

5  A    Correct.

6  Q    Other than receiving -- and I do recall you stating as

7  well that you received a $25,000 check from Mr. Bush at that

8  meeting?

9  A    Yes, ma'am.

10  Q    Other than receiving the check was there other information

11  that you had obtained about this investment that made you

12  feel that you were still investing in a solid, safe program?

13  A    No.  I took Mr. Bush at his word.  And as I said I believe

14  on direct, he had done what he said he would do.  He said

15  I'll pay you 25 percent a month.  Handed me a check for 25

16  percent of my investment about a month later.  So at that

17  point I was comfortable with it.

18  Q    And as I understand the program that he was talking to you

19  about in Coeur d'Alene was a program where if you invested

20  more than $1 million you would receive a 50 percent return?

21  A    I don't believe that's correct, ma'am.  The $1 million was

22  never stated as such that I had to put $1 million in it.  I

23  don't know what the total was.  I refer to it as a 1M

24  program.  I think that was Mr. Bush's term.  I think he had

25  to have at least a million to put together to go to New York

1    to do the deal.  But it was not a requirement that I put a

2    million dollars in.

3    Q    Okay.

4    A    I'm sorry if I didn't answer your question.

5    Q    No.  You're doing just fine.

6         I think I might be having my terminology a little mixed up

7    in terms of I am understanding that what he described to you

8    at that meeting was a level two?

9    A    Yes, ma'am.

10   Q    Does that sound right?

11   A    He referred to it as level two, correct.

12   Q    And that the return on a level two investment would be

13   about 50 percent?

14   A    Each.  Total return --

15   Q    Total return --

16   A    -- for the pooled money was supposed to be 100 percent a

17   month split 50/50.  So 50 percent to me.  50 percent to

18   Mr. Bush and his humanitarian efforts.

19   Q    At any point did that sound to you as too good to be true?

20   A    Well, in retrospect, of course.  But no at the time.  I

21   thought it sounded logical and reasonable.  And I had been

22   paid by him.

23   Q    Sure.  Okay.

24        Now, you started an LLC?  Legal Ops LLC?

25   A    Yes, ma'am.

1    Q    Was that started by you or was it started by somebody

2    working with Mr. Bush?

3    A    That was my company.    That's a Tennessee limited liability

4    company.

5    Q    Okay.    So we've had some testimony about other LLCs that

6    were started by folks working with --

7    A    Mr. Bush had nothing to do with Legal Ops.    That was

8    totally mine.

9    Q    Okay.    Did you ever meet a gentleman by the name of Nigel

10   Scott Grant?    Does that name sound familiar?

11   A    I think so.    I believe I -- and I don't remember the name

12   Nigel.    But I think I met someone named Scott Grant.

13   Q    His full name is Nigel Scott Grant.    But he's generally

14   known as Scott Grant.

15   A    Okay.

16   Q    I just wanted to make sure I gave you the entire name.

17   A    Thank you.    That's fine.

18   Q    What about Nicholas St. James who -- and I'll tell you he

19   is Mr. Grant's son.

20   A    I don't believe so.    No, ma'am.

21   Q    You never met him?    Okay.

22        Now, there came a point when you learned that the

23   money that -- the investment program that you were involved

24   in, the money was going to be moved offshore?

25   A    Correct.

1   Q   Is that right?

2   A   Yes.

3   Q   Did that raise any concerns for you?

4   A   No, not particularly.

5   Q   Now, at some point you learned that Mr. Bush was sending

6   money to a Carolyn Mintus; is that right?

7   A   Well, yes and no.  And the reason I say that is I didn't

8   see him give her any money.  I don't know that he sent her

9   any money.  He told me in the Bahamas that her name was

10  Carolyn.  I only learned much later that her last name was

11  Mintus.  When I was dealing with him, Mr. Bush, I never heard

12  the term Mintus.  The name Mintus.  I'm sorry.  He told me he

13  sent money to the trader in New York.  And later he told me

14  her name was Carolyn.  That's basically what I know.

15  Q   Okay.  In one of your letters that you wrote you made

16  mention of a delay from the bank.  Do you recall that?

17  A   Not specifically.  But I'll be happy to look back at the

18  letters.

19  Q   And I thought I had it written down so I wouldn't --

20  A   Is that the one where I said -- here it is.  It's my

21  March 2nd letter.  I believe Exhibit No. 2032.

22  Q   2032.

23  A   This may be what you're referring to?

24  Q   Yes.  Yes, it is.  It's the last line there at that first

25  paragraph where it says, "Not having heard from you I assume

1    the bank to not come through again"?

2    A    Yes, ma'am.

3    Q    Is that the bank that Carolyn Mintus was involved in, do

4    you know?

5    A    I don't know.  It's the bank that -- Nolon told me that

6    our money was in that bank.  And he and Ms. Mintus -- I now

7    know her name, I didn't then -- but the trader and his name

8    were signatories on that bank account.  And that was the bank

9    that was involved in the mid-term note trade.  So that's what

10   I mean by the bank didn't come through.

11   Q    Mr. Velander, did you get to be good friends with Nolon

12   Bush?

13   A    I'd say we were friends.  Yeah, I'd say we were friends.

14   I think I testified about he was coming to Nashville.  I

15   lived in Memphis.  I'd come over and meet him for lunch.  I

16   did.  I took him to the airport.

17   Q    You had a lot of telephone conversations as well?

18   A    Many, many, many.  Yes ma'am.

19   Q    Thank you.

20            MS. OLSON:  I have no further questions.

21            MR. STORM:  I have no further questions, Your Honor.

22            THE COURT:  Mr. Velander, you're excused.  Thank you,

23   very much, sir.

24            THE WITNESS:  Thank you, Your Honor.

25            MR. LETEY:  Your Honor, the government calls Ken

1    Marshall.

2         THE COURT:   Mr. Marshall, if you'll come to the

3    lectern there.   Stand in front of the microphone.   Wait just

4    a second.

5       If you'd raise your right hand now, sir.

6                         KEN MARSHALL

7       The witness, after being duly sworn, testified as follows:

8         THE COURT:   Mr. Marshall, if you would come to the

9    witness stand to my left.   Please keep the volume of your

10   voice up so people in the courtroom can hear you.   Speak

11   slowly enough so the court reporter can keep up with you.

12        THE WITNESS:   Okay.

13                    DIRECT EXAMINATION

14   BY MR. LETEY:

15   Q   Mr. Marshall, state your full name and spell your last

16   name for the record.

17   A   Kenneth J. Marshall.   M-A-R-S-H-A-L-L.

18   Q   And just a little bit of background information.   How old

19   are you?

20   A   50 now.

21   Q   And where do you currently live?

22   A   St. Louis, Missouri.

23   Q   And how far did you go in school?

24   A   Sophomore in college.

25   Q   And what do you do for a living?

1    A    I own a landscape business.

2    Q    And how long have you done that?

3    A    On my own now for about eight years.  And previously with

4    my brother for 21.

5    Q    Do you know a man named Jerry Martin?

6    A    Yes, I do.

7    Q    Where do you know him from?

8    A    He was the one who initially introduced the opportunity

9    for an investment with my -- with -- with a business partner

10   of mine in Branson, Missouri.

11   Q    Did Mr. Martin introduce you to Rick Felton?

12   A    Yes.

13   Q    Why did you first talk to Mr. -- when did you first talk

14   to Mr. Felton?

15   A    That would have been about January of 2000.

16   Q    Was that on the phone?

17   A    Yes.

18   Q    Who was on that call?

19   A    Jerry Martin, Rick Felton, and me.  Ken Marshall.  He

20   introduced me to the gentleman.

21   Q    Did Mr. Felton talk about the investment opportunity?

22   A    Yes.

23   Q    And what did he say the investment was in?

24   A    It was in a foundation.  And that the opportunity was we

25   can make a monthly profit on the investment with -- with a

1    foundation.  It was vague the first -- because it was a few

2    calls afterwards.  It was just kind of an initial call.  The

3    first one in early January.

4    Q    So were there were subsequent phone calls?

5    A    Yes.

6    Q    And during those phone calls did Mr. Felton explain more

7    about the investment?

8    A    Yes.

9        I also got some paperwork from Mr. Hobbs explaining how

10    the trading program, which he went into in more detail, how

11    it worked and how this investment -- how they could make

12    these returns.  So he sent me some information.

13    Q    And not regarding the information you got from Mr. Hobbs,

14    but did Mr. Felton tell you more about the investment?

15    A    Yes.  He explained it to me after he told the gentleman to

16    send me the information.  He went over it over the phone

17    initially in January of 2000.

18    Q    Did Mr. Felton tell what you type of returns you could

19    receive on your investment?

20    A    Yes.

21    Q    What did he say?

22    A    In the 10 to 50 percent range depending on, you know, your

23    initial investment.

24    Q    10 to 15 per --

25    A    Per month.  I'm sorry.

1   Q   Depending on the size of your investment?

2   A   Yes.

3   Q   Can you explain more?

4   A   Starting at 100,000 up to a million or more.  500,000 was

5   25 percent and will be paid monthly after a 30-day period of

6   money being earned.

7   Q   You said that 10 to 50 percent and $500,000 being 25

8   percent.  What was the return if you invested $100,000?

9   A   About 10 percent.

10  Q   And 50 percent?  How much would you have to invest to

11  receive the 50 percent?

12  A   One million.

13  Q   And how frequently would you receive payment?

14  A   On a monthly basis at 50 percent.

15  Q   In February of 2000 did you make a trip to Spokane,

16  Washington?

17  A   Yes, I did.

18  Q   And why did you make that trip?

19  A   In order to pursue the investment opportunity.  I wanted

20  to meet Mr. Felton.  And he introduced me to another

21  gentleman name Dennis Cluver who ultimately became my partner

22  from Spokane.  And I wanted to go over the investment

23  opportunity in person and I wanted to meet some people who

24  were in the investment.

