1            UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF WASHINGTON

3                    AT SEATTLE

4
    UNITED STATES OF AMERICA,    )   Cause No. 06-5504RBL
5                                )
              Plaintiff,         )   Seattle, Washington
6                                )   November 10, 2008
         vs.                     )   Volume VIII
7                                )
    CHARLES NOLON BUSH,          )
8                                )
              Defendant.         )
9                                )
    _____)

10

11

    _____
12                           TRIAL
              VERBATIM REPORT OF PROCEEDINGS
13        BEFORE THE HONORABLE RONALD B. LEIGHTON
               UNITED STATES DISTRICT JUDGE
14  _____

15
    APPEARANCES:
16
     For the Plaintiff:      Arlen Storm
17                           Tyler Letey

18

19   For the Defendant:      Paula Olson

20
     Reported by:           Nichole Rhynard, CCR, RMR, CRR
21                          Federal Court Reporter
                            206.370.8504
22                          nichole_rhynard@wawd.uscourts.gov

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.
25

1                          EXAMINATION INDEX

2    EXAMINATION BY                                            PAGE
       CHARLES NOLON BUSH
3      DIRECT EXAMINATION          BY MS. OLSON                   5
       CROSS-EXAMINATION           BY MR. STORM                125
4


5


6
                             EXHIBIT INDEX
7    EXHIBITS ADMITTED                                         PAGE
       A-1                                                       26
8      4016                                                      46
       3007, 3008, 3009, 3010, 1011, 3017, 3018, 3019,         124
9      3020 and 3021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        PROCEEDINGS

2    _____

3

4           THE COURT:  Please be seated.  All right.  I had

5    asked that we get together a little early today to work on

6    jury instructions, not knowing whether or not Mr. Bush would

7    be testifying.  As I understand it, Mr. Bush is going to

8    testify; is that correct?

9           MS. OLSON:  Yes, Your Honor, he is.

10          THE COURT:  Given that fact, I think that there is

11   little that we can do with the jury instructions at this

12   juncture.  I will tell you that I am not inclined to give the

13   definition of the corporate sole.  I don't think it has

14   any -- anything to do with making conduct that would

15   otherwise be criminal permissible.  So it's not germane to

16   the issues in this case.  And the issue, with regard to the

17   other proposed instruction, on advice of counsel, is really

18   dependent upon Mr. Bush's testimony.

19          So we'll have to wait for that testimony before the Court

20   can make a decision as to that jury instruction.  Once the

21   testimony is completed, I think jury the instruction process

22   should be relatively easy to deal with.  I just need to hear

23   the testimony before I can make decisions.

24          Now, Mr. Storm, did you provide counsel with a copy of the

25   cases that you presented to this Court?

1          MR. STORM:  I did, Your Honor.

2          THE COURT:  Very well.  Anything that we need to take

3     up before the jury comes in?

4          Mr. Storm?

5          MR. STORM:  Yes, Your Honor, one housekeeping matter.

6     Last Wednesday, we submitted some stipulations to the Court.

7     The matters covered in the stipulations were admitted.  I'm

8     not sure if the Court was planning on reading those

9     stipulations to the jury.

10          THE COURT:  I've got the stipulation from November 5

11     regarding the bank records, representatives from the Bank of

12     Crozier and the country of Nevis.  And point two is the WaMu

13     Bank representative's testimony.  And then you submitted

14     another stipulation on Friday, right?  Or Thursday?

15          MR. STORM:  That's the only one.  There was a prior

16     stipulation, but we read that into the record.

17          THE COURT:  Right.  I know that.

18          Anything else?

19          Have you got all the exhibits you need?

20          MS. OLSON:  I think Ms. Boring has the list.

21          THE COURT:  Do we need to take a few minutes?

22          MS. OLSON:  It shouldn't take me long.

23          THE COURT:  We'll just take a four- or five-minute

24     recess so Jean can get that put together.  And then we'll get

25     the jury back at 9:30.  Court in recess.

1          (Court in recess.)

2          THE COURT:  Please be seated.  Are we ready for the

3  jury?

4          MS. OLSON:  One I just need a sticker.

5          THE COURT:  All right.

6          (Jury enters the courtroom.)

7          THE COURT:  Welcome back, ladies and gentlemen.

8  Please be seated.  We're ready to proceed.  Hope you had a

9  nice weekend.

10         Ms. Olson, you may call your first witness.

11         MS. OLSON:  Your Honor, defense calls Charles Nolon

12  Bush.

13         THE COURT:  Mr. Bush, if you would go forward to the

14  lectern, please; stand before the microphone.  Raise your

15  right hand, be sworn.

16                      CHARLES NOLON BUSH,

17   the witness, after being duly sworn, testified as follows:

18                       DIRECT EXAMINATION

19  BY MS. OLSON:

20  Q   Mr. Bush, will you state your full name, and spell your

21  last name.

22  A   Charles Nolon Bush.  Last name B-U-S-H.

23  Q   And what city do you reside in?

24  A   SeaTac, Washington.

25  Q   What is your age?

1    A    Last Friday, I was 69 years old.

2    Q    Can you tell us where you were born and raised?

3    A    I was born in Nashville, Tennessee, and was there for the

4    first two years of my life and then moved to my father's

5    hometown in Laurel, Mississippi.

6    Q    What does your family do for a living?

7    A    My father's family had Bush Dairy and Bush Construction

8    Company of the State of Mississippi.

9    Q    Have they owned those businesses for a considerable period

10    of time?

11    A    My grandmother and my grandfather married in 1896.  The

12    story is -- I don't know which one had the bull.  But a

13    couple of them had cows; one had a bull.  And that started

14    what became, by 1976, a combination of over 200 dairies and,

15    it's my understanding, the largest independent dairy system

16    in the south -- southern part of the United States.

17    Q    What is your educational background?

18    A    I received a BS degree from the University of Southern

19    Mississippi.  I have a -- the degree is in mass

20    communication.  It's emphasis is on radio and television.

21    Q    What year did you graduate?

22    A    1963.

23    Q    Did you take any other classes -- any significant number

24    of classes in any other subject area?

25    A    My senior year, I went into business with the professor in

1    charge of the marketing department and the professor over the

2    speech department.   They had a management consultant firm.

3    And I became their associate, and they began to personally

4    train me and send me to workshops as far as away as Hawaii.

5    Q    You had another emphasis in marketing?

6    A    My business in marketing, with an interest -- emphasis on

7    public speaking, would be my -- at that point, my career.

8    Q    Have you ever been arrested before this case?

9    A    I have.

10   Q    What were the circumstances?

11        First of all, do you recall what year it was?

12   A    I believe it was sometime 1983, '84.   Somewhere there.

13   The --

14   Q    What was the nature of your arrest?

15   A    In my second marriage, I had a child support issue that

16   was controlled by the State of Mississippi.   And when I moved

17   to Houston, Texas, I went under the family law program of

18   Texas.   And they set my child support payments and began to

19   pay directly to the State of Texas.   I was completely

20   current.   However, the State of Mississippi chose to put out

21   an arrest warrant for me.   That was my understanding.   All I

22   know is that I stepped off an airplane, you know, on a

23   Friday, as I remember, and the detectives there -- the

24   Houston Police Department arrested me, took me to jail.   But

25   as soon as the judge found out about it, the attorneys -- as

1     I recall, I was out in five or six hours or something.

2     Q    Have you been charged with a crime before this case?

3     A    I have never been charged with a crime.

4     Q    Do you have a religious orientation?

5     A    I do.

6     Q    What is it?

7     A    For me, it probably starts when I was 12 or 13.  I was

8     born -- raised into the Catholic church, Catholic faith.

9     Very close to the sisters and was an alter boy.  By age 12 or

10    13, I was actually considering becoming a priest, but as I

11    got towards high school decided that really wasn't committed

12    enough for that.  However, the thought was probably there in

13    the back of my mind, about dedicating my life to Jesus

14    Christ.

15        But it wasn't until 1973 that I had a personal experience

16    of -- you know, with Jesus.  I made a personal commitment to

17    the Lord and decided at that point that I would really like

18    to dedicate my life to Christ.

19    Q    This occurred in 1973?

20    A    Yes.

21    Q    Were you involved in organized church or religion at that

22    time?

23    A    Well, I was starting to work with the Methodist group

24    called "Young Life."  I became interested in helping --

25    because of my own family, my own children, some problems that

1    I had already seen earlier, I felt that -- I had gone,

2    actually, to a retreat in Colorado with Young Life.    And

3    that's -- I think that probably, you know, helped me make my

4    final decision.

5    Q    Did you engage in any bible study?

6    A    Shortly thereafter, I began attending Baraka Church in

7    Houston, Texas.    That's Colonel R.B. Theme's church.    Colonel

8    Theme was there for -- in the last 50 years.    He had the

9    equivalency of his Ph.D. in Greek, Hebrew, Adamic and

10   Chaldean, and worked with the original languages.

11      He graduated top in his class from Dallas Theological

12   Seminary.    So I entered into what has become thousands of

13   hours of bible study under Dr. Theme.

14   Q    Did there come a time when you stopped being so committed

15   to bible study?

16   A    Yes, at the end of my second marriage.    I married the

17   third time, and the lady that I married did not share my

18   interest at the depth that I -- for the sake of the

19   relationship, I stopped the focus for a period of time, until

20   the marriage broke up.

21   Q    What was the name of that wife?

22   A    Tessie Waltman, I believe.

23   Q    Is she the same Ms. Waltman that testified last week?

24   A    That is correct.

25   Q    Let's speak for a moment about your marital history.    How

1  many times have you been married?

2  A  I have been married three times.

3  Q  And just briefly, if you can tell us what year -- first of

4  all, what is the name of your first wife?

5  A  Jeanette.

6  Q  When did you marry her?

7  A  In the early '60s, '61, '62, '63, somewhere in there.

8  Q  Did you have any children with her?

9  A  We had three children.

10  Q  When did you divorce?

11  A  Around 1969.  The marriage was no longer functioning.

12  Q  Can you give us names and ages of the children?

13  A  My oldest son is Charles Nolon Bush III.  My second son

14  was Timothy Parker Bush.  And then Leslie Elizabeth Bush is

15  my oldest daughter.

16  Q  And now, for your second marriage, what was name of that

17  wife?

18  A  Barbara.

19  Q  And when did you marry Barbara?

20  A  In the early '70s.  Around '71.

21  Q  And did you have any children with her?

22  A  We had two children.  We had Justin Miller Bush and

23  Lindsey K. Bush.  Fifth child was a girl.

24  Q  And when did you divorce Barbara?

25  A  It was -- I'm not really certain, but it was the earlier

1    part of the '80s.

2    Q    And then your third marriage, was that to Ms. Waltman?

3    A    That was Ms. Waltman, in 1983.

4    Q    When did you divorce her?

5    A    In 1989, although the marriage had not been doing well for

6    several years at that time.

7    Q    Did you have any children with her?

8    A    We did not.

9    Q    Nolon, are you related to President George W. Bush?

10   A    That is a very interesting question, and -- although when

11   people ask me that question, that is what I always say that

12   that's very interesting.  Since I do have the last name Bush,

13   they all say, are you related?  I've never met George W.

14   Bush, nor have I met his father, nor have I met any members

15   of his family, and that's what I always say.

16        However, my first cousin -- or second cousin, Carolyn

17   Bush, from Laurel, Mississippi, years ago took on a project

18   to trace the genealogy of the Bush family.  And she wrote a

19   book that I did receive a copy.  She sent me a copy of it,

20   some 600 pages, that takes our family back to England in

21   1400.  And in that genealogy, as she presented it, my

22   great-great-great grandfather at some point had three sons.

23   Now, this is as I understand it.  I have no proof of this.

24   And when people ask me the question, I tell them this entire

25   story that I am telling you.

1              As I understand, my great-great-great grandfather's

2    at some point was poet laureate of England.   And on down from

3    that, there were three sons.   One died.   And Prescott Bush's

4    family comes from that line, and my family comes from the

5    other sons's line.   So we all go back to the original

6    great-great-great grandfather somewhere, Carolyn Bush told

7    me.   But I -- that is all I can say in answer to the

8    question.

9    Q    You heard testimony that people have stated that you told

10   other people that you were related to President Bush?

11   A    What I just told you is the only thing I have ever said to

12   anyone.   Normally I say I've never met him.   I would like to

13   talk about that, because I have been in Europe for the

14   last --

15   Q    Mr. Bush, let's --

16   A    Sure.

17   Q    I'm sure you'll have a chance to elaborate.

18        Now, you indicated -- well, let's talk a little bit more

19   about your work history.

20        You indicated that you were involved in business

21   consulting.   Is that --

22   A    That is correct.

23   Q    What kind of businesses were you a consultant for?

24   A    Well, I began applying my education in a field called

25   network marketing and became involved with my first

1   networking opportunity with Holiday Magic Cosmetics in the

2   early '60s.  I built a sizable organization, along with a

3   partner out of New Orleans, Louisiana, who -- I had worked my

4   way through college with him selling cookware.

5   Q   Other than Holiday Magic, did you have any other sales

6   positions?

7   A   Well, I began teaching at IBM and National Cash Register,

8   3M.  We began as a result of my college work and the

9   management consulting firm.  We had contracts even with the

10  official hair fashion committee and the American Chiropractic

11  Association.  We talked sales psychology, communications and

12  human relations.

13  Q   Now, we are speaking of your work history from the time of

14  your graduation from college until you moved to Washington;

15  is that correct?

16  A   That is correct.

17  Q   Did you work for any companies during that time?

18  A   No.  You know, my -- you know, I was either an

19  independent -- worked my way through college.  Also an

20  independent life insurance agent and independent distributor

21  as far -- the network marketing companies I was involved in.

22  But I was a freelance speaker.  I mean, I taught sales

23  training.  I consider myself somewhat a specialist in

24  networking.  And what has happened to me throughout my

25  life -- I have never had a resume.  I have always gone from

1   one contact to a next.  Someone always recommends me to a

2   friend of theirs.

3   Q   Now, you indicated that you put on training seminars; is

4   that right?

5   A   Yes.

6   Q   What were -- first of all, who was your audience?

7   A   Would be whatever company or organization that I was

8   working with and training networking skills.

9   Q   What -- can you give us the name of some companies that

10  you did training seminars for?

11  A   Well, it was a guy I mentioned to you, Holiday Magic

12  Cosmetics.

13  Q   Let me ask you this:  Did you ever do any training

14  seminars for Exxon?

15  A   I did.

16  Q   What about Ford --

17  A   Yes.

18  Q   -- motor companies?

19  A   Yes.

20  Q   General Motors?

21  A   Yes.

22  Q   Any other companies that come to mind?

23  A   Throughout my lifetime, many members of American Chamber

24  of Commerce.  You know, I have done seminars at NASA.  I

25  mean, I have worked for many organizations.

1   Q   Now, there came a time when you moved to State of

2   Washington; is that right?

3   A   Yes.

4   Q   When was that?

5   A   Approximately 1991.

6   Q   What was the event or occasion that brought you to

7   Washington?

8   A   I had been helping a network marketing company in the

9   southern part of the United States that was located -- its

10  headquarters were in Sequim, Washington.  There was a

11  naturopathic physician that had started the company.  And he

12  lived in Sequim.  He attended one of my trainings.  And he

13  and I put on a co-seminar together.  At the end of the

14  workshop, he asked me if I would be willing to come and help

15  him at the home office, and I agreed to come from the south

16  to Sequim, Washington.

17  Q   What was the name of the company?

18  A   Light and Right.

19  Q   What product were they selling?

20  A   They were one of the first companies to feature a weight-

21  loss food supplement, a capsule that had ephedra that was

22  used in a weight loss effort.

23  Q   Were you compensated for this -- first of all, what was

24  your position?

25  A   I started out as -- you might call me assistant to the

1    president, but I was advising the president and the board on

2    how to develop their national expansion.

3    Q    Were you compensated for this?

4    A    I was.

5    Q    What was your salary?

6    A    As I recall, they were paying me 6,000 a month plus

7    bonuses.    They provided me with an automobile, all of my

8    expenses and a home, a condominium out at the country club

9    there in Sequim.

10   Q    How long did you work for Light and Right?

11   A    I believe the relationship was several years, but -- year

12   and a half or so.    The -- my -- as I recall, it was several

13   years.

14   Q    Why did you leave the position?

15   A    The FDA, the Federal Drug Administration, decided to make

16   ephedra a prescription-only drug, and all the organizations

17   like Light and Right that had that product were asked to no

18   longer sell it on the open market.

19   Q    During your time with Light and Right, did you meet a

20   person by the name of Marilyn March?

21   A    I did.

22   Q    Was Marilyn employed by Light and Right?

23   A    Marilyn was one of their distributors.

24   Q    How did you meet her?

25   A    At one of my -- I was helping Dr. Herb Miller.    I was

1  helping him, founder of the company, conduct workshops and

2  training.  And she was one of the distributor organizations,

3  you know, in the audience, was my first contact with her.

4  Q   Did the two of you have occasion to work together?

5  A   We did.

6  Q   And what were you doing; what kind of work were you doing

7  together?

8  A   Well, like all the distributors, I would help her recruit

9  or interview people or give pointers to her organization on

10  how they might better network.

11  Q   As you got to know each other, did you realize that you

12  had some common goals?

13  A   Yes.

14  Q   What were those?

15  A   She had a strong interest in natural health.  We referred

16  to it as "total wellness."  And she had some interest in

17  humanitarian things that focused on domestic abuse.  And she

18  was quite strong in her spiritual convictions as well.

19  Q   Did you learn that she had been the victim of domestic

20  violence?

21  A   I did.

22  Q   And was that something that was an issue for her?

23  A   Yes.  As I understand it, from how she explained it to me,

24  she had once been in a flight for her life and had decided to

25  dedicate an interest to helping abused women and particularly

1    abused shelters, where woman could seek safety for themselves

2    and their family.

3    Q    Did there come a time when your relationship changed from

4    a business one to a personal one?

5    A    Yes.

6    Q    And about when was that?

7    A    Had to have been '95, somewhere -- '94, '95.

8    Q    Did you eventually move in together?

9    A    We did.

10   Q    Where did you live?

11   A    She had a condominium, Waylors Village, in Des Moines,

12   Washington.

13   Q    Is this the same condominium that we've heard described by

14   Patty Rief and Ms. Lorelei Tarsuik?

15   A    It is.

16   Q    Was their descriptions of that condominium accurate?

17   A    Well, the only issue I would take -- it was a very nice

18   condominium, in that it had water views behind Tammy's desk;

19   you look straight out on to the sound, to the marina.   And I

20   don't recall the restaurant that is down there by the marina,

21   but it overlooked that.   And you could see the beach as well

22   there where the condominium -- it was a corner apartment.

23   Fact is, to my knowledge, it's the only apartment in the

24   entire condominium group that has its own private parking at

25   its door.   You actually can park your car and walk through

1  stepping stones right into the condominium.

2  Q   After the Light and Right company was closed, what was

3  your next job?

4  A   We began to look at a series of networking opportunities

5  and ended up being very focused on a company called

6  "TravelMax."

7  Q   When you say "we," who do you mean?

8  A   Marilyn and myself.

9  Q   The two of you began working together?

10 A   As a team.

11 Q   As a team.

12     Would you tell us what TravelMax was?

13 A   TravelMax was a system and network marketing company of

14 independent travel agents.  It did everything that a normal

15 travel agent did but not confined to an office.  Kind of

16 precursor to the Internet, and it was a business without

17 walls.

18 Q   What was your position with TravelMax?

19 A   Again, helping build an organization.  Marilyn and I

20 became a part of the advisory board and built one of the

21 largest organizations the company had.

22 Q   Were the two of you compensated?

23 A   We were.

24 Q   What was your compensation?

25 A   I don't know.  I think it probably -- it would have been

1    above $10,000 at the height.  I'd just probably say above

2    10,000.  Maybe 20,000 at some of the highest checks.

3    Q    For what period of time were those checks for?

4    A    Seems like this went '95, '96, '97, somewhere in that

5    period.

6    Q    That was the period of time that you worked at TravelMax?

7    A    Yes.

8    Q    Going back to your compensation, you mentioned that you

9    received somewhere between $10,000 and $20,000?

10   A    Well, like all networking opportunities, they start out at

11   zero, and then as your organization grows, the commissions

12   grow as well.

13   Q    So do I understand that maybe your highest commission

14   check was $20,000?

15   A    That would be the highest.  And then there may have been

16   bonuses in there that were one time.  I really don't recall

17   all the particulars of that.

18   Q    Were you and Marilyn sharing these checks together?

19   A    Yes.  They were jointly put into an account to pay all

20   expenses and -- expenses are always high in things like that

21   because of all the traveling.  It's not uncommon to spend

22   half of all -- and sometimes, when you're building an

23   organization, as much as 75 percent of all of your income

24   goes to expense.

25   Q    When you say that you earned a commission check of

1    $10,000, is that a gross figure?

2    A    Well, these figures would always be gross, right.

3    Q    So about how much after you paid all of your expenses?

4    Let's say, how much would you have left from a $10,000

5    commission check?

6    A    It would depend upon how much traveling was done, you

7    know, from one check to another.  It was extensive in most

8    cases.

9    Q    Can you give us some sort of an average?

10   A    I would tend to believe, in networking, that you're going

11   to expense out better than half of your earnings.

12   Q    What was the period of time that commission check covered?

13   A    Normally a 30-day period.

14   Q    Now, you worked with TravelMax until 1997; is that right?

15   A    As best I -- you know, I'm just really not -- I really

16   don't remember the specifics on what dates I started during

17   this period.  I just don't know.

18   Q    But is 1997 about your best recollection?

19   A    It seems right.

20   Q    Why did you stop working with TravelMax?

21   A    The president of the company decided to take all the money

22   out of bank accounts, and the company all of a sudden was

23   faced with non operation.