25  Q   Did you have dinner that first night you were in town?

1    A    Yes, we did.

2    Q    And who did you have dinner with?

3    A    Rick Felton and his wife.  Dennis Cluver and his wife.

4    And Jerry Martin.  And me.  And Mark Chamberlain, the

5    gentleman -- my business partner out of the Branson also came

6    up with us.

7    Q    Did Mr. Felton talk about the investment at that dinner?

8    A    All evening long.

9    Q    Did he say anything more about the investment that he

10   hadn't about talked already?

11   A    Explained it thoroughly.  He gave me a piece of paperwork.

12   He drew diagrams and specifically planned out how we could

13   make this money.  How we could do it, you know, by bundling

14   moneys together in a trading program.

15   Q    Trading program.  What was the trading program?

16   A    The trading program was the essence of this where you put

17   bundles of money together in 10 million or more increments to

18   take a leverage and make these tremendous returns.  That's

19   how you're able to make these returns.  That was in the stuff

20   that was faxed over to me by one of Felton's associates.

21   That was Mr. Hobbs, Felton's associate, in January of 2000 to

22   go through it and explain exactly how these returns could be

23   made.

24   Q    Did you meet with some other people the next day?

25   A    Yes.

1    Q    Who did you meet with?

2    A    Dennis Cluver, who is of Spokane, Washington, and

3    eventually my partner in this introduced me to four or five

4    people in Global Prosperity, which were smaller investors.

5    They showed me their balance sheets they had as far as making

6    their monthly statements.  And they -- a couple of them had

7    actually got some money back from Global Prosperity when they

8    asked for some money back.

9    Q    Could you turn to folder Exhibit No. 4086?  Would you

10   briefly describe this?

11   A    This is Global Dominion Financial Services.  This is

12   the -- what I needed to fill out in order to be an investment

13   partner with Global.  And I received this in --

14   Q    Let me stop you right there.

15           MR. LETEY:  Your Honor, we offer Exhibit No. 4086.

16           MS. OLSON:  No objection.

17           THE COURT:  4086 is admitted.

18               (Exhibit No. 4086 admitted.)

19   BY MR. LETEY:

20   Q    And I think you were about ready to tell you where us

21   received this?

22   A    At the meeting with Mr. Felton that first evening.

23   Q    Could you turn to Exhibit No. 4087 and just briefly

24   describe what 4087 is?

25   A    This is the LLC, which in order to get into the program I

1    needed to set up an LLC through GDFS.

2    Q    Let me stop you right there.

3         MR. LETEY:    Your Honor, we offer Exhibit No. 4087.

4         MS. OLSON:    No objection.

5         THE COURT:    4087 is admitted.

6              (Exhibit No. 4087 admitted.)

7    BY MR. LETEY:

8    Q    And still looking at 4087.    When is this dated?

9    A    2/4/00.

10   Q    And how much is -- how much is it for?

11   A    $1,350.

12   Q    And what is this $1,350 for?

13   A    I needed to set this up in order to invest in GDFS before

14   our large portion we had -- this was a prerequisite that I

15   had to do.

16   Q    Before you made this large investment did you talk with

17   Mr. Bush on the phone?

18   A    After this -- after returning home after this meeting

19   Mr. Felton got me on phone with Mr. Bush towards end of

20   February.    This was the first time I talked to Mr. Bush on a

21   three-way conversation.

22   Q    And when was this?

23   A    The end of February.

24   Q    And you said it was a three-way conversation.    Who was on

25   that phone call?

1  A    Mr. Felton.

2  Q    And?

3  A    Mr. Bush.

4  Q    And yourself?

5  A    Yes.

6  Q    What did Mr. Bush tell you about the investment on that

7  phone call?

8  A    The opportunity to invest in the foundation based on the

9  San Quintin project.  He's a humanitarian.  And it would be

10  sharing in the profits from my investment in order to fund

11  the San Quintin project.

12  Q    Did Mr. Bush tell you what type of returns you could

13  expect on your investment?

14  A    I can't remember at that -- the first time.  But I was

15  told by Mr. Felton and I knew going in what the numbers were.

16  What the numbers were.

17  Q    So you didn't talk about it on that phone call then?

18  A    Possibly on that one.

19  Q    Did you tell Mr. Bush that you were thinking about

20  investing?

21  A    Absolutely.  That's the only reason I was able to talk to

22  him.  And the amount.

23  Q    Did you tell him how much you were thinking about

24  investing?

25  A    Yes.

1    Q    And what did you say?

2    A    I told him we were thinking about 500,000 to the 1M, you

3    know, and that I had a partner to get to that level.

4    Q    What is 1M?

5    A    One million.

6    Q    Did you tell him that you wanted to meet in person?

7    A    Yes.

8    Q    And what did he say?

9    A    That would be great.  Come on out.

10   Q    Did you take him up on that?

11   A    Oh, yes.

12   Q    When did you meet with him in person?

13   A    March of 2000.  I flew up with Mr. Chamberlain to Seattle.

14   And Mr. Felton met us there.  Picked us up.

15   Q    There at?

16   A    At the airport.  Took us over the ferry and took us to his

17   compound.

18   Q    Could you describe the property?

19   A    Many acres.  It has a golf course around the outside.  I

20   am a big golfer.  And a little nine hole golf course with a

21   spread of winding -- he was under construction at that time,

22   too, adding on to this property.  And there was quite a few

23   rooms or -- you know, one it was like that was -- it was a

24   long house and it had a board room.

25   Q    Did you guys have a meeting there?

1   A   Yes.

2   Q   Okay.  Did you guys have more than one meeting while you

3   were there?

4   A   I was there most of the day.  Initially, he was busy in

5   the morning.  So Mr. Felton took me around.  We played the

6   golf course and then came inside.  They gave me the tour.

7   Mr. Felton.  And then the -- I met Marilyn, Lorelei, and

8   Patty inside.  And then Mr. Bush came in.  And in the

9   conference room is where I met him the first time.

10  Q   And what did you talk about?

11  A   Initially, you know -- initially, it was, you know, I was

12  telling him -- he was asking me about the investment.  What I

13  was thinking.  And he was explaining on the board -- on the

14  side board is the San Quintin project.  What he's about.

15  This was all about the San Quintin project.  The investment.

16  You know, what he was -- his profits were going to.  The

17  foundation.  And so he showed me the beautiful drafts of all

18  the project would be.  And then on the wall is where he

19  pointed out in the Baja where it was to be located.

20  Q   Did you discuss anything else in that meeting?

21  A   Yes.  Yes.  We discussed the investment after lunch.  We

22  stayed for lunch.  They made us lunch.  And then we got into

23  the investment part in the afternoon after lunch.

24  Q   And what did Mr. Bush tell you about the investment?

25  A   That, you know, the return -- you know, we were at the

1    100,000 level or we could -- no more than a hundred -- no

2    less than 100,000 up to, you know, a million or more.  And

3    the different levels.  And explained that, you know, on these

4    returns half of this would be going to the From the Heart

5    Foundation.  The San Quintin project.

6    Q    You said the different levels.  Could you explain what you

7    mean by that?

8    A    The 100,000 level is 10 percent at a time.  The 500,000

9    level was 25.  And the 1 million was 50 percent a month.  At

10   that time I was --

11   Q    Well, let me stop you there.

12        You said 10, 25, and 50.  And what do those numbers

13   represent?

14   A    The return per month on your investment --

15   Q    Okay.

16   A    -- that I would get.

17   Q    Did he explain how you would get returns on your

18   investment paid?

19   A    Yes.  Well, with the trading program.  With the

20   background, Mr. Felton and how -- you know, he gave me the

21   paperwork how it proceeded and how it worked to show how

22   these returns could be accumulated and we'd be paid.  And

23   then he explained we'd be paid after we put our money in.

24   After a 30-day period -- we could start getting our money

25   back after the 30-day period was up next month.

1  Q    Okay.  Did Mr. Bush talk about any failed investments he

2  had ever made?

3  A    No, sir.

4  Q    So did you decide to become a $1 million investor?

5  A    I didn't have that much.  That's why I asked him on the

6  specifics on the levels.  I had Mr. Cluver, who was already

7  in Global Prosperity, which was the five $10,000 people from

8  the year before.  Met many of his friends and people.  Very

9  happy people.  People got some money back.  And also

10 Mr. Felton invested I believe three-quarters of a million --

11 Q    Let's stick with --

12 A    Okay.

13 Q    I guess when he asked if you'd become a $1 million

14 investor, you said you didn't have the money so -- but did

15 you get other investors then?

16 A    Yes.

17 Q    Who were those investors?

18 A    Mr. Dennis Cluver from Spokane and two friends from

19 St. Louis.

20 Q    Friends of yours?

21 A    Yes.

22 Q    And so how much of this 1 million did you contribute?

23 A    550,000.

24 Q    And how much did Mr. Cluver contribute?

25 A    250,000.

1    Q    And so that's 200,000 from your friends?

2    A    Correct.

3    Q    So did you invest all this money at once?

4    A    We had -- we didn't have it all together on -- by April 15

5    when he kind of said was the break.  He wanted it by the

6    middle of April and -- if we were going to do that level.  I

7    said we only had 800,000 at the time.  He said go ahead and

8    send it.  And then when you get the 200,000 cleared from some

9    investments we had to get cleared you can go ahead and send

10   that.  And then starting the next month then we'd be credited

11   with the $1 million level starting in May and receive -- and

12   then in June start getting our money.

13   Q    Could you turn to Exhibit No. 4089?  Could you just

14   briefly describe this?

15   A    That's the first transaction.  The first amount on April

16   15.

17            MR. LETEY:  Your Honor, we offer Exhibit 4089.

18            MS. OLSON:  May I inquire, Your Honor?

19            THE COURT:  You may.

20                    VOIR DIRE EXAMINATION

21   BY MS. OLSON:

22   Q    Mr. Marshall, what's the writing at the bottom of the

23   page?