24   Q    What did you do after TravelMax?

25   A    We became involved in a company called Gold Unlimited, I

1   believe it was, out of Kentucky.

2   Q    Was that also a network marketing company?

3   A    Network marketing company.

4   Q    What was the product being sold?

5   A    They were selling gold coins, American eagle, gold eagles.

6   Q    Did Marilyn do that with you as well?

7   A    She did.

8   Q    The two of you were promoting that product and selling it?

9   A    Yes.

10  Q    Did you begin working with Gold Unlimited in 1997,

11  approximately?

12  A    I am going to say approximately, because I'm not real

13  certain.    There was probably -- may have been overlap in

14  there, because we tried being part of the advisory board.    I

15  went to Newport Beach, California, to the home office, in the

16  last months, trying to do everything I could with the other

17  management -- not the management -- it was not a management

18  but a distributor board representing the distributors --

19  trying to save the company, you know, trying to determine

20  what was wrong.    We -- somewhere during that period, I think

21  we started -- several of the distributors, we looked for our

22  next opportunity, because we had mature organizations in

23  place.    And, as I recall, that's what caused us to then move

24  to Gold Unlimited.

25  Q    You mentioned going to Newport Beach and working to try to

1  save the company.  Are you speaking of TravelMax?

2  A   Yes.

3  Q   And what -- first of all, how long did you work for --

4  work with Gold Unlimited?

5  A   I don't remember.  I think it was about a year.

6  Q   And why did you stop working with them?

7  A   Again, as -- about -- I am going to tell you.  I think

8  statistically, about nine out of ten network marketing

9  companies, like all businesses, by the way, never make it ten

10  years.  And very seldom that you have a company like Amway or

11  Nutrilite or a company like that stay in business.  Mary Kay

12  Cosmetics.  They're really quite unique when they stay in

13  business long term.

14  Q   Was there anything about Light and Right, TravelMax or

15  Gold Unlimited that was illegal?

16  A   Not anything that I know of.

17  Q   Now, there came a time when you became involved in Global

18  Prosperity?

19  A   That is correct.

20  Q   When was that?

21  A   As a result of looking at the gold coinage, we began to be

22  introduced to just education in money, you know, where money

23  comes from, what it's all about, and Global Prosperity seemed

24  to be interested in those kinds of educational workshops and

25  seminars.  And they were done offshore, and I attended one.

1  Q    Did Marilyn attend those meetings as well?

2  A    Yes, she did.

3  Q    What was the purpose or the principal behind Global

4  Prosperity?

5  A    It helped American businessmen and women open up trust

6  accounts offshore, where they take income that is free and

7  clear, income that they paid their taxes on and everything,

8  and put it into offshore trusts and offshore investment

9  strategies.  And it's able to build in a tax-free

10  relationship until you bring the income back on shore.  And

11  so it was about building income and investment opportunities

12  overseas, offshore, that are foreign to the United States.

13  Q    Was this a group where people join the group?

14  A    The income was earned off of selling the work -- the

15  seminars that consisted of three, four days in length at

16  places like the Bahamas or Cancun, Mexico.  That's how the

17  income stream works.  So you, in effect, sold the education

18  to other people.

19  Q    So it sounds like Global Prosperity had two purposes, one

20  for education and one to sell seminars; is that right?

21  A    Yes.  The seminars were educational in format, yes.

22  Q    Have we heard any names of other people that were involved

23  in Global Prosperity during this trial?

24  A    I believe you heard Joe Newbury and several of the people

25  that had been represented as financial advisors or

1    financial -- whatever they're called.  Were -- came from the

2    Global Prosperity people.  I met many of those people at

3    those workshops.

4    Q    What about Dr. Larry Webster?

5    A    Dr. Larry Webster would be one, yes.

6    Q    What about Preston Knepp?

7    A    Preston Knepp, yes.

8    Q    Was there anything illegal about Global Prosperity?

9    A    Not that I know.

10   Q    Are you familiar with the book entitled "The Creature from

11   Jekyll Island"?

12   A    I am.

13          MS. OLSON:   Your Honor, may I approach?

14          THE COURT:   You may.

15   BY MS. OLSON:

16   Q    I have brought you what has been marked as defendant's

17   Exhibit A-1.  Can you identify what that is?

18   A    Yes.  I can.  This is a book, in my opinion, probably --

19   Q    Before you get to describing the book, just tell us what

20   that is.  First of all, what is the title, and who is the

21   author?

22   A    The complete title is "The Creature from Jekyll Island,

23   "by G. Edward Griffin, and it is "A Second Look at the

24   Federal Reserve."

25   Q    Is this the book that you are familiar with?

1    A    Yes, I am.

2    Q    Do you recall that this book was mentioned by Dr. Webster

3    in his conversation with John Morse?

4    A    Yes, I do.

5             MS. OLSON:   Your Honor, we would offer Exhibit A-1.

6             MR. STORM:   No objection.

7             THE COURT:   Exhibit No. A-1 is admitted.

8                  (Exhibit No. A-1 admitted.)

9    BY MS. OLSON:

10   Q    Nolon, can you give us a brief -- a description of what

11   that book is about.

12   A    Yes.  It is -- it goes back to -- the Jekyll Island is

13   Jekyll Island, Georgia, where the federal reserve is said to

14   be founded.  As a matter of fact, there's a villa on the

15   island.  This is off the cost of Georgia, near Hilton Head

16   Island as well, where, in 1900, the early 1900s, this was the

17   land of the rich and famous.  It's where JP Morgan would

18   summer.  John D. Rockefeller, Edison, Ford, Andrew Carnegie,

19   the great champions of industry and government would go to

20   Jekyll Island.

21   Q    Nolon, would you tie that in, in terms of what the theory

22   of that book is about.

23   A    The theory is about the origination -- I have been to

24   Jekyll Island.  There is a plaque on a villa that says, "On

25   this day in 1910, the federal reserve was founded."

1    The federal reserve is neither federal nor is it reserve;
2    it's a private bank.  And this is the book about how money is
3    generated in the United States of America.  I want to say
4    that I spent -- I have spent hours with G. Edward Griffin.
5    I've had dinner with him, three-hour dinners, twice.  And I
6    would recommend this book to anyone.
7    Q    When did you become familiar with this book?
8    A    G. Edward Griffin spoke extensively at the Global
9    Prosperity workshops -- a thousand, 2000 people at a time --
10   and he's a very good speaker.
11   Q    Is there anything illegal about what this book tells you?
12   A    To my knowledge, the book is the absolute truth of the
13   federal reserve.
14   Q    Did there come a time when you learned about high-yield
15   investment programs?
16   A    Doing my offshore workshops at Global Prosperity, in
17   meeting with G. Edward Griffin and others, I began to
18   understand that the -- as I was told, as it was explained to
19   me, that the federal reserve, the IMF, the International
20   Monetary Fund, and the World Bank have private programs that
21   work within these financial organizations.
22          And I was told that there are many impostors.  There
23   are a few -- if you can ever get to the proper trading
24   groups, that they are very financially rewarded.  However,
25   they must have a humanitarian project tied to them.  They

1    must create jobs.   They must have an economic impact on the

2    growth, specifically of emerging countries.

3    Q    You learned about the high-yield investment program

4    through Global Prosperity; is that right?

5    A    I was introduced to people that claimed to be able to do

6    this sort of thing.

7    Q    Had you ever been involved in any type of investment

8    program before?

9    A    I had not.

10   Q    Did you meet a gentleman by the name of Dick Shane?

11   A    I did.

12   Q    When was that?

13   A    It had to have been in '97, '98, somewhere during this

14   period.

15   Q    Do you recall where you met him?

16   A    I really don't -- Duane Christy and I, in 1997, began

17   working on a potential resort 180 miles south of San Diego

18   that we call San Quintin.   And that is what caused me to, of

19   course, go and meet with Dick Shane.   Dick Shane, he lived in

20   Las Vegas.   And I don't recall exactly how I got there.   But

21   had numerous meetings with Dick Shane.   And he claimed to be

22   able to do these programs.

23   Q    Had he done any work in television?

24   A    He had been the Virginian.   If you recall "The Virginian"

25   TV series, he was the Virginian and had since retired in Las

1    Vegas and was there with his wife.

2    Q    What kind of work was he doing?

3    A    I don't know.  He claimed to be involved in these programs

4    and claimed to have interest and -- around the world.  And I

5    found him to be a very entertaining person.  I believe that

6    Doug Stephan talked about our meeting with him on a -- in

7    Long Beach, California.  I was quite intrigued with him over

8    the humanitarian product of sweet white lupine.  Ya'll

9    probably heard about that.  It was reported by Dick Shane to

10   be a product that had great nutritional value and could be a

11   cash crop for different parts of the world.  So I looked to

12   see -- we had around San Quintin -- we had some of the --

13   Q    I am going to stop you here, Nolon, because we're getting

14   a little bit afield.

15        You mentioned that Mr. Shane was involved in programs.

16   Were these high-yield investment programs?

17   A    That's what said, yes.

18   Q    Now, you also mentioned a gentleman by the name of Duane

19   Christy.

20   A    Yes.  Duane Christy is --

21   Q    And who --

22   A    Do I need to talk about him?

23            THE COURT:  Let's do a question and answer instead

24   of --

25   BY MS. OLSON:

1    Q    When did you meet Mr. Christy?

2    A    I think it was in 1996 or '97.   A banker --

3    Q    What was the occasion under which you met Mr. Christy?

4    A    I believe it might have been a TravelMax presentation.

5    You know.   Mr. Christy traveled a great deal.   He and his

6    partner, Phil Yeager, owned Century 21 of Mexico.   That was

7    the beginning of my relationship with Duane Christy.

8    Q    Did Mr. Christy introduce you to a project in Mexico?

9    A    He did.

10   Q    And what was that project?

11   A    Cabo San Quintin.

12   Q    What was Mr. Christy's vision about Cabo San Quintin?

13   A    He was on the board with Harrison Fagg, I think.

14   Q    Is that the same gentleman that testified?

15   A    That testified here.

16        And they were very interested in building the resort

17   there.

18   Q    Did they have plans for what the resort would involve?

19   A    They did.

20   Q    Tell us just briefly what they were.

21   A    It was a mixed-use resort with a small marina.   The

22   original version was somewhat scaled down, maybe one or two

23   golf courses, hotels like Four Seasons or Ritz Carlton, and a

24   tourist area very similar to Cancun would be -- would be the

25   original tourist destination.

1   Q    Did the project have a humanitarian component?

2   A    Duane and I began to discuss about job creation.  And our

3   goal was to actually move an income community similar to that

4   of San Diego, to move it 180 miles into the interior of

5   Mexico.  And at that point, I think we saw possibly 10 to

6   15,000 jobs being created and a good income flow.

7        We began to talk about schools, began to talk about

8   hospitals and -- but I want to say that it was a lesser scale

9   until Doug Stephan came on board, and then we began to really

10  move it up to a high-end project.

11  Q    The facility that you spoke of, the schools and hospitals,

12  what population would those serve?

13  A    Well, we ultimately saw a job base of over 60,000 people.

14  Q    What type of people?

15  A    These would be all -- that area has the Hoheto tribes, the

16  Indian tribes, and that land was given very much like our

17  native American -- the Hoheto tribes would be like our native

18  American Indian, where the government has given them certain

19  land rights and all.  And Mr. Christy, he controlled some of

20  the Hoheto lands.  He had various options, as well as the

21  board that Harrison Fagg has already testified about.

22  Q    So the jobs and schools and the hospital was going to --

23  your vision was that those things would assist the Hoheto

24  people?

25  A    That is correct.

1    Q    Now, you mentioned that Doug Stephan.    This is the same

2    individual that also testified during this trial; is that

3    correct?

4    A    That is correct.

5    Q    When did you meet Mr. Stephan?

6    A    Dick Shane put us in touch.    I think Dick saw the interest

7    in -- that I had this humanitarian desire and that he wanted

8    me to meet a fellow that he was working with, Doug Stephan.

9    He was attempting to build a small resort in Anacortes,

10   Washington.    And so I went up to Anacortes and met Doug

11   Stephan there.

12   Q    Did he complete his project in Anacortes?

13   A    He did not.

14   Q    What was Mr. Stephan's contribution to the San Quintin

15   project going to be?

16   A    He would play the role of the developer.    He brought to

17   the resort four of the golf professionals similar to Tiger

18   Wood.    You're going to know some of the names.    Ernie Els.

19   You'll know Nick Faldo from England, and I don't recall the

20   other two.    But these were all personal friends of Doug

21   Stephan.    Doug is an avid amateur golfer.    He's a good

22   golfer.    Those are all of his friends.    He brought this

23   vision, now, for four PGA golf courses and the likes of maybe

24   three or four Four Season-type resorts to go with this kind

25   of a play.

1    Q    And I'm going to stop you there.

2         So his role is as a developer?

3    A    He would be handling the development, the phase one, two

4    and three, yes.

5    Q    And what was Mr. Christy's role going to be?

6    A    He was in charge of all land acquisition.  He had been --

7    he and Phil Yeager had owned Century 21 of Mexico for the

8    last 20-plus years.  And Glenn, I think out of 180 offices in

9    Mexico, they have the largest real estate power in Mexico.

10   Duane is probably a foremost expert in acquiring Mexican soil

11   for American ownership.

12   Q    His job was acquisition of the real estate?

13   A    Correct.

14   Q    What was your role going to be?

15   A    My role was the financing.  I now saw, Paula, the

16   opportunity to have my humanitarian project -- the kind of

17   project that they told me was behind these high-yield

18   programs.  The high-yield programs are no good, in and of

19   themselves, unless they are attached to humanitarian effort.

20   They are not get-rich-quick schemes.  And they're available

21   only to a very few.

22   Q    Was the humanitarian aspect of this project important to

23   you personally as well?

24   A    Very personal.  Very personal.

25   Q    Why is that?

1    A    I am a dimming disciple.  What that means is, as a

2    business professional -- Dr. Demming is the man that invented

3    total quality management.  Everything that happened from 1950

4    to 1980 in Japan is Dr. Demmings's work.  I'm talking about

5    Mitsubishi, Panasonic, Sony, Toyota; these are all Demming

6    companies.  And I have taught the Demming system.

7    Q    Before we get off on --

8    A    I want to tell you it's job creation.

9    Q    Job creation.

10   A    And so my life -- I became dedicated, from a spiritual

11   perspective, to see if I could bring jobs to the

12   underprivileged, if you will.

13   Q    And that you saw that you would be able to accomplish that

14   through --

15   A    Through building this resort.

16   Q    -- working with San Quintin?

17   A    Yes.

18   Q    So there came a time when you and Mr. Stephan and

19   Mr. Christy put an agreement together to work together; is

20   that right?

21   A    That is correct.

22   Q    This is the same agreement that we've heard testimony

23   about during the trial?

24   A    It is, but the agreement was signed long after we worked

25   on this project for several years, before the final agreement

1    on percentages and all.  I had to go to work on the funds.

2    Q    Let me stop you here.

3        Do I understand that the three of you worked together

4    under just an oral understanding as opposed to --

5    A    In the beginning, yes.

6    Q    And then later on, it became a written agreement?

7    A    Correct.

8    Q    At some point, did you meet a gentleman by the name of

9    Glenn Stoll?

10    A    I did.

11    Q    First of all, where did you meet him?

12    A    As I recall, when I first met him was in his office in

13    Edmonds, Washington.  Remedies at law.  I was invited there.

14    I sought his advice.

15    Q    Let me stop you there.

16        So you met him in -- at his office.

17    A    Yes.

18    Q    Do you recall approximately what year that was?

19    A    Well, it had to have been -- I am going to say '98, '99.

20    It was obviously before.  I think in '98 is when I -- when I

21    realized that it was time to have a complete structure.  Then

22    I began to talk to him about my desire to be a corporation

23    sole.

24    Q    It was after you made -- you entered into the agreement

25    with Mr. Stephan and Mr. Christy to do the financing?

1    A    Yes.

2    Q    Is that right?

3         And you realized that you needed some sort of a structure?

4    A    Yes.

5    Q    Is that correct?

6    A    Yes.

7    Q    And so you went to discuss that structure with Mr. Stoll;

8    is that right?

9    A    I did.

10   Q    Is Mr. Stoll an attorney?

11   A    He told me that he was an ecclesiastical attorney, not a

12   practicing member of the bar.  Not part of the Washington bar

13   but a church lawyer.  Understanding common law, as I

14   understand the State of Washington is based on, and the corp

15   sole, and church law is based on that.

16   Q    So he suggested to you that the structure that might be

17   best for you is a corporation sole structure?

18   A    That is true.

19   Q    Had you heard about that type of structure before?

20   A    I had been told that the arch diocese of San Francisco was

21   a corp sole.  I had been told --

22   Q    Let me stop you there, Nolon.

23         Before you discussed the corporation sole with

24   Mr. Stoll, had you heard of that type of corporation before?

25   A    I had.

1    Q    What did you come to understand would be advantageous to

2    you to be a corporation sole as you went about getting

3    financing?  What were the advantages of being a corporation

4    sole?

5    A    The advantages are, it establishes you officially in the

6    eyes of all government as a religious society.

7    Q    Is there anything illegal about that?

8    A    The Catholic church, the Mormon church, all corp soles.

9         None I know of, anything illegal.

10   Q    Does the State of Washington have a law that provides for

11   a corporation sole?

12   A    As I understand, there are five states now remaining that

13   have corp sole structures.  The State of Washington is one of

14   them.

15   Q    So did you decide to incorporate as a corporation sole?

16   A    I did.

17   Q    Did you intend to escape any requirements -- any

18   government requirements by being a corporation sole?

19   A    Absolutely not.

20   Q    I am going to ask you -- I am going to put up on the

21   overhead Exhibit 1001 that has already been admitted.

22        Nolon, is this your corporation sole?

23   A    Yes, it is.

24   Q    Is this what you filed with the State of Washington?

25   A    Yes, it is.

1   Q    What is the name of your corporation sole?

2   A    It is "Director of the Cornerstone Institute."

3   Q    When is it dated?

4   A    January the 19th, 1999.

5   Q    Now, does this document describe -- what does this

6   document generally describe?

7   A    Well, there are various articles in there that set out my

8   profession of faith, that set out the basis of my corp sole.

9   Q    I am going to have you read the first paragraph that's

10  entitled Important Notice.

11        Can you see it?

12  A    The Important Notice?

13  Q    Yes.  Let me make it a little bit larger.

14        How's that?

15  A    You would like me to read?

16  Q    Yes, could you read that, please.

17  A    "It is unlawful for this Charter to be incorporated under

18  the laws of any secular state on earth or any of its various

19  religious government of the world.  This is based on

20  Isaiah 8, 9 through 22.

21        "This corporation is registered with the body of

22  Christ, the only true church (Ephesians 4, 4 through 16),

23  having its authority and power ordained of God (Romans 13),

24  and has been chartered by the Kingdom of Heaven under its

25  laws of service to others.

1    "The purpose of this written instrument is for

2    notification to the world, not registration with it.  Filing

3    with any secretary of state or county recorder is to make the

4    vision plain for all to see, that this is a lawful entity, is

5    a sovereign vice regent of the eternal creator (Habakkuk 2, 1

6    through 4), as stated by the people in Article One of the

7    Bill of Rights, amendments of the Constitution of the United

8    States of America.

9    "Regarding the establishment and free exercise of

10   religion, this corporation is not, nor can it be, a creation

11   of the United States or any of its several states.

12   "The office of this corporation derives its powers of

13   creation and existence from our creator God and his son Jesus

14   Christ, our Lord, Savior and King.

15   "The official holder has been ecclesiastically and

16   commercially petitioned by the members of the church to

17   accept such office.

18   "Freedom of religion, the right to contract and due

19   process of law are protected by the constitution and laws of

20   the United States and each of its member states'

21   constitutions and are also recognized by international laws

22   and treaties, as well as the national universal laws of the

23   eternal supreme sovereign."

24   Q    Nolon, who wrote that paragraph?

25   A    This structure -- the paragraph was given to me by Glenn

1    Stoll.

2    Q    In fact, did Mr. Stoll write the entire document?

3    A    He wrote the entire document, yes.

4    Q    Did you participate at all in the writing of the first

5    paragraph?

6    A    No.  I just affirmed that I am in agreement with it.

7    That's who I am.

8    Q    Let me have you read the first two sentences of the second

9    paragraph.

10    A    "Known all men by these presents that the Cornerstone

11    Institute, an unincorporated church ministry, has

12    incorporated the office of its sole overseer, the Director of

13    the Cornerstone Institute, by creating a religious

14    corporation sole of the church on April 15, 1973, under its

15    own authority and jurisdiction."

16    Q    The second sentence, please.

17    A    "On that same day, C. Nolon Bush took possession of the

18    said office as the first duly-appointed and qualified

19    overseer of this corporation."

20    Q    You mentioned -- in the first paragraph, there is an

21    entity called the "Kingdom of Heaven."

22    A    Yes.

23    Q    Would you explain that to us, please.

24    A    It is a religious society located, as I understand, in

25    Oregon, and has some three or 400 groups, both churches and

1  individuals like myself, who are part of that system.

2  Q   Are you a part of the Kingdom of Heaven as well?

3  A   I am.

4  Q   The second paragraph that you read refers to a date,

5  April 15th, 1973.

6  A   Yes.

7  Q   What is significant about that date?

8  A   That is the day that, in my heart, my soul, I believe that

9  I truly surrendered my life to Christ.

10 Q   And does this paragraph indicate that your corporation

11 sole goes back to that date?