24   A    That's the international airbill.  Federal Express.  The

25   company -- I wanted to make sure on some of the -- I believe

1    that might have been attached to one of the earlier ones

2    where I needed to send it overnight.  The paperwork overnight

3    to Global Dominion Financial Services.  So I wanted to make

4    sure I got the paperwork right.  And I might have scribbled

5    some stuff down there.

6    Q    And what is the writing that appears to be scratched off?

7    A    200,000 -- oh, 800,000 Tennessee and then $200,000.  This

8    was a note I was sending him to be sent before instructions

9    of the looks like director.  Please send confirmation to

10    this -- since I didn't have it all, we had -- I didn't have

11    all the million at one time.  I just had 800,000.  I was

12    sending him a note.  And I guess I faxed it over to him and

13    then I --

14    Q    Then you scratched it off later?

15    A    I scratched -- I guess I scratched it off, yeah, because I

16    didn't have all the million.  We started with 800,000.

17    Q    And this is all your handwriting?

18    A    Yes.

19    Q    And all your doing?

20    A    Yes.

21    Q    Thank you.

22           MS. OLSON:  I have no objection.

23           THE COURT:  Exhibit No. 4089 is admitted.

24                  (Exhibit No. 4089 admitted.)

25                  DIRECT EXAMINATION (continued)

1    BY MR. LETEY:

2    Q    And how much does it show -- the wire instructions, how

3    much money?

4    A    800,000 and -- 800,589 I believe is the -- was the

5    total -- 548.  It is 548.  800,548.  That was the code.

6    Q    Could you now turn to Exhibit No. 4088 and just briefly

7    describe this exhibit?

8    A    Basically the same -- I guess I wrote on them basically at

9    the same time for Mr. --

10    Q    Well, just --

11    A    I'm sorry.

12    Q    Could you just identify the exhibit?

13    A    A wire transfer instruction for the 200,000 balance.

14         MR. LETEY:   Your Honor, we offer Exhibit No. 4088.

15         MS. OLSON:   No objection.

16         THE COURT:   4088 is admitted.

17              (Exhibit No. 4088 admitted.)

18    BY MR. LETEY:

19    Q    And it looks like -- I take it you were starting to say

20    that writing on bottom is the same?

21    A    Yes.

22    Q    And how much is this wire instruction for?

23    A    200,000.

24    Q    And is it an even 200?

25    A    Yes.   The 548, wasn't that a code I believe?  I don't

1   recall.  It was total of one million and then a -- a total of
2   one million was sent in April.
3   Q   And you said April.  April of what year?
4   A   2000.  April 27, 2000.
5   Q   So are both of these wires in April of 2000?
6   A   Yes.
7   Q   Based upon when you invested, when should you have started
8   receiving your first payment of returns?
9   A   First week of June.
10  Q   And did you receive that payment?
11  A   No, sir.
12  Q   How about in July?  Did you get a return for that
13  investment then?
14  A   No, sir.
15  Q   Did Mr. Bush ever tell you why you weren't getting paid?
16  A   There was some glitches.  Some problems.  Some delays.
17  Early on I was just talking to Mr. Felton.  I would call the
18  office --
19  Q   I asked about Mr. Bush.  Mr. Bush?
20  A   I couldn't get a response.
21  Q   Did you eventually get about $30,000 back?
22  A   Yes, sir.
23  Q   Is that all of the money that you got back out of your $1
24  million investment?
25  A   Yes.

1   Q   Is Mr. Bush in the courtroom today?

2   A   I'm sorry?

3   Q   Is Mr. Bush in the courtroom today?

4   A   Yes, sir.

5   Q   Could you identify him for the Court?

6   A   The gentleman with the white hair, blue shirt.

7           THE COURT:   Let the record reflect that Mr. Marshall

8   identified Mr. Bush.

9           MR. LETEY:   I have no more questions, Your Honor.

10                        CROSS-EXAMINATION

11  BY MS. OLSON:

12  Q   Mr. Marshall, you first heard about this program through

13  Global Prosperity; is that right?

14  A   Yes, ma'am.

15  Q   Were you a member of that?

16  A   No.

17  Q   Was somebody else a member of that?  And who is that

18  person?

19  A   Jerry Martin.

20  Q   When Mr. Bush was discussing his San Quintin project, do

21  you recall that when you were visiting in Port Orchard?

22  A   Yes.

23  Q   Did he discuss with you the part of that project that was

24  going to benefit poor Mexican people?

25  A   Yes.  It was about the foundation, you know.  He always

1    stressed about the foundation, you know.  You make an

2    investment in yourself and about the foundation.

3    Q    The foundation was for charitable purposes; is that right?

4    A    Correct.

5    Q    And the project in Mexico was going to provide jobs and

6    services for Mexican people; did you understand that?

7    A    I did not understand that, no.

8    Q    But you understood that it had some -- it was going to

9    give benefit to people in Mexico as well as be a resort?

10   A    It was more about the resort.  Yeah, that was about the

11   resort.

12   Q    And was the resort going to have a connection to the

13   foundation?

14   A    He connected it.  You know, he connected it.  But mine was

15   about the investment.  Mine was about the investment.

16   Q    I understand that.  I understand that.  And that was the

17   reason why you were involved was --

18   A    That's the reason.  Yes.

19   Q    Now, the work that you did on -- and in talking to people

20   and meeting with people before you invested, did you consider

21   that, Mr. Marshall, to be due diligence?

22   A    I started in January of 1999 and didn't put my money in

23   until April.  Yes, ma'am.  I talked to many people.  All the

24   people I talked to had either put money in.  Gotten money

25   back.  Had all the sheets.  All the statements, you know.

1    Yes.

2    Q    Thank you.

3            MS. OLSON:    I have no further questions.

4            MR. LETEY:    I have no more questions, Your Honor.

5            THE COURT:    Mr. Marshall, you're excused.    Thank you,

6    very much, sir.

7            MR. STORM:    Your Honor, the government calls Edward

8    Wallace.

9            THE COURT:    Mr. Wallace, if you would come forward to

10   the lectern here.    Stand by the microphone.    Raise your right

11   hand and be sworn, sir.

12                        EDWARD WALLACE

13     The witness, after being duly sworn, testified as follows:

14           THE COURT:    Please be seated at the witness stand

15   immediately to my left.    Please keep the volume of your voice

16   up so people in the courtroom can hear you.    And speak slowly

17   enough so the court reporter can keep up with you.

18                        DIRECT EXAMINATION

19   BY MR. STORM:

20   Q    Mr. Wallace, can you state your full name and spell your

21   last name for the record, please.

22   A    Edward Arthur Wallace.    W-A-L-L-A-C-E.

23   Q    And how old are you?

24   A    I'm 38 years old.

25   Q    How far did you go in school?

1   A   A bachelor of science.  Arizona State University.

2  Graduated.

3   Q   And what city do you live in?

4   A   I live in Tacoma, Washington.

5   Q   And how are you employed?

6   A   I own Destination Harley-Davidson in Tacoma right down the

7  road in Fife.

8   Q   How long have you owned that?

9   A   I have owned it, well, technically since 2004.  I've been

10  part of ownership since 1995.

11   Q   How about your dad?  What did your dad do?

12   A   Well, he owned -- he bought the dealership.  And I'm

13  buying it off of him.  Almost done.  And prior to that ran

14  Kenworth Motor Truck company for PACCAR.

15   Q   And when did your dad buy the Destination Harley?

16   A   1995.

17   Q   Let me have you look at Exhibit No. 13003, please.  And

18  just in general what is that document?

19   A   It's a bill of sale.

20         MR. STORM:  Your Honor, offer 13003.

21         MS. OLSON:  No objection.

22         THE COURT:  13003 is admitted.

23            (Exhibit No. 13003 admitted.)

24  BY MR. STORM:

25   Q   Mr. Wallace, I would like you to walk us through this bill

1    of sale if you would.  First, up in the far left-hand corner

2    it says Destination Harley?

3    A    Uh-huh (affirmative).

4    Q    Is that your dad's Harley shop?

5    A    Yeah.  That's my dad's Harley shop.  That was our logo.

6    Q    And there's two addresses on there.  One for Tacoma and

7    one for Silverdale.  Where is this particular shop?

8    A    This shop is the Tacoma shop at 2302 Pacific Highway East.

9    Q    Okay.  And what's the date on this bill of sale?

10    A    It's March 23, 2000.

11    Q    And who is the purchaser?

12    A    Global Dominion Financial Services.

13    Q    And the address of that purchaser?

14    A    Temple Building, Suite 10, Charlestown, Nevis.

15    Q    And what kind of item is being purchased from Destination

16    Harley?

17    A    This is a 2000 Harley-Davidson Ultra Classic, which is the

18    nickname for the model denoted there.  FLHTCI.

19    Q    And what's the base price on it?

20    A    It's $20,000.

21    Q    And next to accessories there's another figure.  What's

22    that say?

23    A    That's $4,337.60.

24    Q    And can you tell from this bill of sale what the

25    accessories are that are being purchased for $4,000?

1   A   Yeah.   There is basically some engine work and some

2   additional accessories.   Most people that buy these

3   motorcycles, they trick them out a little bit.   And so this

4   has a 1550 stage one kit, which means the motor was made

5   bigger and more powerful.   There is rider back rest.   There's

6   cover for long-term storage.   There is some Electra Glo light

7   rail.   An accessory harness.   And actually this bill of sale

8   doesn't state all the items that encompasses that $4,337.60.

9   But I'm sure there was quite a bit more.

10  Q   So the total price on that Harley Davidson is 24,000?

11  A   $24,337.60.

12  Q   Okay.   And can you tell how that was -- that $24,000 was

13  paid for?

14  A   Two checks.   One in the lower right-hand corner.   One for

15  $18,000 and one for the balance.   $7,192.18 or so.