12 A   That is my understanding.   That is correct.

13 Q   Who did you get your understanding from?

14 A   From Glenn Stoll.

15 Q   Now, I am going to have you read -- this is page 4 of the

16 exhibit, page 2 of what is called the "Charter."   Would you

17 read the first two sentences of article one.

18 A   "The name of this corporation sole is 'Director of the

19 Cornerstone Institute.'   It's integrated axillaries,

20 conventions and associations include, but not limited to,

21 Hulaman Management Services.   It's doing business as

22 fund-raising projects trade names or pure trust

23 organizations."

24 Q   Is this where the Hulaman Management Services business

25 came from?

1  A    That is correct.

2  Q    And so is it your understanding that it falls under your

3  corporation sole?

4  A    That is correct.  It is doing business as.

5  Q    Now, Article III is entitled "Statement of Purpose With

6  Vow of Poverty."  Rather than have you read all of that,

7  would you explain to us what this article states.

8  A    In my taking a vow of poverty, I own nothing.  This just

9  means that at my death, whoever succeeds me would continue to

10  manage the assets of the corp sole.  The corp sole feeds,

11  clothes, transports me -- I don't know if this is answering

12  your question or not.

13  Q    Not exactly.  Because the Article III is entitled

14  "Statement of Purpose with Vow" -- is it first -- see on the

15  screen?

16  A    "Statement of Purpose."

17  Q    "Statement of Purpose with Vow of Poverty."  Let's start

18  first with the Statement of Purpose.  Does this article

19  describe the statement -- does it set forth what the purpose

20  is of your corporation sole?

21  A    Yes.

22  Q    And can you tell us, without reading it -- just describe

23  it to us -- what is the purpose as set forth in this article?

24  A    Well, I would just like to make a difference, and I don't

25  care to have any personal ownership in anything, nor personal

1    income either.

2    Q    Now, let us look at the Article IV.  I am going to ask you

3    to read the first sentence of Article IV.

4    A    "The property of this corporation is managed exclusively

5    not for profit and is irrevocably dedicated to religious,

6    educational, medical or other scientific purposes."

7    Q    Can you explain what is meant by that statement?

8    A    Whatever profits that the corp sole earns are to be given

9    back to humanitarian causes.

10   Q    Is that what you understand a nonprofit corporation would

11   involve?

12   A    Well, it's truly my intent.

13          THE COURT:  We're going to take our midmorning break

14   now.

15          Ladies and gentlemen, remember the Court's admonition

16   about discussing this matter amongst yourselves or with

17   others.  If you would, please, return to the jury room.

18   We'll be back in a few moments.

19          (Jury exits the courtroom.)

20          THE COURT:  Please be seated.  Anything we need to

21   take up at this time?

22          MS. OLSON:  No.

23          THE COURT:  Court in recess.

24          (Court in recess.)

25          THE COURT:  Ready to proceed?

1    MS. OLSON:  Yes.

2        (Jury enters the courtroom.)

3        THE COURT:  Please be seated.  Welcome back.

4        You may continue.

5    BY MS. OLSON:

6    Q    Nolon, let's look at the last page -- well, no.  Actually,

7    I take that back.  Page 4 of your corporation sole document.

8    And the paragraph entitled "Certificate of Evidence of

9    Appointment."  What does that paragraph tell us?

10       Let me ask you another question.  Is Marilyn March

11   mentioned in that paragraph?

12   A    She is the corp sole secretary, yes.

13   Q    And she was appointed by you to be the secretary?

14   A    Correct.

15   Q    And, looking at this paragraph that starts "By unanimous

16   sustaining vote," what is the term of duration of your status

17   as director of Cornerstone Institute?

18   A    It is for life, unless I should advocate due to health

19   reasons or not being able to carry on my duties.

20   Q    Now, was it based upon your incorporation as director of

21   Cornerstone Institute that you began to operate under the

22   name "Hulaman Management Services"?

23   A    That is correct.

24   Q    What does "Hulaman" mean?

25   A    It has some bas back in Jewish tradition, and I'm not

1    certain -- it was just a name that we picked, and it's what I

2    wanted to pick.

3    Q    It has a Jewish tradition?

4    A    It's a Jewish tradition.

5    Q    Did you come to meet a gentleman by the name of Nigel

6    Scott Grant?

7    A    I did.

8    Q    Where did you meet him?

9    A    I -- again, I don't know.  I don't know how we came about

10   to make our acquaintance.  It had to be somewhere in the

11   relationship with Global Prosperity.  You know, he was

12   introduced as someone who was familiar with offshore

13   structures and the fact that he was English.  Someone

14   recommended that I go meet with him.  As I recall, I think I

15   went to Coronado.

16   Q    Before we go any further, may I have you look at the

17   folder which has an exhibit that is marked -- numbered

18   "4016."  Would you look at that document, please.  Have you

19   seen that document before?

20   A    Yes.

21   Q    Can you just briefly describe it.

22   A    It gives his educational background.

23   Q    Before -- just a brief description.  Is it fair to say

24   that it is Scott Grant's resume?

25   A    Yes.

1          MS. OLSON:   I'd offer Exhibit 4016.

2          MR. STORM:   No objection.

3          THE COURT:   4016 is admitted.

4                    (Exhibit No. 4016 admitted.)

5    BY MS. OLSON:

6    Q    Nolon, when you were looking at Mr. Grant's resume, were

7    you impressed by his education?

8    A    Yes.   But I would imagine the international tax banking

9    attorney interested me the most because I was looking -- my

10   endeavors for the Cornerstone Institute were going to be very

11   much international in basis.

12   Q    Are you referring to his LLM degree, master's in law and

13   international law?

14   A    Certainly would lead me to believe that he knows what he's

15   doing.

16   Q    And also his LLM degree in master's of law in taxation

17   degree?

18   A    Yes.

19   Q    Were you also impressed by his graduate diploma in advance

20   international legal studies?

21   A    Yes.

22   Q    As you look at some of his other legal experience and his

23   academic accomplishments, was there other things about his

24   background that impressed you?

25   A    Absolutely.

1    Q    Can you look at -- point to a few things specifically.

2    A    Well, academic accomplishments, Mexican tax law, getting

3    ready to do major effort in Mexico.  I am sure this had --

4    with his offices there in San Diego at Tijuana border and

5    all, he appeared to know a great deal about interaction of

6    U.S. ownership into Mexico.

7    Q    Now, let me have you look at the last part of that resume,

8    entitled "Personal."  And were there things about that aspect

9    of his background that was impressive to you?

10   A    Well, from a personal perspective, being a private pilot,

11   you know, his Air Force relationship, his military

12   experience.  But his offshore, you know, finance centers

13   international banking certainly had my attention.

14   Q    Based upon his resume and his experience, did you seek

15   legal advice from him?

16   A    I did.

17   Q    I am going to ask you to look at what has been admitted as

18   Exhibit 2037.  The first page of that exhibit is a fax cover

19   sheet; is that correct?

20   A    Yes.

21   Q    Now, the second page is entitled "The Hulaman Trust,

22   "International Trust and Fiduciary Agreement"?

23   A    Yes.

24   Q    And there are several pages to this agreement; is that

25   correct?

1    A    Yes.

2    Q    Who wrote this agreement?

3    A    Grant's law firm.  Scott Grant.

4    Q    Did you have anything to do with drafting this trust

5    agreement?

6    A    No.  I just -- you know, this is what he suggested that we

7    use, and we did.

8    Q    When he was going to prepare this agreement, did you

9    explain to him what you wanted it for?

10    A    Well, he was, you know, fully aware of what we were doing.

11    I don't know if I understand the question.

12    Q    Probably wasn't a good question.

13          Did you explain to him that you had entered into an

14    agreement with Mr. Stephan and Mr. Christy?

15    A    Yes.  He knew of all those dealings.

16    Q    And he knew that your role was to provide financing for

17    the project?

18    A    Correct.

19    Q    So did he recommend using the international trust and

20    fiduciary agreement as a way to fulfill your role?

21    A    Yes.

22    Q    Have you read the entire agreement?

23    A    Not lately.

24    Q    Let me have you look at the first paragraph.  Would you

25    read the first paragraph, starting with "The trustee."

1   A    "The trustee is a substantial private trust authorized

2   under the laws of Bahamas to conduct business internationally

3   with its powers, included all rights and privileges to

4   transact the business outlined herein."

5   Q    What did you understand the term "substantial trust" --

6   "private trust" to mean?

7   A    Well, I don't know that I could say that I understand it.

8   Q    Do you understand why Mr. Scott recommended that the trust

9   be authorized under the laws of the Bahamas?

10  A    That's what he wanted to do.

11  Q    You did not tell him --

12  A    I made no suggestions on any of this.

13  Q    Now, paragraph 2.0 at the bottom, could you read that,

14  please.

15  A    "Any interpretation in law of this contract shall be

16  referred to the jurisdiction agreed herein, namely, the

17  English common-law."

18  Q    What did you understand that section to mean?

19  A    That it was congruent with my corp sole paperwork.

20  Q    Do you recall the testimony of William Kerr?

21  A    I do.

22  Q    Do you recall what his testimony was about?

23  A    Yes, I do.

24  Q    Do you recall him going through this document and making

25  criticisms of it?

1    A    Yes.

2    Q    And do you recall that one of his criticisms had to do

3    with the term "private trust"?  Do you recall that?

4    A    That particular thing, I don't recall.

5    Q    You do not understand why Scott Grant put that term or

6    that instrument in there; is that correct?

7    A    No, and, quite frankly, I didn't understand what Mr. Kerr

8    was talking about either.  I'm not an authority on that.

9    Q    Let me have you look at paragraph 5.0.  Would you read the

10   first sentence -- the first -- well, actually, just read --

11   yes, the first sentence.  I'm sorry.  The first sentence of

12   that paragraph.

13   A    "Trustee shall have full and absolute power to deal with

14   the assets as delivered in his or her capacity as trustee,

15   may sell pledge, borrow, exchange or deduct fees, commissions

16   or legal charges, provided that there are such actions are in

17   compliance with accordance of the attached statements of

18   wishes."

19   Q    Stop there.  Thank you.

20        What did you understand that provision to mean?

21   A    That I had clear control of doing anything with these

22   borrowed assets, because I looked upon them as being borrowed

23   funds, and that supported this trust.

24   Q    Now, could I have you look at paragraph 8.0.  And if you

25   would read -- read that paragraph, please, to the best of

1    that you can.

2    A    It's 8.0?

3    Q    Yes, please.

4    A    "That the trustee will hold the assets of the trust in

5    custodial safekeeping and are in bank accounts under its name

6    and in its full custodial control within the requirement set

7    forth herein are made a part hereof, and the trustee herewith

8    guarantees the safety of the said trust property for the

9    interest" -- whatever is behind that.

10   Q    That's difficult to read.

11        Mr. Bush, what did you understand paragraph 8.0 to

12   mean?

13   A    I would say exactly what it says.

14   Q    That funds were to be safe --

15   A    I can explain this later, my thoughts towards this, unless

16   you want me to explain it now.

17   Q    Well, actually I would like you to explain it now.

18   A    Well, these are in bank accounts under its name and its

19   full control.  When I began doing business with New York, and

20   even prior to that, they told me assets would be offsetting

21   all of this.  I just needed to have all my paperwork in

22   order.  And that's what I did.

23   Q    All right.  Now I am going to have you look at page 9 of

24   this exhibit.  And read the very last line of that paragraph.

25   A    This note?

1  Q    Yes, starting with this note.

2  A    "This note has not been registered under the Securities

3  Act of 1933 as" --

4  Q    And then it will continue on the next page.

5  A    "Amended the Securities Act or the securities laws of any

6  jurisdiction and may not be transferred, in whole or in part,

7  unless registered pursuant to the Securities Act and

8  applicable security laws or unless such transfer is made

9  pursuant to effective exemptions from the registration

10  requirements or the Securities Act and made pursuant to

11  effective exemptions from the registration requirements of

12  the Securities Act and all other applicable security laws."

13  Q    What did you understand this section to mean?

14  A    That we had nothing to do with securities.  We're not in

15  the security business.  This is a private contract between my

16  corp sole's entities and the parties.

17  Q    Is that something that you wanted to make sure was a part

18  of this agreement?

19  A    Absolutely.

20  Q    Let me have you direct your attention to the term

21  "promissory note."  What did you understand that to mean?

22  A    That the parties involved here are loaning money.  They

23  are not investing.  They are not investors.  They are

24  lenders.  The corp sole is the investor, not the lender.  The

25  lender is participating in the profits the corp sole might

1   generate that might be used for various seed capital, as far

2   as humanitarian work.

3   Q   Have you taken issue with the use of investment

4   terminology throughout this trial?

5   A   Paula, it has upset me very much since the first word was

6   ever used in this courtroom.  Because in no way did I have

7   investors involved in this; I had lenders.  And they knew

8   this.

9   Q   Now, this Exhibit 2037 was signed by Donald and Chris

10  Fisher; is that correct?

11  A   That appears to be the --

12  Q   And they were one of the many people that lent your

13  corporation sole money; is that correct?

14  A   That lent the project money, yes.

15  Q   Now, you stated that you hired Mr. Grant to put this

16  paperwork together.  Did you talk to any other lawyers about

17  this paperwork?

18  A   In the process of -- I became familiar, you know, with

19  various instruments that were used in going to the Global

20  Prosperity events, but Scott Grant would be the only members

21  of the bar that I sought.  I had, again, my church lawyer,

22  the ecclesiastical lawyer, in the way of Glenn Stoll.

23  Q   So after Mr. Grant put together the international trust

24  agreement, was the project -- or the opportunity to lend

25  money to the project announced to people -- various people?

1    A    Yes.

2    Q    And did you have people helping you with that?

3    A    I did.

4    Q    And who were some of those people?

5    A    Well, Larry Webster and Joe Newbury, and I think some of

6    the ones that we've mentioned, Preston Knepp, Rick Felton,

7    some that we've mentioned.

8    Q    Describe to us how you engaged them in going out and

9    getting people involved in the project.

10   A    Well, there was no formal training of any sort.  They

11   wanted to participate and I -- you know, it's probably a good

12   thing to explain my position.  I'd have to explain the

13   relationship with New York that was behind this.  I mean, we

14   can -- I know we're going to get there.  But it sort of ties

15   all into that.

16        They were aware of my passion for the project.  You

17   know, they could readily see our passion for domestic abuse.

18   They understood, certainly in talking to Marilyn.  While

19   Marilyn had nothing to do with any of my business dealings

20   with New York, she was very much the recipient of the outcome

21   as in -- you know, that's just how it was.

22   Q    And we will talk about that.

23        My question has to do with what discussions you had with

24   Dr. Webster, Mr. Knepp and others who were going to go out

25   and talk to people and invite them to be a lender in the

1  program.

2  A    I am amazed at some of the things that are said.  I never

3  approved anyone's e-mails.  I never approved anyone's

4  presentation material.  I have -- I am amazed at some of the

5  things I have heard in this courtroom.  I was not actually

6  aware of what they were doing.  They were very successful, it

7  certainly appeared, in bringing funds, bringing the lenders

8  and the seed capital that was necessary to make this work.

9  And I was very pleased with that.

10      But I just -- I don't understand some of the statements

11  that had been made in this courtroom.  I am happy to address

12  any of them.

13  Q    Let us talk about the statements of -- the various

14  statements about how much return folks could expect on their

15  money.

16  A    All right.  As I understand these projects that back a

17  humanitarian effort like Cabo San Quintin, they use the term

18  "tranches."  And while you may talk about a 20-percent or 26-

19  percent in a 30-day period, there is no guarantee -- and I

20  believe that's why Scott Grant had things like "best effort"

21  on the paperwork.  There is no guarantee that they'll ever

22  even be one return.  And when we talk about the situation in

23  New York, I will back all that up.  But there may be one

24  month out of the year or there may be multiple.  But there is

25  no guarantee there is even one.

1  Q   You did hear testimony from people that were involved that
2  understood it to be guaranteed?
3  A   Heavens no.  It's not guaranteed.  It's a -- it's a best
4  effort -- it says exactly what it says.  It's not -- it's not
5  guaranteed.  We're not guaranteeing the return.  We have a
6  guarantee 8 percent is there, but we don't have -- every
7  month you're not guaranteeing that you will have that.  And,
8  again, when I talk about New York, I'm talking about how that
9  works.
10  Q   How do you explain that some people understood that they
11  would have great returns on a period of time within a year?
12  A   Well, hopefully, we -- we had those expectations.  I think
13  some of the word in there is that we have some positive
14  expectations.  We have some high levels of confidence.  But
15  everyone understood that these programs start and stop based
16  on a number of things.  It's not a -- this is not a contract
17  to deliver these kind of returns.  They are understood that.
18  Where my program, I feel, differs is that -- I don't know
19  what other people are doing, but my program was backed
20  clearly by my project.  It was the only reason I felt I had
21  the right to even be involved in any of this high-yield
22  thing.
23  Q   Did you ever tell people that their money would never
24  leave the bank?
25  A   Again, their money is tied to master accounts in the banks

 1   of New York.  That money never leaves the account.  Those

 2   bank guarantees.  This cash as -- I am happy whenever you

 3   want to talk about the business plan, how it was

 4   intermixed -- you want me talk about that right now?

 5   Q   No.  Actually, I want to stick with statements that were

 6   made to people that gave money to Hulaman Management

 7   Services.

 8       And were they told that their money would not leave the

 9   bank?

10   A   They were told that the money would always be safe.  When

11   you say "leave the bank," there are offsetting -- I believe

12   and was told there's offsetting moneys that represent their

13   money in banks.  In fact, there's -- I will just throw it

14   out -- $800 million was there.

15   Q   Now, you first -- what was the first place that you put

16   money that you received from lenders?

17   A   Somewhere during the Global Prosperity we met IFR Trust,

18   the Larry Wilcoxson organization in Modesto, California.  And

19   some of the first moneys that we put in -- you know, we

20   believe that could be a legitimate program, Until I went down

21   there personally and met him, and I just did not like what I

22   saw.  At the same time that was going on, I was beginning to

23   meet with Mark Kaposi, representing Carolyn Mintus.

24   Q   Before we get to that.  So you put a certain amount of

25   money in the trust with Larry Wilcoxson; is that correct?

1    A    Right.  And to my knowledge, Paula -- because I differ on

2    many of the figures.  It's been very intriguing and

3    interesting to me to look at the government's figures.  But I

4    think that you're going to show what they say we put in Larry

5    Wilcoxson?

6    Q    I am.  I am going to put on the screen Exhibit 16003.  And

7    we are looking at the top line, which has the figures for IFR

8    Trust, Wilcoxson.

9         Do you see the amount of money that the government

10   reports was placed into the that trust?

11   A    Yes.  And to my knowledge, only $66,000 went to IFR.  But

12   what I don't know -- I don't know if, in fact, some of the

13   financial advisors might have sent more than that.  I don't

14   know that.

15   Q    So, in terms of what was under your control, you believe

16   that much less was given to --

17   A    To my knowledge, that is true.  You know, perhaps --

18   unless I missed something.  I could have missed something.

19   Q    And so do I understand that you discontinued dealing with

20   Mr. Wilcoxson?

21   A    That is correct.

22   Q    And why was that?

23   A    Mr. Wilcoxson was not interested in committing

24   $1.3 billion to me as Carolyn Mintus.  He wasn't interested

25   in this being the scope of humanitarian project.  So,

1    obviously, from -- as soon as I -- this is all, like, within

2    the first 30 days I decided that I want to really direct my

3    attention to New York.

4    Q    There were other things about the way he operated his

5    business that gave you concern?

6    A    His office operation, it was somewhat disarray.  I did not

7    go to his home that you saw here.  I went to his office.  I

8    just didn't like what I saw.

9    Q    And so then you met a gentleman by the name of Mark

10   Kaposi?

11   A    Mark Kaposi.

12   Q    Who is he?

13   A    Mr. Kaposi was a representative of Carolyn Mintus' banking

14   dealings in New York.

15   Q    When did you meet Mr. Kaposi?

16   A    He was actually here in Washington, State of Washington,

17   visiting some people.  He was brought to me as someone they

18   knew.  One of the Global Prosperity people had met him, and

19   he -- we had a meeting together.  And I explained to him --

20   Q    Before we get to that, can you give us a time frame as to

21   when you met him?

22   A    Well, it's got to be sometime in 1988 -- 1998.

23   Q    Early 1999, you're figuring?

24   A    Well, we are working on all this.  But it's -- well, I

25   guess it's first nine -- '98, '99, somewhere in those

1     first -- it could be days -- either side of the first of the

2     year.

3     Q    And so you stated you had a meeting with him?

4     A    Yes.

5     Q    What did you discuss at the meeting?

6     A    My project, what I wanted to do.  All of this has always

7     been based on San Quintin.  And he said, "Oh, this is a

8     humanitarian" -- he began to tell me, "This is perfect for

9     what Carolyn Mintus needed."

10    Q    What did he tell you about Carolyn Mintus?

11    A    That she was one of a half dozen people on the face of

12    this earth that could get things done, and if I would come to

13    New York and meet with her, she would satisfy my due

14    diligence.

15    Q    Do you go to New York?

16    A    I did.

17    Q    Did you meet with her?

18    A    I did.

19    Q    What was the nature of your meeting with her?

20    A    She was living -- as they told me, she had been -- told me

21    she had been living for, like, 15 years or something at the

22    Saint Regis Hotel.

23         And in my first meeting with her, there were two

24    members of the federal reserve board of New York, or at least

25    they said they were.  When I say, Paula, that they were

1    members of the -- I think they actually represented

2    themselves as retired members.

3    Q    So you met with her --

4    A    I took her word for it.

5    Q    You met with her and two possibly retired members of the

6    federal reserve?

7    A    Yes.

8    Q    And anybody else at this meeting?

9    A    Well, this is the first of many meetings that would come

10   which would be leading New York bankers that would -- where

11   the money was going to be put.  They brought representatives

12   from the bank.