16  Q   So was it paid for --

17  A   60 cents.   Sorry.

18  Q   -- in cash?

19  A   Essentially.

20  Q   With two checks?

21  A   Yeah.

22  Q   And the balance due and owing?

23  A   Zero.

24  Q   Whose signature is this in the bottom left-hand corner?

25  A   Bottom left corner, that's my younger sister Christy.

1   Christy Wallace.

2   Q   And what date did she sign it?

3   A   March 24, 2000.

4   Q   Can you tell whose signature in the right-hand corner?

5   A   In the right-hand corner it looks like a Charles Nolon

6   Bush.

7   Q   Thank you, sir.

8        MR. STORM:   I have no further questions.

9                    CROSS-EXAMINATION

10  BY MS. OLSON:

11  Q   Good afternoon, Mr. Wallace.

12  A   Good afternoon.

13  Q   Do I understand in 2000 your father was running the shop?

14  A   Correct.

15  Q   Were you there at all?

16  A   No.  I was running a different dealership in Tigard,

17  Oregon.  I'd spend a couple days a month in the shop.

18  Q   Do you think you were there at the time, the date of this

19  invoice in March of 2000?

20  A   No.

21  Q   Okay.  Did your father donate things to auctions for

22  charity?

23  A   Yes.

24  Q   Did he do that a lot?

25  A   A fair amount.

1    Q    Do you think he donated this motor bike to a charity?

2    A    I do.

3    Q    And that the motor bike was bid on and purchased at the

4    charity --

5    A    Yeah.

6    Q    -- during an auction?

7    A    Right.  And it was a minimum bid.  So that might need to

8    be explained.

9    Q    Please.  Would you explain that?

10    A    Yeah.  Actually, a different motorcycle was donated to

11    DAWN, Domestic Abuse Women's Network.  The original

12    motorcycle was an $18,000 Road King FLHR.  And that bike

13    apparently, if I can finish the story -- yeah, go ahead.

14    Apparently, that bike was purchased at the auction because

15    DAWN went ahead and forwarded us the minimum bid amount on

16    that bike.  And then the people or person that purchased this

17    motorcycle paid the difference to move up from the Road King

18    to the Ultra Classic and then added accessories to it.

19         And so of the two checks we received, one was from DAWN.

20    Our assumption being that DAWN received money they needed to

21    for the bike and the second one was a cashier's check.

22    Q    So how much of the 18 -- the initial 18,000 do you

23    think -- would you have expected that DAWN would have

24    received?

25    A    I would expect that they would have received at least that

1   and I would imagine money above because the idea behind

2   offering a minimum bid product is that it's really worth more

3   than 18.   We provide it to the auction at a value.   Hopefully

4   somebody bids really what it's -- more what it's worth and

5   then the auction makes a little bit of money.

6   Q    Okay.   All right.   But the auction is going to repay you,

7   the shop, the minimum bid of 18,000?

8   A    Yeah.   The minimum amount.   Correct.

9   Q    And keep the rest as their --

10   A    Yeah.   That's the idea.   Their profit.

11   Q    Okay.   Thank you.

12          MS. OLSON:   I don't have any further questions.

13                      REDIRECT EXAMINATION

14   BY MR. STORM:

15   Q    Mr. Wallace, just to make sure I understand, the purchaser

16   in this case, Charles Nolon Bush, paid $24,000 for the bike;

17   is that correct?

18   A    Well, what I know for sure is that I received a check for

19   $18,000 from DAWN plus the difference.   But DAWN wants to

20   call us and authorized us to release the bike to Charles

21   Nolon Bush.   So I would assume that that's because he's the

22   one who bought the bike at auction for at least $18,000.

23   Probably more.

24   Q    And then added another six grand?

25   A    Yeah.   Well, he bid two grand to have the bike he wanted

1    and then added another $4,337.   Yeah.

2    Q    Thank you.

3         MS. OLSON:   No further questions.   Thank you, Your

4    Honor.

5         THE COURT:   Mr. Wallace, you're excused.   Thank you,

6    very much.

7         THE WITNESS:   Thank you.

8         THE COURT:   We're going to take a short afternoon

9    break.   We're going to break at 3:45, as I told you.   But

10   we'll split the time in half.   We'll take about a 10-minute

11   break to give you a rest.   And if you'd return to the jury

12   room, we'll be back here in 10 minutes.

13        (Jury exits the courtroom.)

14        THE COURT:   Okay.   Anything we need to take up at

15   this time?

16        MR. STORM:   No, Your Honor.

17        MS. OLSON:   No, Your Honor.

18        THE COURT:   Court in recess.

19                    (Short recess taken)

20        HE COURT:   Ready for the jury?

21        MR. STORM:   We are, Your Honor.

22        (Jury enters the courtroom.)

23        THE COURT:   All right.   Please be seated.

24   The government may call its next witness.

25        MR. LETEY:   Your Honor, the government calls Robert

1    Shaw.

2         THE COURT:   Mr. Shaw, if you would come forward to

3    the lectern.   Stand in front of the microphone.   Raise your

4    right hand and be sworn, sir.

5                        ROBERT SHAW

6    The witness, after being duly sworn, testified as follows:

7         THE COURT:   Please be seated in the witness chair

8    immediately to my left.   Please keep the volume of your voice

9    up so people in the courtroom can hear you.   And speak slowly

10    enough so the court reporter can keep up with you.

11                     DIRECT EXAMINATION

12    BY MR. LETEY:

13    Q    Mr. Shaw, please state your full name and spell your last

14    name for the record.

15    A    Robert A. Shaw.   S-H-A-W.

16    Q    And where do you live?

17    A    Goodlettsville, Tennessee.

18    Q    And how far did you did you go in school?

19    A    Lipscomb University.   A bachelor's degree.

20    Q    And what do you do for a living?

21    A    I'm a general contractor.

22    Q    Do you have a business?

23    A    Yes.   McPherson Shaw, Incorporated in Nashville,

24    Tennessee.

25    Q    Did your company develop a real estate project called

1    Windermere in Hendersonville, Tennessee?

2    A    Yes, it did.

3    Q    Did you sell one of the units in that development to Nolon

4    Bush?

5    A    I did a lease purchase agreement.

6    Q    Did you meet with Mr. Bush before this lease purchase

7    agreement?

8    A    Yes.

9    Q    And where did you meet at?

10    A    At the property.   The address was 31 Windermere,

11    Hendersonville, Tennessee.

12    Q    Did Mr. Bush say why he was looking for a house?

13    A    He wanted to buy a residence for his ex-wife and his

14    daughter.

15    Q    What type of financing was Mr. Bush looking for?

16    A    He didn't mention any kind of financing to me.   He wanted

17    to do a lease purchase because he told me he didn't have the

18    funds on the front end and would have them later.   Six, eight

19    months or a year down the road.   And so we entered into a

20    lease purchase agreement.

21    Q    I will need to you explain a lease purchase.   What I

22    referred to was financing.   Would you explain what a lease

23    purchase is?

24    A    Yes.   A lease purchase agreement was set up with $3,000

25    each month.   2,000 going to basically rent and then 1,000

1    going towards principal purchase at the end of the lease

2    purchase agreement if all other conditions of the agreement

3    were met.

4    Q    Could you turn to Exhibit No. 12012?  It should be that

5    exhibit right there.   And it might not be the first one.

6    A    Which one?

7    Q    12012.

8    A    Okay.

9    Q    Could you briefly describe this?

10   A    This is the lease with option to purchase rental agreement

11   that I referred to earlier as a lease purchase option.

12   Q    I will stop you there.

13            MR. LETEY:   Your Honor, we offer Exhibit No. 12012.

14            MS. OLSON:   No objection.

15            THE COURT:   Exhibit No. 12012 is admitted.

16                 (Exhibit No. 12012 admitted.)

17   BY MR. LETEY:

18   Q    Would you explain to us what this is?

19   A    This is just the agreement we spoke of earlier that

20   outlines a rent of $2,000 a month with 1,000 per month going

21   to the principal purchase amount.   And Mr. Bush had up to

22   three years to exercise the purchase agreement phase of this

23   contract.

24   Q    And if you could turn to the last page of this exhibit.

25   And is that your signature on the left?

1    A    Yes, it is.

2    Q    And whose signature is that on the right?

3    A    I don't know the gentleman's name.  Mr. Bush said that he

4    wanted to keep this contractual agreement separate from his

5    other business dealings and he wanted to do the lease

6    purchase in the form of a foundation and that this person

7    handled his affairs in that foundation.  I never met this

8    person and I don't who it is.

9    Q    Would you turn to Exhibit No. 12013?  Could you just

10   briefly describe what this exhibit is?

11   A    This is the second part of the agreement.  The contract to

12   purchase 31 Windermere if Mr. Bush so chose to do that in

13   that three-year period option of the lease purchase

14   agreement.

15           MR. LETEY:   Your Honor, we offer Exhibit No. 12013.

16           MS. OLSON:   No objection.

17           THE COURT:   12013 is admitted.

18               (Exhibit No. 12013 admitted.)

19   BY MR. LETEY:

20   Q    What is this document called?

21   A    Earnest money contract.

22   Q    And when is it dated?

23   A    7/26/99.

24   Q    And is that the same date as the exhibit we were just on

25   before?  12012?

1    A    It is.

2    Q    And could you turn to the fourth page of this document?

3    Is that your signature on the left?

4    A    It is.

5    Q    And again the signature on the right?

6    A    It's the exact same signature on the lease purchase

7    agreement.

8    Q    Would you turn to Exhibit No. 12017?  Would you just

9    briefly describe this exhibit?

10   A    These were the two checks that were cut to McPherson Shaw,

11   my company at the time that the agreement was signed and

12   agreed to --

13   Q    That's sufficient for now.

14        MR. LETEY:    Your Honor, we offer Exhibit No. 12017.

15        MS. OLSON:    No objection.

16        THE COURT:    12017 is admitted.

17             (Exhibit No. 12017 admitted.)

18   BY MR. LETEY:

19   Q    And what is the $20,000 for?

20   A    It was an earnest money down payment for the lease

21   purchase.