13   Q    We're talking about this first meeting.

14   A    Now, there had been -- before that meeting -- you need to

15   understand, too, there had been numerous telephone calls that

16   I had with her dealing with this subject.  And that, yes,

17   this is what she wanted.  Purpose of my trip there was to

18   become comfortable with the fact that she could make this

19   happen.

20        We've talked about "The Creature from Jekyll Island."

21   And these people seem to be very knowledgeable about the

22   federal reserve.

23   Q    Had they heard of the book?

24   A    Yes.  They were right in with the fact that humanitarian

25   projects were behind the whole world banking system, and my

1    project measured up.

2    Q    So what was the proposal that Carolyn Mintus made to you

3    about how she could be involved in funding San Quintin?

4    A    She needed my project to help her with other things.  She

5    had to pick a project, and she picked mine.

6    Q    And what was the benefits of you going with her?

7    A    She told me that she would -- and I knew I was going to

8    need -- this Court has talked about when they ask people did

9    you know Mr. Bush was $300 million behind, something like

10   that.  I believed all that money was sitting in the bank in

11   New York.  She committed to $800 million in an account to

12   fund the first phase of this project, and up to 1.3 billion

13   she committed to me.

14   Q    Is that what she told you in the first meeting?

15   A    There were many conversations over the phone call.  I just

16   talked about the fact I was going to need 800 million.

17   Because I was talking to Doug Stephan about that was my part.

18   The Cornerstone was working on paperwork where -- and we

19   ultimately signed that paperwork representing 800 million.

20   That is why I signed the contract.

21   Q    So you told Ms. Mintus that you needed to provide $800

22   million to San Quintin?

23   A    Doug Stephan for our side of the deal.  I was going to

24   need approximately that much.

25   Q    What kind of program did she outline for you so that she

1    could assist you in funding that sum of money?

2    A    Well, she told me to go ahead and continue to collect --

3    you know, I explained to her what I was doing.

4    Q    Let me stop you there.

5         Did you explain to her about the trust agreement that

6    Mr. Grant had drawn up.

7    A    Sure.  She knew that I was -- she understood -- of course,

8    this is over the course of time.  Because we've not yet gone

9    offshore.  But she certainly advised me that being offshore

10   was a good idea.

11   Q    And we're not talking about that yet.  We're still talking

12   about the beginning relationship of you and Carolyn Mintus?

13   A    She wanted my project and wanted to put up $800 million.

14   Q    Did she explain to you how this was going to work?  Did

15   she go through the steps of how the program was going to

16   work?

17   A    Well, just the -- that they made these tranches.  These

18   trades were down, and they bought and sold paper.  I hear it

19   called "mid-term bank note."  I don't know what that is.

20        Quite frankly I'm not a financier.  I was interested

21   for humanitarian purposes in building my project, and she

22   said she could fund it.

23   Q    Was the idea that you would get money from lenders and

24   give it to her?

25   A    I would give it to her and -- but -- but I would -- it

1    would take her a few months to get things set up.  She would

2    take whatever money I could send and that I was, in fact, to

3    do the seed capital that it took to do engineering work, soil

4    samples, proceed with Duane Christy on the land options, you

5    know, the -- do whatever it took to get things done.  Work on

6    the architectural work, doing it all.  I was to do that.

7    Q    All right.  So, again, getting back to the -- how this

8    program began, you were going to get money from lenders and

9    give it to her?

10   A    Yes.

11   Q    And then what was she going to do with it?

12   A    She would then put the money to work.  But she had my

13   project as -- and that represented billions of dollars worth

14   of assets potentially that -- that was the end result of her

15   program.  So she just doesn't need the money that we were

16   sending; she needed my project.  She had to have a project,

17   and she wanted my project.

18   Q    I understand that.  What I am wanting to know after you

19   gave her the money that you received from your lenders --

20   A    Began sending her money.

21   Q    Do you know what she did with it?

22   A    She said she was mixing it with hundreds of millions of

23   other dollars.  She said this would go in a $300 million cash

24   account, that whatever money I sent her would ride in with

25   that money and I could be guaranteed that my project would be

1    built and I didn't even have to pay it back over a period of

2    time.

3    Q    So the money would go into a much larger fund?

4    A    Yes.

5    Q    Is that right?  And would there be any return on that

6    money?

7    A    Yes, the return paid for the project, as well as it

8    generated cash that the individual lenders could get their

9    interest payments on.

10   Q    Do I understand, then, that the plan was, she would return

11   to you the interest that was earned on the lenders' money?

12   A    That's correct.

13   Q    How would the profit from the money be used?

14   A    Well, the majority of it, of course, is going to go into

15   the project itself.   But there were going to be various

16   interest payments.   Again, the 26-percent thing is not

17   guaranteed.   You know.   She later told me, when she had not

18   funded, to go ahead and pay the interest payments.   And so

19   that is when you see particularly the whole system's flowing,

20   when it gets offshore.

21   Q    So after you have your first meeting in New York, you

22   enter into this plan with her?

23   A    Correct.

24   Q    So do you begin sending her money?

25   A    I do.

1   Q    And did you have regular communication with her?

2   A    Absolutely.  Yes.

3   Q    How often, say, in a week's period of time might you talk

4   to her?

5   A    Oh, I don't know.  I spoke to her, I would think, you

6   know, at least once a week.  We -- you know, multiple times.

7   But, now, I am also, of course, talking to Kaposi as well.

8   He's representing her.  And I was feeling -- you know, he

9   went with me numerous times to New York with her.  We had

10  many joint meetings.  And so, whether I was talking to her

11  or -- I think he talked to her daily.

12  Q    So you had conversations with both her and Mr. Kaposi?

13  A    Correct.

14  Q    You mentioned that you had numerous meetings with Carolyn

15  Mintus.

16  A    Yes.  I went to New York repeatedly.

17  Q    And what would you do at those meetings?

18  A    She would introduce me to various bankers and, you know,

19  where money was, where they were doing business.  Now, again,

20  they may be -- they were imposters.  These are things -- I

21  just took their word for it.

22  Q    So at the various meetings, you were meeting other

23  bankers?

24  A    Yes.  They were very secretive about all this, by the way.

25  Q    What were the nature of your conversations during the

1    meeting?

2    A    That I could trust her.

3    Q    So were they acting as references for her?

4    A    They even said in 1992, she had done one of the biggest

5    mid-term programs in Switzerland that the world had ever

6    done.

7    Q    Did you hear the testimony of Mr. Stephan, when he went

8    with you to one of the meetings?

9    A    Sounded like, to me, that she was not the Carolyn Mintus

10   that I had known.   Seemed like a lot of pressure on her.

11   Q    Let me stop you there.

12        Were you present at that meeting?

13   A    I was there.

14   Q    And what was the nature of the conversation at the

15   meeting?

16        First of all, let me ask you this:   What was the

17   purpose of you going with Mr. Stephan to meet Carolyn Mintus?

18   A    We were behind on this phase one and phase two that we had

19   been talking about.   Things were behind.   Promises made.

20   Every day, every week.   As I recall, this meeting followed a

21   quarterly return that was supposed to be sent, and several

22   hundred million that should have already been sent to Stephan

23   hadn't arrived.   And we had to have -- it was -- for me to be

24   taking all this pressure alone, without -- I wanted them to

25   go with me and hear from her voice what was going on.

1    Q    And Mr. Stephan went?

2    A    He went.

3    Q    Did she act differently at that meeting than she had in
4    previous meetings?

5    A    She said so many things that didn't make any sense.

6    Q    Were you surprised by her behavior?

7    A    Completely surprised.

8    Q    And this was not the person that you had come to trust?

9    A    I was starting to feel she was bordering on insanity.
10   Some crazy things that she was talking about.  People living
11   in the middle earth.  You know, I could not believe what I
12   was hearing.

13   Q    Let's address this now, since we're here.

14        You stated and you've heard throughout the trial that
15   there were many expectations of lenders that were not
16   fulfilled in terms of getting returns on their money?

17   A    Yes.

18   Q    Was this a subject that you discussed with Carolyn Mintus?

19   A    Absolutely.

20   Q    Were you concerned about that?

21   A    Completely.  I mean, I had not only given my word, but she
22   had even told us to make payments, to make interest payments,
23   that we had offsetting moneys there, we could expect it,
24   everybody's money was safe, she had my back protected, and
25   that we had nothing to be concerned about.

1    I might add, I wanted to say, too, because I offered my

2    staff to participate in this.  I put every friendship I had

3    in the world on the line with this.  And I guess that is what

4    upsets me the most about sitting up here.  I really believed

5    in this woman.

6    Q    Now, let's change subjects for a minute here.

7         Do you know the foundation called "From The Heart

8    Foundation"?

9    A    I do.

10   Q    Was that your foundation?

11   A    No.  It was Marilyn's dream to join forces with DAWN, The

12   Domestic Abuse Women's Network, which she was an active

13   member, and the shelters -- food, clothing shelter for

14   domestic abuse families at risk.

15        MS. OLSON:  Could I have Exhibit 5001, please?

16   BY MS. OLSON:

17   Q    Mr. Bush I'm going to show you what's been admitted as

18   5001.  Is this the "Articles of Incorporation" for the From

19   The Heart Foundation?

20   A    Yes.  I would say yes.

21   Q    Have you seen that document before?

22   A    I don't know that -- you know, I was aware that she was

23   doing things.  But I don't recall, you know, looking at the

24   document.

25        MS. OLSON:  Your Honor, may I approach?

1          THE COURT:   You may.

2    BY MS. OLSON:

3    Q   Mr. Bush, let me have you look at that document for a

4    minute and see if you recall the document.

5    A   Well, I am aware that she was doing this, but this may

6    very well be the first time that I recall looking at it.

7    Q   As you look through it, does it -- does the format of it

8    look familiar?

9    A   Absolutely.

10   Q   What does it resemble?

11   A   Glenn Stoll's -- my own paperwork.  It resembles the

12   corporation sole for Cornerstone Institute.

13   Q   What was your involvement in From The Heart Foundation?

14   A   Looks like that I signed "clerk."  I couldn't -- I don't

15   remember that, if I signed it -- looks like my signature.

16   Q   What is the date of the document?

17   A   May 15th.  There would be no reason why I wouldn't sign it

18   at all.

19   Q   What role did you play in this foundation?

20   A   The Cornerstone Institute was 100 percent Hulaman

21   Management Services, committed to her dream to make a major

22   difference.  The Mariners' program, it's the reason I signed

23   the five-year lease.  I was committed.

24   Q   Before we get to that.  You joined her commitment?

25   A   One hundred percent.

1    Q    Now, after -- in the early part of 1999, after you started

2    working with Carolyn Mintus, did you begin to receive a lot

3    of money?

4    A    Yes.

5    Q    From lenders?

6    A    Yes.

7    Q    Did you send all of that money to Carolyn Mintus?

8    A    No.

9    Q    What did you do with the rest of it?

10   A    I divided it into three parts.  One part went to seed

11   capital, and that was to get our project started.  Main one

12   of course for me was Cabo San Quintin.  Getting the both of

13   time expense and getting Doug Stephan moving with engineering

14   work and what needed to be done on San Quintin, because there

15   was $2 million that went out to that effort.

16        Third of the money, you know, would been earmarked to go

17   to Mintus herself.  And a third of it would be to handle the

18   total operations of whatever it took to make things work

19   until Mintus funded the $800 million.

20   Q    Do I understand that the money that came in from lenders,

21   you divided it into three parts, as you described?

22   A    Paula, I did the best that I could to have --

23              MR. STORM:   Objection.

24              THE COURT:   Sustained.

25   BY MS. OLSON:

1  Q    You divided it into three parts?

2  A    I did.

3  Q    Did you tell the lenders that you were doing that?

4  A    Absolutely not.

5  Q    Why not?

6  A    Because I am in charge, I am the chief trustee and I am in

7  a sworn secrecy thing with these members of -- the retired

8  members of the federal reserve board, this whole thing going

9  on in New York, and I was -- based on what they told me to

10  do, I did.  I did, based on believing there was $800 million

11  up there.

12  Q    You're following their direction?

13  A    I am following their direction.

14  Q    Did you hear the testimony from some people, from lenders,

15  here in the trial that said if they had known that their

16  money was not -- was going to be spent on other things, they

17  would not have participated?

18  A    Had I known --

19  Q    First of all, did you hear that?

20  A    I did hear that, yes.

21  Q    What is your response to that?

22  A    That I wouldn't have done what I did, had I known that we

23  didn't have $800 million sitting in banks in New York.

24        THE COURT:  We're going to take our noon recess at

25  this time.

1           Ladies and gentlemen, we'll be at recess until 1:30.

2    Remember the Court's admonition, have a nice lunch and we'll

3    be back at 1:30 ready to go to work.

4           (Jury exits the courtroom.)