22   Q    And the $3,000?

23   A    That was the first month's payment.

24   Q    Would you turn to Exhibit No. 12018?  And could you

25   briefly describe this exhibit?

1    A    This is the payment for the first year of the lease

2    purchase agreement.

3              MR. LETEY:   Your Honor, we offer Exhibit No. 12018.

4              MS. OLSON:   No objection.

5              THE COURT:   12018 is admitted.

6                   (Exhibit No. 12018 admitted.)

7    BY MR. LETEY:

8    Q    And who is that check made out to?

9    A    McPherson Shaw, Incorporated.   Our company.

10   Q    Would you turn to Exhibit No. 12009?   Would you briefly

11   describe this exhibit?

12   A    This is the photo of the entrance to the neighborhood in

13   Hendersonville, Tennessee Windermere of which the unit we

14   were just speaking of is a house in.

15   Q    Does it accurately reflect what it looked like at the time

16   of the purchase?

17   A    It does.

18              MR. LETEY:   Your Honor, we offer Exhibit No. 12009.

19              MS. OLSON:   No objection.

20              THE COURT:   12009 is admitted.

21                   (Exhibit No. 12009 admitted.)

22   BY MR. LETEY:

23   Q    And now could you just explain what this is now that

24   everybody has seen it?

25   A    Okay.   This is just the entrance gate to the condominium

1   development Windermere of which the unit 31 was purchased.

2   Q   Could you turn to Exhibit No. 12010 and 12011?  Could you

3   just generally describe those exhibits?

4   A   This is the front elevation photo of the unit that we were

5   just speaking of.  Unit 31 Windermere that was purchased.

6   Q   Are both of those the same?

7   A   They are.  One of them shows the entire building.  One of

8   them is just focused in on the actual unit itself.

9   Q   Does it accurately reflect the conditions of the property?

10  A   It does.

11       MR. LETEY:   Your Honor, we offer Exhibit Nos. 12010

12  and 12011.

13       MS. OLSON:   No objection.

14       THE COURT:   12010 and 12011 are both admitted.

15       (Exhibit Nos. 12010, 12011 admitted.)

16  BY MR. LETEY:

17  Q   And looking at 12010, which unit is it?

18  A   It's the center unit.  The address is 31 Windermere.

19  Q   And could you explain the specs of the units?

20  A   Oh, it's basically a three-bedroom unit.  Two and a half

21  bath.  I don't remember the exact square footage.  Somewhere

22  around 1,800 square feet.  Two-car garage.  This neighborhood

23  has an alley so the garage enters from the rear.

24  Q   Looking at 12011, is that just a closer up view of the

25  property?

1   A   It is, yes.

2   Q   Who lived in this home?

3   A   Mr. Bush's ex-wife and his daughter.

4   Q   What were their names?

5   A   Lindsey was the daughter.  I do not remember the ex-wife's

6   name.

7   Q   Did Mr. Bush eventually fall behind in the payments?

8   A   He did.

9   Q   Would you turn to Exhibit No. 12014?  Just generally

10  describe what this is.

11  A   Bruce Mitchell with RE/MAX is the real estate company that

12  was involved as the listing agent for this lease purchase

13  agreement.  This was a document that I had Mr. Mitchell draft

14  and fax to Mr. Bush about payments that had been made and

15  late fees that were due.

16  Q   Let me stop you right there.

17          MR. LETEY:   Your Honor, we offer Exhibit No. 12014.

18          MS. OLSON:   No objection.

19          THE COURT:   12014 is admitted.

20              (Exhibit No. 12014 admitted.)

21  BY MR. LETEY:

22  Q   All right.  Let's go into it in a bit more detail on it

23  now.  You started to say -- who is this fax sent by?

24  A   It was sent by Bruce Mitchell.  The listing real estate

25  agent with RE/MAX.

1    Q    And when is it dated?

2    A    February 19, 2001.

3    Q    And who did you fax this to?

4    A    Mr. Bush.

5    Q    And can you explain the numbers for us here?

6    A    The $36,000 figure there at the top was the yearly payment

7    that was due.  Insurance expense for homeowners insurance was

8    the 462.  City and county taxes was the 1,746.  And then as

9    per the agreement, if the lease purchase payments were late

10   there was a 10 percent late fee added.  That brought that

11   yearly total to $41,808.  Mr. Bush made a payment in 2000 of

12   15,000.  That left a balance due of 26,808.

13   Q    And this information at the bottom, it says please call

14   Patsy.  What is that regarding?

15   A    Towards the end of our business association Mr. Bush

16   wanted to wire money to my account rather than send checks.

17   So that just -- he had requested that.  So Mr. Mitchell put

18   down the bank person's name and phone number so that he could

19   get wiring instructions.

20   Q    Did Mr. Bush ever catch up on the payments?

21   A    No, he didn't.

22   Q    Did you eventually evict Mr. Bush's ex-wife and daughter

23   Lindsey?

24   A    I did.

25   Q    Did you tell Mr. Bush that you were going to evict his

1    ex-wife and Lindsey if he didn't make payments?

2    A    Yes, I did.

3    Q    Did Mr. Bush's ex-wife ever make lease payments?

4    A    No, she did not.

5    Q    Do you know why not?

6    A    She didn't have the funds to do so.  She just worked at a

7    decorating shop and barely had enough money to, you know, pay

8    utilities and gas and things like that.

9            MR. LETEY:   I have no more questions of this witness,

10    Your Honor.

11                        CROSS-EXAMINATION

12    BY MS. OLSON:

13    Q    Good afternoon, Mr. Shaw.

14        Let me have you look again at Exhibit No. 12012, please.

15    And I'm looking at the last page of that exhibit and the

16    signature that you're not certain whose signature that is.

17        Now, how did this document get signed?

18    A    We faxed it to Mr. Bush.  And he said he would get it

19    signed and get it back to us.  And this is the way it came

20    back to us with this signature.

21    Q    Since that was not Mr. Bush's signature, did you require

22    some sort of proof that that was an authorized signature?

23    A    No.  He verbally assured me that this was the way he

24    wanted to handle the transaction and I took that as face

25    value.

1    Q    So you didn't require a power of attorney or any other

2    documentation?

3    A    No, I did not.

4    Q    Do you know who the LK Foundation is?

5    A    No, I do not.

6    Q    Were the payments that you were asking for on a yearly

7    basis, or was that the arrangement that he would make

8    payments on a yearly basis as opposed to monthly basis?

9    A    No.    The agreement was a monthly basis.

10    Q    But the check reflected in Exhibit No. 12018 is a yearly

11    payment; is that correct?

12    A    Which check was that?

13    Q    That is Exhibit No. 12018.    I have it up on the screen.

14    A    Okay.

15    Q    So is that for a year's period of time?

16    A    That would have been a partial year.    A full year would

17    have been 36,000.    I'm not sure why this was an odd amount.

18    But when Mr. Bush kind of got behind on some things, he was

19    just making some partial payments pretty much all the way

20    through.

21    Q    Now, this check is dated August 27, 1999; is that right?

22    A    Yes.

23    Q    And when he got behind in his payments he was later than

24    that, wasn't it?

25    A    I don't remember the exact dates, ma'am.    I'm sorry.

1    Q    No.   That's fine.   Let me see if I can help you.

2        Let's look at Exhibit No. 1014, please.   And that is, as I

3    understand it, the fax that you had sent to him for his

4    past-due payments?

5        THE COURT:   For the record, that's 12014.

6    BY MS. OLSON:

7    Q    12014.

8    A    That is correct.   Those were payments that were past due.

9    Q    And the date on that fax is in 2001?

10   A    Correct.

11   Q    So back in 1999 he was making full payments?

12   A    He got behind in payments right after the first year of

13   the agreement.   This document just happens to be later in

14   chronological order than that.

15   Q    Okay.   You seem to have a lot of detailed information

16   about Mr. Bush's ex-wife.   How did you come to know so much

17   about her?

18   A    Well, any time someone purchases a home from us we do a

19   punch list and fix any kind of odds and ends that needs to be

20   taken care of.   And so I get to meet clients and get to know

21   them.   Plus, Hendersonville is only a community of about

22   35,000 people.   So it's a small town.   We have a chance to

23   meet friends and neighbors.   And then I felt sorry for

24   Mrs. Bush because as the financial part of the contract

25   failed and payments were not coming in, I called Mr. Bush a

1    few times and didn't get return phone calls.

2        So she was the only contact I really had.  And so she was

3    a little bit of a victim.  I had to pretty much tell her that

4    I couldn't let her stay there for free.  I was going to have

5    to ask her to move out.  And so we got to be -- I don't know

6    if I want to say friends.  But we got to be acquaintances.

7    Q    So that's how you learned about her?

8    A    Yes.

9    Q    Thank you, Mr. Shaw.

10        MS. OLSON:  I have no further questions.

11        MR. LETEY:  I have no questions, Your Honor.

12        THE COURT:  Mr. Shaw, you are excused.  Thank you,

13    very much.

14        MR. LETEY:  Your Honor, the government calls Mark

15    Mueller.

16        THE COURT:  Mr. Mueller, if you'll come forward to

17    the lectern.  Stand in front of the microphone there.  Raise

18    your right hand and be sworn, sir.

19                        MARK MUELLER

20     The witness, after being duly sworn, testified as follows:

21        THE COURT:  Please be seated at the witness stand

22    immediately to my left.  Please keep the volume of your voice

23    up so people in the courtroom can hear you.  And speak slowly

24    enough so the court reporter can keep up with you.

25                     DIRECT EXAMINATION

1    BY MR. LETEY:

2    Q   Mr. Mueller, could you please state your full name and

3    spell your last name for the record.