5           THE COURT:   Please be seated.

6           Anything we need to take up at this time?

7           MS. OLSON:   No.

8           THE COURT:   How you doing for time?

9           MS. OLSON:   We are about two-thirds through.

10          THE COURT:   Okay.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              A F T E R N O O N   S E S S I O N
 2          THE COURT:  Anything we need to take up before the
 3   jury comes back?
 4          Let's bring in the jury.
 5          (Jury enters the courtroom.)
 6          THE COURT:  Welcome back, ladies and gentlemen.  If
 7   at any time you need a break, raise your hand and we'll get
 8   you out of here and give you a break.
 9          Okay.  Ms. Olson, you may continue.
10   BY MS. OLSON:
11   Q   Nolon, before we took our lunch break, you mentioned a
12   couple of terms that I think might help with some
13   explanation.
14      First of all, you mentioned the term "seed capital."  What
15   does that mean?
16   A   This would be a term that I use personally about getting a
17   project started.  At least that's how I viewed what I was
18   doing here.  This certainly would refer to my commitment to
19   purchase Century 21 rights and several ancillary things that
20   were going on with the project.
21   Q   Let me stop you there.
22          Let's just focus on the term "seed capital" and just
23   a simple explanation of what that means.
24   A   I saw it in a number of phases.  It was first in getting
25   the project started.
```

1    Q    Let me stop you there.

2         Is it fair to say that seed capital is an amount of

3    money to get the project started?

4    A    Yes.

5    Q    Okay.  And that money would be used for many different

6    things?

7    A    Yes.

8    Q    You mentioned several times that Carolyn Mintus said that

9    she needed your project.

10   A    Yes.

11   Q    Do you recall that?

12   A    Absolutely.

13   Q    Explain why she needed your project?

14   A    Well, as it -- it wasn't a new thing to me, that she was

15   telling me for the first time.  I heard all of these money

16   programs that worked internal to international banking always

17   needed some humanitarian effort tied to it.  The development

18   of a country, maybe putting in infrastructure.  Could be an

19   airport, could be a subway, many things.

20   Q    Specific to Carolyn Mintus, why did she need your project?

21   A    She needed my project to justify what she called her high-

22   yield program.  Her high-yield program needed -- according to

23   her, needed a program like San Quintin to make it work.

24   Q    Do you know what kind of process she went through to

25   select a humanitarian project?

1   A    I do not.

2   Q    Now, before we broke, we were going to talk about the

3   amount of money that you had access to over 1999, 2000, maybe

4   on past that.   And there were several things that money was

5   spent on.

6        The first thing that I want you to address is the

7   money that you spent on the estate at Port Orchard.

8   A    Yes.

9   Q    How much money do you recall you spent in buying that

10  piece of property?

11  A    Well, as I recall, the property was $2 million, somewhere

12  in the neighborhood of $2 million to purchase the property.

13  Over a period of time, we'd allocated about a million dollars

14  to go into -- there was a down payment.   I don't recall

15  exactly what that was.   And then we had some monthly payments

16  that we were going -- and then we knew up front that there

17  would be remodeling done to accommodate Marilyn's From The

18  Heart Foundation, with specific emphasis on her domestic

19  abuse program.

20  Q    I have put up what has been admitted as Exhibit 16005.   Do

21  you recall seeing this exhibit before?

22  A    Yes.

23  Q    Do you remember what it is?

24  A    I think it was -- talked about Nolon and Marilyn -- this

25  was something -- the spread sheet said that our combined --

1    what we spent.

2    Q    Is this the summary of the expenses -- expenditures that

3    the government put together --

4    A    Yes.

5    Q    -- for bank accounts?

6    A    That is what it appears.

7    Q    Now, you look at the line about the Port Orchard estate.

8    A    Uh-huh (affirmative).

9    Q    That figure is $1,172,451?

10   A    Okay.

11   Q    Does that sound about what you paid for that estate?

12   A    I don't know why the million -- $2 million is what I -- I

13   thought we were paying $2 million for it.  Again, I don't

14   remember.  I just don't remember the number.  I don't exactly

15   remember what we paid for it.

16   Q    Do you think you paid over a million?

17   A    Well, yes, we paid over a million.  And maybe what -- the

18   problem is, I think we had projected that about a million was

19   going to be spent on the improvements.  That may be why $2

20   million sticks in my mind.

21   Q    How much did you spend on improvements?

22   A    I understand it was around a million dollars.  That is

23   what Marilyn had told me.

24        Something that I think the Court should understand

25   about this project, unless --

1    Q    No, we're going to do the question-and-answer thing.

2    A    Okay.

3    Q    So can you explain why you decided to spend so much money

4    on the estate at Port Orchard?

5    A    Yes.  It was -- we internally referred to it as "the

6    retreat."  It was certainly not my home.  It was not -- it

7    was to be given from the heart for their use.  But it was

8    beginning of a development project.  I had plans for it.

9    Q    Is that why you bought parcels of property that surrounded

10   the estate?

11   A    That's correct.  Almost 100 acres attached to the golf

12   course, right.

13   Q    Now, there has been testimony about the amount of security

14   that was placed in the estate.  Do you recall that?

15   A    Yes, I do.

16   Q    Can you explain why there was so much security at the

17   estate?

18   A    Marilyn had gone over many times with me what it's like to

19   be in a domestic abused relationship and being fearful of the

20   other spouse.  By the way this works both -- she told me both

21   men and women can be victims of another gender -- of the

22   spouse.  And she -- her goal was to invite children from the

23   halfway houses, from the shelters.  They were to come on to

24   play golf, to play tennis, to walk in the trails.  She had

25   plans for horses.  She was a horsewoman.  She had great plans

1    as a recreational -- for abused families -- these families

2    coming out of the homeless shelters.

3    Q    I'm going to stop you there, Nolon, and redirect you to

4    the part --

5    A    And she wanted security of that -- she was concerned about

6    phones being tapped.  She was concerned about spouses that

7    were trying to find information.  She knew maybe at sometime

8    it might leak, that this is a domestic abuse haven.  And so

9    she began setting up in her own mind, and I saw nothing wrong

10   with that.  It sounded reasonable to me.

11   Q    Did you have reason to have security at the estate?

12   A    Well, people in New York and in Scott Grant's office,

13   everybody wanted the highest level of privacy.

14   Q    Did they recommend to you to get the highest level of

15   privacy?

16   A    Absolutely.  Absolutely.  So I began to, you know, look at

17   that.  I never really thought about this.  This thing has

18   never been anything in my life before now, before this was

19   occurring, and now, all of a sudden everybody is telling me

20   we've got to be conscious of banking records, we've got to be

21   conscious of -- you know -- and I will say also, during this

22   period of time, or the last two years prior to -- prior to

23   2000, going to the Global Prosperity workshops, Dick Cox, who

24   spoke here, he was always a featured speaker.  He would have

25   tables out.

1  Q   So is that where you met Mr. Cox, through --

2  A   I don't know if I met him there.  But people like him

3  would have booths, and so I began to -- I don't think I

4  actually met him there.  I think -- actually, I think Marilyn

5  found him.

6        But all of a sudden, people are talking to me about

7  safety and these sort of things.

8  Q   Other people are making recommendations to you about this?

9  A   Yes.   Absolutely.

10  Q   Now, the remodeling.  Considerable amount of money was --

11  almost a million dollars was spent on the remodeling?

12  A   Yes.

13  Q   Why was so much money spent on the remodeling?

14  A   I think when Marilyn got started, she probably thought it

15  was going to be a lot less than that, but when Mr. O'Neill,

16  or whoever the decorator was, along with the builder -- or

17  the remodeler -- they found that there were structural

18  problems in the house.  It was an older house.  And the

19  internal beams would not support a number of changes.  And so

20  all of a sudden, what started out to be -- looked like a

21  pretty fixed nature, became this big work in progress.

22  I did not know the extension on the back of the house --

23  it never -- just never clicked to me.  All of a sudden, there

24  were a lot of things being done.  I pretty much trusted --

25  you know, I really didn't have anything to do with the

1   remodel.

2   Q   Let me stop you there.

3       So was the remodeling primarily left to Marilyn?

4   A   It was completely her.

5   Q   Did you have any input into it at all?

6   A   Nothing other than the kind of office that I needed and

7   the kind of support staff.  It was not my intention to live

8   there.  It was a gift, you know, to her project.

9   Q   So the only part of it, of the remodeling that you were

10  involved in, was your office and the space for your staff?

11  A   Yeah.

12  Q   There was testimony about Mr. Herald -- that he acted as a

13  chef out at the estate.

14  A   Yes.

15  Q   Why did you feel the need to hire somebody to be a chef of

16  the estate?

17  A   There were always people coming, you know, from other

18  places, and rather than take them somewhere to eat, we just

19  found that, both in taking care of the staff, of feeding

20  them -- it's a ways out in the country; there is nothing

21  close by.  And it was the idea that once someone got there,

22  they would just stay.  That is where -- plus, you know, doing

23  special charitable events and all, that was all, you know,

24  planned in the making.

25  Q   And he prepared the food for those events?

1    A    Yes, he did.

2    Q    Did you feel, then, that having him was cost effective?

3    A    Again, this all ties back to, had New York performed, it's

4    fine.  But when things, of course, don't work out, it becomes

5    a problem, becomes a challenge.

6    Q    But at the time --

7    A    Based on what I had thought and believed it was going on,

8    it seemed reasonable to me, yes.

9    Q    What about having a masseuse come out weekly and give

10   massages?  Why was that necessary?

11   A    It was sort of a perk for the office.  It's basically

12   where I think it started.  That and Marilyn's interest in

13   homeopathic and wellness, you know, things.  She believed

14   very much that -- in preventive healthcare.  And I think she

15   saw herself as offering some kind of healthcare package and

16   looked upon it, you know, that way.  After my motorcycle

17   accident, I can certainly understand.

18   Q    Well, we'll discuss that when we get there?

19        Now, there was some expense spent on Cora.  Do you

20   remember who Cora is?

21   A    Yes.

22   Q    Who was she?

23   A    She was the German Shepherd that Marilyn acquired as a

24   personal service dog, for her protection.

25   Q    Did Cora stay with Marilyn primarily?

1  A    Absolutely.  24 hours a day.  You know, with the exception

2  of -- sometimes she was put out in the doghouse, or if

3  Marilyn went -- didn't take her, maybe, to the ball game or

4  something like that.  But she was pretty much at her side

5  most of the time.

6  Q    We saw pictures of quite the doghouse for Cora.  Why did

7  you think it was necessary to spend money making such an

8  elaborate doghouse and kennel?

9  A    This is another item I never really gave it much thought

10  to.  Something that she wanted.  And no way does that mean I

11  was not for it.  I just didn't -- she wanted -- she wanted a

12  dog compound for Cora, so that's what she chose to do.  She

13  did want it to blend in with the rest of the facility.  She

14  had long-term plans for --

15  Q    I'm going to stop you there, Nolon.

16        Did you pay the check -- did you pay the bills for

17  the remodeling?

18  A    Hulaman Management Services did.  It was sort of a

19  clearinghouse for all these kinds of expenses, yes.

20  Q    And you signed the checks?

21  A    Some of them.

22  Q    Were you aware of the amount of money that was being

23  spent?

24  A    Absolutely.  I would report -- I think Lorelei even

25  brought up the fact that I was asking all the time about

1    where we were in our total expenditures on everything.

2    Because I passed all these items to New York and -- saying,

3    "This is what I am spending."

4    Q    Let me stop you there.

5         Did you have concerns about how much money was being

6    spent.

7    A    Not based on the business plan, I didn't.  I was not

8    concerned, thinking there is 800 million worth of backup.

9    I'm not really -- I am thinking this is a very small thing to

10   be doing if it kicks off her long-term plan.  But as soon as

11   the city went under construction, I planned on moving to Cabo

12   San Quintin myself.

13   Q    Now another major expense was the purchase of the suite

14   at -- for the Mariner baseball games.

15   A    Yes.

16   Q    And also the Diamond tickets.

17   A    Yes.

18   Q    Do you recall that?

19   A    Yes.

20   Q    Why was that expenditure made?

21   A    I'm not a baseball fan myself.  Marilyn's an avid fan.

22   And their "refuse to abuse," "these hands are not made for

23   hitting" just seemed to work well.  The Mariners' passion in

24   some of their charitable focuses seemed to work well with

25   her, and it was something she said she wanted to do as a

1   fund-raising thing.

2      So it, again, at the time, made a great deal of sense.

3   And, again, I think I mentioned this earlier.  But if I

4   thought there was there any problem, I never would have

5   signed a five-year lease on something.  I fully thought

6   everything was okay.

7   Q   Is this the same explanation for why you bought the suite

8   for the Seahawks?

9   A   Absolutely.  Now, these were money making items.  They

10  were given to various charities.  They were auctioned off.

11  And they raised money.  The use of those --

12  Q   Let me stop you there.

13      How were they auctioned off?  Describe how that took

14  place.

15  A   Would go to a particular charity.  Let's just say like the

16  Jamie Moyer Foundation charity.  And they would have maybe

17  200 or 300 people there, where Jamie and his wife were doing

18  their -- I believe they were in education -- educational

19  events.  And Marilyn would give them the suite for one or

20  more nights.  And the auctioneer would say, Here is 15, 20

21  seats at Safeco Field of the Lou Gehrig -- you will pay the

22  food but -- whoever gets it will pay the food cost, but we're

23  going to auction it.  Sometimes it went for, like, $5,000

24  which was considerably more.

25      So it was used over and over again for things like that.

1   Q    So it wasn't used simply for you to entertain?

2   A    That's correct.   She had various events, and she would

3   have people like DAWN.   She would have different groups up

4   there.

5   Q    That Marilyn brought to the suite as well?

6   A    Right.

7   Q    There was testimony that you purchased a condominium for

8   your ex-wife, Barbara.   Do you recall that?

9   A    Now, if you'll look at the paperwork, you'll see that

10  it's LK, I think, Trust Foundation.   That stands for Lindsey

11  Kay.   That is my youngest daughter.   She, out of all of my --

12  Q    I will stop you there, Nolon.

13       I understand that the actual entity that purchased the

14  condominium is the Lindsey K. Trust.

15  A    Yes.   But it sits underneath my corp sole.   She is

16  heir-apparent.   Out of all -- my youngest child, I felt she

17  is the one that has the greatest heart for charity.   And I

18  saw her being possibly my heir-apparent.

19  Q    Why did you feel that it was appropriate to spend money

20  coming from lenders on a condominium for Barbara?

21  A    I really didn't see it as spending money.   I saw it as an

22  asset placement.   All the real estate in that area -- I don't

23  know about since the meltdown -- has appreciated very well.

24  I thought it was a decent place for me to do what I did.

25  Q    So you were hoping at some point, a profit could have been

1    made from reselling it?

2    A    Absolutely.  I saw it -- it was going to be up to my

3    daughter to decide what she wanted to do with it.

4    Q    Now, I understand that as you were spending money, you

5    were consulting with Carolyn Mintus?

6    A    Yes.

7    Q    Did you consult with anybody else?

8    A    Well, of course, when I was not talking with Carolyn, I

9    was talking to Mark Kaposi.

10   Q    Did you consult with Scott Grant about the amount of money

11   that was being spent?

12   A    Absolutely.

13   Q    Did he approve of what you were doing?

14   A    With him believing there is 800 million, as I did, he saw

15   nothing wrong with what I was doing.  Certainly nothing

16   illegal.

17   Q    There was evidence from the government that you paid your

18   staff in cash.  Do you recall that?

19   A    I do.

20   Q    Did you pay your staff in cash?

21   A    There was a -- I think an IRS representative made

22   statements to some $9,000 figure.

23   Q    That's another question.  But this question has to do with

24   paying your staff in cash.

25   A    All right.

1    Q    Did you do that?

2    A    I did.  As a matter of fact, we acted kind of like a bank.

3    We cashed people's checks.

4    Q    But did you issue the checks first, or did you just --

5    A    We did both.  There were some people that we were paying

6    checks.  I would take $9,000 on a pretty -- the weekly -- if

7    you'll look at charts, I think they all -- that's been

8    represented as evidence here, that the cost of that operation

9    was about $9,000 a week.

10   Q    That was your payroll expense?

11   A    That was the payroll.  And so I would take the -- you

12   know, I would pay cash where necessary, cash checks where

13   necessary.  I made it convenient so people didn't have to go

14   to the bank.

15   Q    And you were not deliberately choosing $9,000 in order to

16   avoid reporting requirement by the bank?

17   A    Not unless that miraculously turned out -- absolutely not.

18   Just happened to be what it was.

19          By the way, I did not know that.  I did not know

20   anything about $9,000 being anything.  I didn't know that it

21   meant anything.

22   Q    You didn't know that there was a limit on how much

23   money --

24   A    Did not know that.

25   Q    Now, there came a time when there was delays from Carolyn

1    Mintus on -- on the returns of the money.  Do you recall

2    that?

3    A    Yes, I do.

4    Q    When do you believe that the delays actually started?

5    A    Well, hard to say.  They were being delayed weekly,

6    monthly.  I mean just always --

7    Q    What period of time?  When was the first -- let me ask you

8    this.  When was the first time that you expected a return on

9    the money invested with Carolyn Mintus to arrive?

10   A    Sometime in the early part of '99 there somewhere.

11   Q    And you waited a considerable period of time for those

12   returns to arrive, didn't you?

13   A    I did.

14   Q    After a few months of delay, why didn't you take some kind

15   of action to force the money to arrive?

16   A    I was so convinced that I had the real thing here.  This

17   was based on numerous meetings to New York.  And each time I

18   would go up there, they'd have an excuse and someone to

19   support the program.  And I just believed in it.  I just

20   believed it.

21   Q    You heard investors -- lenders that testified here in

22   court, and they testified that they heard excuses from you --

23   A    Yes.

24   Q    -- as well?

25   A    They did.  Based on what she told me, then I would try to

1  tell everyone everything is okay, believing that to be the

2  case.

3  Q   So you were relaying information you received from Carolyn

4  Mintus?

5  A   Yes.

6  Q   What I am looking for, Mr. Bush, is the quadrant, which

7  I -- at one time had it here.

8       Do you recall the quadrant diagram?

9  A   I do.

10  Q   And -- I do have it.

11       This is page 4 of Exhibit 8041.  This is the

12  so-called quadrant.

13       Who drafted -- who made this diagram?

14  A   Scott Grant.

15  Q   And whose idea was it to make a quadrant?

16  A   Well, Scott Grant.  He was attempting to get -- it's my

17  understanding -- and understanding of how he would run a

18  Global Dominion, run the Nevis organization and, you know,

19  what its commitments would be and what its structure would

20  look like.

21  Q   What was the purpose of having a quadrant like this?

22  A   I think he said clarity.  Made sense, with his legal

23  banking background.  He pointed out some presentation and, as

24  I remember, it was pretty much the crux of how he presented

25  what Global Dominion did.

1   Q   When you say "clarity," was it clarity in terms of getting

2   other people to invest or to lend money?

3   A   Well, I would think so, because Global Dominion did many

4   things I did not know about that I later found out about.

5   Q   I am going to show you the first page of a ten-page

6   document.  And this is beginning on page 6 of Exhibit 8041.

7   And it begins up at the top, "Confidential.  Dear Nolon."

8   Does this look familiar to you?

9   A   It looks familiar.

10   Q   I am going to show you page 10 of the document, at the

11   bottom.  It says "Cheers, Scott."

12   A   Uh-huh (affirmative).

13   Q   Does this help you recall this document?

14   A   Well, it certainly looks like things that we've talked

15   about.

16   Q   Does it appear to be a business plan?

17   A   Yes.

18         MS. OLSON:  Your Honor, may I approach?

19         THE COURT:  You may.

20   BY MS. OLSON:

21   Q   I am going to ask you to look through this document.

22   A   Yes.  I remember this.

23   Q   Describe what is contained in that document.

24   A   Well, he was seeing it, you know, with a real emphasis

25   of -- particularly on Nevis.  We -- there was -- tied in to

1   all this, there was one piece of property left on Nevis that

2   was waterfront.  Downtown Charlestown.  And this was all

3   being built around that office.  He wanted something similar

4   to Morning Star.  He wanted a major banking building there.

5   And this is the plan.  And it deals with -- as we've all

6   noticed the last couple of years, how many storms come

7   through that area, so hurricane relief is a part of this

8   document, and housing and construction.

9   Q   Did you help him put that document together?

10  A   We discussed all the ideas in here, but he put it

11  together.  This is his own composition.

12  Q   Was this a plan that you were going to become involved in?

13  A   It was certainly something that long term and kind of like

14  a partnership, I would think, with both Global Dominion and

15  ICBM, or whatever Scott Nicholas' company was, that they were

16  going to be involved in.

17  Q   Was that something that Nicholas St. James was also going

18  to be involved in?

19  A   Correct.  The two of them would be shepherding these

20  projects.

21  Q   You were not going to be intimately involved in any of

22  those things?

23  A   No.  I gave -- at no time have I ever had signature rights

24  on any bank accounts.  They were managing everything.

25  Q   We're focusing on the projection plans in that document.

1   A    Yes.

2   Q    Now, I am going to have you look at Exhibit 4014.  Do you

3   recognize this?  This is the top part.  Do you recognize this

4   document?

5   A    I think we saw this as an exhibit before, right?

6   Q    Right.

7   A    I don't recall this document.

8   Q    Let me ask you this:  Do you recall this document being

9   described as a "compounding table"?

10  A    Yes, I would say that, yes.

11  Q    Did you ever have this document in your possession?

12  A    I have seen -- similar things like this came from Mintus

13  that -- based on her programs of certain draws that might

14  come out of certain things out of the investment program.

15  But, you know, I just -- I don't recall how -- I mean, I just

16  don't recall this document.  That's all.

17  Q    Do you recall the meeting at which you discussed it?

18  A    Is this the one that Cody talked about or -- was it there?

19  Q    I'm not sure which lender at this point.  But it was

20  discussed by one of them.

21  A    I would never think that these figures would be used to an

22  individual lender.  They relate, I think, to the overall

23  project, not to a particular individual.  As to whether or

24  not -- I've looked at these figures for the overall project,

25  not one individual lender.

1   Q    So do I understand --

2   A    I am just wondering if they became confused with --

3   because I constantly talked about what the project did, and

4   not so much what lenders did.

5   Q    Let me stop you.

6        Would the numbers on this table be used to entice somebody

7   to lend money to your program?

8   A    Never used anything to entice anyone.

9   Q    Now, Hulaman Management Services was changed to Global

10  Dominion Financial Services; is that right?

11  A    That is correct.  When Scott Grant took everything over,

12  yes.

13  Q    And whose idea was it to change it to Global Dominion?

14  A    It was Scott's.

15  Q    What was the purpose for the change?

16  A    I think to put it under one managing system, you know, to

17  be done in Nevis.

18  Q    What benefits were there to the investor or lenders to

19  change to Nevis?

20  A    I was certainly led to be that the records would be safe,

21  you know, well handled, that it would just be better

22  organization, better administration.

23  Q    What benefit would there be as far as their money

24  investment was concerned?

25  A    It's basically being controlled by a law firm and -- that

1    I was placing faith and confidence in.

2    Q    So do I understand that after it was changed to Global

3    Dominion, the operation was taken over by Scott Grant?

4    A    Scott and Nicholas completely.

5    Q    Did you have much control over it after that?

6    A    Well, first I thought so.  However, you've shown me the

7    information here I didn't know that even existed.

8    Q    Can you give me an example of some of that information?

9    A    Bank accounts that were opened up, money that was moved.