4    A   It's Mark Mueller.   M-U-E-L-L-E-R.

5    Q   And what state do you currently live in?

6    A   Kirkland, Washington.

7    Q   And how far did you go in school?

8    A   I just graduated high school.

9    Q   And what do you currently do for a living?

10   A   Real estate agent.

11   Q   Did you used to own Bronze Edition Gallery?

12   A   I did.

13   Q   And where was that?

14   A   In downtown Kirkland.

15   Q   Is the Bronze Edition Gallery still in business?

16   A   It is not.

17   Q   And why is that?

18   A   Just lack of business.

19   Q   While owning the gallery did you meet Mr. Bush and

20   Ms. March?

21   A   I met Mr. Bush I believe one time or maybe twice.   And

22   Marilyn was the main person who'd come in to the gallery.

23   Q   Where did you meet Mr. Bush?

24   A   In the gallery.   At the gallery.

25   Q   Roughly when would this have been?   Timeframe?

1   A    In what year?

2   Q    Yes.

3   A    I think it was in either '98 or '99.

4   Q    Did you ever go out to the property in Port Orchard?

5   A    I did.

6   Q    What was the occasion?

7   A    To take a big wall piece that they had purchased from the

8   gallery.  To install it and also bring out another piece of

9   artwork that they had purchased from the gallery.

10  Q    Which pieces was that you had that you installed?

11  A    It was a big -- I believe it was a three-panel stainless

12  steel piece called -- I think it was Cape of the Horses or --

13  Q    Could you describe the house for me?

14  A    Driving up to the house, it was a beautiful property just

15  where it sat.  The house didn't seem to be that

16  extraordinary.  The interior of the house although was very

17  nice.

18  Q    Did you get a tour of the house?

19  A    We did.

20  Q    We?  I'm sorry.  Who?

21  A    My wife came out with me.

22  Q    Okay.  On the occasion that you met Mr. Bush did you ask

23  him what did he for a living?

24  A    I did not.

25  Q    How about Ms. March?  Did you ask her?

1    A    I did ask -- I know that she had said they did some

2    charity work and what have you and have a couple foundations.

3    Q    Would you turn to Exhibit No. 12006?  Could you just

4    briefly describe what this is?

5    A    This piece here was --

6    Q    What is this?

7    A    A sculpture.

8    Q    Is this an invoice?

9    A    This is an invoice from Bronze Edition, correct.

10          MR. LETEY:   Your Honor, we offer Exhibit No. 12006.

11          MS. OLSON:   No objection.

12          THE COURT:   12006 is admitted.

13              (Exhibit No. 12006 admitted.)

14   BY MR. LETEY:

15   Q    Now could you explain what this is?  What this is?

16   A    This was a tall heron sculpture.  Bronze edition -- I mean

17   a bronze sculpture.  A limited edition piece.

18   Q    And is this from your gallery?

19   A    Yes, it is.

20   Q    And when is this dated?

21   A    This is dated 8/18/99.

22   Q    And what is the total purchase price?

23   A    It was -- with tax it's $11,397.57.

24   Q    And who was this billed to?

25   A    This was billed to Millennium Development.

1  Q   Was this one of the pieces that was sold to Mr. Bush and

2  Ms. March?

3  A   Yes, it was.

4  Q   Could you turn to Exhibit No. 12007?  Could you just

5  briefly describe what this is?

6  A   This was a check made out to the Bronze Edition Gallery

7  for a heron piece also.  Sculpture piece.

8         MR. LETEY:   Your Honor, we offer Exhibit 12007.

9         MS. OLSON:   No objection.

10         THE COURT:   12007 is admitted.

11               (Exhibit No. 12007 admitted.)

12  BY MR. LETEY:

13  Q   And when is this check dated?

14  A   This check is dated 9/7/99.

15  Q   And how much is it for?

16  A   $6,397.54.

17  Q   And can you read what it says in the "for" line?

18  A   I was looking at that.  It's the balance due.  The balance

19  due on the Blue Heron piece.  I can not read what's down

20  below that, though.

21  Q   And what is Blue Heron?

22  A   Blue Heron is a sculpture of a blue heron bird.

23  Q   Can you turn to Exhibit 13004 in your binder?  Could you

24  briefly describe what 13004 is?

25  A   This is an invoice in regards to two pieces from the

1    gallery that they had purchased.

2              MR. LETEY:   Your Honor, we offered Exhibit No. 13004.

3              MS. OLSON:   No objection.

4              THE COURT:   13004 is admitted.

5                        (Exhibit No. 13004 admitted.)

6    BY MR. LETEY:

7    Q    And when is this invoice dated?

8    A    This invoice is dated 10/13/1999.

9    Q    And who is it billed to?

10   A    This was billed to Bronze Edition -- or I'm sorry.   TNS

11   Worldwide LLC.

12   Q    And does it say Marilyn March?

13   A    It does say Marilyn March.

14   Q    And how much is this invoice for?

15   A    $14,644.98.

16   Q    And can you explain what -- what is the purchase?   What

17   are they purchasing here?

18   A    This purchase was the piece I had told you that I took out

19   and hung.   The three-piece stainless steel horse piece, which

20   was a wall piece.   And the Thunder Ridge piece was a

21   sculpture also by Steve Retsloff, which was, I believe, three

22   horses in bronze cast.

23   Q    Would you turn to Exhibit No. 13005?   Could you just

24   briefly describe that?

25   A    This is also an invoice from the Bronze Edition Gallery

1    for a piece purchased.

2              MR. LETEY:   Your Honor, we offer Exhibit 13005.

3              MS. OLSON:   No objection.

4              THE COURT:   13005 is admitted.

5                   (Exhibit No. 13005 admitted.)

6    BY MR. LETEY:

7    Q    When is this dated?

8    A    11/20/1999.

9    Q    And who is it billed to?

10   A    This is billed to Hulaman Charities International.

11   Q    How much is the total for the invoice?

12   A    $4,333.14.

13   Q    And on the description what are they purchasing here?

14   A    This here is another limited edition bronze sculpture.

15   Q    What's it called?

16   A    Promises to Keep.

17   Q    Would you turn to Exhibit No. 13006?   Could you just

18   briefly describe this exhibit?

19   A    This is an invoice also to Marilyn March for another

20   sculpture purchased.

21             MR. LETEY:   Your Honor, we offer Exhibit No. 13006.

22             MS. OLSON:   No objection.

23             THE COURT:   13006 is admitted.

24                  (Exhibit No. 13006 admitted.)

25   BY MR. LETEY:

1    Q    When is this invoice dated?

2    A    This invoice is dated 11/23/1999.

3    Q    And who is it billed to?

4    A    This is T & S Worldwide LLC and also Marilyn March.

5    Q    And how much is this invoice?

6    A    $4,848.99.

7    Q    And what piece of artwork is this?

8    A    This is also a limited edition bronze sculpture.

9    Q    Would you turn to 13007?  Could you briefly describe this

10   exhibit?

11   A    This is a check made out to the Bronze Edition Gallery.

12        MR. LETEY:   Your Honor, we offer Exhibit No. 13007.

13        MS. OLSON:   No objection.

14        THE COURT:   13007 is admitted.

15             (Exhibit No. 13007 admitted.)

16   BY MR. LETEY:

17   Q    You said it's a check for Bronze Edition?

18   A    Correct.

19   Q    What account --

20   A    Hulaman Management Services.

21   Q    Would you turn to Exhibit No. 13008 and briefly describe

22   the exhibit?

23   A    This is also a check made out to the Bronze Edition

24   Gallery.

25        MR. LETEY:   Your Honor, we offer Exhibit No. 13008.

1          MS. OLSON:   No objection.

2          THE COURT:   13008 is admitted.

3                    (Exhibit No. 13008 admitted.)

4   BY MR. LETEY:

5   Q   And when is this check dated?

6   A   11/13/1999.

7   Q   And who is the check to?

8   A   Bronze Edition Gallery.

9   Q   And what's the name on the account that the check was

10  drawn on?

11  A   Hulaman Management Services.

12  Q   And can you read the "for" line?

13  A   Yeah.   It's balance and paid in full to invoice number

14  9144.

15  Q   Would you turn to Exhibit No. 13009?   Could you just

16  briefly describe this?

17  A   This is a check made out to the Bronze Edition Gallery.

18          MR. LETEY:   Your Honor, we offer Exhibit No. 13009.

19          MS. OLSON:   No objection.

20          THE COURT:   13009 is admitted.

21                    (Exhibit No. 13009 admitted.)

22  BY MR. LETEY:

23  Q   When is this check dated?

24  A   11/20/1999.

25  Q   And can you tell the name of the account that it's drawn

1    on?

2    A    Hulaman Management Services.

3    Q    And how much is the check for?

4    A    $4,333.14.

5         MR. LETEY:    I have no more questions of this witness,

6    Your Honor.

7         MS. OLSON:    We have no questions.

8         THE COURT:    You're free to go.    You're excused.

9         MR. STORM:    Your Honor, the government calls Michael

10   O'Neill.

11        THE COURT:    Mr. O'Neill, if you would come forward to

12   the lectern, sir.    Stand before the microphone and raise your

13   right hand to be sworn.

14                        MICHAEL O'NEILL

15     The witness, after being duly sworn, testified as follows:

16        THE COURT:    Sir, you may be seated at the witness

17   stand immediately to my left.    Please keep the volume of your

18   voice up so people in the courtroom can hear you.    Speak

19   slowly enough so that the court reporter can keep up with

20   you.

21                       DIRECT EXAMINATION

22   BY MR. STORM:

23   Q    Mr. O'Neill, can you state your full name and spell your

24   last name for the record, please.

25   A    Michael O'Neill.    O-N-E-I-L-L.

1   Q    And how old are you?

2   A    62.

3   Q    How far did you go in school?

4   A    Through college.  Bachelor's degree.

5   Q    What town do you live in?

6   A    Burien, Washington.

7   Q    And how are you currently employed?

8   A    Designer with Gaspars Construction.

9   Q    Did you have a business of your own before that?

10  A    I did.

11  Q    What was that called?

12  A    Michael O'Neill Interiors.

13  Q    And how long did you run Michael O'Neill Interiors?

14  A    I believe from '93 to 2002.  It wasn't always a full-time

15  business.