10   Q    I will show you what has been admitted as Exhibit 2066.

11   Do you recall seeing this document?

12   A    I do.

13   Q    Do you understand that there are several pages to it?

14   That's the first page?  Second page?  Do you recall this

15   page?

16   A    Yes.

17   Q    The third page?  Do you recall this?

18   A    Yes.

19   Q    And the last page?  Do you recall that --

20   A    Yes.

21   Q    -- as being part of it?

22   A    Yes.

23   Q    Now, this is the Global Dominion paperwork for

24   Dr. Mansueto.  Is that what it showed on the first page?

25   A    I believe so.

1    Q    Is that paperwork that was given to investor lenders when

2    the program was moved to Global Dominion?

3    A    Well, this particular program became as a surprise to me,

4    because I later found out that he was actually opening up

5    credit unions, and so I --

6    Q    Before we get to that --

7    A    But this is all Scott's paperwork.

8    Q    Is this the typical set of documents --

9    A    I believe so.

10    Q    Who drafted this document?

11    A    Well, Scott would have.

12    Q    Did you have anything to do with the drafting of this

13    document?

14    A    Not to my knowledge.

15    Q    Did you know that the investors were told that they had to

16    open up an LLC to move their accounts to Nevis?

17    A    Absolutely.

18    Q    Did you understand why?

19    A    That that was required for him to do whatever structure

20    that he was doing.  That was Scott's requirement.

21    Q    Did you know that Scott was receiving money from the

22    investor/lenders for that purpose of setting up the LLC?

23    A    Well, I knew there were administrative fees involved, but

24    I couldn't say that I knew exactly what they were.

25    Q    At the time that Global Dominion began, how familiar were

1    you with offshore business?

2    A    No more than what I had read or been in seminar.

3    Certainly not the way Scott and Nicholas would know.

4    Q    How much authority did you have over the business

5    operations in Nevis?

6    A    I guess I would have to say none.  I could direct wire

7    transfers.  I could talk to either Scott or Nicholas and

8    require, you know, money be sent for the retreat, the

9    building project, or I could direct, you know, money to be

10   sent to Mintus.  I could make a request for them.  But, of

11   course, they alone controlled the accounts.

12   Q    Were you a signator on any of the accounts?

13   A    No.

14   Q    Are we talking three accounts?  Was one of those accounts

15   the Royal Bank of Canada account?

16   A    I have never, to my knowledge, signed anything that

17   related to an offshore bank account.  If I have, it would

18   have to be -- I don't recall Royal Bank of Canada or anyone.

19   Q    Do you have recollection of an account at the Bank of

20   Crozier?

21   A    Yes.

22   Q    What did you know about that account?

23   A    This was a bank that Scott recommended be opened, and, of

24   course, it was.  And a relationship that he and the president

25   of Crozier built.

1  Q   Did you have anything to do with this account?

2  A   No.  It was his idea.  I mean, I was aware of it, but I --

3  you would have to define what you mean.

4  Q   Were you a signator on the account?

5  A   No.

6  Q   Did you deposit money into the account?

7  A   I transferred money from time to time to the account, yes.

8  Q   Did you take withdrawals from the account?

9  A   And I did take withdrawals from the account, yes.

10 Q   Did you take them yourself, or did you direct somebody

11 else to do it?

12 A   Well, I never took anything myself.  I mean, I would make

13 a request, you know, for transfer of funds.

14 Q   I will show you Exhibit 3007, which is the account for the

15 Royal Bank of Canada.  I will show you page 24 of that

16 account.

17      This is part of the account statement for

18 November 30th, 1999.  Do you see that?

19 A   Yes.

20      THE COURT:  Is this 3007?

21      MS. OLSON:   3007.

22      THE COURT:  Is it in?

23      MS. OLSON:   Your Honor, it's part of the stipulation.

24      THE COURT:  That's what I thought.  I don't see it on

25 here.

1      MS. OLSON:   Your honor, I believe it came in through

2   Agent Breed.

3      THE COURT:   All right.   Go ahead.

4   BY MS. OLSON:

5   Q   Do you see, on the -- my left side of the screen, a

6   listing of stock?

7   A   Yes.

8   Q   Do you see that?

9   A   Yes.

10  Q   Do you have any knowledge about the purchase of that

11  stock?

12  A   I do not.

13  Q   Do you have any knowledge about the purchase of any stock

14  in -- that was deposited with the Royal Bank of Canada?

15  A   No, I do not.

16  Q   Did you authorize the purchase of any stock?

17  A   I had a meeting with -- in the Bahamas with the Royal Bank

18  of Canada, and I don't really recall what occurred at that

19  meeting, except that Scott and Nicholas continued to deal

20  with them after that.   I think I may have talked with the

21  banker about what our projects and where we were going.   And

22  Scott was even exploring buying a bank in the Bahamas.   I

23  believe the man's name that is on here might have been that

24  man he was working with.   But all of this was done by Scott,

25  and I'm just not aware of it.

1  Q   You were paying Mr. Grant and Mr. St. James for their

2  services, weren't you?

3  A   That's correct.

4  Q   I'm showing you what has been admitted as Exhibit 16004.

5  Do you recognize this?

6  A   I do.  I recognize the figures.

7  Q   And what do you recall that they were?

8  A   Well, I honestly did not know that he had taken that

9  much --

10 Q   Let's start with the part about do you remember what the

11 figures --

12 A   The only way I remember this is seeing it here, that I saw

13 it here, as far as the.

14 Q   Is this the amount of fees that were paid to these

15 individuals?

16 A   I have no idea.

17 Q   But is that what the --

18 A   But I guess that is what it's saying.  Yeah, I guess it's

19 what it's saying.

20 Q   Did you have any knowledge you were paying this amount of

21 money?

22 A   No, I did not.

23 Q   Did you intend to pay this amount of money to these

24 individuals?

25 A   Absolutely certainly not, until -- nothing like this.

1    Unless Mintus had performed.

2    Q    Various people that were promoting and doing financial

3    planning, did you pay those persons as well?

4    A    I agreed certain things for them, and, again, this is

5    something Scott was handling.

6    Q    Do you recall what kind of payment arrangements you made

7    with them?

8    A    I do not remember, no.

9    Q    I am speaking of Dr. Webster, Mr. Knepp, those

10   individuals.

11   A    I recall 5 percent or something like that.  I mean, I --

12   but I really don't recall the particulars.

13   Q    I am going to show you a portion of spreadsheet "R" from

14   Exhibit 16007.  I am going to take you to the end of that and

15   make it larger.

16        Do you recall this to be the spreadsheet of the money

17   that was paid to the promoters?

18   A    Yes.

19   Q    And we have gone over this spreadsheet?

20   A    Yes, we have.

21   Q    And we added up the figure -- we added up the amount that

22   was paid to the various people in the spreadsheet?

23   A    Yes.

24   Q    Do you recall that we came to an amount for Preston Knepp

25   of $941,691.12?  Does that sound like the total figure that

1    we came to from adding up the amount?

2    A    I believe so.

3    Q    And for Dr. Webster, did he receive $392,777.66?

4    A    I would believe these figures are correct, but I have no

5    way of confirming them in my own mind, other than -- if you

6    have record to prove it, that must be what it is.

7    Q    When we added these numbers up from spreadsheet R," is

8    that what we came to?  For Dr. Webster?  Do you recall?

9        What about Rick Felton?  Do you recall that he received

10   $80,000?

11   A    I believe that's correct.

12   Q    Did he receive anything else?

13   A    I financed a -- I think he probably would have received

14   more than that.  But we financed a houseboat for him, and I

15   think it was $475,000 was what we financed for him.  You

16   know, we gave him the money, probably in lieu of all the work

17   that he had done.

18   Q    Were you surprised, when we added these figures up, at the

19   amount of money these people made?

20   A    Very shocking.

21   Q    You heard, as we have spoken on testimony of investor

22   lenders here during the trial, some of them have some serious

23   emotions about what took place.  Do you recall that?

24   A    Yes.

25   Q    How did you feel when you heard their stories?

1          MR. STORM:   Objection, relevance.

2          THE COURT:   Overruled.  I will allow it.  Short

3    leash.

4    BY MS. OLSON:

5    Q    Let me ask you this:  Were you upset to hear their

6    stories?

7    A    Very upset.

8    Q    Why was that?

9    A    Certainly not what this was about.  I mean, to have -- I

10   mean, many of these people are friends of mine.  They're very

11   close friends.  And, you know, to find, you know, the

12   discontent, the unhappiness, the disappointment, you know,

13   felt really that I had -- like, this is sort of my watch, if

14   you will.  At my watch, things have gone this way and that,

15   you know, based on what -- my depending on what someone else

16   is telling me, then I pass things on to them.  And we see the

17   end result here.

18   Q    Do you recall the testimony from Cody Bly when he

19   contacted you asking for a wheelchair for his grandmother?

20   A    That really cut deep because that's the kind of thing that

21   I -- I think I would do whatever is necessary in a situation

22   like that.  I do not remember -- I remember a wheel --

23   something about a wheelchair.  I do not remember it being

24   Cody's grandmother.  But, Paula, this is happening at a time

25   following my motorcycle accident.

1    Q    And we're going to get to this.

2         Do you recall the testimony from Mr. Bly that that

3    was about the same time as your motorcycle accident?

4    A    It looks like it was in recovery, when I was recovering

5    from it.  That's why it's quite possibly he may have told me

6    that and I don't remember.

7    Q    I will stop you there.

8         What was the date of your motorcycle accident?

9    A    It was May the 6th, about 12:30 noon, of 2000.

10   Q    Where did it take place?

11   A    In Port Orchard.

12   Q    Can you briefly what happened --

13   A    I was traveling around 45 miles an hour down a country

14   road, went through an intersection that had stop signs on

15   both sides of the road and had turn lanes.  And as I passed

16   through the intersection, a man in a Ford 250 pickup truck

17   just pulled right out in front of me, about 50 feet before --

18   he just pulled out in front of me about 50 feet away, with my

19   doing 45, 50 miles an hour, something like that.

20   Q    What happened to you?

21   A    Of course, I realized there was nothing that I could do

22   and that this was going to be an accident and probably a

23   pretty bad one.  And -- in my training I did --

24   Q    Tell --

25   A    I hit the truck dead center, rather than trying to --

1    there was no way to miss it.  So I just hit it.  And I tried

2    to let go and just fly.  But then my helmet -- I broke my

3    helmet, but it put a dent in the front of the truck.  I went

4    about 140 feet away, down range, in the air, and I was

5    unconscious for about 45 minutes.

6    Q   Once you got to the hospital, what was the extent of your

7    injuries?

8    A   My left wrist that had once been seven to ten bones was

9    now 70 pieces.  So it pulverized my left wrist.  I, at that

10   point, had no wrist.  And two compound fractures.  A Bendix

11   fracture over on the right side, because it had completely

12   bent this thumb all the way back.

13        So, as a result, in the emergency room, the

14   orthopedic -- no, the surgeon told me that it was really a

15   mess.  He could not promise me that I would have much use of

16   my left hand.  Pretty serious.

17   Q   I am going to stop you there.

18        Did you have surgery?

19   A   I did.

20   Q   Did you have period of recovery?

21   A   Surgery lasted eight hours, and, of course, I went into a

22   recovery period that covered next three months.

23   Q   What was the total amount of time that you were in

24   recovery from the accident?

25   A   Are we talking about therapy or --

1    Q    Just the total amount.

2    A    Well, I had no use of hands for basically three months.    I

3    didn't have any hands.

4    Q    The three months --

5    A    I had to have someone do everything for me, feed me,

6    clothe me, wash me.

7    Q    And then after the three months, did you begin physical

8    therapy?

9    A    I did.    They told me I would probably never be able to

10   touch my fingers together.

11   Q    Did you ultimately regain use of your left hand?

12   A    I did.

13   Q    During the period of physical therapy, how much time did

14   you commit to your therapy?

15   A    Daily.    Following the therapist going -- doing all of her

16   exercises at her clinic in Silverdale, plus a lot of home

17   work that I had to do.

18   Q    Approximately how many hours a day did you spend?

19   A    I'm sure I was dedicating as much as two to three hours a

20   day, you know, working on recovery.

21   Q    So if this occurred in May and your recovery period was

22   about six months long?

23   A    Yes.    I am going to say by October, I was starting to --

24   you know, I began to start trying to -- I remember going to

25   New York to meet with Mintus, you know, as soon as I could.

1  Q    During this period of time, who was managing the business?

2  A    Well, everybody.  You know, Scott is doing, of course, his

3  part, and I guess everybody else is doing what they're doing.

4  Q    So during the six-month period of time that you were in

5  recovery, did you have any hands-on operation with the

6  business?

7  A    Well, you know, I would work on the speaker phone when I

8  could and -- you know, it's just that my focus -- you know,

9  I -- it was -- I was just in this recovery.  It was more

10  than -- some people thought the thing probably should have

11  broken my back, neck or both.  I had survived it.  And

12  actually, I felt it was miracle of God that -- that -- but it

13  was a very trying period of time for me.  Very foggy, fuzzy

14  time for me.

15  Q    So your memory during those months is unclear?

16  A    Yeah.  I really could not tell you really what went on

17  during that, with the clarity that I think I would normally

18  have.

19  Q    As it got later into the year of 2000, in the fall and

20  winter of 2000, was there more pressure from the lender of

21  the investors for their returns?

22  A    Certainly.

23  Q    And who was telling you about this -- their concerns?

24  A    Well, I was certainly getting it from, you know, people

25  calling in, you know, irate telephone calls.

1   Q    What did you do in response to those calls?

2   A    Well, of course, I went back to New York.

3   Q    What did Carolyn Mintus tell you?

4   A    She brought in one of the top bankers in New York, the

5   man -- the president of the bank, and as I remember, I think

6   he had the largest system on Long Island, banking system, and

7   he vouched for her and asked me to move money into his bank,

8   and I did.

9   Q    You still were trusting in Ms. Mintus?

10  A    My biggest challenge -- and Mintus always had somebody to

11  support everything she was doing.  I just continued to have

12  complete blind faith in her ability to deliver.

13  Q    Going back to your motorcycle accident, did you eventually

14  get a monetary settlement as a result of the accident?

15  A    I did.

16  Q    And how much was that?

17  A    In the spring I think of -- spring to summer of 2002, they

18  finally settled with me for about $83,000.  There is probably

19  more than that, but, of course, the attorneys got what they

20  got, but my -- the part that was left over for me was

21  approximately 82 to $85,000.  Somewhere in there.

22  Q    Did you have to pay any medical bills or other expenses

23  from that money?

24  A    They had already been paid in addition to that.  Seems

25  like this was the personal injury settlement of -- very

1  difficult situation because my insurance company was the same

2  insurance of the man who hit me had.  So they settled out for

3  that.

4  Q  I am going to show you what has been admitted as Exhibit

5  16001.  Do you recall seeing this document before?

6  A  Yes, I do.

7  Q  This document was produced by the government; is that

8  right?

9  A  Yes.

10  Q  Do they have a list of three programs; is that right?

11  A  Yes.

12  Q  The first program is the Hulaman Management Services?

13  A  Yes.

14  Q  The second program is the Global Dominion Financial

15  Services?

16  A  Yes.

17  Q  And the third program is the Cornerstone Institute?

18  A  Yes.

19  Q  Do you see that?

20  A  Yes.

21  Q  And then they have dates of when the programs began and

22  ended.  Do you see those?

23  A  Yes.

24  Q  I want to directed your attention to the Cornerstone

25  Institute portion of that.

1    A    Okay.

2    Q    Are you with me?

3    A    Yes.

4    Q    What is the date that the government believes that program

5    began?

6    A    January the 1st of 2000.

7    Q    Is that --

8    A    I mean, June.  I'm sorry.  June the 1st of 2000.

9    Q    Do you recall that period of time?

10    A    Well, of course, that would be, you know -- it looks like

11    that's about 24 days, the start, you know, after my

12    motorcycle accident.

13    Q    And they have an ending period of January the 31st, 2002?

14    Do you see that?

15    A    I see that, yes.

16    Q    What was happening between June of 2000 and January of

17    2002?

18    A    Well, I am looking for other alternatives, you know, to

19    back up Mintus.  I am looking at other possibilities.  Really

20    wasn't that I had lost faith in Mintus but that I felt like I

21    had to do some other things.  I felt like I needed to at

22    least attempt and -- so I think --

23    Q    Let me stop you there, Nolon.

24         So you were looking for other sources of funding; is that

25    correct?

1   A    Yes.

2   Q    What was another source that you found?  Well, let me ask

3   you this:   Did you find any other sources?

4   A    Well, we found a group of people related to the Mormon

5   church in Salt Lake City.  They promised me a number of

6   things, but it never happened.  We had the La Begga thing

7   that, I believe, Doug Stephan talked about.

8   Q    What happened with that?

9   A    Actually, it was one of the -- one of the fellows in Salt

10  Lake introduced us to Mr. La Begga.  And he proved up what he

11  said was 1.6 billion in bearer bonds and asked if he could

12  come and work with us and financial the project.  So,

13  obviously, Doug Stephan and I thought that it was a great

14  idea.

15  Q    Was he willing to do that?

16  A    He came to the retreat.  He met with me.  He even spent

17  the night.  Then we took him to the, I believe, the Bank of

18  California in -- here in Tacoma.  We took him and introduced

19  him to the private banking segment of Bank of California.

20  Q    Did he bring his bonds to the bank?

21  A    He gave them all the CUSIP numbers.  They entered them in

22  the computer and opened up an account.  And I understand -- I

23  was later told -- that for about 24 hours, he had 1.6 billion

24  in deposit there.

25  Q    But it turned out that he did not?

1   A   Turned out to be some kind of a bank scam that -- no one

2   ever explained to me why it didn't work, but it had -- this

3   is not anything I am doing.  I am sitting there with the

4   banker and with this man that says he wants to finance our

5   project.

6   Q   Mr. Bush, do you recall the testimony of Starla Ryan?

7   A   I do.

8   Q   And do you recall her testimony, that she spent a

9   considerable amount of time on the telephone with you?

10  A   I do not doubt her testimony.  I just do not remember it.

11  That's my big problem.  I just do not remember.

12  Q   Now, she became involved with a group called American

13  Legal?

14  A   Yes.

15  Q   Do you recall that?

16  A   Yes.

17  Q   Do you know anything about American Legal?

18  A   I am certainly aware of all the people involved, yes.  But

19  I was not aware -- I do not ever recall -- I think I saw

20  Marina Pacific.  I saw some statement or something.  I have

21  never seen one of those before.  There were some structures

22  there that were all new to me.  I am just not aware.

23  Q   Do you recall authorizing the establishment of Marina

24  Pacific?

25  A   Well, no.  It wouldn't have been anything that I did.

1    It's not -- it's not one of my organizations.  But I think

2    it's someone that evidently was doing business with Global

3    Dominion.  I would think.  It appeared that way.

4    Q    Do you recall the testimony of David Franke?

5    A    I do.

6    Q    Do you remember him?

7    A    Yes, I do.

8    Q    You had dinner with him?

9    A    I remember the dinner.

10   Q    Do you recall telling him that you owned the land in

11   Mexico?

12   A    I have never told anyone I owned the land in Mexico.

13   Never.  That was -- Duane Christy was totally in charge of

14   land procurement.

15   Q    Let me stop you there.

16        Do you recall Mr. Franke testifying that you did tell

17   him that?

18   A    Well, maybe he said it.  If he said it, he said it.  I

19   don't know.

20   Q    But you do not believe that you ever told him that?

21   A    May I talk about what I -- what I remember our

22   conversation with Mr. Franke about?

23   Q    Yes.  Go ahead.

24   A    Okay.

25        Mr. Franke was in the construction business.  And we

1    talked about his participation possibly in infrastructure and

2    maybe he might play some role.  And I just do not know

3    whether or not I brought it up, he brought it up, but that

4    would be something that I probably, you know, would explore

5    with someone like him.  And I know we did talk about possibly

6    his involvement.  That's what I remember about the meeting.

7    Q    He did get someone involved; is that correct?

8    A    Yes.

9    Q    To your recollection?

10   A    Yes.

11   Q    In 2002, did you look outside of the United States for

12   funding?

13   A    Yes.

14   Q    Where did you look?

15   A    The people in Salt Lake City were introducing us and had

16   actually gone to Switzerland and Zurich and had someone there

17   for some four five months, claiming every day they were going

18   to fund the project.  I actually stayed there during this

19   entire time, but, as I understand, their program was never

20   successful.

21   Q    Did there come a time when you went to Poland?

22   A    By July of 2002, I was really -- I didn't really know

23   quite what to do.  We had one asset left that I could see

24   that was really worth my pursuing that I could actually do

25   something myself.

1    Q    Let me stop you there.

2         I am showing you what's been admitted as Exhibit

3    16003.   Do you recognize this?

4    A    Yes, I do.

5    Q    And what do you recall about it?

6    A    According the government's numbers, it says that this is

7    where certain amounts of money went that we spent.

8         Is that what you're saying?

9    Q    Yes, that these are placements of funds in various places.

10   A    Right.

11   Q    Is that right?

12   A    Right.

13   Q    Is one of those places Century 21?

14   A    Century 21 appears -- yes, $1,720,000.

15   Q    Now, that line that is between -- that is over 1 and 7 is

16   my line.   And do you recall that number to be different?

17   A    Yes.   There is an additional -- about 103 million.   And,

18   again, I can be off on these numbers.   But I believe this one

19   7 -- I could have the figures reversed.

20        At this time, the parent company of Century 21, worldwide,

21   was Cendant, the Cendant Corporation.   And I had previously

22   sent about 1.3 million, I believe, to Phil Yaeger's personal

23   bank account here in Seattle, and I had Cendant 1.7, for a

24   total of about $3 million.

25   Q    So you had had business -- a business relationship with

1  Century 21 through Phil Yeager?

2  A   Through Phil Yeager.   May I say who Phil Yeager is?

3  Q   I am going -- that was my next question.

4       Who is Phil Yeager?

5  A   Phil -- there were originally seven founders of Century 21

6  there were seven people, in this early '60s, living in

7  southern California.   Phil is one of the original seven men

8  who created Century 21.

9  Q   When did you meet Mr. Yaeger?

10  A   Of course, I had been doing business with his business

11  partner, Duane Christy, since '97.   I think our relationship

12  started in '95, '96, '97, but we started working on the

13  resort in '97.

14       I would go to Mexico City, where their headquarters

15  for Mexico had been for over 20 years, and I would stay at

16  Phil and Duane's home in Mexico City.   And I got to know Phil

17  very well over that period of time, working with Duane on San

18  Quintin.

19  Q   I am going to stop you there.

20       Let's now go back to July of 2002.   And did you

21  travel to Poland?

22  A   I did.

23  Q   What was your purpose in going to Poland?

24  A   My purpose in going to Poland was to sell Poland.   What

25  that $3 million represented was a partial interest in Global

1   Real Estate LLC, which was Phil and Duane's company that

2   owned the trademark rights of Century 21 in 22 countries.

3   Q    Before you --

4   A    And Poland was one of those countries.

5   Q    Were you going to sell that interest in Poland; is that

6   the idea?

7   A    I was to find the -- we had -- just to explain to you what

8   was going on:  We had Poland, we had Italy, we had Austria,

9   we had Greece, Germany, those five -- and Poland -- those

10  five EU countries, and we had the Scandinavian countries of

11  Denmark, Norway, Sweden, Finland.  So we owned the trademark

12  rights.  That just means we make a percentage off of every

13  Century 21 office as they are developed in those countries.

14  And then we owned -- obviously already had Mexico.  We owned

15  all of South America.

16  Q    Now, focusing again on Poland, what were you going to do

17  in Poland?

18  A    We were going to sell -- get Poland off because --

19  remember, this is an asset of Cornerstone Institute.  And so

20  I wanted to go ahead and get that part started.  Then, we

21  had -- we had other plans, you know.

22  Q    Did you have an agreement with Mr. Yaeger when you went to

23  Poland?

24  A    I did.

25  Q    What was that nature of that agreement?

1    A    The original agreement was for about 35-percent ownership

2    of Global Real Estate, 30 to 35.  We were still working on

3    that.  I paid him approximately -- the price on that was for