16  Q    Do you know who Patty Rief is?

17  A    I do.

18  Q    And how do you know Patty Rief?

19  A    Patty and I worked together in real estate.

20  Q    Did she refer some work to you back around 1999?

21  A    She did.

22  Q    Okay.  And who was that work for?

23  A    Marilyn March.

24  Q    And did you meet with Marilyn March?

25  A    I did.

1    Q    Where did you meet?

2    A    Red Robin in Des Moines, Washington.

3    Q    And did she describe the work that she wanted done?

4    A    She did.

5    Q    And what kind of work did she want done?

6    A    She purchased a large home.  She and Mr. Bush.  And she

7    wanted it remodeled.

8    Q    And did you also view the property?

9    A    I did.

10   Q    And is that out at Port Orchard?

11   A    Yes.

12   Q    It's been referred to as View Park.  Did you also know it

13   by another View Park?

14   A    I knew it as Cornerstone.

15   Q    And who told you that?

16   A    Marilyn March.

17   Q    And did she tell you the purpose of the remodeling?

18   A    Well, it was to be their home.  And it was also to be a

19   place to bring clientele.

20   Q    And by clientele you mean what?

21   A    Investors.

22   Q    Did she tell you what kind of work Mr. Bush was in?

23   A    That he was an international investor.

24   Q    After viewing the home did you receive a retainer?

25   A    I did.

1    Q    And how much money was that?

2    A    $5,000.

3    Q    And you agreed to engage in the remodeling project?

4    A    I did.

5    Q    Let me talk to you about the budget.  What was the initial

6    budget?  Or was there an initial budget?

7    A    There wasn't an initial budget.  It was kind of -- it was

8    basically they wanted to start in a hurry.  They wanted to

9    start with the demolition.  And it was pretty much design as

10   you go.  So there was not a budget established because it

11   hadn't been designed yet.

12   Q    In your experience is that unusual?

13   A    Yes.

14   Q    And how long did you -- from when to when did you work on

15   this remodeling project?

16   A    Started in June of '99 and through the end of 2000.

17   December of 2000.

18   Q    So is that about 18 months?

19   A    Yes.

20   Q    And who was making the day-to-day decisions between

21   Ms. March and Mr. Bush?

22   A    Ms. March.

23   Q    And did she consult with Mr. Bush?

24   A    I believe so.  But Mr. Bush was not present very much when

25   I was there.  So there was -- they were made -- discussions

1     were held away from my presence.

2     Q    Now, were the funds coming in steady to fund the project

3     or were they cyclical?

4     A    No.  They were cyclical.  It would depend on -- funds were

5     sporadic.  Sometimes there would be more money to put into

6     the project and other times it would be relatively thin.

7     Q    And did Marilyn March explain to you why that was?

8     A    Because funds from the investments were not consistent.

9     Q    And did she say from the investments were not consistent?

10    A    Well, I don't know if that was the word she used.  But

11    money was, you know, not available on a consistent basis.

12    And I assume that's where it was coming from.

13    Q    Who did she go to get money to fund the project?

14    A    To Mr. Bush, I believe.

15    Q    Let me have you, if you would, look at some pictures.  Let

16    me have you -- if you would look at the exhibits in front of

17    you.  In the folders 13016 through 13027.  If you could flip

18    through those.  See if you recognize them.

19            MS. OLSON:  What was the ending number?

20            MR. STORM:  27.

21            THE WITNESS:  Okay.

22    BY MR. STORM:

23    Q    What are those photographs of?

24    A    The property.

25    Q    At Ms. March and Mr. Bush's property at Cornerstone?

1    A    Right.  At Cornerstone.

2              MR. STORM:   Your Honor, offer 13016 through 13027.

3              MS. OLSON:   No objection.

4              THE COURT:   Exhibits 13016 to 13027 is admitted.

5              (Exhibit Nos. 13016 through 13027 admitted.)

6    BY MR. STORM:

7    Q    Mr. O'Neill, could I have you look at 13016, please?

8    A    Yes.  That's the entrance to the property.

9    Q    That gate that you see in that photo, was that there when

10   you started your remodelling project?

11   A    No.

12   Q    Was that part of the remodeling project?

13   A    It was.

14   Q    Let me have you look at 13017.  What is that a photo of?

15   A    That's the back of the house.  That was an addition that

16   we put on the back of the house.  Two glassed-in porches.

17   Q    And when you say that's an addition we put on the back of

18   the house, if you touch that screen with your finger you can

19   actually make a mark that will show us what the addition is.

20   A    (Witness complies.)

21   Q    Was that a fairly significant addition to the house?

22   A    I would say so.

23   Q    And how about the interior of the house?  Is it fair to

24   say that was a major remodel?

25   A    It was a complete remodel.

1    Q    Does that mean you gutted the house?

2    A    Yes.

3    Q    Let me have you look at 13018, please.    What are we

4    looking at?

5    A    That's a -- without the stuff in front of it.    That wasn't

6    there.    That's a waterfall.

7    Q    And is it fair to say that when you -- did you install

8    this as part of the remodel?

9    A    I did.

10    Q    When you installed this there would have been water

11    pouring down over this waterfall?

12    A    Yes.

13    Q    How tall is that waterfall?

14    A    Well, the slab in front is probably around five feet.

15    Q    And what's the waterfall itself made out of?

16    A    Slate.    Slate slab.

17    Q    And you're probably not happy about the water being turned

18    off and the flowers being put in it?

19    A    Yeah.    I had it a little bit different than that.

20    Q    Let me have you look at 13018, please.

21        COURT REPORTER:    I'm sorry, Counsel.    The number?

22        MR. STORM:    13019.

23    BY MR. STORM:

24    Q    Mr. O'Neill, what are we looking at in this photo?

25    A    I believe that's the entrance to the house and the top of

1    the spiral staircase.

2    Q    And if you're standing near this spiral staircase are you

3    fairly close to the slate waterfall that we just looked at?

4    A    Yes.  It would be to your left through that doorway.

5    Q    And is the spiral staircase part of the remodeling

6    project?

7    A    Yes.

8    Q    And what is special about the wood in this spiral

9    staircase?

10    A    Well, it's -- it was made and shipped -- it was made back

11    east and shipped out.  It's steam bent.  Very nice spiral

12    staircase.

13    Q    Let me have you look at 13020.  What are we looking at in

14    this photo?

15    A    That's the kitchen.

16    Q    What was done to the kitchen?

17    A    New countertops.  That island and table that you see

18    coming out towards you, that was all new.  New appliances.

19    Cabinets were left.

20    Q    Let's take a look at 13021.

21    A    That's the back of the island.  Everything on the left was

22    added.  The only thing that wasn't added are the cabinets.

23    The oak cabinets.

24    Q    How about 13022?

25    A    That's the spiral staircase.

1   Q    And if we take that down then we end up in the basement of

2   the house?

3   A    Lower level.  Right.  It really wasn't a basement.  It was

4   a second level.

5   Q    Let me have you look at 13023.

6   A    The spiral staircase again.

7   Q    13024?

8   A    That's the family room.  Rec room area.  The fireplace was

9   existing.  The gas insert was new.

10  Q    How about the beams that come up the wall and across the

11  ceiling?

12  A    The beams, we would have had to add those because the

13  beams coming across are fake.  The slanted beams are solid.

14  They were original.

15  Q    I will have you look at 13025.

16  A    That's the entrance to the steam room.

17  Q    And that's in the basement?

18  A    Yes.  Lower level.

19  Q    Now, I don't have a photo of this but is there also a

20  sauna?

21  A    Yes.

22  Q    Okay.  And I had to have this explained.  What's the

23  difference between a steam room and sauna?

24  A    Steam room is wet.  The steam in a sauna has a dry heat.

25  It's encased usually in redwood or cedar.  Cedar usually.

1  Q   And as part of this remodeling project you put in both?

2  A   Right.

3  Q   Let me have you look at 13026.  What's that?

4  A   That's the massage room.

5  Q   Was that part of your remodeling project?

6  A   Yes.

7  Q   13027?

8  A   That's the inside of the addition on the back on one of

9  the levels.  I think it's the lower level.

10 Q   Now, is it also my understanding that in doing this

11 remodeling project there were lots of things that you were

12 not also responsible for?  The things we looked at you were

13 responsible for but --

14 A   I was basically responsible for the aesthetic.

15 Q   Okay.  And for the telecom and security and --

16 A   No.

17 Q   -- the generators, generator house, outhouse, none of

18 those?

19 A   No.

20 Q   The parts of the project that you were responsible for

21 only, approximately how much money was spent?

22 A   Approximately around 750,000.

23        MR. STORM:  Thank you.  I have no further questions.

24                    CROSS-EXAMINATION

25 BY MS. OLSON:

1  Q    Mr. O'Neill, you dealt primarily with Marilyn March

2  throughout this entire remodeling?

3  A    I did.

4  Q    Now, you stated you believed that she consulted with Nolon

5  Bush but you were not present for any of those consultations;

6  is that right?

7  A    Correct.

8  Q    So you're only --

9  A    I wouldn't say any.  I mean, he might have been there when

10  we discussed his bedroom and his bathroom.

11  Q    So that may have been one consultation?

12  A    Right.

13  Q    But the rest of them you did with Marilyn herself?

14  A    Primarily.

15  Q    All right.  So if she consulted with Mr. Bush, you're only

16  assuming that; is that right?

17  A    Well, she would say I would have to ask Nolon about

18  whatever.  But most of the decisions were -- seemed to come

19  directly from her.

20  Q    Okay.  Did you have an understanding as to why they wanted

21  a nice house?

22  A    My understanding was that, A, they wanted to live there

23  and, B, that it was to bring clients.  It was a place to

24  have -- they wanted guest rooms.  They wanted a place to have

25  visitors.

1   Q    And did you understand that they had a lot of social

2   events?

3   A    Yes.

4   Q    And charity functions?

5   A    Yes.

6   Q    And they were using the house for that purpose?

7   A    Yes.

8   Q    And so they wanted it to be a nice place for people to

9   come?