4    about 30 to 35 million.  So I paid him about 10 percent on

5    it.  Mintus was funding the rest.  This was another part of

6    her program.

7    Q    Were you successful in your efforts to sell Poland?

8    A    Actually, sold it twice.  And I will explain that.

9    Q    What happened the first time?

10   A    The people did not close on the -- they lost their initial

11   deposit; they had a nonrefundable deposit.  But I ended up

12   selling to a second person.  That did close, and the region

13   was bought.  And June the 21st of 2006, Poland -- Century 21

14   of Poland was launched.

15   Q    Did you recover any assets from that sale?

16   A    We were promised about a quarter of a million.  They ended

17   up only paying about half of that.

18   Q    And did you personally receive any funds to put back into

19   the program?

20   A    No.  It only covered my whole living expense that I had

21   been there for -- since the four years it had taken to do

22   that.

23   Q    What money did you use for traveling expenses in Poland?

24   A    I took the $83,000 that represented the motorcycle

25   settlement.  I gave half of it to From The Heart Foundation.

1    I gave half of it to Marilyn.  And I took the other half and

2    went to work on the Century 21 program.

3    Q    Do you believe that you have hidden any information from

4    the Court?

5    A    Absolutely not.

6    Q    Did you intend to defraud anybody of money?

7    A    No.

8    Q    Do you understand what it means to defraud?

9    A    I believe I do.

10   Q    Did you intend to do that?

11   A    I did not.

12   Q    Did you intend to harm anyone?

13   A    I did not.

14   Q    Or to have anybody lose money?

15   A    No.  And, again, what hurts the most, I think, is my

16   staff.  Having my staff decide to put money into this program

17   is very painful to me.

18   Q    One question, Mr. Bush, that is out of sequence, but

19   reminds me I have not asked you:  Did you ever fly the flag

20   of Nevis at Port Orchard?

21   A    That was, I thought, a very -- I found it sad but kind of

22   amusing.  To my knowledge, I have never seen any flag flying

23   out at the retreat but the American flag.  And I don't even

24   know what the Nevis flag looks like.  So I -- and if someone

25   had a Nevis flag, it's news to me.  The idea of the retreat

1   being an embassy is, for me, just completely preposterous.   I

2   have no idea where that came from.

3        May I talk about Poland more?

4   Q   What is missing from Poland?

5            MR. STORM:   Objection, Your Honor.   No question.

6            MS. OLSON:   There is not a question pending.

7            Your Honor, may I have a minute, please?

8            THE COURT:   You may.

9   BY MS. OLSON:

10  Q   Mr. Bush, so you were successful in some respects during

11  your trip in Poland?

12  A   Very, very successful.

13  Q   Were there other respects in which you were not

14  successful?

15  A   Yes.

16  Q   What were those?

17  A   Following the sale of Century 21 of Poland, Phil Yeager

18  and I, having done -- having accomplished that, I asked Phil

19  one day by phone -- I said, Phil, what does Century 21 Real

20  Estate look like 15 years from now?   Phil is 80 years old, 10

21  years older than I am.   And I said, You were the originator

22  of Multiple Listing Services, you were head of education of

23  California, you are founder of Century 21, the largest single

24  system in the world today.   What can you tell me, before you

25  retire, about the future of the international real estate?

1          And he said, Nolon, I'll get back to you on that.

2    And for the next couple of months, he thought about it, and

3    then one day he called me.

4          MR. STORM:   Object to the relevance.

5          THE COURT:   Sustained.

6    BY MS. OLSON:

7    Q    Nolon?

8    A    Yeah?

9    Q    Judge Leighton is telling you to stop with your answer.

10   A    So I can't talk about recovery?

11   Q    I am going to ask you another question.

12         Were you working on another project in Poland?

13   A    Yes.   Phil Yeager and I became partners in a new project

14   proposal.

15   Q    Was that project successful?

16   A    It had been going on for a three-year pilot inside the

17   United States, and it was a new approach to real estate,

18   something that he was already doing.   And he decided to make

19   me, 50/50, his partner in Europe.   And he asked me to build

20   it in Europe.

21   Q    Did you have enough time to do that?

22   A    All the paperwork was finished.   Everything was done.   And

23   when -- the day that I heard about my indictment -- I did not

24   know I had been indicted, and the day that I was told about

25   my indictment, two hours following my finding out about my

1    indictment, there was a world conference telephone call where

2    that service center that would have connected 15,000 real

3    estate offices worldwide was stopped, as a result of the

4    indictment.

5    Q    Did that end any further efforts to make that deal happen?

6    A    That -- and that deal would have cleaned up this problem

7    here, had I been able to --

8    Q    How much money do you think you would have gained if you

9    had been able to complete your project?

10   A    Century 21's organization last year originated about --

11   almost a little over half a trillion dollars of home loans.

12   This would have built a system that started doing,

13   in addition -- more than that.  And we are talking about

14   hundreds of millions of dollars.

15   Q    I am talking about back in June of 2006.  How much money

16   were you figuring that you would have been able to have

17   raised at that time?

18   A    Phil had given me basically the EU Turkey and Russia to

19   work with.  And the EU alone should has been in excess of

20   $50 million.  So it would have cleaned up this situation.

21   Q    Is that the EU money?

22   A    Yes.  I'm going to say -- yeah, EU.

23   Q    How much is that in United States dollars?

24   A    Exchange rate today is today 1.5 or something like that.

25   Q    But approximately in 2006?

1   A    Well, this would have happened the summer -- the summer of

2   2007 is when, of course, it would have occurred.  Because we

3   had been working on it since June of -- 21 of '06 that we

4   opened up the office.

5   Q    I am just trying to give the jury an idea as to how much

6   U.S. dollars would have been gained.

7   A    I am going to say 75 million.

8          MS. OLSON:   I don't have any further questions.

9          THE COURT:   We're going to take our midafternoon

10  break at this time.

11         Ladies and gentlemen, remember the Court's

12  admonition.  If you could return to the jury room.  We'll be

13  back with you in a few moments.

14         (Jury exits the courtroom.)

15         THE COURT:   Please be seated.

16         Neither Ms. Boring nor I have listed exhibit --

17  although that entry did look familiar to me -- Exhibit 3007.

18  So what I would like you to do is, by modification, simply

19  alter the stipulation to include Exhibit 3007, since it

20  didn't appear that there was any objection to the exhibit.

21         So, Jean, I am going to give you the Post-It back.

22  We can take care of it.

23          But neither Ms. Boring nor I had it on our list of

24  admitted exhibits.

25         Court will be in recess.

1           (Court in recess.)

2           THE COURT:   Please be seated.

3       Mr. Storm, are you ready to proceed?

4           MR. STORM:   There is one housekeeping matter.   Last

5   week, there were a number of records we stipulated to.   In

6   addition to that, there were a number of foreign business

7   records that Mr. Bush had not previously seen.   However,

8   Ms. Olson agreed that they were appropriately admitted under

9   3505 but for the fact that she contested the relevance.   So

10  we were not able to stipulate to them.   And I proffered why

11  they were relevant.   Agent Breed testified to relevance.

12  After I proffered to their relevance, the Court admitted

13  them.   But there is no written record of that.   Maybe that is

14  how Ms. Olson remembers this happening.

15          MS. OLSON:   That's correct.

16          MR. STORM:   Among those records are 3007.

17          THE COURT:   Do you have a written list, because --

18          MR. STORM:   Yes.

19          THE COURT:   I guess I could go back on realtime, but

20  I haven't seen...

21          Let me just write these numbers down quickly.

22          3007 to 3011, 3017 to 3021.   Those will be admitted.

23  (Exhibit Nos. 3007, 3008, 3009, 3010, 1011, 3017, 3018, 3019,

24                   3020 and 3021 admitted.)

25          (Jury enters the courtroom.)

1                          CROSS-EXAMINATION

2    BY MR. STORM:

3    Q    Mr. Bush, you indicated you have expertise in sales

4    technology?

5    A    Somewhat, yes.

6    Q    I believe you indicated that on direct; is that true?

7    A    Yes.  Somewhat.

8    Q    I believe you also indicated on direct that you have

9    expertise in networking; is that true?

10   A    I do.

11   Q    Let me talk to you about corporate soles.  If I could have

12   you look at Exhibit 1001, page 3.  If I could just start off,

13   I will read to you the first paragraph that is not written in

14   caps, which says:  Know all men by these presence that the

15   Cornerstone Institute is unincorporated church ministry has

16   incorporated the office of its sole overseer, the director of

17   the Cornerstone Institute, by creating a religious

18   corporation sole of the church on April 15, 1973, under its

19   own authority and jurisdiction.

20          And it goes on to name you as taking possession of

21   that office.

22       The Cornerstone Institute is an unincorporated church

23   ministry; is that what it is?

24   A    Well, I don't know how to answer that.  Is this what the

25   paperwork says?  I only know what the paperwork says.  Does

1    it not speak for itself?

2    Q    Let me have you turn to page 6 of that same document.

3    Down at the bottom under.    Nolon Bush.    Did you sign that

4    document?

5    A    I did.

6    Q    Did you read that document before you signed it?

7    A    I did.

8    Q    And according to that document that you read and signed,

9    the Cornerstone Institute is an unincorporated church

10    ministry; is that true?

11    A    If it's what the paperwork says, that's what it is.

12    Q    Do you agree with the paperwork?

13    A    I agree with the paperwork.

14    Q    You are the director of the Cornerstone Institute?

15    A    I am.

16    Q    You're in the best position to know what it is; is that

17    right?

18    A    Yes.    That's true.

19    Q    You indicated that the church ministry could provide for

20    your needs as required; is that correct?

21    A    That's correct.

22    Q    Could it buy you a Harley-Davidson motorcycle if it wanted

23    to?

24    A    Well, of course.

25    Q    Could it buy you a Cadillac if it wanted to?

1   A   Well, it really can't buy me anything.  It can take an

2   asset position in a Harley or an asset position in a

3   Cadillac.  But it can't buy me anything because I don't own

4   anything.

5   Q   But you're the director --

6   A   I may have the use of it.

7   Q   Okay.  You can decide who gets to use it, who doesn't get

8   to use it, whether you park it in the garage or run it off a

9   cliff; is that right?

10  A   I wouldn't run it off a cliff.

11  Q   You get to decide that because you're director of the

12  entity providing you with the asset?

13  A   I am the director.

14  Q   Could it buy you a weekly massage?

15  A   It may avail me to the service, yes.

16  Q   Original bronze artworks, could it buy you those things?

17  A   It didn't buy me anything.  Those were gifts, you know,

18  that were given to the From The Heart Foundation.

19  Q   Could it give gifts to your family if it wanted to?

20  A   It may give gifts to anyone, yes.

21  Q   And, for example, did you give $4,000 a month to your son,

22  Charles Nolon Bush III, while you were director of the

23  Cornerstone Institute?

24  A   I don't recall that.  Charles Nolon Bush III --

25  Q   So he could write a book?

1    A    I don't recall that.

2    Q    Did he write a book?

3    A    He has been working on a book, yes.

4    Q    Did you help him along in working on that book by

5    providing him with money as a stipend?

6    A    I don't recall that.  The figure you mentioned -- I may

7    have helped him from time to time with funds, but I don't

8    recall 4,000 a month.

9    Q    Helped him from time to time while you were director of

10   the Cornerstone Institute; is that right?

11   A    I helped many people with -- as the director of the

12   Cornerstone Institute; is that right?

13   Q    Did you buy him a laptop?

14   A    I don't recall.

15   Q    Did you buy him a car?

16   A    You're talking about Charles Nolon Bush III?

17   Q    Yes.

18   A    Not to my knowledge.

19   Q    Did you buy anybody else a car?

20   A    No.  I remember the trucks that were used out at the

21   retreat.  And Marilyn March, she was given a garage -- a

22   Dodge Durango.

23   Q    Could the Cornerstone Institute buy a condo for your

24   daughter and ex-wife?

25   A    Not buy a condo.  Give them the use of the condo while we

1    held the asset in trust.   Yes.

2    Q    So it's fair to say that the Cornerstone Institute could

3    buy anyone anything as long as you, as director, agrees with

4    it; is that right?

5    A    Just like the Mormon church and the Catholic church, yes.

6    Q    Because you are a church -- or you are the director of an

7    unincorporated church ministry, you have no income; is that

8    right?

9    A    I have no income.   That's correct.

10   Q    So, because you have no income, it's impossible for you to

11   pay taxes; is that right?

12   A    I wouldn't know how to answer that question.   I don't know

13   how to answer it.

14   Q    As a church, you don't have to pay taxes do you?

15   A    I don't know if churches pay taxes.

16   Q    Excuse me.   I'm sorry.   I cut you off.

17   A    I would like to answer your question.   I don't know how to

18   answer it.

19   Q    Let me have you look at Exhibit 12002, please.

20        Do you recognize that exhibit?

21   A    I do.

22   Q    I am going to come back to 12002.

23        Let me have you look at 13001.

24        Do you recognize this exhibit?

25   A    Yes.

1   Q    And is your signature down in the bottom, left-hand corner

2   of that exhibit?

3   A    Yes, it is.

4   Q    You're signing that signature as the director; is that

5   correct?

6   A    Yes, I am.

7   Q    Director of what?  Cornerstone?

8   A    Yes.  Well, that's -- that is my official name, is Charles

9   Nolon Bush or C. Nolon Bush, Director.

10  Q    You're signing as the director of something.  Would that

11  be Cornerstone?

12  A    That would be Cornerstone.

13  Q    On that document, do you see, down at the bottom, the

14  total amount listed?

15  A    Yes, I do.

16  Q    Is there any sales tax listed on that document?

17  A    I believe I saw it at the top.

18  Q    Where do you see sales tax?

19  A    It looks like where it says Tax, 1475.59.

20  Q    Okay.  Let me have you look at Exhibit 1220, please.

21       What is this document?

22  A    It looks like Mr. Cox's invoice.

23  Q    Let me have you look at the bottom of that invoice.  Do

24  you see, down in the bottom, left-hand corner, where it says

25  tax-exempt status IRS authorized charity?

1    A    Yes.

2    Q    Is that because you're acting as the director of the

3    Cornerstone Institute?

4    A    You know, I don't know how that got on there.  I don't

5    know that -- is this an invoice that I issued?

6    Q    It appears to be an invoice issued by Richard Cox of

7    Domestic International Consultants for work performed for

8    you.

9    A    So I am going to assume Mr. Cox wrote that on there.

10   Q    Did you hear him testify regarding the document?

11   A    I don't remember his testimony about the document.

12   Q    So would it be fair to say that, as director of

13   Cornerstone Institute, if a merchant would agree to not -- or

14   charge you -- not charge you sales tax -- you didn't have to

15   pay it -- but if they wouldn't agree you had to pay it.  Is

16   that fair to say?

17   A    I would not, wouldn't know that.

18   Q    You don't know why you're listed as tax exempt from this

19   document?

20   A    I don't know why he put tax exempt.  I assume that that is

21   something he wanted to put on there.

22   Q    As a church, were you required to pay taxes?

23   A    To my knowledge, no.

24   Q    So, then, he rightly put that on there; isn't that right?

25   A    I don't know.  I don't know if it's right or not.

1   Q   What about federal income taxes; were you are required to
2   pay federal income taxes as a church?
3   A   I'm not -- to the best of my knowledge, no.
4   Q   So you could put everything in the name of church, have
5   all your income go to the name of church, have the church
6   completely support you and, as long as the merchants who you
7   dealt with agreed, you could pay no taxes, state or -- if you
8   chose not to file -- federal.  Is that what you're telling
9   us?
10  A   I wouldn't know.
11  Q   Is that what you did?
12  A   Not to my knowledge.  I don't recall doing this with
13  anyone.
14  Q   Did you file federal income tax returns?
15  A   I've been told I don't have to file federal tax returns.
16  I think my corp sole says that.  I think my corp sole says
17  that, according to Glenn Stoll, I was instructed that I don't
18  and that I am tax exempt.
19  Q   So, as a church, while you were operating Cornerstone
20  Institute, you were able to live as high as you liked on the
21  church income and not pay taxes; isn't that right?
22  A   No, it's not right, because I don't live high as I like.
23  I own nothing.
24  Q   Church owns it all?
25  A   Church has everything.

1  Q  You're the director of the church?

2  A  I am director of the church.

3  Q  You know, it sounds a little bit like a tax scam.

4  A  I wouldn't know.

5  Q  You were asked by Ms. Olson if there was anything illegal

6  about Global Prosperity; is that right?

7  A  I recall her asking about the legality of this.

8  Q  Do you know that the leaders of Global Prosperity were

9  prosecuted in this district for tax fraud?

10 A  I have heard that, yes.

11 Q  You've heard that, and yet an hour ago or so, you

12 testified that there was nothing illegal about Global

13 Prosperity?

14 A  At the time I was working with them, there was nothing

15 illegal about Global Prosperity.  That's correct.  I have

16 heard that this had happened after I dealt with Global

17 Prosperity.  I know of -- this would be something that you

18 probably know a great deal about.  I just heard that.

19 Q  My recall of the question to you on the stand, Mr. Bush,

20 was:  Is there anything illegal about Global Prosperity?

21 A  To my knowledge, there's nothing illegal about Global

22 Prosperity when I was there.

23 Q  The fact that the leaders were prosecuted for federal tax

24 fraud doesn't alter that answer?

25 A  I know nothing about that issue.  I have not read any

1    indictments.  I have not seen anything.  I don't know.  I

2    would not know about that.

3    Q    How much did you play Glenn Stoll for your corporation

4    sole?

5    A    I don't recall.  I think our total fees, according to the

6    records I think that y'all had, was something like $30,000.

7    Q    You paid him $30,000 for the corporation sole?

8    A    For, I think, the total fees that he had done, you know,

9    for -- for the Cornerstone Institute.

10   Q    Which included other things as well as the corporation

11   sole?

12   A    Absolutely, yes.  He was our ecclesiastical attorney, yes.

13   Q    Which means that he ran interference with law enforcement;

14   isn't that right?

15   A    I wouldn't know that.

16   Q    In fact, you became a promotor of corporation soles; is

17   that right?

18   A    I have never promoted corporation soles in my life.

19   Q    Let me have you look at Exhibit 2034, please.  Page 3.

20         If I could have you look down at the bottom.  I would

21   like you to read the last bullet point on your document.

22   A    You want me to read it?

23   Q    Yes, please.

24   A    "Upon request, Hulaman can make available to clients

25   corporation soles, offshore IBCs and trusts."

1   Q    This is paperwork that you gave to investors before they

2   invested; isn't that right?  This is an introduction package.

3   A    This is, what, kind of a memorandum of understanding or

4   something?

5   Q    You are the director of Cornerstone, and Cornerstone

6   Hulaman is an arm of Cornerstone, according to your

7   paperwork.

8   A    That is correct.

9   Q    So in this document, you appear to be promoting

10  corporation soles.

11  A    No, sir.  Not promoting.  If you'll notice, it says:  Upon

12  request.

13      In other words, I'm just saying that if someone were to

14  request that, we certainly can direct information toward

15  that.  But I'm not promoting anything.

16  Q    By putting in the paperwork that if they request, you'll

17  provide; that's not a request?

18  A    No, it's upon request.  It's merely offering a service of

19  information that we can direct, you know, attention to this.

20  We are -- we are familiar with it.  But I'm not promoting

21  anything.  There is nothing for sale here.

22  Q    Who would you refer them to?

23  A    Well, in this case, you know, it would be to, you know,

24  probably Scott Grant, I would imagine.

25  Q    Or Glenn Stoll?

1  A   Glenn Stoll would certainly -- I mean, he did my work.  So

2  I was certainly pleased with him, yes.

3  Q   Hulaman is a Jewish tradition?

4  A   A rabbi told me that that was a traditional name.

5  "Hula" -- I don't know what the "hula" part -- you know, I

6  just don't know.  I may have known one time.  It was

7  discussed and I -- I have an interest in Masonic Judaism, and

8  I just do not -- I cannot recall exactly what the derivative

9  from Hebrew it was.

10 Q   When you learned of high-yield investments from Global

11 Prosperity, you were told -- and I put this in quotes in my

12 notes -- that there are many imposters promoting high-yield

13 investments; is that right?

14 A   That is correct.

15 Q   You went into this knowing, with eyes wide open, that

16 there are lots of con men out there promoting high-yield

17 investments; correct?

18 A   That is correct.

19 Q   In fact, you dealt with Larry Wilcoxson in late 1998,

20 early 1999, and then you determined he was likely a fraud; is

21 that right?

22 A   Well, I determined that I had an option.  I was concerned

23 about him because he wasn't interested in my project.  He

24 wasn't -- there wasn't a humanitarian side to what he was

25 doing.  I chose to take my money elsewhere.

1   Q   You never got any returns from your investment with him,

2   did you?

3   A   To my knowledge, I did not.

4   Q   In fact, a little bit later on, you learned that he had

5   been shut down by the feds; is that right?

6   A   I heard that, yes.

7   Q   And you relayed it on to Vickie Webster?

8   A   I don't really recall talking about Larry Wilcoxson with

9   anyone.  I may have, but I don't recall it.

10  Q   But you knew it; you knew he was shut down by the feds?

11  A   I had been told that he was in trouble.  I never read any

12  information on him.  I know nothing about it.

13  Q   Ms. Olson asked you about Exhibit 2037, Trust and

14  Fiduciary Agreements.  Let me have you take a look at that

15  document.

16       Now, this particular document went to the Fishers.

17  Do you recall them testifying at trial?

18  A   I believe so.

19  Q   And David Fisher, Mr. Fisher, testifying?

20      And who is this on the front page?  It says Tammy.

21      She worked for you, right?

22  A   Yes.

23  Q   Let me have you look at page 2 of this Trust and Fiduciary

24  Agreement.  This is the document that you testified to on

25  direct but it's also the document that folks got after they

1   gave you their money; is that right?

2   A    I believe that was the process, yes.

3   Q    Well, it was your process.  Is it right or not?

4   A    Well, as best I remember, that was the process, yes.

5   Q    Let me have you look at a document that was created before

6   they invested.  Let me have you look at Exhibit No. 2034.  I

7   will have you look at page 3 of that document again.

8         Is this a document, first of all, that you gave folks

9   before they sent you their money?

10  A    It looks familiar, yes.

11  Q    There are number of representations made in that document,

12  correct?

13  A    Pardon?

14  Q    There's a number of representations made on those bullet

15  points of that document, correct?

16  A    The bullet points, yes.

17  Q    And those are intended to be made to the investor who is

18  going to give you money; is that right?

19  A    That's correct.

20  Q    For them to rely on in giving you that money; is that

21  right?

22  A    That's correct.

23  Q    Can you read the first bullet point for me, please.

24  A    Minimum 10,000 USD required.

25  Q    During your operation of Cornerstone Institute, that

1  minimum changed from time to time, going up constantly; is

2  that right?

3  A    That's correct.

4  Q    Can you read the second bullet point, please.

5  A    The funds are held in trust by Hulaman until one million

6  USD total is reached.

7  Q    What happens when one million USD total is reached?

8  A    The trader that we were working with does whatever they do

9  with it.  I don't know.

10  Q    We'll turn to the next page in just a moment but -- let's

11  turn to the next page right now.  Let me have you look at the

12  following page.

13       Let me have you read from where it says -- the first

14  paragraph -- Promissory note.  Just go ahead and read down

15  through the first couple of sentences.

16  A    Starting with Promissory note?

17  Q    Yes, please.

18  A    "A promissory note in the amount of the principal plus

19  minimum interest of 8 percent per annum and a divisible

20  interest in the 100 million USD letter of credit.  Once 1

21  million minimum has accumulated in the commitment provider's

22  trust, trust account funds will be transferred into a trading

23  situation with a private merchant bank, and additional

24  security will be made available from the merchant bank in the

25  form of an insurance guarantee or divisible interest

1    thereof."

2    Q   So here is the answer to the first bullet point.  Is --

3    once a million dollar's accumulated, it's going to be placed

4    into a private merchant bank for a trading situation; is that

5    correct?

6    A   That is what the people in New York had said to me, yes.

7    Q   But until the million dollars is accumulated, it's going

8    to be held in trust, right?

9    A   Well, the million dollars is really already there.  You

10   know, we are just -- from what I understand.  It's not my