10  A    Yes.

11       MS. OLSON:   Thank you.   I have no other questions.

12       MR. STORM:   I have no further questions.

13       THE COURT:   Mr. O'Neill, you're excused.   Thank you,

14  very much, sir.

15       MR. STORM:   Your Honor, the government calls Marianne

16  Haukli.

17       THE COURT:   Ms. Haukli, if you'd come forward to the

18  lectern.   Stand in front of the microphone.   Raise your right

19  hand and be sworn, please.

20                        MARIANNE HAUKLI

21    The witness, after being duly sworn, testified as follows:

22       THE COURT:   Please be seated at the witness stand

23  immediately to my left.   Please keep the volume of your voice

24  up so people in the courtroom can hear you.   Speak slowly

25  enough so that the court reporter can keep up with you.

1                           DIRECT EXAMINATION

2    BY MR. STORM:

3    Q    Ms. Haukli, can you state your full name and spell your

4    last name for the record, please.

5    A    My name is Marianne Haukli.  Last name H-A-U-K-L-I.

6    Q    And how old are you?

7    A    I'm 40.

8    Q    How far did you go in school?

9    A    12th grade.

10   Q    And what city do you live?

11   A    I live in Port Orchard.

12   Q    And how are you employed?

13   A    Self-employed.

14   Q    And what kind of work do you do?

15   A    I do massage therapy.

16   Q    Do you have a company name?

17   A    I do.  I don't really use it formally but it's Touch of

18   Health.

19   Q    What were you doing in 1999?

20   A    Massage therapy.

21   Q    Do you know who Marilyn March is?

22   A    Yes, I do.

23   Q    And how do you know Marilyn March?

24   A    She was a client of mine.

25   Q    Where did you meet her?

1    A    She came to my office.

2    Q    And was that in Port Orchard?

3    A    Yes.

4    Q    After some time did the nature of that relationship change

5    where she no longer came to your office?

6    A    Yes.  I started coming out to her home and doing massage

7    out there.

8    Q    And did she invite you to come to her home?

9    A    Yes.

10   Q    And was that at the View Park in Port Orchard?

11   A    Yes.

12   Q    And did she live there with Nolon Bush?

13   A    Yes.

14   Q    And were there a number of staff members there?

15   A    Yes.

16   Q    When you first started going to the property, View Park,

17   did you -- was the remodeling project finished?

18   A    I think it was in process.

19   Q    And did you start giving massages to various individuals

20   at that property?

21   A    Yes.

22   Q    And who was that that you gave massages to?

23   A    I gave massage to Marilyn, Nolon, Laura, Sara, Joanne,

24   Lorelei, Patty, and sometimes Pete.  And I think that's it.

25   Q    Okay.  And how often -- how frequently did you go to the

1    property?

2    A    I was usually there three days.

3    Q    Per week?

4    A    Yes.

5    Q    And how long of a massage would Nolon and Marilyn get?

6    A    They would usually get an hour and a half each.

7    Q    90 minutes each?

8    A    Or 90 minutes each.

9    Q    Once per week?

10   A    Yes.

11   Q    And how about the other staff members?

12   A    They were 60 minutes each.

13   Q    Who paid you to go to there three days a week?

14   A    Sometimes Marilyn gave me money and sometimes Lorelei

15   would give me the money at the end of week.

16   Q    And how were you paid?

17   A    In cash.

18   Q    And how much were you paid per week?

19   A    I was paid $700.

20   Q    And was it just loose bills or in an envelope or how was

21   that?

22   A    Yes.   Loose bills in an envelope.

23   Q    And was the -- were you out in the -- in an out building

24   or was a massage room finished inside the house?

25   A    When I first started it was upstairs above the offices.

1   Just one part of the living room, I guess.   But then I moved

2   downstairs into the new remodel.

3   Q    Massage room?

4   A    In the massage room, yes.

5   Q    How long did you continue to go to View Park to provide

6   massages?

7   A    I would -- nine to ten months.   I'm not really sure.

8   Q    Okay.   And why did things change?   Why did you stop?

9   A    I think they -- well, for one they ran out of money.   And

10  they asked me to take less money than I was charging and I

11  said I didn't want to do that.

12  Q    Did you go to any baseball games while you were still

13  there -- or let me back up for just a second.

14       When was is it that you stopped visiting View Park?

15  A    I believe it was in June.

16  Q    Of what year?

17  A    2000, I think.   Yeah.

18  Q    And so for the period that you were going out there did

19  you go to any baseball games?

20  A    Yes, I did.

21  Q    And where were those?   At Safeco Field?

22  A    Yes.

23  Q    And was it in the Lou Gehrig suite?

24  A    I don't remember the name of the suite.   But it was a

25  suite --

1  Q   It was a suite?

2  A   -- on the third baseline.

3  Q   And did Nolon and Marilyn also have Diamond Club seats?

4  A   Yes.

5  Q   How many did they have?

6  A   I think four.  But I went there a couple of times.

7  Q   And were you able to go to the Diamond Club seats and

8  enjoy that experience?

9  A   Yeah.  Twice.

10  Q   Where were those located?

11  A   Behind home plate.

12  Q   Did you go to any charity events with Marilyn and Nolon?

13  A   I went to one that the Jamie Moyer Foundation had north of

14  Seattle.  Alderbrook -- not Alderbrook  Alderwood.  It was a

15  bowling event.

16  Q   What was that like?

17  A   Well, it was fun.  All the Mariners bowled with the teams

18  that were there.  And we had a silent auction.

19  Q   So you guys got to bowl with the Mariners?

20  A   Uh-huh (affirmative).

21  Q   Side by side?

22  A   Uh-huh (affirmative).

23  Q   Who paid for that?

24  A   I assume it was Nolon and Marilyn.  But I don't know if it

25  was something that they did pay for.  That I don't know.  But

1    there was an event that had to be paid for.  I assume that's

2    what --

3    Q    You didn't pay for it?

4    A    I didn't pay for anything.

5              MR. STORM:    Thank you.

6                              CROSS-EXAMINATION

7    BY MS. OLSON:

8    Q    Was Marilyn March concerned about health?

9    A    Yes, I would say so.

10   Q    Was she a person that was into fitness?

11   A    Yes.

12   Q    Was she concerned about the health of the people that she

13   was with?  Her staff and Nolon?

14   A    I assume she was.  Yeah.

15   Q    Is that -- by virtue of her offering massages to her staff

16   does that -- could that lead you to believe that she was

17   concerned about their health?

18   A    I'm not sure what you mean by concerned.  Like if they

19   were in bad health?  Or that just to --

20   Q    No.  That she, you know, wanted them to, you know, feel

21   good or wanted you to address any physical concerns that they

22   had through massage?

23   A    I'm not sure if it was that other than just offering a

24   benefit to the staff.

25   Q    Okay.  All right.

1        When you went to the Jamie Moyer Foundation event you

2   didn't pay for anything?

3   A   Huh-uh (negative).   No.

4   Q   Did you bring a guest?

5   A   No.

6   Q   Thank you.

7            MS. OLSON:   I have no other questions.

8            THE WITNESS:   Thank you.

9            MR. STORM:   I have no further questions, Your Honor.

10           THE COURT:   Ms. Haukli, you're excused.   Thank you,

11   very much.

12           THE WITNESS:   Thank you.

13           THE COURT:   We're going to break for the evening.

14   And in your case, ladies and gentlemen, for the weekend.

15   You're going to have a lot of spare time.   Use it

16   productively for purposes other than this trial.   Don't do

17   any investigation.   Don't drive to Port Orchard.   Don't do,

18   you know, any of the things that you might think about doing

19   to learn more about this case because it's important that

20   everything you know about this case you learned from this

21   room and only this room.   It's important that you not discuss

22   this matter with anyone.   If anybody tries to talk to you

23   about it, let me know.   Turn your attention away from any

24   media coverage of this trial.   Have a great weekend.   We'll

25   be back Monday at 9:30 ready to go to work.   Have a great

1  weekend.

2          (Jury exits the courtroom.)

3          THE COURT:  Please be seated.  Anything we need to

4  take up at this time?

5          MR. STORM:  No, Your Honor.

6          MS. OLSON:  We have one matter, Your Honor.  I would

7  like to produce to the Court for in camera review, I've got

8  two CDs which I received from the government of telephone

9  conversations and then one CD which are e-mails back and

10 forth between Mr. Bush and others, if I may.

11         THE COURT:  Okay.

12         MS. OLSON:  And this is pursuant to the Court's order

13 of December 21st.

14         THE COURT:  Great.  Thank you.  I will review these

15 this weekend.

16    How are we doing for time?

17         MR. STORM:  Your Honor, we're moving along.  We're

18 ahead of schedule in fact.

19         THE COURT:  Yeah.  You're going at a good pace.  I

20 just wanted to know if we're going to have any issue Monday

21 on Mr. Grant's staff.  Is that correct?

22         MS. OLSON:  That's correct.

23         THE COURT:  When are you planning on resting?

24         MR. STORM:  I think we'll be done by Wednesday or

25 Thursday.

1          THE COURT:  Okay.  All right.  Okay.  I'll take a

2    look at this.  I'll read your brief again on the motion in

3    limine.  And be prepared to deal with that on Monday.  Have a

4    good weekend.

5      If you want to leave your stuff here, just put it off to

6    the side.  We've got sentencings all day tomorrow and a

7    motion for summary judgment and reconsideration.  So just put

8    it off to the side.  Or if you've got it in a room, that's

9    fine, too.  I will see you on Monday.  Court will be in

10   recess.

11          (Court in recess.)

12

13                    *    *    *    *    *

14                 C E R T I F I C A T E

15

16      I, Nichole Rhynard, Federal Official Court Reporter,

17   certify that the foregoing is a correct transcript from the

18   record of proceedings in the above-entitled matter.

19

20   /S/  Nichole Rhynard, CCR, CRR, RMR

21

22

23

24

25