11   million dollars; it's theirs.

12   Q   What are you telling people here?  You're telling people

13   that you're going to hold a million dollars in trust.  Let's

14   turn back to the bullet points on the previous.

15   A   I am telling them exactly what the people in New York told

16   me was going on.

17   Q   I want to know what you told people.  Let's read this

18   bullet point here.  Funds are held in trust by Hulaman until

19   one million dollars USD total is reached.  And then you're

20   going to place it with the trader, according to the page we

21   just read.

22   A   Well, I already have a trust account, according to New

23   York, already set up.  It's already there in place, you know,

24   for me that was backing my project.  That's what I was told.

25   Q   Wait.  This says that Investors' funds are going to be

1 held in trust until you accumulate million dollars.

2 A   Only using the paperwork that they recommended I use.

3 That's all I am doing.

4 Q   Well, here is the problem:  If you're going hold their

5 money in trust until you accumulate a million dollars and

6 you're going to provide it to the investment provider, who is

7 going to place it in the merchant bank, and while you're

8 holding their million dollars, these investors' million

9 dollars in trust, you take it out and start spending it on

10 SUVs and houses and gifts to your children, then their

11 million dollars is not being held in trust it's being spent.

12 Do you agree with that?

13 A   Not because I believe there was 800 million sitting in New

14 York.  That was an offsetting factor to me.

15 Q   This is what you were telling people who were getting

16 ready to give you your money.  This is what you sent them

17 before they gave you their money.  You're telling them you're

18 going to hold their million dollars in trust and then you're

19 going to invest it.

20 A   And I've done that in advance, by what I understand New

21 York had done for me.

22 Q   Is that what this says here?  If I am going to give you my

23 401(k) account, can't I rely on this document?

24 A   I am only doing what someone told me to do; that's all I

25 am doing.

1    Q    You're not doing what you told the investors you would do.

2    You said you would hold -- before they gave you their money,

3    you said you would hold their money in trust until you got a

4    million dollars, and then you would invest it.  Isn't that

5    what it says here?

6    A    I don't know how to answer your question because, as I

7    understood, I had the million dollars sitting in New York and

8    a great deal more with it, and this is just all setting

9    paperwork for what has already been put in place for me.  I

10   am sitting there.  This piece of paper is being given out.  I

11   am believing that somebody in New York has all this covered

12   for me and this is --

13   Q    David Fisher --

14   A    This is just a piece of paper representing David's

15   interest in the project.

16   Q    David Fisher is believing that you're holding his million

17   dollars in trust until you get a chance to invest it because

18   then it's accumulated.  That is what he believes based on

19   what you told him.

20   A    And I am issuing the paper based on what someone else has

21   told me.

22   Q    You testified a couple hours ago that you intentionally

23   did not tell people like David Fisher that you were going to

24   take their money out and spend it; isn't that right?

25   A    Well, I wasn't spending David's money.

1    Q    Whose money were you using to buy the house and the SUVs

2    and the masseuse and the chef?

3    A    The only reason I am doing that is because I believe that

4    there is money sitting in New York that offset this.

5    Q    Whose money you were using to buy those things?

6    A    Well, I am using the money that we're taking in.

7    Q    David's money?

8    A    Well, it certainly is money, yes.  The equivalent of it

9    sits in New York.

10   Q    That's not what that says, is it?

11   A    I don't really know what this says, because I -- this is

12   paperwork that I was given, it's what I am using and it's

13   supposed to match with New York.

14   Q    Tammy Stuckey testified that you looked over all the

15   paperwork very carefully.

16   A    And this is what I was told to do.  This satisfied New

17   York.  I am just as -- I feel just as much the victim here as

18   everyone else.

19   Q    You feel like a victim?

20   A    Yes, I do.

21   Q    You intentionally did not tell David Fisher you were going

22   to spend his money.  That was your testimony two hours ago.

23   Is that right?

24   A    I don't remember what my testimony was two hours ago.

25   Q    You don't remember being asked that question?

1  A   I don't remember talking about Fisher two hours ago.

2  Q   All investors.  You intentionally did not tell any

3  investor how you were going to use their money?

4  A   These are not investors; they are lenders.

5  Q   You testified that you intentionally did not tell the

6  people who gave you money what you were going to do with

7  their money; isn't that right?

8  A   I was just doing what I was told to do.  It's the only

9  answer that I have.  I believe what I was doing was right and

10  just.

11  Q   Let me have you look at the second -- the bullet point

12  that starts with This program is designed.  Can you read

13  that.

14  A   This program is designed with a very high degree of

15  confidence of success to yield 25 percent every 30 days,

16  payable in arrears and dispersed as an irrevocable pay order

17  and wishes of the client.

18  Q   It says it's designed with a very high degree of

19  confidence.

20          You were told by Global Prosperity before you got

21  into this that it was filled with con artists; isn't that

22  right?

23  A   As I understand, every business is.

24  Q   And yet you're making a representation of safety regarding

25  a very high degree of confidence without telling anyone that

1    there is a good chance that you're going to be dealing with a

2    con artist when your money gets invested; isn't that right?

3    A    My answer continues to be the same thing.    This is based

4    on my confidence in New York.    I mean, this is what causes

5    all this to be written.    And I don't know anything else to

6    say beyond that.

7    Q    Well --

8    A    If I hadn't believed in New York, I wouldn't have written

9    it.

10   Q    You didn't believe you could be wrong, based on Global

11   Prosperity's representation, that it's filled with con

12   artists?

13   A    I was not dealing in New York based on Global Prosperity.

14   I was dealing based on people that were presented to me as

15   being able to do what they could do.    And I believed them.

16   Q    Before Cody Bly took money out of his account and gave it

17   to you, don't you think he was entitled to know that there is

18   a lot of con artists practicing in this area?

19   A    I wouldn't know.    I don't know how to answer that

20   question.

21   Q    What do you think?    If you were an investor, wouldn't you

22   want to know that before you gave your hard-earned money to

23   somebody like you?

24   A    Well, I did the due diligence that I could do and did as

25   much as I felt I could do.    And I did that.    And I assumed he

 1    did the same thing.

 2    Q    Let's talk about that.

 3         You testified that in early 1999, Mintus stopped paying

 4    and that there were promises day in and day out, week in,

 5    week out; isn't that right?

 6    A    Mintus didn't stop paying.    Mintus never paid.

 7    Q    She failed to pay?

 8    A    Failed to pay.

 9    Q    And --

10    A    We sit here right now as a result of that.

11    Q    And as a result -- or in spite of her failure to pay, you

12    continued promoting her program, without including any kind

13    of addendum to that bullet point that says:    Look, she's not

14    paying.    I'm really concerned about it, but, hey, give me

15    your money anyway.

16    A    I was not concerned with it.    I just believed it was a

17    matter of the way that she was doing business and what was

18    going on within the market.    I fully believed in her.    If

19    you're asking me if I am stupid, you're asking me I gave the

20    wrong people money, I gave -- I did business with the wrong

21    people, I would have to agree with that.

22    Q    Before Cody Bly or Ray -- before Ray Donohue took his

23    money, his $800,000, and gave it to you, don't you think he

24    deserved to know that Mintus was not paying?

25    A    If you're asking me am I embarrassed and do not feel good

1  about the way this turned out, the answer is absolutely --

2  Q   I am asking you if Raymond Donohue, before he gave you

3  $800,000, deserved to know that Carolyn Mintus wasn't paying

4  you?

5  A   I just don't know.  I can't answer that question.  I don't

6  know.  I'm assuming that he believed in me the same way that

7  I believed in Mintus.

8  Q   I'm assuming that too.

9  A   Yes.

10  Q   And you knew that you weren't being paid.

11  A   I knew that the cash-flow hadn't come yet, but I believed

12  that it would.  I believed I was privileged to be working

13  with her.  I believed it was -- I was just duped; that's all.

14  I made the decision.

15  Q   Did you make the decision to go back and add an addendum

16  or a footnote at least to this "very high degree of

17  confidence" assertion?

18  A   At the time that this -- what's written stands written.  I

19  believe that.  Obviously, we're looking at hindsight being

20  20/20.

21  Q   Let's look at another bullet point on there.  The third

22  bullet point, promissory -- "While in trust, funds are

23  secured by a promissory note in the amount of principle plus

24  a minimum of 8 percent per annum."

25          If your 8 percent per annum is guaranteed, then your

1  principal by conclusion was also guaranteed, correct?

2  A   I don't know.  Again, all this paperwork structure is, you

3  know -- was approved by New York.  It was -- you know, it's

4  just basically -- they say it was part of their program, I

5  mean -- and I have offsetting funds there, and I believed

6  that.

7  Q   It was approved by you.

8  A   It was approved by me but, you know, based on my belief in

9  them.  Yes.  There is no question we gave this paperwork out.

10 And this is the way it was, to the best of my belief, but I

11 believe that someone else has money someplace else

12 representing it.  Yeah, just -- all it is.  I believed in the

13 wrong people.  That's all.

14 Q   Before you tell people make representations of safety, you

15 don't believe you have any obligation to tell them what the

16 risks are?

17 A   Are you trying -- I mean, are you, in fact, putting me in

18 a position of being some kind of a security house or

19 something?

20 Q   I just want to know what you believe about that.

21 A   This program is represented by what I believed in.  I am a

22 victim here.  I told them what I believed.  And, you know,

23 when -- if my confidence is based on something else that is a

24 lie, I mean, if that's it, then, obviously, this comes to a

25 conclusion that brings us here.

1  Q   So far, we know about two things that you believe.  You

2  believe when you get into this, that it's filled with con

3  artists, and you believe you're not getting your money.  And

4  you still promote it.

5  A   I didn't believe I was one of those con people, nor did I

6  believe that I was dealing with a con.

7  Q   You knew, from the day Bill Miertschin cut you a check,

8  that you were going to take two-thirds of it and do what you

9  wanted with it, didn't you?

10  A   No, I didn't.

11  Q   I think you testified about two hours ago that you had a

12  formula:  one-third, one-third, one-third.

13  A   And how does that relate to your question?  I don't

14  understand.

15  Q   You knew, from the time Bill Miertschin cut you a check,

16  that you weren't going to put two-thirds of that money into

17  any kind of investment?

18  A   I did this based on thinking there was 800 million behind

19  me.

20  Q   You knew you weren't going to put it in any kind of

21  investment from day one, right?

22  A   I did this based on thinking there was $800 million

23  backing this up.

24  Q   Did you plan from day one to put all of Bill Miertschin's

25  money in any kind of investment?

1  A   I believed I already had the equivalent of Bill's in

2  another account in my name.

3  Q   So the answer is, no, you did not intend to put all his

4  money into any kind of investment; is that right?

5  A   I talked to you about my business plan, of which I was

6  operating under -- with Mintus' approval.

7  Q   Let's talk about the Mexico project.

8      You signed, on July 27th of 2000, a contract that

9  obligated you to pay $800 million to develop the Mexico

10  project; is that correct?

11  A   I believe that's correct.

12  Q   Let me have you look at Exhibit No. 12043.

13      If I could have you look at what's marked as

14  government exhibit page 11.

15      Government 11 is the contract -- is the addendum,

16  Exhibit A, to the contract that you signed, the operating

17  agreement, for Cabo San Quintin; is that right?

18  A   That's correct.

19  Q   So in September of 2000, you were obligated to come up

20  with $1,626,000 approximately for that project; is that

21  correct?

22  A   That's correct.

23  Q   And by April of 2001, you were to have 120 -- appears to

24  be 125 million provided to the project; is that correct?

25  A   That's correct.

1  Q   By January of 2002, you were to have provided 313 million

2  to that project; is that correct?

3  A   That's correct.

4  Q   You've stated that Mintus had not been paying you since

5  early '99.  So she clearly was not paying you in -- between

6  September 2000 and February 2002; is that correct?

7  A   That's correct.

8  Q   So each month that she did not pay you, this project was

9  sinking faster and faster; is that correct?

10  A   That is correct.

11  Q   So when you met with Mr. Franke at Eagles Nest in Central

12  Oregon in the summer of 2001, you were $200 million in the

13  hole in this project; is that correct?

14  A   Well, it's not correct, because none of these phases

15  occurred.  So there is nothing being in the hole about

16  anything.  The Mintus money has not yet begun to flow.

17  Q   So you were behind in your obligation.  You were to have

18  paid $200 million --

19  A   None of these things were represented to Mr. Franke.

20  Q   You were to have paid $200 million that you had not paid;

21  is that correct?

22  A   This was a proposed plan that we -- it was a document that

23  we signed based upon Mintus giving me the 800 million.  And

24  you can see how far the 800 million would have gone.  But she

25  was yet to start the project.

1    Q    Mr. Bush, by August 2001, you were to have paid $200

2    million that you hadn't paid; is that right?

3    A    Well, that's not right.  That's not correct.  What you're

4    saying is not correct.  This project has not started.  You're

5    assuming that this work is not yet -- has not yet started.

6    We are waiting for Mintus to pay the first check.

7    Q    It hasn't started because you haven't provided the money

8    that you committed to provide it.

9    A    I'm sorry.  I'm not following.

10   Q    Let me ask a different question.

11        When Mr. Franke, by the time he had met with you, had

12   divvied up $45,000 for this project -- do you remember him

13   testifying about that?

14   A    I do.  I still believed in Mintus then.  I was still

15   believing in her.  And Mark Kaposi as well.  Mark was as much

16   responsible for my belief that she would come through.  And

17   the banker she presented me to.

18   Q    Okay.  By this time, you still believed -- okay.  So by

19   this time, you know from your -- from the get-go that there

20   is still a con artist, you know she hasn't paid you since

21   early '99 and you know she's $200 million behind.  How do you

22   still believe in her?

23   A    It's a good question.  I have sat here for eight, nine

24   days now, and I don't get it.  I mean, I've seen things here

25   I don't understand.  I have come across -- these are numbers

1   I don't understand.  What I do understand is that she didn't

2   give me the 800 million that she promised.  I continued to

3   believe that she would.

4   Q   Let me ask you a better question.  Mr. Franke is driving

5   home from Reno with his wife, Peggy, and you're calling him

6   on his cell phone and you're saying, It's going great, can

7   you give me another hundred grand?

8       Did you bother to tell him at that point --

9   A   I do not recall doing that.  I recall Mr. Franke telling

10  me he's talking to his partners about putting another hundred

11  grand in.  I did not beg Mr. Franke to do anything.  Nor did

12  I pursue him.  I don't recall any of this.

13  Q   In any point when you dealt with Mr. Franke, did you tell

14  him that Carolyn Mintus was $200 million late on her

15  payments?

16  A   Well, Carolyn Mintus wasn't any of his affair.

17  Q   That's kind of a major point, don't you think?

18  A   No, I don't.

19  Q   You don't?

20  A   No.

21  Q   If you were investing in a resort --

22  A   He wasn't investing; he was lending money.  I was the

23  investor with Mintus.

24  Q   You said the project was backed by -- the money was backed

25  by the Mexico project.  If the projects dies, his money is

1    gone.

2    A    Well, Mintus and Mark Kaposi were still telling me that

3    the project was fine.

4    Q    If you were investing $100,000 of your hard-earned money,

5    wouldn't you want to know the project is going to die if

6    somebody out there in New York who is already $200 million

7    late isn't going to pay, or is $200 million late and might

8    not pay?  Wouldn't you want to know that?

9    A    Prosecutor, you are aware that I am sending Mintus money

10   all this time myself.  I am doing the same thing, that people

11   are giving me money, and I am sending her money as well.

12   Q    Let's talk about that.  You're doing, kind of, something

13   similar.  You're sending one-third, and you're living on the

14   remainder.

15   A    No, I'm just using money out of offsetting accounts.  I

16   believed there was 800 million there.  I did not think I was

17   living off someone else's money.  If I had thought that, I

18   wouldn't have done it.  And I can tell -- I can go over this

19   over and over and over and over again.  I have been duped

20   here.  I believed in the woman.  I believed in her.  I

21   believed in her and all of her people with the federal

22   reserve and all of her bankers.  I believe them.

23   Q    And the longer you're willing to believe that, the longer

24   you can bring in a masseuse for $700 a week and drive a new

25   Cadillac and live in a big mansion?

1    A    Not proud of it.  Absolutely.

2    Q    Because once you stop -- once you admit you no longer

3    believe it, you got to stop, right?

4    A    Yes.  That's true.

5    Q    Then it's all gone.  Isn't that right?

6    A    Well, we tried to find our money from Mintus, but we're

7    not successful.

8    Q    Starla Ryan.  You say that you don't remember --

9    A    I honestly -- the name is very, very familiar to me.  That

10    doesn't -- I just do not remember.  I do not remember her

11    money coming in, and I don't remember those expenditures.

12    That doesn't mean that it didn't happen.  I just do not

13    remember.

14    Q    She probably remembers $40,000 better than you do.

15        Do you contest that her money went into your account,

16    $40,000 on two occasions?

17    A    I don't know.  If this is what the records say, then I

18    would believe that that's true.  I don't know that.

19    Q    Mr. Bush, I'm showing you what's been marked as Exhibit

20    16010.  This shows, up near the top, the second line down,

21    funds from Starla Ryan:  $40,000.  This is the second deposit

22    by her.  On January 23rd, 2002.  Do you see that?

23    A    Yes, sir.

24    Q    Now, do you see that this chart is referring to Exhibit

25    7528 at US Bank, up in the left-hand corner?

1  A   Yes, sir.  I see that.

2  Q   Do you agree that 7528 was a U.S. Bank account that you

3  were the signator on?

4  A   I did not know.

5  Q   Let me ask you a couple more questions, and then we'll

6  look at that issue.

7        This chart shows that her money was transferred in

8  three transfers; 36,500 of it was transferred in three

9  transfers to account 7510.  Do you see that?

10  A   I see that 7510, yes.

11  Q   Do you recognize account 7510 --

12  A   I do --

13  Q   -- as being your account?

14  A   I do not recall.  I thought I would.

15  Q   The second page of Exhibit 16010, do you see that that's a

16  US Bank account for 7510 -- for account 7510?

17  A   I see that.

18  Q   Do you see the $36,000 was transferred from 7528 in three

19  transfers under the first three Amount columns?

20  A   Yes.

21  Q   And, then, do you see what happens to that money as the

22  next few days go by, between January 24th and January 30th?

23  Do you see that that balance is reduced down to $312?

24  A   Yes.

25  Q   And do you see what that money was spent on in the

1   description account?

2   A   Yes, I do.

3   Q   Pete Harold, your chef, got $2,000.   From The Heart

4   Foundation got $7,000.   Yvonne Crepeau, your employee got

5   $2000.   Qwest got $6,000.   Then, again, Qwest 1,500, 1,600.

6   Are those all your bills?

7   A   Well, they appear to be, yes.

8   Q   Do you remember paying them?

9   A   I don't.

10  Q   One thing that is lacking on Yvonne -- or on Starla Ryan's

11  $40,000 is any of it going to the Mexico project.   Is that a

12  fair statement regarding that account?

13  A   That is true.   I mean -- as far as it appears.

14  Q   Let's take a look, first, at account 7528, which is

15  Exhibit 11023.   I'm sorry, Exhibit 5004.   Let's go to the

16  second page of that exhibit.

17          Mr. Bush, up on the top, it appears to be your

18  signature as director of Cornerstone Institute; is that

19  correct?

20  A   That appears to be --

21  Q   Does this appear to be a signature card for account 7528?

22  A   Yes.

23  Q   The date on it is May 15th, 2000?

24  A   Yes.

25  Q   And so your motorcycle accident was May 6 of 2000?

1  A   May the 6th of 2000.

2  Q   So you were up and about, at least able to sign this

3  signature card, by nine days later; is that right?

4  A   You know, I would have sworn it was somebody else's

5  signature.  Now, I can understand.  Somebody's trying to

6  stick a pencil, I guess -- I'm trying to sign something.

7  Q   Down below Authorized Signers, there is one name on

8  account 7528.  Whose name is that?

9  A   That's my name.

10  Q   So that's your account?

11  A   Uh-huh (affirmative).

12  Q   You're the only one authorized to conduct business on it.

13  So if Starla Ryan's $40,000 check ended up in that account,

14  it ended up in your account; is that right?

15  A   That's the account that I have control over, yes.

16  Q   Let me have you look at exhibit -- account 7510, which is

17  Exhibit 50007.  And the second page -- signature card also.

18       Mr. Bush, does this account appear to be a signature

19  card for account 75 -- listing only the last four numbers of

20  the account, number 7510?

21  A   Yes.

22  Q   Also signed on May 15th, 2000?

23  A   Yes.

24  Q   Who is the only authorized signer on this account?

25  A   Myself.

1    Q    So if Starla Ryan's money was transferred from 7528 to

2    7510 and every dime was spent on your bills, you would be

3    responsible for that, wouldn't you?

4    A    Yes.  I would be responsible, yes.  I am responsible.  No

5    question about it.

6    Q    You intentionally did not tell Starla Ryan that you were

7    going to take all of her money and spend it on your bills,

8    did you?

9    A    I don't recall telling Starla Ryan anything.

10    Q    The reason you didn't tell any of these individuals who

11    gave you money that you were going to take their money and

12    spend it is because you knew if you did, they wouldn't give

13    it to you; is that right?

14    A    I didn't know I was taking their money and spending it.

15    Q    Whose money were you spending?

16    A    I thought Mintus' money is what I was spending, or Mintus'

17    system.  I believed that all this money was sitting in New

18    York and all I was doing, as she asked me to do, was conduct

19    business, while she completed her trades.  And I believed

20    that.  And I am embarrassed about this.  My blind faith in

21    her.

22    Q    You had no other income while you were director of

23    Cornerstone Institute?  You had no other job; is that right?

24    A    That is correct.

25    Q    You didn't bring any money into your directorship of

1   Cornerstone Institute, to speak of; isn't that right?

2   A    Well, I would have thought, had Mintus done what she said,

3   that I brought something to bear.

4   Q    You didn't bring any of your own money into Cornerstone

5   Institute directorship, did you?

6   A    There is no money, you know, to be brought into

7   Cornerstone.  We were doing all this on borrowed money.

8   Q    You started around December of 1998, and you went through

9   January of 2002, didn't you?

10  A    That's correct.

11  Q    You paid Tammy Stuckey a thousand dollars per week in

12  cash?

13  A    I believe that's correct.

14  Q    You paid Lorelei Tarsuik your administrative assistant

15  $125,000 a year; isn't that right?

16  A    That is correct.

17  Q    And you wired that money, for the most part, to an

18  offshore account; isn't that right?

19  A    I believe that was our agreement, yes.

20       THE COURT:  Mr. Storm, how much longer?

21       MR. STORM:  Maybe about a half an hour.

22       THE COURT:  We'll take our recess.

23       Ladies and gentlemen, we'll take our evening recess.

24  Tomorrow is a holiday, as you know.

25       Remember the Court's admonition about speaking to others

1    about this matter, doing your own research.  Turn your

2    attention away from any news on this matter.  Keep an open

3    mind until you've been instructed on the law and heard the

4    arguments of counsel.

5           I would anticipate that we'll have closing arguments

6    on Wednesday.  But I could be wrong.  So keep an open mind.

7    Think about other matters other than this case.  We'll see

8    you Wednesday morning.

9           (Jury exits the courtroom.)

10          THE COURT:   Anything we need to take up?

11          MR. STORM:   Not from the government.

12          THE COURT:   Court in recess.

13          (Court in recess).

14

15                      *    *    *    *    *

16                   C E R T I F I C A T E

17

18      I, Nichole Rhynard, Federal Official Court Reporter and

19   Certified Realtime Reporter, do certify that the foregoing is

20   a correct transcript from the record of proceedings in the

21   above-entitled matter.

22

23   /S/  Nichole Rhynard, CCR, CRR, RMR

24

25