1        UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF WASHINGTON

3            AT SEATTLE

4

UNITED STATES OF AMERICA,    )    Cause No. 06-5504RBL

5                             )

        Plaintiff,            )    Seattle, Washington

6                             )    November 11, 2008

    vs.                       )    Volume IX

7                             )

CHARLES NOLON BUSH,           )

8                             )

        Defendant.            )

9                             )
_____)

10

11

_____

12                        TRIAL
              VERBATIM REPORT OF PROCEEDINGS

13        BEFORE THE HONORABLE RONALD B. LEIGHTON
              UNITED STATES DISTRICT JUDGE

14 _____

15

   APPEARANCES:

16

    For the Plaintiff:    Arlen Storm

17                         Tyler Letey

18

19  For the Defendant:     Paula Olson

20

    Reported by:          Nichole Rhynard, CCR, RMR, CRR

21                         Federal Court Reporter
                          206.370.8504

22                         nichole_rhynard@wawd.uscourts.gov

23

24  Proceedings recorded by mechanical stenography, transcript
    produced by Reporter on computer.

25

1                          EXAMINATION INDEX

2      EXAMINATION BY                                    PAGE
         C. NOLON BUSH (CONTINUED)
3        CROSS-EXAMINATION          BY MR. STORM           3
         REDIRECT EXAMINATION       BY MS. OLSON          39
4

5

6
                            EXHIBIT INDEX
7      EXHIBITS ADMITTED                                 PAGE
         12037                                            13
8        12038                                            15

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2 _____

3           THE COURT:   Anything we need to take up?

4           MS. OLSON:   No, Your Honor.

5           MR. STORM:   No, Your Honor.

6           THE COURT:   If you're ready to proceed, let's bring

7 out the jury.

8           MS. OLSON:   Your Honor, could I just have one minute

9 with Mr. Bush?

10          THE COURT:   All right.

11          (Pause in the proceedings.)

12          MS. OLSON:   We're ready.

13          THE COURT:   All right.

14          (Jury enters the courtroom.)

15          THE COURT:   Mr. Bush, if you would resume the stand,

16 sir.  You're still under oath.

17     All right.  Please be seated.  Welcome back, ladies and

18 gentlemen.

19     Mr. Storm, you may continue.

20          MR. STORM:   Thank you, Your Honor.

21                    C. NOLON BUSH (CONTINUED)

22     The witness, after being duly sworn, testified as follows:

23                    CROSS-EXAMINATION

24 BY MR. STORM:

25 Q   Mr. Bush, I would like you briefly to go back and take a

1    look at Exhibit No. 1001, please.  And page 4 of that

2    exhibit.  And just to refresh our recollection, let me have

3    you look at the top paragraph.  And do you agree that the

4    name of the corporation sole that you were the director of

5    was the director of Cornerstone Institute?

6    A    Yes, sir.

7    Q    And that Hulaman Management Services was the fundraising

8    arm of Cornerstone Institute?

9    A    Doing business as, yes.

10   Q    Let me have you now look at Exhibit No. 1002 and -- I'm

11   sorry, 10002.  And let me have you look at the top third of

12   that document, please.  Who is that letter from?

13   A    It says the Department of Financial Institutions

14   Securities Division.

15   Q    And who is it to?

16   A    To Charles Nolon Bush.

17   Q    And that's you?

18   A    That's my name, yes.

19   Q    And what's it regarding?

20   A    It looks like they're inquiring about us offering the sale

21   of securities.

22   Q    Let me just -- can I have --

23   A    Oh, I'm sorry.  Hulaman Management Services.  Cornerstone

24   Institute.

25   Q    Okay.  Can you read the first paragraph of that letter,

1    please?

2    A    "The Washington securities administrator has received

3    information indicating that your firm or individuals

4    representing it may now be or recently have been engaged in

5    activities connected with the offer or sale of securities to

6    persons in the State of Washington, a best efforts direct

7    participation fund."

8    Q    Can I have you look at page 3 of that document?  And if

9    you look at the top third of the page, what's the date of the

10   delivery of that letter?

11   A    It would be -- looks like it would be October the 30th,

12   1999.

13   Q    And it was signed by Yvonne Crepeau; is that correct?

14   A    That looks like her signature, yes.

15   Q    And she was your employee?

16   A    That's correct.

17   Q    Let me have you look at Exhibit No. 10003, please.  And

18   just looking at the top third of the letter, what's the date

19   on this letter?

20   A    November the 3rd, 1999.

21   Q    And who is this letter to?

22   A    It says Andrew MacKay, securities investigator, State of

23   Washington Department of Financial Institutions.

24   Q    And so this is to the Department of Financial

25   Institutions.  The same organization that sent you the letter

1    on October 30, 1999; is that correct?

2    A    Right.   And I also see that it says Securities Division on

3    there as well.

4    Q    Okay.  It is the same organization that sent you the

5    letter on October 30, 1999; is that correct?

6    A    Yes, sir.  It appears to be, yes.

7    Q    And what's the regarding line?

8    A    Reference Charles Nolon Bush.   Hulaman Management Services

9    and Cornerstone Institute.

10   Q    And can you read the first paragraph, please?

11   A    "I am in possession of your letter dated the October 28th,

12   1999 addressed to Mr. Bush regarding the entities named

13   above.  I serve as legal counsel for those entities and will

14   be handling all matters pertaining to them in relation to

15   your office."

16   Q    Can you read the next sentence, please?

17   A    "Neither of those entities are Mr. Bush's -- are

18   Mr. Bush's --" let me see.  "Neither of those entities are

19   Mr. Bush's firm as implied in the opening sentence of your

20   letter.  Further --"

21   Q    Just the first sentence, please.

22   A    Sure.

23   Q    So it says neither of those entities.  That's regarding

24   Hulaman Management Services and Cornerstone Institute; is

25   that correct?

1   A    That's what it appears, yes.

2   Q    You were the director of both of those entities?

3   A    I am the director of both of them, yes.

4   Q    Let me have you look down at the bottom.  Who is this

5   letter signed by?  Is it signed by Glenn Stoll?

6   A    By Glenn Stoll, yes.

7   Q    And you've testified that he was your ecclesiastical

8   minister?

9   A    That's correct.  Yes.  He was in charge of our common-law

10  church.  Ecclesiastical law, as I understand.  That's what he

11  said to me.

12  Q    And what does it say next to the cc line on that letter?

13  A    It says a carbon copy to Charles Nolon Bush.

14  Q    You did not call Andy MacKay and tell him, look, there has

15  been a big mistake here.  I am the director of both of those

16  firms after receiving this letter, did you?

17  A    I did not, no.  I left everything up to Mr. Stoll of these

18  matters.

19  Q    Well, did you tell Mr. Stoll there has been a huge mistake

20  here?  I'm the director of those firms.  This has got to be

21  corrected?  That is an important organization?

22  A    I'm sorry.  I don't understand the question.

23  Q    Did you tell Mr. Stoll to correct this huge error?

24  A    What is the error that he's correcting?  I don't

25  understand.

1    Q    That you are in fact related to the firms Hulaman

2    Management Services and Cornerstone Institute?

3    A    Prosecutor, I don't understand this letter to say what

4    you're saying.  What I understand this letter to say is that

5    we're selling securities.  We don't sell securities.  People

6    lend this money.  There are no -- we are not in the security

7    business.  That's what I understood the letter --

8    Q    Well --

9    A    Maybe -- maybe I misunderstand the letter.  But that's --

10    this is what Mr. Stoll told me the letter said.  It was in

11    relationship to securities.  And we don't do securities.

12    That's what I understand his answer was.  Possibly he should

13    have written a better letter.  But, again, I don't know about

14    letter writing.  I'm not an ecclesiastical lawyer.  And we

15    didn't sell securities.  Never have sold securities.

16    Q    I didn't ask you that question.

17    A    All right.

18    Q    I asked you if you corrected his assertion that the

19    entities Hulaman Management Services and Cornerstone

20    Institute are your firms.  You were the director?

21    A    I -- I -- I -- I don't understand that.  I felt this was a

22    letter about securities.

23    Q    Well, let me see if I can clarify.  First sentence --

24    A    What his first sentence --

25    Q    -- the second paragraph --

1   A   What this first sentence --

2   Q   Let me finish my here, please.

3      First sentence.  Second paragraph.  Neither of those

4  entities are Mr. Bush's firms as implied in the opening

5  sentence of your letter?

6   A   Now, I believe the emphasis here for Mr. Stoll is he

7  explained to me was as implied.  So I think Mr. Stoll, as I

8  understand it, interpreted this letter applying a certain

9  way.  And he said it did not pertain to me.  This is what he

10  told me he did.

11   Q   You got a cc copy of this letter?

12   A   I have seen this letter, yes.  Yes.  And I stand on

13  that -- I, myself, according to Mr. Stoll, do not believe

14  that this letter applies to me.

15   Q   Do you believe that you are the director of Cornerstone

16  Institute and Hulaman Management Services?

17   A   I am the director of Hulaman, yes, and also Cornerstone

18  Institute.  But we don't sell securities.

19   Q   Let me have you look at 2038, please.  It's one of the

20  account statements that Ms. Stuckey-Webb testified sending at

21  your request.  Do you recall that testimony?

22   A   Yes, I do.

23   Q   And can you read up in the upper left-hand corner

24  regarding who this was sent to?

25   A   The Fishers.

1  Q   Can you look at the second line under the word

2  "subtractions," and what does that say?

3  A   It says $3,000.

4  Q   Now looking over to the left, what does -- under

5  "transaction description" what does it say?

6  A   Transaction descriptions.  We're talk about the

7  administration fee?  Is that what you're --

8  Q   Yes.

9  A   Administration fee, uh-huh (affirmative).

10  Q   Ms. Stuckey-Webb testified that before she sent out these

11  account statements you reviewed them very carefully; is that

12  right?

13  A   Well, I certainly reviewed them.  I don't know about the

14  word carefully.  But I certainly reviewed them, yes.

15  Q   And you knew that they were claiming to charge a fixed

16  administrative fee in the account statement, didn't you?

17  A   Well, surely.  Yes.

18  Q   Let me have you look at Exhibit No. 2032, please.  What is

19  the date at the top of that letter?

20  A   March the 2nd, 2000.

21  Q   And it's from whom?

22  A   I believe I saw David Velander -- David Velander's name on

23  there.

24  Q   And who is it to up in the upper left-hand corner?

25  A   It says dear -- well, it says C. Nolon Bush, Hulaman

1    Management Services.

2    Q    And it's got your correct fax number; is that right?

3    A    I do not remember the fax number.  But I would believe

4    that that's correct.

5    Q    Let me have you read the first sentence of the second

6    paragraph, please.

7    A    "I am being inundated with requests for return of

8    investment.  Therefore, please consider this letter a request

9    for immediate return of $1,010,000.  I assume you will pay

10   the profits as promised in the very near future with payments

11   also for the time the profits remain unpaid."

12   Q    Just remind me again what the date on that letter was?

13   A    March the 2nd, 2000.

14   Q    Let me have you look at 13003, please.  Does this document

15   look familiar to you?

16   A    Yes.

17   Q    And what's the date on this sales invoice?

18   A    This is March the 23rd, 2000.

19   Q    And so this is 21 days, three weeks after Mr. Velander

20   asked for his money back; is that right?

21   A    That's correct.

22   Q    And in the document it represents that you paid $24,337.60

23   in cash for the purchase of a Harley-Davidson motorcycle; is

24   that right?

25   A    That is correct.

1   Q   Mr. Bush, did you think about giving Mr. Velander that

2   $24,000?

3   A   Well, I don't see any connection between the two.  The

4   Harley -- the majority of this money I understand went to

5   charity.  You know, I basically was covering -- I don't see a

6   connection between Mr. Velander -- Mr. Velander's dealing

7   with a Global Dominion problem.  You know, this was a From

8   the Heart issue that I chose.

9       I will again remind you that all of these transactions are

10  done thinking that I've got $800 million sitting in the Bank

11  of New York.

12  Q   Did you call David Velander and say I know you want your

13  million dollars back, but I would like to make a $24,000

14  deposit to charity?

15  A   I did not feel that was necessary.

16  Q   You just thought you could take money that belonged to him

17  or any other investor and do whatever you wanted?

18  A   Counselor, that's what I did.  I did this.

19  Q   Your testimony is you did not think about giving David

20  Velander that $24,000 back?

21  A   I did not.

22  Q   Let me have you look at the exhibit to your left.  12037.

23  And that has not been submitted.  And just generally tell me

24  what that letter is.

25  A   This is a letter -- I believe it's from Phil Yeager, I

1    believe, to myself.

2    Q    To you?

3    A    Yes.

4            MR. STORM:    Your Honor, offer Exhibit No. 12037.

5            MS. OLSON:    No objection.

6            THE COURT:    12037 is admitted.

7                    (Exhibit No. 12037 admitted.)

8    BY MR. STORM:

9    Q    Mr. Bush, what's the date on the top of the letter?

10   A    It is May the 25th, 1999.

11   Q    And whose initials are those down at the very bottom of

12   the letter?

13   A    They're my initials and I believe Phil Yeager's initials.

14   Both of us.

15   Q    Can I have you read the first two sentences of that

16   letter, please?

17   A    "I propose the following arrangement to address your

18   providing funding of $30 million to acquire a 35 percent

19   interest in an entity which we are to mutually agree upon the

20   global entity."

21   Q    And the second sentence?

22   A    "Assuming all of the 30 million in funding is received in

23   accordance with the schedule below, you or an entity you will

24   designate will have 35 percent in interest in global upon

25   receipt of the 30 million."

1    Q    So on May 25, 1999 you were going to take $30 million and

2    invest it in Century 21; is that correct?

3    A    That is correct.

4    Q    May 25, 1999 you were promoting Hulaman Management

5    Services' mid-term notes; is that correct?

6    A    I was promoting a program to build my resort in San

7    Quintin, Mexico.   Yes.

8    Q    Do you remember the private merchant placement promise

9    that we went over two days ago?

10    A    Yes, I do.

11    Q    For Hulaman Management Services?

12    A    I do.

13    Q    This document does not reflect any kind of investment in a

14    private merchant bank, does it?

15    A    This is a result of discussions I had with Mintus, who was

16    willing to fund this 30 million.   You know, she saw this as

17    part of our global program because it involves what

18    ultimately will become the Century 21 rights in 22 countries

19    around the world.

20    Q    Let me have you look at 12038.   And if you'd just briefly

21    describe this document.

22    A    This is again from Phil Yeager looking at the different

23    entities that Mr. Yaeger controls.

24            MR. STORM:   Your Honor, offer 12038.

25            MS. OLSON:   No objection.

1          THE COURT:   12038 is admitted.

2                  (Exhibit No. 12038 admitted.)

3   BY MR. STORM:

4   Q   Mr. Bush, can you tell me who this -- what's the date on

5   this letter?  This fax?

6   A   This is March the 1st of 2000.

7   Q   Who is it to?

8   A   It is to myself.

9   Q   Who is it from?

10  A   From Phil J. Yaeger.

11  Q   Can you read the first two paragraphs of that letter,

12  please?

13  A   "Dear Nolon, I am sure you are aware of my disappointment

14  regarding your failure to fund our operations per our

15  agreement of May the 25th, 1999."

16  Q   And the second paragraph, please?

17  A   "The last eight months have been -- has been a continuous

18  series of promises, letdowns, and emergency short-term

19  funding which have only held the global operations together.

20  This has created major stress within our operation and

21  building of accounts payable, missed opportunities, inability

22  to meet promises, and loss of credibility business-wise and

23  personal."

24  Q   So Mr. Yaeger -- or, Mr. Bush, Carolyn Mintus never came

25  through with this money, did she?

1    A    She did not.

2    Q    So by March 2, 2000 this is one more example, according to

3    you, of Carolyn Mintus's failure just to come through on any

4    kind of agreement; is that right?

5    A    That is correct.   And there had been numerous meetings

6    with Ms. Mintus about this and her bankers.   And they

7    continued to assure me that they were just days away from

8    completing their first tranches and release of parts of my

9    800 million.

10    Q    And despite this failure by Carolyn Mintus, on top of all

11    the other failures by her, after March 2nd of 2000 you went

12    on to promote the Mexico project as an investment; isn't that

13    right?

14    A    I had been working on the Mexico project since 1997.

15    Q    After March 2nd, 2000 you directly promoted the Mexico

16    project to Mr. Franke; is that right?

17    A    I continued to work on everything with the belief that

18    Ms. Mintus was going to fulfill her commitment.   And this is,

19    by the way, based on members of the Federal Reserve that I

20    met with and bankers in New York telling me that Ms. Mintus

21    was okay.

22    Q    After March 1st, 2000, after this failure on top of all

23    the other failures, you went on to promote the Mexico

24    project; is that right?

25    A    Mr. Christy and I were very much committed to the Mexico

1    project.

2    Q    Did you promote it after March 1st, 2000?

3    A    Of course I did.

4    Q    And it's your testimony that it was completely necessary

5    for Mintus to come through for that project to succeed; isn't

6    that right?

7    A    It was certainly my belief, yes, that she would perform.

8    Q    And so by the time you sold this project to Mr. Franke,

9    she was 100 million behind, which made you 100 million

10   behind?  And you knew about this failure on March 2000 in the

11   Century 21 investment; isn't that right?

12   A    Well, she was not 100 million behind until we reached

13   those phases.  We had not yet reached those phases.  She was

14   well aware that we needed this money to get to those phases.

15   And I had most blind faith that she would deliver.

16   Q    Well, it was very blind --

17   A    I am ashamed.  I am embarrassed.  You know, I -- you know,

18   but I did what I did.

19   Q    When you met with Mr. Franke you did not tell him that she

20   had failed on this $30 million investment in addition to the

21   100 or 200 million she was behind on the Mexico project, did

22   you?

23   A    I had been cautioned by New York of the utmost secrecy.

24   That I was not to discuss anything we were doing or met with

25   anyone.

1  Q    Mr. Bush, when you met with Mr. Franke you did not tell

2  him about this $30 million failure by Carolyn Mintus, did

3  you?

4  A    I did not -- Franke and I talked mostly about the idea

5  that he might work as a contractor on the project.

6  Q    Don't evade the --

7  A    We spent more time on that than we did in his investing in

8  the project.

9  Q    He had already invested $50,000 --

10 A    But my repeated conversations with him, the continued

11 conversations had to do with his interest, his construction

12 company and playing some role.  And I would gladly -- as soon

13 as Mintus funded things, I would gladly place his offers or

14 whatever to participate in the building.  He had great

15 interest.  And he talked about bringing other people, you

16 know, into it as well if in fact we could become an active --

17 you know, have a building relationship.

18 Q    There was going to be no Mexico project if she doesn't

19 come through.  No building.  He's not going to be there with

20 a bulldozer.  There is nothing.

21 A    Well, the wonderful thing, Prosecutor, is hindsight is

22 20/20.

23         MS. OLSON:   There was no question.

24         THE COURT:   Sustained.

25     Go ahead.

1    BY MR. STORM:

2    Q   When you met with Mr. Franke, don't you think he would

3    have wanted to know that in addition to being $200 million

4    behind, Carolyn Mintus was also 30 million behind on this

5    project?

6    A   Not allowed to talk about Mintus with him.  And my faith

7    was that Mintus would come through.  And that was the

8    confidence I exuded and, you know, felt strongly about at

9    that point.  That she would perform.  And this is also based

10   on the backup from Mark Kaposi and many others, you know, so.

11   Q   Mr. Bush --

12   A   I am the victim here.

13   Q   -- you promoted GDFS -- let me change gears for a minute.

14   You promoted GDFS with, among others, Cody Bly, Greg

15   McCormick, Bill Miertschin, Raymond Donohue, and Ken

16   Marshall; isn't that right?

17   A   Yes, I did, with great belief in the project.

18   Q   Let me have you look at Exhibit 1010, please.  And page 2.

19   Is this an account statement or a signature card for an

20   account using the last four digits 0367?

21   A   Yes.  All the signatures appear to be fine with me.

22   Q   And what's the date on this?

23   A   I see the 11th of February 1999.

24   Q   And the signer on this account is who?

25   A   It says C. Nolon Bush, director.

1    Q    And the name on the account, looking back on page 1?

2    A    I see it says account.  On the card it says Hulaman

3    Management Services, yes.

4    Q    So account 0637, Hulaman Management Services, you are the

5    only signer?

6    A    That is correct.

7    Q    Let me have you look at page 2.  Page 3, please.  What's

8    that document say up at the top?

9    A    Exemption from interest reporting and backup withholding.

10   Non-resident alien or foreign entity classification.

11   Q    And who is the customer?

12   A    Hulaman Management Services.

13   Q    And who is the signer?

14   A    It's Charles -- or C. Nolon Bush, director.

15   Q    And what's the date on the document?

16   A    2/11/99.

17   Q    This document was signed before GDFS was created in Nevis;

18   isn't that right?

19   A    That is correct.  That is correct.

20   Q    Now let me have you look now at document 11008.  And

21   looking at -- what's the date on this fax?

22   A    December the 29th, 1999.

23   Q    And who is it from?

24   A    Cora -- oh, okay.  I think I refer to him as A.J.  I think

25   that's how Nicholas always talked about him.  I don't know

1  exactly how to pronounce his name.

2  Q    Mr. Bush, do you remember Ajit Simha testifying at trial

3  that you would call him and request money be transferred to

4  your accounts?

5  A    You know, my dealings -- my dealings with Nevis were

6  really only, to my knowledge, between Nicholas and Scott

7  Grant.  I don't recall ever, you know, working -- I just

8  don't recall that.

9  Q    Do you recall him testifying to that fact?

10  A    I don't.  I did not hear him say that.

11  Q    Let me have you look at page 2 of that document.  If you

12  can look at the top third where it says "sender," who is the

13  sender on this document?

14  A    I think it say Bank Crozier.

15  Q    And this is a wire transfer; is that right?

16  A    A wire transfer, yes.

17  Q    What's the date, looking at the middle of that?

18  A    It's the 29th of December 1999.

19  Q    And how much is being transferred?

20  A    I see 300,000 there.  I believe that's correct.

21  Q    And who is the ordering customer?

22  A    Global Dominion Financial Services.

23  Q    And then looking down under beneficial customer, who is

24  the beneficial customer?

25  A    Hulaman Management Services.

1    Q    And what account is the number -- excuse me, the last four

2    digits?

3    A    0367.

4    Q    On December 29th, 1999, $300,000 is being transferred to

5    the account that you are the signer on in Hulaman Management

6    Services that we just talked about, right?

7    A    That is correct.  And as I understand, this is certainly

8    the way Scott Grant said these transactions would be handled.

9    Q    And let me go back to Exhibit No. 1010 for just one

10   moment.  Let me have you look at page 23 of that document.

11   Now look down where it says December 30 on other deposits.

12   Does that reflect a wire transfer, the receipt of $300,000

13   into your account?

14   A    I would say that's true.  And I do not recall anything

15   that they ever were supposed to send that we didn't receive.

16   Q    So if I understand this transaction correctly, investors

17   now are sending their investments to Nevis, to Bank Crozier;

18   is that right?

19   A    Yes.

20   Q    After GDFS is created?

21   A    Yes.

22   Q    And now you're receiving $300,000 of those investors'

23   money back in Washington state into your account?

24   A    That is correct.

25   Q    And you testified a couple days ago that it cost about

1    $9,000 a week for you to operate View Park; is that right?

2    A    That is correct.   I recall that that's somewhere in the

3    neighborhood or was the weekly operating cost.

4    Q    Well, I think you called View Park Cornerstone; is that

5    right?

6    A    Pardon?

7    Q    You called View Park Cornerstone?

8    A    I actually call it the retreat.   But, you know,

9    Cornerstone Institute is behind it.   And it is a gift to From

10   The Heart Foundation.   Not my home.

11   Q    Let me have you look at Exhibit No. 16007.   Page 17.   And

12   look at the bottom third of that page, please.

13        Now, I believe you testified that these are cash

14   withdrawals that you took from various accounts.   But look

15   under account number.   Do you see cash withdrawals being

16   taken at the bottom third of that page from account 0637

17   which we've just been talking about?

18   A    Yes, I do.

19   Q    Okay.

20   A    And, again, Hulaman Management Services was set up -- you

21   know, these entities were set up as somewhat of a

22   clearinghouse.

23        And I'd to call attention -- the Court's attention to the

24   fact that I believe my records are very meticulous.   Nothing

25   is hidden here.   It is all out in the open.   And it is all

1    backed by what I believed was $800 million.  I would never be

2    this meticulous about anything if I were not certain about

3    what I was doing.

4    Q    Let me talk about these records.

5    A    Absolutely.  I want you to.

6    Q    Let me have you look at the date November 24, 1999.

7    Account 0637.  How much money did you take out of the bank on

8    that day from account 0637?

9    A    Looks like 7,500.

10    Q    December 6, 1999 how much money did you take out of

11    account 0637 on that day?

12    A    Looks like 9,000.

13    Q    December 13, seven days later, how much did you take out

14    on that day?

15    A    9,000.

16    Q    December 17, four days layer, 1999 how much did you take

17    out of account 0637 on that day?

18    A    9,000.

19    Q    December 21, four days layer, how much did you take out of

20    0637 on that day?

21    A    9,000.

22    Q    So your $9,000 a week seems to have gotten much larger.

23    Now it's 9,000 every four days?

24    A    No.  We actually kept a safe.  A very, very nice, safe

25    safe, you know, at the retreat.  And sometimes when I would

1  see that I'm not going to be available or I'm going to be

2  traveling, you know, I attempted to keep a certain level of

3  cash in there so that they could conduct things in my

4  absence, you know.

5      And since -- the thing to understand, too, about this is

6  I'm the only one who has signature rights on this account.

7  I'm the only one doing this, too, by the way.  I'd like to

8  draw attention to that.

9  Q  Well, let me draw your attention to December 23, 1999.

10  How much cash did you take out of the bank --

11  A  9,000.

12  Q  December 28, five days later, how much did you take out of

13  the bank?

14  A  9,000.

15  Q  December 29, 1999, one day later, how much did you take

16  out of the bank?

17  A  9,000.

18  Q  December 30, one day later, how much did you take out of

19  the bank?

20  A  And some of this money also is being gifted to shelters.

21  They are doing certain things.

22  Q  Mr. Bush?

23  A  Yes?

24  Q  My question before you is how much did you take out of the

25  bank on December 30, 1999?

1   A    9,000.

2   Q    One day later, December 31st?

3   A    9,000.   9,000.

4   Q    9,000 four days in a row; is that right?

5   A    Whatever it took for us to operate.   That's what I was

6   doing, yes.

7   Q    Could you have saved yourself some time by just taking

8   36,000 out of the bank instead of going back to the bank four

9   days in a row?

10  A    There's a -- I had an understanding also with the branch

11  manager.  I think this -- I want to think that this is a

12  branch that's in Port Orchard.  I'm not sure.  It's one of

13  the little small areas around there.  The bank did not keep a

14  lot of cash.  It replaced its cash on a regular basis.  And

15  my agreement with the manager was that I would keep my

16  withdrawals to low amounts so she would not run short on

17  cash.

18  Q    What is the name of the manager?

19  A    You could check back and see the manager.  This -- I was

20  well known at that bank.  They understood exactly what I was

21  doing.  And they did everything to meet my needs.

22  Q    Mr. Bush, when Ms. Olson asked you about taking $9,000 out

23  two days ago you said it was because that's what it cost to

24  run the place for a week?

25  A    That's how I ran my operation.

1   Q   You didn't say one word about having any kind of

2   agreement --

3   A   I am now.  I am now saying that I did not know -- there is

4   something else I would like to explain to you --

5           MR. STORM:  Your Honor, I would object to --

6           THE COURT:  Sustained.

7       Just wait for the question, sir.

8   BY MR. STORM:

9   Q   Mr. Bush, let me have you look at Exhibit No. 11010.  Wire

10  transfers.  Look up at the top, please.  Tell me what bank

11  this is from.

12  A   Well, it's from Global Dominion Financial Services.

13  Q   Bank Crozier?

14  A   Bank Crozier.

15  Q   What's the date?

16  A   January the 4th, 2000.

17  Q   Do you see January the 5th, 2000?

18  A   January the 4th, 2000; is that what it is?

19  Q   Go ahead and --

20  A   Is there another --

21  Q   Look in the middle.  What's the amount on this

22  transaction?

23  A   200,000.

24  Q   This is about a week after the last transaction that we

25  just talked about?  The $300,000?

1    A    Yes.

2    Q    Who is the beneficial customer?

3    A    It says Hulaman Management Services escrow account.

4    Q    And that's the 0637 account we've just been talking about;

5    is that right?

6    A    That's correct.  One of our clearing accounts.  Yes.

7              THE COURT:  Let the record reflect it's 0367.

8              MR. STORM:  Thank you, Your Honor.

9    BY MR. STORM:

10   Q    Let me have you look at Exhibit 11012.  Another wire

11   transfer.  What is the sender on this transaction?  What

12   bank?

13   A    Bank Crozier.

14   Q    And what is the date of this transaction?

15   A    2000 -- February the 15th, 2000.

16   Q    How much are you transferring and how much is being

17   transferred?

18   A    250,000.

19   Q    Who is the ordering customer?

20   A    It is Global Dominion Investments LLC.

21   Q    And who is the beneficial customer?

22   A    Hulaman Management Services.

23   Q    Account 0637?

24   A    Yes.  Correct.

25   Q    Let me have you look at Exhibit 11014, please.

1              THE COURT:   Again can you correct that on the record

2    as to 0367?

3              MR. STORM:   Thank you, Your Honor.   I will focus on

4    that.

5    BY MR. STORM:

6    Q    Let me have you look at 11014.   Who is the sender in this

7    occasion?

8    A    Bank Crozier.

9    Q    And what's the date of this transaction?

10   A    The 20th of March 2000.

11   Q    How much is being sent?

12   A    250,000.

13   Q    Who is the ordering customer?

14   A    Global Dominion Investments LLC.

15   Q    And who is the beneficial customer?

16   A    Hulaman Management Services.

17   Q    What account number?

18   A    0367.

19   Q    Let me have you look at Exhibit 11016.   The second page.

20   Who is the sender on this wire transfer?

21   A    Bank Crozier.

22   Q    What's the date?

23   A    20th of April 2000.

24   Q    How much money is being transferred?

25   A    200,000.

1  Q  Who is the ordering customer?

2  A  Global Dominion Investments.

3  Q  Who is the beneficial customer?

4  A  Hulaman Management Services.

5  Q  What account?

6  A  0367.

7  Q  Let me have you look at Exhibit No. 11018, please.  Who is

8  the sender on this wire transfer?

9  A  Bank Crozier.

10  Q  How much money -- or what date?

11  A  2nd of May 2000.

12  Q  How much money is being transferred?

13  A  150,000.

14  Q  Who is the ordering customer?

15  A  Global Dominion Investments.

16  Q  And the beneficial customer?

17  A  Again Hulaman Management Services.

18  Q  And the account number?

19  A  0367.

20  Q  Let me have you look at Exhibit No. 11020, please.  Who is

21  the sender on this wire transfer?

22  A  Bank Crozier.

23  Q  What is the date?

24  A  24th of May 2000.

25  Q  How much money is being transferred?

1    A    50,000.

2    Q    Ordering customer?

3    A    Global Dominion Investments.

4    Q    And beneficial customer?

5    A    Cornerstone Institute.

6    Q    And the account number?

7    A    7510.

8    Q    Do you recall the day before yesterday that that was an

9    account that you were the only signer on?  Or do you want to

10   check?

11   A    Cornerstone Institute?

12   Q    Yes.

13   A    No.  I'm the only one.  If it's a US Bank account, to my

14   knowledge there's no signatures on US Bank except myself.

15   Q    Let me have you look at Exhibit No. 11022.  Page 2.  What

16   is the sending bank?

17   A    Bank Crozier.

18   Q    And what is the date?

19   A    The 24th of May 2000.

20   Q    How much money is being sent?

21   A    100,000.

22   Q    Who is the ordering customer?

23   A    Global Dominion Investments.

24   Q    And the beneficial customer?

25   A    Cornerstone Institute escrow.

1    Q    And what's the account number?

2    A    7528.

3    Q    Do you recall the day before yesterday that that was also

4    an account which you were the only signer?

5    A    I am the only signer on that account.  That's correct.

6    Q    Now, in addition to having a great deal of investor money

7    sent back from Nevis to accounts that you were the only

8    signer on, you also had money sent back to accounts -- or an

9    account that Marilyn March was the only signer on; is that

10   correct?

11   A    I had money sent to From The Heart Foundation.  I believe

12   that's true.

13   Q    Let me have you look at Exhibit No. 3022.  Page 2.  What

14   is the name of this account?

15   A    Hulaman Management Services/From The Heart Foundation.

16   Q    And the account number?

17   A    6733.

18   Q    Is that your name up above as secretary?

19   A    That is correct.

20   Q    And what's the date on this account?

21   A    15th of February 2000.

22   Q    Who is the only signer on this account?

23   A    Marilyn March.

24   Q    Now, despite the fact that Marilyn March is the only

25   signer on this account, you in fact exercised a great deal of

1   authority over it; isn't that right?

2   A    Absolutely.   Yes.

3   Q    Let me have you look at Exhibit No. 3023.   What's the date

4   on this letter?

5   A    September the 12th, 2000.

6   Q    And who is it written to?

7   A    Carol Lee Brown.

8   Q    Who is it written by?

9   A    C. Nolon Bush, director.

10  Q    That's you?

11  A    That is me.

12  Q    And can you read the content of the letter, please?

13  A    "This letter serves as request to close out the Hulaman

14  Management Services/From The Heart account.   Please transfer

15  remaining funds back into Hulaman Management Services

16  account, which will also be closed out shortly."

17  Q    You were consolidating at this point account funds; is

18  that correct?

19  A    You know, I don't -- I'm not aware of what the purpose

20  behind this would be.   I just -- I don't recall, frankly, why

21  this is happening.   If I did, I would be more than happy to

22  explain it to you.   I don't know.

23  Q    You would agree, though, that the funds in this account

24  are being transferred to an account that you're the only

25  signer on?

1   A   Absolutely.   Yes.

2   Q   Let me have you look at Exhibit No. 11002, please.

3   Page 2.   Who is the sender on this wire transfer?

4   A   Bank Crozier.

5   Q   And the date?

6   A   10 March 2000.

7   Q   How much money is being transferred?

8   A   100,000.

9   Q   Who is the ordering customer?

10  A   Global Dominion trust services.

11  Q   And the beneficial customer?

12  A   Hulaman Management Services/From The Heart Foundation.

13  Q   And the account number?

14  A   6733.

15  Q   Let me have you look at Exhibit No. 11004.   Who is the

16  sender on this account, on this wire transfer?

17  A   Bank Crozier.

18  Q   And the date?

19  A   The 26th of April 2000.

20  Q   And how much money?

21  A   50,000.

22  Q   Who is the ordering customer?

23  A   Global Dominion investments.

24  Q   And who is the beneficial customer?

25  A   Hulaman Management Services/From The Heart Foundation.

1  Q   Let me have you look at Exhibit 11006.   Page 2.   Who is

2  the sending bank for this transaction?

3  A   Bank Crozier.

4  Q   And the date?

5  A   22nd of May 2000.

6  Q   How much money?

7  A   120,000.

8  Q   Ordering customer?

9  A   Global Dominion investments.

10 Q   And the beneficial customer?

11 A   Hulaman Management Services/From The Heart Foundation.

12 Q   Let me switch gears a little bit.   Let me have you look at

13 Exhibit No. 14026.   What's the date on this Tully's stock?

14 A   The date is November the 13th, 2000.

15 Q   And do you recall Tom O'Keefe, who signed it down in the

16 right-hand corner, testifying that you met with him regarding

17 buying Tully's stock?

18 A   I do.

19 Q   And you paid $250,000 for this Tully's stock; is that

20 right?

21 A   I believe that was $2.50 a share.   100,000 shares.   Yes.

22 Q   And on November -- let me have you look at another

23 exhibit.   12043.   Page 11.   Will you look at this chart and

24 tell me how much money by November 13th, 2001 you had not

25 paid per your agreement to the Mexico project?

1  A    These where merely -- if you'll look at the top, this says

2  60-month funding projection.  And it's all based on -- I

3  can't go from phase one until I go to two.  And I can't go

4  from two until I go to two and three.

5      So, you know, this is merely a format based upon what

6  Mintus is planning on giving is us.  I signed this agreement

7  expecting to do these phases.  But until she starts funding,

8  we can't look at these phases this way.  It is a projection.

9  Q    Well, according to this projection, by November 13th, 2001

10  she's failed to give you about $300 million.  It's getting

11  pretty close to 300 million?

12  A    That is correct.  She is behind.

13  Q    And she's failed to give you another 30 million that -- a

14  year earlier that you needed to pay Phil Yaeger?

15  A    That is correct.

16  Q    When you buy this Tully's stock for $250,000 you decided

17  not to put it in the Mexico project; isn't that right?

18  A    As a matter of fact, I bought the Tully's stock because

19  Mr. O'Keefe told me they were going public and that this was

20  going to be like a Starbucks IPO.  And this was what the man

21  from the telecom company, Bill Brouillet, is what the person

22  working with said this is going to be one of the greatest

23  returns in the world.

24  Q    Sounds like a good investment?

25  A    I tell you what.  I thought it fit just perfectly in with

1   From The Heart for giving it a real foundation.   Yes.

2   Q   Getting back to the question, though.   On November 13th

3   when you bought that Tully's stock you chose not to put

4   $250,000 into the Mexico project?

5   A   That is correct.   I made a judgment call.   Yes.   Just like

6   I made the judgment call of believing Mintus.   Very, very --

7   by the way, hindsight, very poor judgment, I might add, on my

8   part.   Tully's never went public.

9   Q   By November 13, 2001, the Mexico project would have been

10  an absolutely horrendous investment based on Mintus's failure

11  to pony up this 300 million and her failure to pony up

12  $30 million for Century 21, right?

13  A   I still believe to this date in both projects.

14  Q   It would have been a horrendous investment by November 13,

15  2001?   Abysmal, right?

16  A   I don't know that.   That may be your opinion.   It's not

17  mine.

18  Q   And when you called Starla Ryan a few months later -- did

19  you know she was a widow at the time?

20  A   I did not.

21  Q   When you called her a few months later, told her the

22  Mexico project was going great and asked her for forty more

23  thousand dollars that you used to pay your bills, did you

24  tell her you were putting your own money -- or not your own

25  money, but other investment money into Tully's and not in the

1    Mexico project?

2    A    I would like to correct what I just said about her being a

3    widow.  I am sure that probably came into a conversation at

4    some point.  But I don't remember referencing any of that.

5    Q    When you told her that Mexico --

6    A    I was doing -- I was making the decisions.  I was

7    making and, as I understand, you know, following -- I'm not

8    making excuses for my automobile/motorcycle problem that I

9    had there.  But it had a profound effect on me following --

10   many of the things I think I did following 2000 --

11   Q    When you asked her for that 440,000 that you saw you used

12   to pay your bills, did you tell her --

13   A    I did not.

14   Q    -- that you had put 250,000 in Tully's and not in the

15   Mexico project --

16   A    I did not ask her for 40,000.  I understand she gave it to

17   Marina Pacific Credit Union.  And we are not doing business

18   with Starla.  We're doing it with the credit union.  And

19   that's -- you know, I am like -- so much of this, I'm

20   embarrassed in my belief in Mintus and what would happen.

21       But, you know, I made judgment calls.  When I --

22   Prosecutor, there are things that I have seen in this

23   courtroom since I have been here that I didn't know.  There

24   are so many discrepancies about a lot of things.  But this

25   all happened on my watch.  It did.

1  Q    Did you tell Mr. Franke when you met with him that if he

2  had 250,000 or any money, he should go to Tully's and not the

3  Mexico project?  Did you tell him that?

4  A    I did not see Mr. Franke involved in the Tully's

5  transaction.

6  Q    I don't have any other questions.

7            THE COURT:   Ms. Olson?

8                              REDIRECT EXAMINATION

9  BY MS. OLSON:

10  Q    Good morning, Nolon.

11  A    Good morning.

12  Q    On Monday when Mr. Storm began his cross-examination of

13  you he brought up several areas.   One of the areas that he

14  brought up was your involvement in Global Prosperity.   Do you

15  recall that?

16  A    Yes.

17  Q    Do you recall him asking you questions about that?

18  A    I recall it, yes.

19  Q    Do you recall him asking -- asking you questions referring

20  to the fact that Global Prosperity was found to have been

21  engaged in illegal activity?

22  A    At the time I was involved with Global Prosperity I knew

23  of no illegal activity they were involved in.

24  Q    Who were some of the other people that were also involved

25  with Global Prosperity?

1    A    Joe Newbury  and, of course, the Websters.  Preston Knepp.

2    Almost all of the financial advisors, if you, you know, could

3    call them that, had attended the seminars and were, I guess,

4    knowledgeable of things.  Yes.

5    Q    Did any of those people have any knowledge, to your

6    knowledge, that there was anything illegal about Global

7    Prosperity?

8    A    Absolutely none to my knowledge.

9    Q    Mr. Storm also asked you questions about your giving Larry

10    Wilcoxson money early in the program.  Do you recall that?

11    A    Yes.

12    Q    And you early on met with Mr. Wilcoxson; is that correct?

13    A    I did.  I went to Modesto, California to his office.  I

14    did not go to his home.  But I did go to his office.  What he

15    said was his office.

16    Q    And what judgment did you come to about Mr. Wilcoxson?

17    A    Well, the office was in disarray.  And I had a number of

18    questions I asked.  And, you know, these were all related to

19    people in Europe that they had no interest in my talking to

20    or having any dealings with.  And, you know, my biggest

21    concern in all these matters, of course, was my resort.

22         So I left there --

23    Q    Let me stop you there.

24         Tell me what conclusions you came to about Mr. Wilcoxson.

25    A    That I did not see us putting really any more money with

1  his organization.

2  Q   And so it wasn't surprising to you that later you found

3  out that he had engaged in illegal activity?

4  A   Well, you know, surprising.  I did not look upon him as

5  being illegal.  His structure all of a sudden did not suit my

6  humanitarian effort.  He appeared to be only interested in

7  trading and -- I'm going to assume that if he had been

8  legitimate, was legitimate, that there were humanitarian

9  projects they had already selected to back his and mine was

10 not anything were interested in.

11 Q   But you stopped dealing with him?

12 A   That is correct.

13 Q   And you began to deal with Carolyn Mintus?

14 A   I did.

15 Q   Was there any indication in any of your dealings with her

16 that she was not being honest with you?

17 A   No.  Quite the opposite.  When you go to the St. Regis

18 Hotel, which is -- of course is a very prestigious hotel

19 there off Fifth Avenue and Park Avenue where they told me she

20 had been living for 12 or 15 years and she takes me to

21 dinner.  And I think this was actually -- it was the first or

22 second time that we met.  And she introduces me to two

23 retired members of the Federal Reserve Bank of New York.  And

24 they talk about all of the things they've done.  And it was

25 quite delightful.  And how they believed my project was

1   really something to behold.

2       And so I --

3   Q   Let me stop you there.

4   A   That was only the beginning.  Many bankers followed that.

5   Q   And the many meetings that you had after that, you were

6   continually -- were you continually reaffirmed?

7   A   Over and over again.  And this is coming with some of the

8   top bankers of New York assuring me, you know, where my money

9   was going to go.  And it was safe.  And I was very fortunate

10  to be doing business with her.

11  Q   Mr. Storm characterized the delays of Carolyn Mintus to

12  make payments as a failure.  Did you see them as failures?

13  A   Well, I didn't.  I took Mark Kaposi's word that these

14  things are so unique.  And just to have the opportunity to be

15  a part -- I was mesmerized by this group.  There was a great

16  deal of work that went into assuring me everything was

17  wonderful and that I was a very fortunate individual to be a

18  part of their program.

19  Q   This morning Mr. Storm showed you Exhibit 1001 -- I'm

20  sorry, 10002 and 10003.  He had them up on the screen.  And

21  we don't need to --

22  A   What are these?

23  Q   One was the letter from the State Department of Financial

24  Institutions.  Do you recall that?

25  A   Correct.

1    Q    And then the second one was the response letter from Glenn
2    Stoll?
3    A    Yes.
4    Q    Do you recall that?
5    A    Yes.
6    Q    Did you rely on Mr. Stoll to respond to that letter from
7    the state department?
8    A    100 percent.
9    Q    And did you give him carte blanc authority to respond as
10   he believed was the appropriate way?
11   A    100 percent.
12   Q    Did you believe that your paperwork was clear enough to
13   advise people that it was not a security?
14   A    Absolutely.  And may I address this question?
15   Q    Well, does it respond to my question?
16   A    Yes, it does, because he had a page up here talking about
17   us being a foreign entity or something.  I think it was a
18   bank record that related to these issues.
19        To make sure that I was not confused as a security or
20   anything, I asked Carol Lee, whose name is in private
21   banking.  She handled -- she was my contact there.  And I
22   asked her one day to make sure that we did not have any
23   interest bearing accounts.
24        Glenn Stoll assured me we were a foreign entity.  And
25   that's the -- he had that document up here.  And I made

1  certain that we did not draw interest on any of our accounts

2  that would make us subject to any kind of IRS problem, you

3  know.  And Carol Lee and I talked at length about this.  And

4  she recommended that I sign that document.  And I believe

5  Duane Christy also signed it.  I saw his signature on there,

6  too.  Because at that point we were considering all of this

7  was going to be backed by San Quintin.

8  Q    Okay.  And I believe you're referring to Exhibit No. 1010,

9  and we'll look at that in a moment.

10      Mr. Storm showed you a series of withdrawals from accounts

11  that you had control over?

12  A    Yes.

13  Q    Do you recall that?

14  A    I do.

15  Q    They were in the approximate amount of $9,000?

16  A    $9,000.

17  Q    Do you recall that?

18  A    I do.

19  Q    Can you explain to us why you took money out in those sums

20  over that period of time?

21  A    Yeah.  And I certainly apologize to the Court for not

22  thinking about my agreement with the management of the

23  branch.  They had a limited amount of cash.  They did not

24  like to keep a lot of cash there.

25      And so I told them I would try to limit most of my

1    withdrawals from something that was similar to the weekly

2    operating expense.  I many times would go several different

3    days -- and, again, this was totally respecting the bank's

4    request.  And to my knowledge this wasn't just one manager.

5    They would periodically change managers.

6        So I had this discussion probably with at least three

7    different managers about cash management of that branch.  And

8    I was only doing what was convenient for them.  I would bring

9    the 9,000 back.  It would go into the safe.  And then the

10    retreat would use it as they saw fit.

11    Q    So you were doing this -- taking the withdrawals like this

12    to accommodate the banks; is that correct?

13    A    Well, it was a combination of both.  I mean, because I

14    would make my -- I don't know what kind of internal books

15    they were keeping.  But the operating expense -- because

16    sometimes I would be gone for a month at a time.  And the

17    bank just liked the idea that if I kept my withdrawals within

18    some reasonable period, it would help them.  And as I recall

19    I think they used to keep like an extra 9,000 extra in there,

20    but not more than that, in the event that I would come.  But

21    that was only an agreement between branch manager and myself.

22            THE COURT:  Ms. Olson, we're going to take our

23    midmorning break.

24        Ladies and gentlemen, we'll be at recess for a few

25    moments.  If you would please remember the Court's admonition

1    not to discuss this matter amongst yourselves.  Retire to the

2    jury room.  We'll be back with you in a little bit.

3              (Jury exits the courtroom.)

4              THE COURT:  Please be seated.  Anything we need to

5    take up?

6              MR. STORM:  No, Your Honor.

7              MS. OLSON:  No, Your Honor.

8              (Court in recess.)

9              THE COURT:  Please be seated.

10        Ready to proceed?

11             MS. OLSON:  Yes.

12             (Jury enters the courtroom.)

13             THE COURT:  Please be seated.

14   BY MS. OLSON:

15   Q    Nolon, Mr. Storm asked you if you promoted the Mexican

16   project after March of 2000.  Do you recall that?

17   A    Yes.

18   Q    Weren't you promoting the Mexican project approximately

19   sometime in the late 1990s?

20   A    That is correct.

21   Q    You promoted that continuously?

22   A    Continuously.

23   Q    Never stopped?

24   A    It was my dream.  Yes.

25   Q    He showed you Exhibit No. 1010, which was the signature

1    card for the Hulaman Management bank account.  Do you recall

2    that?

3    A    Yes, I do.

4    Q    And he showed you the third page of that document which

5    had your signature on it.  Do you recall that?

6    A    Yes.  Yes, I do.

7    Q    Looking up at item number 2 of that document, who is the

8    agent that is listed?

9    A    Care of Duane Christy, agent.

10   Q    And what was the purpose of him being the agent on this

11   account.

12   A    Well, for sake of the foundation.  The fundraising.

13   Everything we were doing.  It was all, you know, Mexican

14   based.  And so we looked upon with the express purpose that

15   everything driving what we were doing, of course, was our

16   project.

17   Q    And he was one of your partners?

18   A    Yes.  He was one of the partners in Cabo San Quintin.  And

19   he's still a partner, by the way.

20   Q    Mr. Storm also showed you a letter to Carol Lee dated

21   September 12, 2000.  Do you recall that?

22   A    Yes.  Carol Lee was my representative at private banking

23   in US Bank.

24   Q    Actually, I think her name is Carol Lee Brown?

25   A    Yes.

1   Q   And that letter pertained to consolidating accounts.  Do

2   you recall him asking you about that?

3   A   Yes.

4   Q   Was the date on this letter in relation to your recovery

5   from your motorcycle accident?

6   A   That's a good point.  I vaguely remember the letter.  But

7   I do not remember all the reasons for -- you know, operation

8   reasons for doing that.

9   Q   And is this an example of how your memory failed you after

10   your accident?

11   A   I took a pretty good lick on my head.  But my nerves were

12   not the best after the motorcycle accident.  I think it took

13   me a year and a half to two to really, really totally

14   recover, if you can call it that.

15   Q   Now, he showed a couple of letters from Phil Yaeger?

16   A   Yes.

17   Q   Do you recall that?

18   A   I do.

19   Q   And the last letter was in 2000?

20   A   I believe so.

21   Q   Was that the end of your dealings with Mr. Yeager?

22   A   Absolutely not.

23   Q   And you testified on Monday that you continued to be

24   engaged with Mr. Yaeger when you went to Poland; is that

25   right?

1   A    That's true.

2   Q    Now, do I understand that when you went to Poland you were

3   looking for a buyer for the franchise in Poland; is that

4   right?

5   A    That is true.

6   Q    And did you find a buyer?

7   A    I did.

8   Q    And what was the name of that person?

9   A    I don't know -- Onshay Voigt I think was the original

10  letter of intent.   Onshay Voigt was a venture capitalist, you

11  know, working in the Polish market.

12  Q    What was the price, the purchase price that he agreed to?

13  A    He agreed to pay $400,000 for the 25-year ownership of the

14  trademark.   That gave him the right to sell franchises inside

15  of Poland.

16  Q    Was that figure the initial payment or was that the total

17  price?

18  A    The total price was for 400,000.   But he paid a $10,000

19  nonrefundable deposit.

20  Q    And did you receive a commission from that sale?

21  A    Well, what I received were advances from Phil Yaeger.   He

22  had started, of course, funding all my expenses in that sale

23  because there was much to be done between even the letter of

24  intent to the final 400,000.   To the closing date on it.

25  Q    Was that sale to Mr. Voigt consummated?

1    A    It was not.  When it came time for him to pay the balance

2    of the 390,000, Onshay Voigt and his lawyer and his group

3    were not able to come up with the funds.

4    Q    Did you find a second buyer?

5    A    I did.  He was actually a man that I was introduced to the

6    same time with Voigt.  One of his best friends who had

7    already told me six months before, I don't think Voigt will

8    close this.  And the moment he doesn't close it, I want a

9    letter of intent and I will put 20,000 down nonrefundable.

10    And that's exactly what happened.

11    Q    And he did do that?

12    A    He did do that immediately.  And I turned that paperwork

13    over to Phil Yaeger.

14    Q    Was that sale completed?

15    A    That was completed, yes.

16    Q    Did you receive a commission from that sale?

17    A    I did.  But it was half of what Cornerstone Institute was

18    originally promised.

19    Q    And did you have yet another business arrangement with

20    Mr. Yaeger?

21    A    I did.  Mr. Yeager and I --

22            MR. STORM:  Your Honor, I object to the relevance.

23            MS. OLSON:  Well, Your Honor, he's brought up --

24    first it was brought up on direct examination.  And then it

25    was addressed again on cross.  And so it's just completing --

1    THE COURT:   This is different than what was

2  originally brought up on direct?  That's what my question is.

3    MS. OLSON:   It is not.

4    THE COURT:   Okay.

5  BY MS. OLSON:

6  Q   There was a third -- first of all, let me ask you this.

7  When was that sale to the second buyer?  When was that sale?

8  A   Well, the grand opening for Century 21 to the second

9  purchaser was June the 21st of 2006.

10 Q   So was it prior to that --

11 A   Prior to that.  Six months before we completed everything.

12 And then they set the grand opening date and we went from

13 there.

14 Q   Now, on direct examination you talked about yet another

15 business relationship with Mr. Yaeger?

16 A   Well, we had a contract, if you remember, for $30 million.

17 It was --

18 Q   But let me ask you this.

19    Did it have to do with the call centers --

20 A   Yes.

21 Q   -- the referral centers?

22 A   Right.  That was, of course, when I found out -- the day

23 that I found out that I had been indicted, which was a total

24 surprise for me, in August of 2007.  I had no idea --

25    MR. STORM:   Objection.

1         THE COURT:   Sustained.

2         THE WITNESS:   Anyways, the -- we were -- Mr. Yaeger

3    and I were 50/50 partners in the largest call center to be

4    opened for real estate purposes in central Europe there in

5    Warsaw and with a sister office in Mexico City.

6    BY MS. OLSON:

7    Q    Let me change directions and ask you about -- Mr. Storm on

8    Monday asked you about giving your son Charles Nolon Bush III

9    a car.   Do you recall that?

10   A    Yes, I did.   And what --

11   Q    Let me ask you this.

12        Did you give your son a car?

13   A    I did not give Charles Nolon Bush III a car.   No.

14   Q    Did you give anyone --

15   A    But I gave -- yes.   I gave Justin Miller Bush, my second

16   son, I gave -- Barbara's -- you know, when I was married to

17   Barbara I gave him a car, which was a Diamonte.   A Mitsubishi

18   Diamonte I had prior to all of this happening.   And I gave --

19   Q    Let me stop you there.

20        So you did not use any funds to buy either one of your

21   sons a car?  Is that your recollection --

22   A    Well, I would like to explain that if I may.

23        None to Justin Miller Bush.   The Diamonte I gave -- it was

24   paid off.   It was free and clear before all of this even

25   started back in the middle '90s.   But the car had low

1    mileage.  30,000 miles.  And I gave that car to Justin.

2        Justin had a truck.  And now this does, of course, relate

3    to Charles Nolon Bush III.

4    Q    Okay.  And how does it relate to him?

5    A    Well, I gave -- I had -- Justin left Tennessee where his

6    truck was.  He flew out.  And I gave him my Diamonte.  And I

7    had Chuck go pick up his truck.  And I gave the truck,

8    Justin's truck, to Charles Nolon Bush III.

9        And I made several payments.  I did not pay any $4,000 a

10   month.  You know, that confused me.  Justin was earning money

11   by working at the retreat.  Cutting grass.  Working with

12   Dr. Ladley.

13   Q    Thank you.  I have no further questions.

14            MR. STORM:  I have no further questions.

15            THE COURT:  Mr. Bush, you are excused.  Thank you.

16            MS. OLSON:  Your Honor, the defense rests.

17            MR. STORM:  We have no additional witnesses, Your

18   Honor.

19            THE COURT:  Ladies and gentlemen, you have now heard

20   all the testimony that is going to be presented to you.

21   We're going to recess until 1:00.  We will take -- we will be

22   working here to get jury instructions completed.  Before you

23   leave I will read a stipulation into the record.  But we are

24   going to break at until 1:00.  And at that time you'll return

25   here and I will instruct you on the law and you will hear

1    closing arguments.

2        It will be particularly important now that you have heard

3    all the testimony that you still try to maintain -- you

4    maintain an open mind until you get into the jury room and

5    begin your deliberations.  You have not been instructed on

6    the law.  You have not been advised by counsel of their

7    perspective on these facts in the form of closing arguments.

8        So please do not is discuss this matter amongst

9    yourselves.  Do not allow anybody to discuss it with you.

10   And don't do any of your own investigation or view any news

11   coverage of this matter.

12       Now I am going to read this stipulation and then we'll

13   break for lunch.

14       The parties stipulate and agree to the following:

15       1.   If called as witnesses, representatives of the Bank

16   Crozier and the country of -- in the country of Nevis would

17   testify that Government Exhibits 3001, 3002, 3003, 3004,

18   11002, 11004, 11006, 11008, 11010, 11012, 11014, 11016,

19   11018, 11020, and 11022 are records of regularly conducted

20   activity as that term is defined in Rule 803(6) of the

21   Federal Rules of Evidence.  The parties therefore agree and

22   stipulate to the admission of the exhibits pursuant to 18

23   U.S.C. Section 3505.

24       If called as a witness, a representative of Washington

25   Mutual Bank would testify that Government Exhibit No. 1008 is

1    a record of regularly conducted activity as that term is

2    defined by Rule 803(6) of the Federal Rules of Evidence.    The

3    parties therefore agree and stipulate to the admission of the

4    exhibit pursuant to Rule 902(11) of the Federal Rules of

5    Evidence.

6        So stipulated.    Dated this 5th day of November and signed

7    by the lawyers in this matter.

8        Based on the stipulation, those exhibits that were

9    referred to have been admitted and they will be available to

10    you during your deliberations.

11            (Exhibit Nos. 3001, 3002, 3003, 3004,

12            11002, 11004, 11006, 11008, 11010,

13            11012, 11014, 11016, 11018, 11020,

14            11022, and 1008 admitted.

15        THE COURT:    All right.    So, ladies and gentlemen, we

16    are now going to break until 1:00.    Have a nice lunch.    Get

17    ready to come back and go to work.

18            (Jury exits the courtroom.)

19        THE COURT:    Please be seated.

20        What I would like to do is complete the preparation of the

21    jury instructions at this time.    First, I have a question

22    that's really one of housekeeping.

23        Have there been certain charts and summaries that have

24    been shown but not admitted?    Or have all of the charts and

25    summaries that have been shown actually been admitted?    I had

1  the pie charts in mind.  And were they admitted or were they

2  not admitted?

3         MR. STORM:  They were not.

4         THE COURT:  Okay.  Then I will give both instructions

5  on that.  It's a simple matter.

6      Then let me say with respect to the proposed jury

7  instructions from the defense, as I indicated earlier, I am

8  not inclined to give Instruction -- proposed Instruction

9  No. 2.  I do not believe that the statute regarding corporate

10 sole informs the jury in any manner as to the legality of the

11 conduct of which Mr. Bush is accused here.  And it is not --

12 it is not in any way germane.

13     I would add that there is a good-faith instruction that

14 has been submitted by the government that I will be giving.

15 And that will allow you, Ms. Olson, to argue your point.

16     I am also not willing to give the advice of counsel

17 instruction.  I do not believe that there is any foundation

18 for such an instruction.  I don't know -- on the one hand,

19 Mr. Stoll is not a lawyer.  I'm not sure what an

20 ecclesiastical lawyer does.  But I'm pretty certain that

21 there is nothing that pertains to this case that is of an

22 ecclesiastical nature or any -- the Court -- the record

23 before the Court does not give any basis for the Court to

24 believe that Mr. Stoll somehow passed judgment on the Mintus

25 operation or the San Quintin operation and the way it was

1    promoted, the representations that were made in any way,

2    shape, of form.

3        As to Mr. Grant, the first thing that comes to mind is the

4    fact that he was paid almost $2 million, which is a pretty

5    good fee for corporate advice.  The evidence suggests that

6    Mr. Grant was up to his eyeballs in the operation and is more

7    akin to a partner than legal counsel.

8        And, in any event, it does not appear to the Court based

9    on the evidence before it that at any time Mr. Bush made a

10   full disclosure of all material facts to his attorney,

11   received advice as to the specific course of conduct that he

12   or she should follow, and relied on the advice in good faith.

13   And on the basis of that lack of evidence in the record, the

14   Court declines to give the advice of counsel instruction.

15       Ms. Olson?

16       MS. OLSON:  Your Honor, may I be heard on that,

17   please?

18       THE COURT:  Yes.  And also I want you to take your

19   formal objection exception for preservation.

20       MS. OLSON:  And I will.  But I do just want to be

21   heard on the advice of counsel.

22   I understand where the Court is coming from on the

23   corporation sole instruction.  And I do understand there --

24   the advice of counsel instruction was not proposed for

25   Mr. Stoll's advice because we -- I agree he is not a member

1   of bar.  And it is directed towards Nigel Scott Grant's

2   advice.  And I think that testimony by Mr. Bush was that from

3   the very beginning he was talking to him about what kind of a

4   program that he wanted.

5       You know, the cases that the government has presented to

6   oppose this instruction I think really highlight the

7   difference between the reasons in those cases why the

8   instruction was not acceptable and the reasons why it's

9   acceptable here.  And I think that the cases fall in two

10  categories.  One where the defendant client did not give full

11  information to the attorney, and the other is where they gave

12  false information to the attorney and relied on advice.

13      And that didn't happen here.  Mr. Grant knew what was

14  going on from day one.  He knew what kind of a program he

15  wanted.  He knew why he wanted it.  He knew what the goals

16  were.  And he made recommendations to Mr. Bush.  He drew up

17  the paperwork.  Mr. Bush testified he didn't really even

18  understand all the paperwork.

19          THE COURT:  Well, and here is the problem.  Why I'm

20  doing what I am doing.  The advice that Mr. Grant may have

21  given regarding the legality of this doesn't pass the giggle

22  test.  And the reason it doesn't pass the giggle test is

23  that -- and the government didn't even deal with this.  This

24  $800 million that's sitting over here in the corner, that is

25  the explanation of why Mr. Bush thought he had access to all

1    these funds and so forth and so on.  There is no lawyer in

2    the world that wouldn't recognize that there is no legal

3    obligation or basis for Mintus to say I've got $800 million

4    here that is yours and you need to go out and find widows and

5    wage earners to throw in 20,000 bucks at a time to somehow

6    free up this $800 million -- I mean, this is a Glen Turner

7    dare to be great operation.  And, you know, Mr. Grant's law

8    degree is not -- is not a get-out-of-jail-free card for

9    people who are otherwise aimed at ripping folks off.

10            MS. OLSON:  You know, and I think from the Court's

11   comments it appears to me that the Court is evaluating all of

12   the evidence.

13            THE COURT:  I have to.  That's the instructions.

14            MS. OLSON:  But from -- and Mr. Bush is entitled to

15   put on his defense and to present his theory of the case.

16   And his theory, his defense is that he went to Scott Grant

17   and he said I want to -- I need to get funding for this

18   project.  You know, I want to do it -- I got this corporation

19   sole thing going on and I need somebody -- I need a lawyer to

20   draw up the paperwork.  And so Mr. Grant did.  Mr. Grant

21   should have told Mr. Bush from day one that this whole Mintus

22   idea was a bad one, but he didn't.

23       So it's not really the quality of the advice.  I think

24   it's the reliance.  Mr. Bush's good-faith reliance.

25            THE COURT:  The point is you have a good-faith -- you

1  have a good-faith instruction that is going to allow you to

2  make this argument.

3          MS. OLSON:   I understand.

4          THE COURT:   The reason I'm not allowing it is that

5  the Court has a gatekeeper function with regards to jury

6  instructions, has to be satisfied itself that there is some

7  foundation that -- and from where I sit if, if, if Mr. Bush

8  made full disclosure of all material facts, then Mr. Grant's

9  a partner.  He's a co-conspirator.  And I'm not going to

10  allow -- I'm not going to elevate a lawyer who is a

11  co-conspirator to somehow a member of a learned profession

12  who blesses this operation.

13      And that's why -- you can make that argument and I will

14  overrule any objection that the government makes.  You can

15  make that argument based on the instructions you have.  The

16  Court's not going to participate by giving an instruction and

17  somehow even remotely running the risk of commenting on the

18  evidence.

19          MS. OLSON:   I understand.  Thank you, Your Honor.

20          THE COURT:   Thank you, very much.

21      Anything else?  And I will take that as a formal

22  objection --

23          MS. OLSON:   Thank you.

24          THE COURT:   -- to the Court's refusal to give the

25  instructions.  Otherwise, the instructions as presented by

1    the government will be presented.

2        Anything further at this time?

3            MR. STORM:   No, Your Honor.

4            THE COURT:   All right.  I expect us to be ready to go

5    and argue this case at 1:00.  So make sure that the room is

6    set up the way you want it and that we have the technology

7    all set up so that it conforms to the manner in which you

8    want to present.

9        Any guesstimate about how much time you need?

10           MR. STORM:   Your Honor, Mr. Letey will be giving the

11   government's closing.  He's anticipating about 40 minutes

12   with 10 minutes of rebuttal.

13           THE COURT:   Okay.

14           MS. OLSON:   And, Your Honor, I'm thinking in the

15   neighborhood of half an hour.

16           THE COURT:   Okay.  Very well.

17           MR. STORM:   Your Honor, just in case this wasn't

18   caught, when I went back over the jury instructions that the

19   government provided, in the mail fraud jury instruction I at

20   the bottom use the word "wire fraud" instead of "mail fraud."

21   And I apologize for that typo.

22           THE COURT:   Okay.  In the mail fraud instruction?

23           MR. STORM:   Yes.

24           THE COURT:   I'm looking at it.  Line 25?

25           MR. STORM:   I believe that's right.

1          THE COURT:   A mailing is caused when one knows that

2     the wires will be used in the ordinary course of business or

3     when one can reasonably foresee such use, and that should be

4     when the mails?

5       All right.  Very well.  Anything else?

6          MR. STORM:   No, Your Honor.

7          MS. OLSON:   No, Your Honor.

8          THE COURT:   We'll be at recess until 1:00.

9          (Court in recess.)

10         THE COURT:   Before we proceed any further, I want to

11    give the lawyers one last opportunity to make any formal

12    objections or exceptions to the instructions.   The defense

13    has excepted to the Court's refusal to give the two jury

14    instructions that they proposed on advice of counsel and on

15    the corporate sole.

16      Are there any objections to the instructions that are

17    being given?  The charging instructions?

18         MS. OLSON:   No, Your Honor.

19         THE COURT:   Okay.  Very well.  Are we ready for the

20    jury then?

21         MR. STORM:   We are.

22         THE COURT:   All right.  What we're going to do is

23    I'll instruct them on the law.  And do you all have copies of

24    instructions?

25         MR. STORM:   We don't.  I have the government's copy.

1      THE COURT:  Do you have a copy of the verdict form or

2  anything?

3      MR. STORM:  No.

4      MS. OLSON:  Just what the government filed.

5      THE COURT:  What I'm going to do is when the jury

6  comes back, I will instruct them on the law.  Rather than go

7  over the indictment counts -- I think they're all in the

8  verdict form -- I'll skip straight to the verdict form and

9  indicate that I think that's a straight duplicate by my

10  comparison.

11      MR. STORM:  Yes, Your Honor.

12      THE COURT:  So I'll go straight to the verdict form.

13  I'll then direct their attention to Mr. Letey who will give

14  the closing argument for the government, and Ms. Olson who

15  will give the closing argument for Bush, and then the

16  rebuttal for Mr. Letey.

17      At that point we will select the juror who will not

18  deliberate and I'll allow him or her to get their things.  I

19  will instruct them on not discussing the matter further in

20  case we need to re-call them.  And at that point then the

21  jury will be allowed to go into the jury room to deliberate.

22      Are we clear on our exhibits now?  We've gone over the

23  list.

24      THE CLERK:  We've got about five more minutes.

25      THE COURT:  All right.  Anything further?

1          MR. STORM:   For clarity, I'm planning on doing

2     rebuttal.

3          THE COURT:   All right.   Let's bring the jury back

4     then.

5          (Jury enters the courtroom.)

6          THE COURT:   Ladies and gentlemen, welcome back.

7     Please be seated.

8       I am going to now instruct you on the law.   You have a

9     copy of the jury instructions in front of and you can follow

10    along.   Let me remind you that we will be going then directly

11    into closing argument.   As one of the instructions informs

12    you, closing arguments of counsel are not evidence.   And so

13    during that period of time you will not be taking notes.

14    Your note-taking days are over.   You'll have them during your

15    deliberations and can refer to them, but you are not to take

16    notes during the closing arguments of counsel or during the

17    instructions as given by the Court.   You will have your

18    instructions to follow along.

19      So if you would kindly follow along with me.   Instruction

20    No. 1.   Members of the jury, now that you have heard all of

21    the evidence it is my duty to instruct you on the law which

22    applies to this case.   A copy of these instructions will be

23    available in the jury room for you to consult.   It is your

24    duty to find the facts from all the evidence in the case.   To

25    those facts you will apply the law as I give it to you.   You

1    must follow the law as I give it to you whether you agree

2    with it or not.  And you must not be influenced by any

3    personal likes or dislikes, opinions, prejudices, or

4    sympathy.  That means that you must decide the case solely on

5    the evidence before you.  You recall that you took an oath

6    promising to do so at the beginning of case.

7        In following my instructions, you must follow all them and

8    not single out some and ignore others.  They are all equally

9    important.  You must not read into these instructions or

10   anything the Court may have said or done any suggestion as to

11   what verdict you should return.  That is a matter entirely up

12   to you.

13       The indictment is not evidence.  The defendant has pleaded

14   not guilty to the charge.  The defendant is presumed to be

15   innocent and does not have to testify or present any evidence

16   to prove innocence.  The government has the burden of proving

17   every element of the charge beyond a reasonable doubt.

18       The defendant has testified.  You should treat this

19   testimony just as you would the testimony of any other

20   witness.

21       Instruction 4.  Proof beyond a reasonable doubt is proof

22   that leaves you firmly convinced that the defendant is

23   guilty.  It is not required that the government prove guilt

24   beyond all possible doubt.  A reasonable doubt is a doubt

25   based upon reason and common sense and is not based purely on

1  speculation.  It may arise from a careful and impartial

2  consideration of all the evidence or from a lack of evidence.

3     If after a careful and impartial consideration of all the

4  evidence you are not convinced beyond a reasonable doubt that

5  the defendant is guilty, it is your duty to find the

6  defendant not guilty.  On the other hand, if after a careful

7  and impartial consideration of all the evidence you are

8  convinced beyond a reasonable doubt that the defendant is

9  guilty, it is your duty to find the defendant guilty.

10     Instruction 5.  The evidence from which you are to decide

11  what the facts are consists of:  one, the sworn testimony of

12  any witness;  two, the exhibits which have been received into

13  evidence;  and, three, any facts to which all the lawyers have

14  stipulated.

15     Instruction No. 6.  In reaching your verdict you may

16  consider only the testimony and exhibits received into

17  evidence.  Certain things are not evidence and you may not

18  consider them in deciding what the facts are.  I will list

19  them for you.

20     1.  Arguments and statements by lawyers are not evidence.

21  The lawyers are not witnesses.  What they have said in their

22  opening statements and will say in their closing arguments

23  and at other times is intended to help you interpret the

24  evidence, but it is not evidence.  If the facts as you

25  remember them differ from the way the lawyers state them,

1    your memory of them controls.

2        2.   Questions and objections by lawyers are not evidence.

3    Attorneys have a duty to their clients to object when they

4    believe a question is improper under the Rules of Evidence.

5    You should not be influenced by the question, the objection,

6    or the Court's ruling on it.

7        3.   Testimony that has been excluded or stricken or that

8    you have been instructed to disregard is not evidence and

9    must not be considered.  In addition, some testimony and

10   exhibits have been received only for a limited purpose.

11   Where I have given a limiting instruction, you must follow

12   it.  Anything you may have seen or heard when the Court has

13   not been in session -- was not in session is not evidence.

14   You are to decide the case solely on the evidence received at

15   the trial.

16       7.   Evidence may be direct or circumstantial.  Direct

17   evidence is direct proof of a fact, such as testimony by an

18   eyewitness about what that witness personally saw or heard or

19   did.  Circumstantial evidence is proof of one or more facts

20   from which you could find another fact.  You should consider

21   both kinds of evidence.  The law makes no distinction between

22   the weight to be given to either or circumstantial evidence.

23   It is for you to decide how much weight to give any evidence.

24       In deciding the facts in this case, you may have to decide

25   which testimony to believe and which testimony not to

1    believe.   You may believe everything a witness says or part

2    of it or none of it.

3         In considering the testimony of any witness you may take

4    into account:

5         1.   The opportunity and ability of the witness to see or

6    hear or know the things testified to.

7         2.   The witness's memory.

8         3.   The witness's manner while testifying.

9         4.   The witness's interest in the outcome of the cause and

10   any bias or prejudice.

11        5.   Whether other evidence contradicted the witness's

12   testimony.

13        6.   The reasonableness of the witness's testimony in light

14   of all the evidence.

15        7.   Any other factors that bear on believability.

16        The weight of the evidence as to a fact does not

17   necessarily depend on the number of witnesses who testified.

18        9.   You are here only to determine whether the defendant

19   is guilty or not guilty of the charges in the indictment.

20   Your determination must be made only from the evidence in the

21   case.   The defendant is not on trial for any conduct or

22   offense not charge in the indictment.   You should consider

23   evidence about the acts, statements and intentions of others,

24   or evidence about other acts of the defendant only as they

25   relate to this charge against the defendant.

1          10.    The defendant is on trial only for the crimes charged

2     in the indictment and not for any other activities.

3          11.    A separate crime is charged against the defendant in

4     each count.    You must decide each count separately.    Your

5     verdict on one count should not control your verdict on any

6     other count.

7          12.    You have heard evidence of other acts engaged in by

8     the defendant.    You may consider that evidence only as it

9     bears on the defendant's motive, opportunity, intent,

10    preparation, plan, knowledge, identity, absence of mistake or

11    accident, and for no other purpose.

12         13.    You have heard testimony from persons who because of

13    education or experience are permitted to state opinions and

14    the reasons for their opinions.    Opinion testimony should be

15    judged just like any other testimony.    You may accept it or

16    reject it.    And give it as much as weight you think it

17    deserves considering the witness's education and experience,

18    the reasons given for the opinion, and all the other evidence

19    in this case.

20         14.    Certain charts and summaries have been shown to you

21    in order to help explain the facts disclosed by the books,

22    records, and other documents which are in evidence in the

23    case.    They're not themselves evidence or proof any fact.    If

24    they do not correctly reflect the facts or the figures shown

25    by the evidence in the case, you should disregard these

1    charts and summaries and determine the facts from the

2    underlying evidence.

3        15.    Certain charts and summaries have been received into

4    evidence.    Charts and summaries are only as good as the

5    underlying supporting material.    You should, therefore, give

6    them only such weight as you think the underlying material

7    deserves.

8        16.    The defendant is charged in Count 1 of the indictment

9    with securities fraud in violation of Section 78(j)(D) of

10   Title 15 of the United States Code.    In order for the

11   defendant to be found guilty of that charge, the government

12   must prove each of the following elements beyond a reasonable

13   doubt:

14       First, the defendant used a device or scheme to defraud

15   someone, made an untrue statement of a material fact or

16   failed to disclose the material fact which resulted in making

17   the defendant's statements misleading.

18       Second, the defendant's act or failure to disclose was in

19   connection with the purchase or sale of a security.

20       Third, the defendant directly or indirectly used or caused

21   to be used the mail or the telephone or other instrumentality

22   of interstate commerce in connection with the acts or failure

23   to disclose.

24       And, fourth, the defendant acted for the purpose of

25   defrauding buyers or sellers of securities.

1    To defraud someone means to make a statement or

2  misrepresentation which is untrue and known to the defendant

3  to be untrue, or knowingly to fail to state something which

4  is necessary to make other statements true and which relates

5  to something important to the purchase or sale.

6    A mailing or use of the telephone or some other

7  instrumentality of interstate commerce is caused when one

8  knows that the mail, telephone, or other instrumentality will

9  be used in the ordinary course of business or when one can

10  reasonably foresee such use.  It is not necessarily that the

11  untrue statement itself passed through the mail or over the

12  telephone or over -- or through some other instrumentality or

13  interstate commerce so long as the mail or telephone or other

14  instrumentality was used as a part of the purchase or sale

15  transaction.  It is also not necessary that the defendant

16  made a profit or that anyone actually suffered a loss.

17    The government need only prove that the objects purchased

18  or sold were in fact securities.  They need not prove that

19  the defendant had specific knowledge that the objects

20  purchased or sold were securities.

21    The term security includes an investment contract.  The

22  contract need not be in writing.  An investment contract is

23  an investment of money in a common enterprise with profits to

24  come solely from the efforts of others.

25    Instruction 18.  The defendant is charged in Counts 2

1    through 14 of the indictment with wire fraud, in violation of

2    Section 1341 of Title 18 of the United States Code.  In order

3    for the defendant to be found guilty of that charge, the

4    government must prove each of the following elements beyond a

5    reasonable doubt:

6        First, the defendant devised or knowingly participated in

7    a scheme or plan to defraud in order to obtain money or

8    property, with all of you agreeing on the particular scheme

9    or plan to defraud.

10        Second, the scheme to defraud was material and it would

11    reasonably influence a person to part with money or property.

12    That is, it would reasonably influence a person to part with

13    money or property.  Excuse me.

14        Third, the defendant acted with intent to defraud.

15        And, fourth, the defendant used or caused to be used wire

16    communications in interstate or foreign commerce to carry out

17    or attempt to carry out an essential part of the scheme.

18        In determining whether a scheme to defraud exists, you're

19    entitled to consider not only the defendant's words and

20    statements, but also the circumstances in which they are used

21    as a whole.

22        A defendant's actions can constitute a scheme to defraud

23    even if there are no specific false statements involved.  The

24    deception need not be premised upon words or statements

25    standing alone.  The arrangement of the words or the

1    circumstances in which they are used may create an appearance

2    which is false or deceptive, even if the words themselves

3    fall short of this.  Thus, even if statements as part of the

4    scheme are not literally false, you may consider whether the

5    statements taken as a whole are misleading or deceptive.

6    Evidence beyond a reasonable doubt that a scheme was

7    reasonably calculated to deceive is sufficient to establish a

8    scheme to defraud.

9        A wire communication is caused when one knows that the

10   wires will be used in the ordinary course of business or when

11   one can reasonably foresee such use.  It does not matter

12   whether the material wired was itself false or deceptive so

13   long as a wire was used as part of the scheme, nor does it

14   matter whether a scheme or plan was successful or that any

15   money or property was obtained.

16       19.   The defendant is charged in Counts 15 through 17 of

17   the indictment with mail fraud, in violation of Section 1341

18   of Title 18 of the United States Code.  In order for the

19   defendant to be found guilty of that charge, the government

20   must prove each of the following elements beyond a reasonable

21   doubt:

22       First, the defendant devised or knowingly participated in

23   a scheme or plan to defraud in order to obtain money or

24   property, with all of you agreeing on a particular scheme or

25   plan to defraud.

1    Second, the scheme to defraud was material.  That is, it

2    would reasonably influence a person to part with money or

3    property.

4    Third, the defendant acted with the intent to defraud.

5    And, fourth, the defendant used or caused to be used the

6    mail to carry out or attempt to carry out an essential part

7    of the scheme.

8    In determining whether a scheme to defraud exists, you are

9    entitled to consider not only the defendant's words and

10    statements, but also the circumstances in which they are used

11    as whole.

12    A defendant's actions can constitute a scheme to defraud

13    even if there are no specific false statements involved.  The

14    deception need not be premised upon words or statements

15    standing alone.  The arrangement of the words or the

16    circumstances in which they are used to create an appearance

17    which is false or deceptive, even if the words themselves

18    false short of this.

19    Thus, even if statements as part of the scheme are not

20    literally false, you may consider whether the statements

21    taken as a whole are misleading or deceptive.

22    Evidence beyond a reasonable doubt that a scheme was

23    reasonably calculated to deceive is sufficient to establish a

24    scheme to defraud.

25    A mailing is caused when one knows that the mail will be

1   used in the ordinary course of business or when one can

2   reasonably foresee such use.  It does not matter whether the

3   material mailed was itself false or deceptive so long as the

4   mail was used as a part of the scheme, nor does it matter

5   whether the scheme or plan was successful or that any money

6   or property was obtained.

7      20.  An intent to defraud is an intent to deceive or

8   cheat.  Good faith is a complete defense to each count

9   because good faith is inconsistent with an intent to defraud.

10  Good faith means a belief or opinion honestly held without an

11  intent to mislead.  However, the defendant's belief that

12  victims of any fraud will be paid in the future or will

13  sustain no economic loss does not constitute a good-faith

14  offense if there is an intent to defraud.

15     The defendant does not have the burden of proving he acted

16  in good faith.  The government must prove beyond a reasonable

17  doubt that the defendant acted with the intent to defraud and

18  did not act in good faith.  Proof that the defendant acted

19  with reckless disregard for the truth of material

20  misrepresentations he may have made is inconsistent with good

21  faith.

22     An act is done knowingly if the defendant is aware of the

23  act and does not act through ignorance, mistake, or accident.

24  The government is not required to prove that the defendant

25  knew that his acts or omissions were unlawful.  You may

1    consider evidence of the defendant's words, acts, or

2    omissions along with all the other evidence in deciding

3    whether the defendant acted knowingly.

4        Instruction 22.  The defendant is charged in Counts 18

5    through 32 of the indictment with engaging in unlawful money

6    transactions with the proceeds of securities fraud, wire

7    fraud, and mail fraud.  In order for the defendant to be

8    found guilty of that offense, the government must prove each

9    of the following elements beyond a reasonable doubt:

10       First, the defendant knowingly engaged in a monetary

11   transaction.  That is, deposited funds to a bank account,

12   transferred funds from one bank to the another, or withdrew

13   funds from a bank account.

14       Second, a monetary transaction with the funds with a value

15   greater than $10,000 which was derived from securities fraud,

16   wire fraud, or mail fraud.

17       Third, the defendant knew that the money transaction

18   involved proceeds of a criminal offense.

19       Fourth, the monetary transaction took place in the United

20   States.

21       And, fifth, the monetary transaction in some way or degree

22   affected interstate or foreign commerce.

23       23.  In order to convict the defendant of engaging in an

24   unlawful monetary transaction with the proceeds of securities

25   fraud, wire fraud, or mail fraud, in violation of Title 18,

1    United States Code Section 1957, you need not find the

2    defendant guilty of the specific securities fraud, wire

3    fraud, or mail fraud counts he is charged with in the

4    indictment.

5        Rather, you must find only that the funds used in the

6    monetary transactions charged in the engaging -- charged in

7    the engaging and unlawful monetary transactions offenses were

8    the proceeds of acts of securities fraud, mail fraud, or wire

9    fraud, even if such acts are not charged in the indictment.

10       Further, you need not find that all of the funds used in

11   the transaction were derived from fraud.  It is sufficient

12   for the government to show that the funds came from an

13   account in which tainted proceeds were commingled with other

14   funds.  I have previously instructed you on the elements of

15   securities fraud, wire fraud, and mail fraud.

16       24.  A defendant may be found guilty of securities fraud,

17   wire fraud, mail fraud, and engaging in an unlawful monetary

18   transaction even if the defendant personally did not commit

19   the act or acts constituting the crime but aided and abetted

20   in its commission.

21       To prove a defendant guilty of aiding and abetting the

22   government must prove beyond a reasonable doubt:

23       First, securities fraud, wire fraud, mail fraud, or

24   engaging in an unlawful monetary transaction was committed by

25   someone.

1    Second, the defendant knowingly and intentionally aided,

2    counseled, demanded, induced, or procured that person to

3    commit each element of securities fraud, wire fraud, mail

4    fraud, or engaging in an unlawful monetary transaction.

5    And, third, the defendant acted before the crime was

6    completed.

7    It is not enough that the defendant merely associated with

8    the person committing the crime or knowingly or

9    unintentionally did things that were helpful to that person

10    or was present at the scene of the crime. The evidence must

11    show beyond a reasonable doubt that the defendant acted with

12    the knowledge and intention of helping that person commit a

13    securities fraud, wire fraud, mail fraud, or engaging in an

14    unlawful monetary transaction.

15    The government is not required to prove precisely which

16    defendant actually committed the crime and which defendant

17    aided and abetted.

18    Instruction No. 25. Your verdict must be based solely on

19    the evidence and on the law as I have given it to you in

20    these instructions. However, nothing that I have said or

21    done is intended to suggest what you verdict should be. That

22    is entirely for you to decide.

23    26. Some of you have taken notes during the trial.

24    Whether or not you took notes, you should rely on your own

25    memory of what was said. Notes are only to assist your

1   memory, and you should not be overly influenced by your

2   notes.

3       27.   The punishment provided by law for this crime is for

4   the Court to decide.  You may not consider punishment in

5   deciding whether the government has proved its case against

6   the defendant beyond a reasonable doubt.

7       28.   A verdict form has been prepared for you.  After you

8   have reached unanimous agreement on a verdict, your

9   foreperson will fill in the form that has been given to you,

10  sign and date it, and advise the Court that you are ready to

11  return to the courtroom.

12      29.   If it becomes necessary during your deliberations to

13  communicate with me, you may send me a note through the

14  bailiff signed by your foreperson or by one or more members

15  of the jury.  No member of the jury should ever attempt to

16  communicate with me except by a signed writing, and I will

17  respond to the jury concerning the case only in writing or

18  here in open court.

19      If you send out a question, I will consult with the

20  lawyers before answering it, which may take some time.  You

21  may continue your deliberations while waiting for the answer

22  to any question.  Remember that you are not to tell anyone,

23  including me, how the jury stands numerically or otherwise on

24  the question of the guilt of the defendant until after you

25  have reached a unanimous verdict or have been discharged.

1       Then there are 32 counts contained in the indictment.  I'm

2    not going to read those counts to you because they are

3    duplicated in the verdict form.  You may follow along as I

4    read the verdict form because the verdict form will mirror

5    the counts in indictment.

6       There is a verdict form.  There will be one verdict form

7    in the jury room with you, and that will be signed,

8    ultimately prepared by the foreperson.  It follows or tracks

9    the indictment that you have in your jury instructions.

10      Count 1.  January 23, 2002.  Securities fraud.  Sale of a

11   security to S.R. in the form of a $40,000 investment in Cabo

12   San Quintin.  Mark guilty or not guilty.  There are two

13   squares.

14      2.  11/9/99.  Wire fraud.  Wire transfer of $8,000 from

15   the account of G.M. at Woodstone Credit Union, Federal Way,

16   Washington to an account opened in the name of Global Funding

17   at Bank Crozier, St. George's, Grenada.  And then a box for

18   guilty or not guilty can be marked based on the jury's

19   determination.

20      Count 3.  January 6, 2000.  Wire fraud.  Wire transfer of

21   $1,350 from the account of D.F. at US Bank, Everett,

22   Washington to an account opened in the name of Global

23   Dominion Financial Services at Bank Crozier, St. George's

24   Grenada.  And again the same box, guilt or not guilty, can be

25   filled in by the foreperson.

1    Count 4.  January 7, 2000.  Wire fraud.  Wire transfer of

2    $21,000 from the account of G.M. at Woodstone Credit Union,

3    Federal Way, Washington to an account opened in the name of

4    Global Funding at Bank Crozier, St. George's, Grenada.  Box

5    for guilty or not guilty.

6    Count 5.  January 27, 2000.  Wire fraud.  Wire transfer of

7    $1,375 from the account of R.D. at Pacific Northwest Bank,

8    Gig Harbor, Washington to an account opened in the name of

9    Global Dominion Financial Services at Bank Crozier, St.

10   George's, Grenada.  And a box for guilty or not guilty.

11   6.  January 31, 2000.  Wire fraud.  Wire transfer of

12   $25,092 from the account of R.D. at Pacific Northwest Bank,

13   Gig Harbor, Washington to an account opened in the name of

14   Global Dominion Financial Services at Bank Crozier,

15   St. George's, Grenada.  And again a box for guilty or not

16   guilty.

17   7.  5/11/2000.  Wire fraud.  Wire transfer of $20,000 from

18   the account of J.A. at Wells Fargo Bank, Seattle, Washington

19   with an account opened in the name of Global Funding at Bank

20   Crozier, St. George's, Grenada.  And again a box for guilty

21   or not guilty.

22   Q   Count 8.  October 31, 2000.  Wire fraud.  E-mail

23   newsletter from financial planner L.W. in Bremerton,

24   Washington to B.H. in Salida, Colorado promising future

25   dividends and stating, among other things, quote, "The good

1  news is that Global Dominion Financial Services is in the

2  process of updating the client accounts.  After the update is

3  complete your balance should reflect an increase of 150

4  percent..."  And there an ellipses and a period.  "This

5  additional 150 percent will be placed in a holding account in

6  March 2001," end of quote.  And a box for guilty or not

7  guilty.

8      Count 9.  December 11, 2000.  Wire fraud.  E-mail

9  newsletter from financial planner L.W. in Bremerton,

10  Washington to B.H. in Salida, Colorado promising future

11  dividends and stating, among other thing, "Your balance

12  should reflect --" quote, "Your balance should reflect an

13  increase of 150 percent...  This additional 150 percent will

14  be placed in a forward account until March 15, 2001.  At that

15  time the new balance will be available to you," end quote.

16  And a box for guilty or not guilty.

17      Count 10.  December 20, 2000.  Wire fraud.  E-mail

18  newsletter from financial planner L.W. in Bremerton,

19  Washington to D.H. in Salida, Colorado offering a new

20  investment opportunity in Cabo San Quintin stating, among

21  other things, quote, "GDFS is alive and well...  The Baja

22  management group has created and is now offering an

23  opportunity to the GDFS client base to become part of this

24  exciting new resort," end of the quote.

25      Count 11.  March 22, 2001.  Wire fraud.  E-mail newsletter

1    from financial planner L.W. in Bremerton, Washington to D.H.

2    in Salida, Colorado promising the wiring of dividends and

3    stating, among other things, quote, "As you know, GDFS is in

4    the process of sending wires out to the LLC managers who have

5    requested them...  Best guest on the wires, they should be

6    completed by April 15," end of quote.  And then a box for

7    guilty or not guilty.

8        Count 12.  April 20, 2001.  Wire fraud.  Wire transfer of

9    $25,000 from the account of B.F. at Bank of Cascades,

10   Pineville, Oregon to an account opened in the name of

11   Cornerstone Institute escrow account at US Bank, Seattle,

12   Washington.  A box for marking guilty or not guilty.

13       13.  April 23, 2001.  Wire fraud.  Wire transfer of

14   $20,000 from the account of B.F. at Bank of Cascade,

15   Pineville, Oregon to an account opened in the name of

16   Cornerstone Institute escrow account at US Bank, Seattle,

17   Washington.  And a box for guilty or not guilty.

18       14.  May 18, '01.  Wire fraud.  E-mail newsletter from

19   financial planner L.W. in Bremerton, Washington to D.H. in

20   Salida, Colorado promising future dividends and stating,

21   among other things, quote, "GDFS has decided to prepare the

22   next dividend on June 15 or thereabouts.  GDFS has stated

23   that they are expecting the dividend to be between 11 and a

24   quarter percent up to 25 percent," end of quote.  And a box

25   for guilty or not guilty.

1      15.  January 27, 2000.  Mail fraud.  Global Dominion

2  Financial Services application packet sent to R.D. from Gig

3  Harbor, Washington to Global Dominion Financial Services,

4  Charleston, Nevis.  Mark a box for guilty or not guilty.

5      16.  March 17, 2000.  Mail fraud.  Hulaman Trust Credit

6  Union certificate account sent by Global Dominion Financial

7  Services from San Diego, California to G.M. in Federal Way,

8  Washington.  A box for guilty or not guilty.

9      17.  June 8, 2000.  Mail fraud.  A letter notifying D.F.

10  that an online bank account had been established for D.F.

11  into which Global Dominion Financial Services profits would

12  be deposited and sent by Global Dominion Financial Services

13  from San Diego, California to D.F., Everett, Washington.  And

14  a box for guilty or not guilty.

15      18.  December 29, 1999.  Unlawful monetary transaction.

16  Wire transfer of $300,000 from an account opened in the name

17  of Global Dominion Financial Services at Bank Crozier, St.

18  George's, Grenada to an account opened in the name of Hulaman

19  Management Services escrow account at US Bank, Seattle,

20  Washington.  And then a box for guilty or not guilty.

21      19.  January 5, 2000.  Unlawful monetary transaction.

22  Wire transfer of $200,000 from an account opened in the name

23  of Global Dominion Financial Services at Bank Crozier,

24  St. George's, Grenada to an account opened in the name of

25  Hulaman Management Services escrow account at US Bank,

1   Seattle, Washington.   And a box for marking guilty or not

2   guilty.

3       Count 20.   January 12, 2000.   Unlawful monetary

4   transaction.   Wire transfer of $200,000 from an account

5   opened in the name of Global Dominion Financial Services at

6   Bank Crozier, St. George's, Grenada to an account opened in

7   the name of Hulaman Management Services escrow account at US

8   Bank, Seattle, Washington.   And a box to mark guilty or not

9   guilty.

10      Count 21.   February 15, 2000.   Unlawful monetary

11  transaction.   Wire transfer of $250,000 from an account

12  opened in the name of Global Dominion Investments at Bank

13  Crozier, St. George's, Grenada to an account opened in the

14  name of Hulaman Management Services escrow account at US

15  Bank, Seattle, Washington.   And then a box to mark guilty or

16  not guilty.

17      Count 22.   February 17, 2000.   Unlawful monetary

18  transaction.   Wire transfer of $175,000 from an account

19  opened in the name of the Heart Foundation LLC at Bank

20  Crozier, St. George's, Grenada to an account opened in the

21  name of From The Heart Foundation at US Bank, Seattle,

22  Washington.   And a box to mark guilty or not guilty.

23      23.   March 10, 2000.   Unlawful monetary transaction.   Wire

24  transfer of $100,000 from an account opened in the name of

25  Global Dominion Financial Trust Services at Bank Crozier,

1  St. George's, Grenada to an account opened in the name of

2  From The Heart Foundation at US Bank, Seattle, Washington.

3  And a box to mark guilty or not guilty.

4      24.  March 20, 2000.  Unlawful monetary transaction.  Wire

5  transfer of $250,000 from an account opened in the name of

6  Global Dominion Investments at Bank Crozier, St. George's,

7  Grenada to an account opened in the name of Hulaman

8  Management Services escrow account at US Bank, Seattle,

9  Washington.  And a box to mark guilty or not guilty.

10      15.  March 27, 2000.  Unlawful monetary transaction.  Wire

11  transfer of $300,000 from an account opened in the name of

12  Global Dominion Investments at Bank Crozier, St. George's,

13  Grenada to an account in the name of Hulaman Management

14  Services escrow account at US Bank, Seattle, Washington.  And

15  a box to mark guilty or not guilty.

16      Count 26.  April 20, 2000.  Unlawful monetary transaction.

17  Wire transfer of $200,000 from an account opened in the name

18  of Global Dominion Investments at Bank Crozier, St. George's,

19  Grenada to an account opened in the name of Hulaman

20  Management Services escrow account at US Bank, Seattle,

21  Washington.  And a box to mark guilty or not guilty.

22      27.  April 26, 2000.  Unlawful monetary transaction.  Wire

23  transfer of $50,000 in an account opened in the name of

24  Global Dominion Investments at Bank Crozier, St. George's,

25  Grenada to an account opened in the name of From The Heart

1    Foundation at US Bank, Seattle, Washington.  And a box to

2    mark guilty or not guilty.

3        Count 28.  April 26, 2000.  Unlawful wire transaction.

4    Wire transfer of $35,569.27 from an account opened in the

5    name of Global Dominion Investments, Bank Crozier,

6    St. George's, Grenada to an account opened in the name of

7    From The Heart Foundation at US Bank Seattle, Washington.

8    And a box to mark guilty or not guilty.

9        29.  May 2, 2000.  Unlawful monetary transaction.  Wire

10    transfer of $150,000 from an account opened in the name of

11    Global Dominion Investments at Bank Crozier, St. George's,

12    Grenada to an account opened in the name of Hulaman

13    Management Services escrow account at US Bank, Seattle,

14    Washington.  And a box to mark guilty or not guilty.

15        Count 30.  April 22, 2000.  Unlawful monetary transaction.

16    Wire transfer of $120,000 from an account opened in the name

17    of Global Dominion Investments at Bank Crozier, St. George's,

18    Grenada to an account opened in the name of From The Heart

19    Foundation.  And a box to mark guilty or not guilty.

20        31.  May 24, 2000.  Unlawful monetary transaction.  Wire

21    transfer of $100,000 from an account opened the name of

22    Global Dominion Investments at Bank Crozier, St. George's,

23    Grenada to an account opened in the name of Cornerstone

24    Institute escrow account at US Bank Seattle, Washington.  And

25    a box to mark guilty or not guilty.

1          32.    Count 32.    May 24, 2000.    Unlawful monetary

2    transaction.    Wire transfer of $50,000 from an account opened

3    in the name of Global Dominion Investments at Bank Crozier,

4    St. George's, Grenada to an account opened in the name of

5    Cornerstone Institute at US Bank, Seattle, Washington.    And a

6    box to mark guilty or not guilty.

7          And then the verdict form is dated this blank day of

8    November 2008, to be signed by the foreperson.

9          All right.    Ladies and gentlemen, you have now been

10    instructed on the law.    You have had the verdict form recited

11    to you.    I would now ask you to kindly direct your attention

12    to Mr. Letey, who will deliver the closing argument on behalf

13    of the government.

14          MR. LETEY:    May it please the Court, Counsel, members

15    of the jury.

16          On July 15, 2002 Nolon Bush left the United States for

17    Poland.    And in his wake he left broken trust, depleted

18    savings, diminished home equity, and empty retirement

19    accounts.

20          There is only one real issue in this case.    Did Nolon Bush

21    intend to deceive the investors of this $35 million he took

22    and spent as he pleased?    The answer to that question is

23    absolutely he did.

24          How did it start?    Hulaman Management Services.    Nolon

25    Bush was living in a two-bedroom condo in the SeaTac area.

1    He had no money and was moving from one multi-level marketing

2    program to the next.   Then in December of 1998 he began

3    selling investments.   An IFR trust for Larry Wilcoxson of

4    Modesto, California.   He told investors a high probability of

5    25 percent return for every four to six weeks.   He told the

6    investors it was risk free.   He told them their money would

7    never leave the bank.   And he told them that it was

8    guaranteed.

9        But he knew the money was going to leave the bank.   He

10   knew that he was going to spend two-thirds of the money as he

11   pleased.   But he didn't stick with Larry Wilcoxson very long.

12   He shifted to Carolyn Mintus.   Yet the offering remained the

13   same.   25 percent return every four to six weeks guaranteed.

14   Your money will never leave the bank.

15       Besides his verbal representations, he sent fraudulent

16   account statements.   Account statements prepared by Tammy

17   Stuckey.   Tammy Stuckey testified that she went to work for

18   Nolon Bush while they were still living at the condominium.

19   She was paid $1,000 a week cash stuffed in an envelope.

20       She did as Nolon Bush instructed.   He's the one that

21   determined how much money to put on the account statements.

22   But he knew there were no profits.   He knew where the money

23   was going.   He was spending it.

24       And in addition to the account statements, he also sent

25   the investors checks.   Those investors that wanted their

1   money right away, he sent them their dividend checks earning

2   25 percent.

3       The purpose of these statements and these checks?  To

4   excite the investors.  What would the investors do?  They

5   would invest more money.  They would tell their friends.

6   They would they their family members.  They would tell the

7   members of their church.  And they would tell their

8   co-workers.  And they, too, would invest.

9       He recruited financial planners.  Financial planners like

10  the Websters.  These were his front line to the investors.

11  And they're the ones that sent the newsletters later on after

12  the investment was failing.

13      During this time of Hulaman Management Services, Nolon

14  Bush raised in excess $9.5 million.  That was from December

15  of '98 to September of 1999.  What did he do with the money?

16  He invested less than one-third of it.  He spent the rest as

17  he pleased.  He purchased View Park Estate.  He bought

18  artwork.  He bought the suite at Safeco.  He bought a suite

19  for the Seahawks stadium.  And then he paid back investors

20  some of the money.  The appearance?  The investment's

21  profitable.  He was a successful businessman.  And this all

22  went towards the deception.

23      But then Hulaman ended.  It shifted to Global Dominion

24  Financial Services.  This is when it became more secretive.

25  Files were shifted to Scott Grant's office in Coronado, the

1    phones were sent to Nevis, and the bank accounts were
2    overseas.
3        But he continued to promote from View Park and from Safeco
4    Field.  He continued to tell investors the money would never
5    leave the bank.  Guaranteed return.  25 percent per trade.
6    And he continued to send the account statements.  He didn't
7    tell the investors of the failure of Carolyn Mintus.  No.  He
8    continued to raise money.  And between October of '99 and May
9    of 2000, he raised in excess of over $20 million.
10       Once again, one-third of that money was invested.  But
11   most of it was stolen.  About 1.5 million went towards the
12   improvement of his home that he purchased.  About one-third
13   went back to the investors.  More for the Mariners.  And the
14   appearance continued.  The appearance of success.  He had the
15   suite.  He had the home.  And the investors had their money.
16       This time, though, the investors' money was going
17   offshore.  But he had to get the money back somehow to spend.
18   That is where the money laundering counts come in.  Those are
19   Counts 18 through 32.  Between December of 1999 and May of
20   2000, almost $2.5 million was transferred back to accounts
21   controlled by Nolon Bush and Marilyn March in the U.S.  This
22   money came from accounts overseas where the investors had
23   sent their money.
24       Then Ron Henderson from the FBI called in April of 2000,
25   and Global Dominion started to wrap up.  By May of 2000, it

1    shut down.  But the investor contact didn't end.  He needed

2    to continue to lull the investors.  He had all the angry

3    phone calls coming.  They maintained that they were going to

4    Nevis.

5        And then you had the newsletters from the Webster's.  Why

6    did he need to do that?  He needed to do that to keep the

7    investors at bay.  Those newsletters are the basis for Counts

8    8 through 11 and Count 14.  These are the e-mails from the

9    Webster's to Dorothy Hostetler.  The basis of these e-mails?

10    March 15, 2001, 150 percent bonus dividend.  This was if

11    investors agreed to keep their money in until March 15, 2001,

12    he would give them a 150 percent dividend.  This is a number

13    that Nolon Bush came up with.

14        September of 2001 the Nevis office shuts down.  Investors

15    are left holding the bag.  They don't know what to do.  There

16    is no one to get a hold of.  But that doesn't stop Nolon

17    Bush.  He has to continue.  He has to raise money.  This is

18    what he's doing for a living.  This is what he's living on.

19        So it becomes just the Mexico resort.  And this is

20    Cornerstone Institute.  July 27, 2000 he signs the deal with

21    Doug Stephan to contribute $800 million towards the

22    development of the resort in Mexico.  This is two weeks after

23    the 150 percent dividend goes down.  He doesn't have the

24    money to pay the investors at the time, yet he's committing

25    $800 million to a resort in Mexico.

1    He begins to promote the resort through Mike Shanahan.

2    Because it was different than the Carolyn Mintus investment,

3    the story changed a bit.  This time the lies were

4    construction is almost complete.  Of course, construction

5    hadn't started.  Or even that they had purchased the land, of

6    which none of those had actually occurred.

7    He didn't tell investors that he was hundreds of millions

8    of dollars behind in his payments.  He had only paid

9    $1.9 million of the $800 million that he committed.  And he

10   defaulted on the payments in the first four months.

11   From June 2000 to January of 2002, Nolon Bush raised in

12   excess of $5.7 million.  And, once again, a third goes

13   towards investments and the rest is diverted to spend as he

14   pleased.

15   An example of this is Starla Ryan.  Special Agent Breed

16   testified about what happened to Starla Ryan's last $40,000

17   in January of 2002 when she invested.  The bank account that

18   it went into had $4.00 in the account when her money was

19   deposited.  Over 36,000 of that was transferred to another

20   account of Nolon Bush's that had very little money in it.

21   Almost $10,000 was withdrawn in cash of that money.  The rest

22   to pay utility bills.  To pay Pete Herald, the chef.  This

23   was money that Nolon Bush was living off of.  The house of

24   cards came crumbling down.

25   March 7, 2002 he's kicked out of the Mexico resort project

1  because he can't contribute the money that he's obligated to

2  do.

3      June 2002.   Foreclose proceedings begin on View Park

4  Estate.

5      July 15, 2002 Nolon Bush leaves the country never to come

6  back.  Most investors never hear from him again.  A few do.

7  And those that he does talk to, he wants more money from

8  them.

9      How do we know that Nolon Bush told the investors at

10 Hulaman and Global Dominion that their money would never

11 leave the bank?  That he was going to pool it into $1 million

12 and then immediately invest it?  Or the guaranteed rate of

13 return that he promised?  Or that it was completely safe and

14 that they were earning dividends?  We know this from the

15 investor that testified.

16     We heard from Dr. Robert Mansueto, the dentist from

17 Coronado.  He met Nolon Bush in June of '99.  He met him

18 through Scott Grant.  Nolon Bush told him the money would

19 never leave the bank.  It was absolutely safe.  He invested

20 money.  A month later he receives an account statement

21 showing his increased balance.  A month later he gets a check

22 back for the dividend for what he thinks is a return on

23 investment.  He invests more money.

24     We heard from Dave Velander.  David Velander, an attorney

25 from Kentucky, he invested $100,000 in March of 1999.  He'd

1    been told by Nolon Bush the investment was in mid-term notes.

2    Very successful.   No risk.   May 1999 he gets a check for

3    $25,000 from Nolon Bush.   He believes it's working.   He

4    invests more.   In total, David Velander invested

5    $1.85 million.

6       And then we heard from Donald Fisher.   Donald Fisher lived

7    in Everett at the time he invested, but now he is a retired

8    individual.   He is responsible for accounts -- his are Count

9    3 and Count 17 of the indictment.   He heard Nolon Bush speak

10    at a presentation.   Nolon Bush talked about an offshore

11    investment.   8 percent guaranteed where he could get up to 50

12    percent return.   It was a high-yield, short-term investment.

13    Mr. Fisher refinanced his home.   Pulled out equity and

14    invested that money.   He got account statements back showing

15    his increased value.   What did he do?   Told other people

16    about it and they invested as well.

17       Judith Allison from Seattle.   That's Count 7 of the

18    indictment.   She learned of the investment through a friend.

19    She attended a presentation where Larry Webster spoke.   He

20    said 8 percent guaranteed.   One-year investment.   25 percent

21    percent per turn return.   She invested $15,000.   She did get

22    her share certificate a short time later.   The balance on her

23    share certificate had gone up by over $8,000.   She'd already

24    thought she'd made money.   She invested another $20,000.

25       And we also heard from Cody Bly.   He was in Canada when he

1  invested.  He learned of the investment from Rick Felton.  He

2  invested $10,000.  He gets an account statement showing an

3  increased value of 26 percent.  $2,600 on this $10,000

4  investment.  He's thinking about investing more.

5      He has a friend that comes with him to Port Orchard to

6  meet Nolon Bush.  His friend has a large amount of money and

7  he's thinking about a investing large amount of money.  He

8  meets with Nolon Bush.  He's told the property is the embassy

9  of Nevis.  He sees the golf course.  He sees the house.  He

10  sees that Nolon Bush is a very wealthy man.  He isn't told

11  that the money will never leave the bank.  He's told that

12  Global Dominion Financial Services is a bank.  Nolon Bush

13  provides him a chart showing that in two years a $1 million

14  investment would be worth $868 million.

15      Cody Bly left and eventually invested another $15,000.

16  That was $15,000 he didn't have.  He had to borrow some of

17  that from family members.

18      We also heard from Greg McCormick.  Greg McCormick is

19  Counts 2, 4 and 16 of the indictment.  He's from Spokane

20  Valley.  He learned of the investment from Tammy Stuckey, the

21  person who created the account statements for Nolon Bush.  He

22  meets Nolon Bush at the suite at the Mariners.  He's promised

23  an 8 percent return guaranteed.  25 percent likely.  The

24  principal will never be in jeopardy.  He used retirement

25  savings in order to make his investment.  He made three

1    investments.   We heard from William Miertschin.   William

2    Miertschin was from Texas.   He invested $100,000 with Nolon

3    Bush.   But he still wanted to meet him.   And he came to View

4    Park and he met him in 2000.   Nolon Bush told him that it was

5    a trading program.   Trading was imminent.   And the money

6    would never leave the bank.   And that it was insured.   And

7    that he had done this successfully for several years.   At

8    this point -- this is February of 2000 -- Nolon Bush

9    testified that he was expecting a payment from Carolyn Mintus

10   in early '99.   William Miertschin is one of the people that

11   talked to Nolon Bush after he had already gone to Poland.

12   When he talked to Nolon Bush, Nolon Bush asked for more

13   money.

14        We heard from Ray Donohue from Gig Harbor.   Those are

15   Counts 5, 6, and 15.   He learned of the investment from a

16   member of his church.   He was told by that person that other

17   members of the church had invested.   He was told there was a

18   9 percent guarantee and it was a 12- to 13-month investment.

19   He was told there is urgency in his investment, though,

20   because the minimum investment was set to go up to $100,000.

21   That's $100,000 that Ray Donohue didn't have.   So he got his

22   money in early and made the $25,000 investment.

23        We also heard from John Morris.   John Morris is from

24   Texas.   He's the individual that recorded the telephone calls

25   with Larry Webster.   In those telephone conversations, Larry

1    Webster told him that in 1999 there had been eight

2    transactions.  Seven of them had paid 25 percent and one of

3    them had paid 26 percent.  He was told that it was guaranteed

4    9 percent.  And Larry Webster also explained to him the

5    levels of investment.  If he invested $1 million, 50 percent

6    per month.  If he invested $10 million, it's 70 percent

7    month.  John Morris invested $25,000.

8        We then heard from Ken Marshall.  Ken Marshall was from

9    St. Louis, Missouri.  He flew from Spokane -- or he flew to

10   Spokane to meet with Rick Felton.  Rick Felton told him about

11   the levels of investment much like Larry Webster had told

12   John Morris.  $1 million investment.  50 percent return per

13   month.  While he was there Ken Marshall met with investors

14   who had already invested.  They told him about the account

15   statements.  They told him about the money that they had

16   gotten back.

17       He travels back to St. Louis.  He's thinking about

18   investing.  But before he does that, he wants to meet Nolon

19   Bush in person.  He flies to Seattle.  Goes out to View Park.

20   Plays golf while he's waiting.  He's an avid golfer.  Nolon

21   Bush tells him about the $1 million investment.  50 percent

22   return per month.  Consistent with what Rick Felton told him.

23   He contributes that $1 million.  550,000 of it is his.

24       And then there's the Cornerstone Institute investors.  We

25   heard from Dave Franke and Starla Ryan.  This is towards the

1  end.   Dave Franke is Counts 12 and 13.   He's from central

2  Oregon.   He learned of the investment through Mike Shanahan.

3  Mike Shanahan told him that he had done business with Nolon

4  Bush for 20 years.   He told him the property had already been

5  purchased and it's for the Mexico project.

6      He makes two investments.   One for $25,000 thousand.   One

7  for $20,000.   He then meets Nolon Bush later the summer of

8  2001.   Fall of 2001.   Nolon Bush spreads out on the table at

9  the restaurant the plans for the resort.   He tells him that

10  the property has been purchased in Mexico and they're ready

11  to break ground.   He wants more money.

12      And then there's Starla Ryan.   She's the last investor we

13  talked to.   Starla Ryan learned of the investment from Mike

14  Shanahan as well.   She had gone to Michael Shanahan because

15  of the tax problems that her deceased husband got into with

16  the trust that he had purchased.   During that they talked

17  about an investment opportunity.   And Nolon Bush calls her

18  up.   Nolon Bush tells her he's building a resort in Mexico.

19  Phase one is almost complete.   She invests $40,000 from life

20  insurance money.   He tells her that phase one is almost

21  complete.   He doesn't tell her that construction hasn't

22  begun.   He doesn't tell her that they don't even own the land

23  that the resort's going to sit on.   And he doesn't tell her

24  that he's $100 million behind in his payments.

25      She gets an account statement showing that 40 grand has

1   earned $4,500.   A little while later she gets another call

2   from Nolon Bush.   He says that they just need a little bit

3   more money for infrastructure.   Phase one is almost complete.

4   She invests $40,000 more money.   By this point they still

5   haven't broken ground.   Still haven't started construction.

6   Still don't even own the land.   And at this point Nolon Bush

7   is $300 million behind in payments.

8        How do we know that he lied to investors?   When he said

9   the money would never leave the bank.   When he said he would

10  invest the money as soon as he accumulated $1 million.   And

11  that he lied when he said that the investment was completely

12  safe.   In fact, they were not earning dividends.

13       We heard it from other witnesses.   You heard it from Agent

14  Carrie Breed.   She testified that only about a third of the

15  money that was raised ever went towards an investment.

16  8.7 million was paid back to investors.   But it didn't come

17  from a return on investment.   There were no returns from

18  Larry Wilcoxson.   And only $53,000 from Carolyn Mintus.   In

19  fact, David Velander alone received more than $53,000 in

20  dividends back.   All the remaining dividends that Nolon Bush

21  paid to investors came directly from new investors' money.

22  He was robbing Peter to pay Paul.   The rest of the money he

23  took and spent.

24       How else do we know that he lied about how -- what he was

25  he was going to do with the money?   Ajit Simha.   Ajit Simha

1    was the manager of the office in Nevis.  He testified that he

2    received instructions from Scott Grant and Nolon Bush to

3    transfer large amounts of -- wire large amounts of money to

4    their respective accounts.  And he also knew that the money

5    was coming from the investors.

6    　　　We also heard from the people who got the money.  There is

7    the View Park Estate.  We heard from Joe Ladley, the person

8    who sold the house for $1.8 million.  We heard from the

9    people that did construction.  We heard from the plumber.

10   The framers.  The interior designer who oversaw the remodel.

11   Over $3.8 million was spent on View Park Estates.

12   　　　The defense would have you believe that View Park Estates

13   was for charity.  Well, we know this isn't true because we

14   know who Marilyn March talked to.  The two people that she

15   knows the best for the purpose of View Park Estates, the real

16   estate agent that sold them the property and the interior

17   designer who oversaw the remodel.  Marilyn March told Patty

18   Rief, the real estate agent, the purpose was to impress

19   clients and that she wanted a different piece of property

20   that was going to be used as a shelter.  Michael O'Neill.

21   Marilyn March said she intended to live there and that she

22   wanted to impress clients.

23   　　　We also heard from the View Park staff.  We heard from the

24   personal chef.  He was paid in cash.  We heard from the

25   masseuse.  Paid in cash $700 a week.  And Nolon Bush received

1    a 90-minute massage every week.

2        We you heard from the head of security.  We also heard

3    from Lorelei Tarsiuk, the administrative assistant who was

4    paid $125,000 a year to be Nolon Bush's personal assistant.

5    Paid to an offshore account.

6        We heard about the condo that was purchased in Tennessee

7    for his daughter.  The Dodge Durango paid for with investor

8    money.  The Ford truck paid for with investor money.  Over

9    $600,000 to the Mariners for the luxury suite and Diamond

10   Club seats.  Over $90,000 to the Seahawks for tickets to the

11   Seahawks.  There's the artwork.  The Harley Davidson.  The

12   Cadillac.  And over $40,000 to Richard Cox for debugging.

13       The defense would have you believe that Nolon Bush

14   intended to pay the investors back with $800 million that he

15   received from Carolyn Mintus and that he believed this.  Even

16   if he did believe this, he's still guilty.  Still guilty

17   because he lied to the investors to get their money in the

18   first place.

19       The jury instructions state that good faith is a complete

20   defense to intent to defraud.  But the instructions also

21   state that a belief that an investor will be repaid in the

22   future does not make it good faith if there is intent to

23   defraud.  Additionally, the instruction states reckless

24   disregard for the truth is inconsistent with good faith.

25       Nolon Bush intentionally lied to the investors to get

1    their money.  He didn't act in good faith when he spent their

2    money.  And he did not act in good faith when he didn't tell

3    them that Carolyn Mintus was failing.

4        Nolon Bush's actions also show that he did not really

5    believe that he was going to get paid from Carolyn Mintus.

6    Nolon knew before he got into this that most high-yield

7    promoters were frauds.

8        The first person he got involved with was Larry Wilcoxson.

9    He told Vicki Webster that Larry Wilcoxson had been searched

10   by the FBI.  What was his response to that?  He moved the

11   operations to Scott Grant's office and overseas.

12       Vicki Webster told him that she did a search on Carolyn

13   Mintus on the Internet and found on a fraud website that she

14   was a non-performer.  His response to her?  Don't believe

15   everything you read.

16       And then you have Douglas Stephan.  Douglas Stephan meets

17   her.  She talks about a development that she had been

18   involved with.  He knew it was not true.  He tells this to

19   Nolon Bush afterwards.  His response?  He just blows it off.

20       All the while he's been expecting money from Carolyn

21   Mintus since early 99.  And he couldn't believe that the

22   Mexico project was going to work because he still needed the

23   money from Carolyn Mintus in order to make that investment.

24       There are also other actions of Nolon Bush that speak

25   volumes.  The CIA-quality enigma devices to conceal and

1    scramble the phone calls.   Richard Cox repeatedly coming out

2    to the house to debug.   Nolon Bush would have you believe the

3    purpose of that was because the place was going to be a

4    shelter and it was to protect the people that were staying

5    there.   Yet the first time Richard Cox came to debug, it was

6    at the condo.   He debugged Grant's office.   And he even

7    debugged Nolon Bush's car in June of 2000.

8         There is a letter he received from the Washington State

9    Department of Financial Institutions.   This is notice that

10   maybe he's selling a security.   What does he do?   He gives

11   the letter to Glenn Stoll to respond.   And his response?

12   Nolon Bush is not connected to Hulaman Management Services or

13   Cornerstone Institute.

14        In April of 2000, Ron Henderson of the New York FBI calls.

15   Lorelei Tarsiuk takes the phone call.   He wants to talks to

16   Nolon Bush.   She takes a message.   She tells Nolon about it.

17   His response?   Contact Glenn Stoll to find out how to

18   respond.   Not I am going to talk to Ron Henderson.   I'm

19   expecting money from Carolyn Mintus.   Maybe she's a fraud.

20   Maybe I can -- he can help me get my money back for my

21   investors.

22        And then we also have cash withdrawals.   $1.4 million in

23   cash withdrawals.   Many of which were in $9,000 increments.

24   He would have you believe that's a week's worth of expenses

25   at View Park, yet in December of 1999 alone he withdraw

1    $81,000 in $9,000 increments.

2        And then, of course, there's payments to investors.  Part

3    and parcel to the Ponzi scheme that this was, he had to pay

4    off the investors to keep them happy even though he wasn't

5    getting a dime from the investments.

6        The defense also relies on the claim that he relied upon

7    his attorney.  The attorney tells him, if you call it a loan,

8    it's a loan.  But that's simply not what investors were told.

9    Why?  Because if he told investors that he had planned to

10   take two-thirds of the money and spend it as he pleased, they

11   would not have invested.  They testified to it.  And it's

12   common sense.

13       The judge has read you jury instructions on securities

14   fraud, wire fraud, mail fraud, and unlawful monetary

15   transactions.  A person commits security fraud when there is

16   a scheme to defraud in connection with the sale of a security

17   using interstate commerce for the purpose to defraud the

18   investors.  That second element, in connection with the sale

19   of a security, it includes an investment contract.  And there

20   is a definition of an investment contract provided.  And

21   investment of money and common enterprise with profits to

22   come solely from the efforts of others.

23       That's what happened with Starla Ryan's money.  Starla

24   Ryan gave the money to Nolon Bush.  It was based upon Nolon

25   Bush's efforts that there was going to be profit from this

1    investment based upon other people's actions.  She was not

2    going to be the one digging in Mexico.

3         Additionally, in the security section it states need to

4    show that the products were securities.  Not that Nolon Bush

5    knew them to be securities.  Just because you believe that

6    doesn't mean it's not a security.

7         There is overwhelming evidence that Starla Ryan's

8    investment was a security.  And it was securities fraud.

9    There is no question that he intended to defraud her.  He

10   knew that they were -- that the resort had not begun

11   construction.  He knew they didn't even own the land.  He

12   knew they hadn't started construction because they didn't own

13   the land.  And he knew he was $300 million behind in payments

14   on the resort.  And then what did he do with her money?  He

15   spent it.  Didn't spend a dime of it on the resort.

16        Wire fraud.  A person commits the crime of wire fraud when

17   there is scheme to defraud, there's a promise or statements

18   that are material made, acts with intent to defraud, and uses

19   out wires to carry out the scheme.  Additionally, it states a

20   wire communication is caused when one knows that wires will

21   be used in the ordinary course of business or when one can

22   reasonably foresee the use.

23        Those wires from the investors to make their investment in

24   the e-mails from the Webster's to Dorothy Hostetler, those

25   were in the ordinary course of the scheme.  And they

1    certainly should be foreseen.  They were foreseen by Nolon

2    Bush.

3         There is overwhelming evidence of the material

4    misstatements that were intended to defraud.  The use of the

5    money.  He gave the appearance of being a successful

6    businessman running a successful investment.  But that money

7    came from investors.  That's what the basis of his appearance

8    was -- the investor money.

9         He said the money would never leave the bank.  We already

10   know the money left the bank.  He said the investment was

11   guaranteed.  The investment wasn't guaranteed.  And then

12   there was fraudulent account statements to help induce people

13   to invest more money and tell other people about it.  And

14   then he just spent the money.  All of this shows his intent

15   to defraud.

16        The crime of mail fraud.  Very similar to wire fraud.

17   Same elements except instead of the use of wires, use of the

18   mails.  And there is also the same language about causation.

19        The mail communication is caused when one knows that the

20   mails will be used in the ordinary course of business or one

21   can reasonably foresee such use.  The mailings to the

22   investors and from the investors, that was in the ordinary

23   course of the scheme.

24        There is also overwhelming evidence of the intent to

25   defraud.  Still his claim of never leaving the bank,

1  guarantee of investment, fraudulent account statements, how

2  he spent the money on himself all showed his intent to

3  defraud.

4      Then there's the unlawful monetary transactions.  That is

5  when he knowingly engaged in a monetary transaction of over

6  $10,000 involving the proceeds of a criminal offense.  The

7  transactions occurred in the U.S.  Involved interstate or

8  foreign commerce.  The definition also says it is sufficient

9  for the government to show the funds came from an account in

10  which the funds were commingled with other funds.

11      Here again the evidence overwhelming.  The money transfers

12  came from the Caribbean.  Accounts where the investor funds

13  were sent to.  And where did it come back to?  Accounts

14  controlled by Nolon Bush and Marilyn March.

15      The evidence in this case proves beyond a reasonable doubt

16  that Nolon Bush deceived the investors to get a hold of their

17  money.  He lied to the investors when he said the money would

18  never leave the bank.  He lied to them when he sent them

19  account applications showing that their investment would be

20  held in trust.  He lied to them when he sent them trust

21  agreements saying all of their funds had been deposited.  He

22  lied to them when he sent them the fraudulent account

23  statements.  And he took two-thirds of their money and spent

24  it as he pleased.  He spent it on a house.  He spent it on

25  personal staff.  He spent it on luxury suites.  He spent it

1    on cash.   And he spent it on vacations.

2        In the making these false assertions Nolon Bush sold

3    securities, used the mails, used the wires, and wired money

4    back to his bank account.   Accordingly, we ask that you find

5    him guilty.   Guilty of securities fraud, guilty of wire

6    fraud, guilty of mail fraud, and guilty of money laundering.

7    Thank you.

8        THE COURT:   Thank you, Mr. Letey.

9        Now, ladies and gentlemen, if you would kindly direct your

10    attention to Ms. Olson, who will deliver the closing argument

11    on behalf of Mr. Bush.

12        Ms. Olson.

13        MS. OLSON:   Thank you, Your Honor.   Please the Court,

14    Counsel, Mr. Bush, ladies and gentlemen of the jury.

15        First of all, I want to thank you on my own behalf and on

16    behalf of Nolon Bush for committing your time and spending

17    the last two and a half weeks here in this courtroom

18    listening to the evidence.   Every time we've looked at you

19    we've noticed you intently watching the witnesses, reading

20    the documents, and taking notes.   There is nothing more that

21    we can ask from you in your service here as jurors.

22        As I said in my opening, there is nothing to me that is

23    more amazing and incredible than our American judicial

24    system.   Our justice system that allows a man like Nolon Bush

25    to walk into this courtroom every day an innocent man and to

1    face the evidence put on by the government as they attempt to

2    convince you that he is no longer innocent.

3        And it is you who are his judges and who will determine

4    whether or not he loses that cloak of innocence.  And the

5    term is jury of his peers.  And he knows that you are a jury

6    of his peers because he is just like you.  He is a person who

7    has had successes and failures in his life.  Who has had

8    dreams that were realized and dreams that were dashed.  Who

9    made bad decisions and good decisions.  Who made good

10   investments and who made poor investments.

11       And so, again, there is nothing more we can ask of you but

12   to judge him fairly and to apply the law that Judge Leighton

13   has given you through the jury instructions.

14       I think the last couple of weeks you've seen a whole

15   number of stories being told up there on the witness stand.

16   And they kind of weaved together and they sort of become a

17   picture.  The government sees a picture of a villain.  Of a

18   con man.  Of somebody who lied to folks.

19       We don't see that at all.  When we put the pieces together

20   kind of like a quilt where you take pieces of material with

21   different colors and you put them together and you stand back

22   and you look at it and you see a picture, when we do that,

23   when we put the pieces of stories together, we don't see a

24   villain at all.  We see a man with good intentions.  A man

25   who had humanitarian goals and ideals and who wanted to

1    create something in Mexico.  Not just a resort, but a place

2    for poor people to have job.  That's what we see when we put

3    it together.

4        And those stories start first with a group of men.  Three

5    men.  Duane Christy, whose whole idea it was to begin with to

6    have a resort in Mexico.  He joined with Nolon and with Doug

7    Stephan.  And they divided up jobs and they worked on this

8    project.

9        Then there was the stories of the people that worked with

10    Nolon Bush to help with the financing.  That was his job, was

11    to get financing.  People like -- you never met Larry

12    Webster, but you met Vicki Webster.  And that he talked about

13    what she did and how she became committed.  And she believed

14    in the same goals that Nolon Bush had.  And she went out and

15    talked to people.  And how that worked out for her?  Badly.

16        And we heard stories of -- finally, the primary story here

17    is that of Nolon Bush and Marilyn March who met each other,

18    had the same religious beliefs, the same religious

19    convictions and the same humanitarian goals and who joined

20    forces and to try to make something happen.  And they failed

21    as well.

22        And the final little piece here is the story of a lawyer

23    and his son -- Nigel Scott Grant, Nicholas St. James -- who

24    had a vision of creating this little business empire in the

25    Caribbean.  A little Island of Nevis.  Also failed.

1    Ladies and gentlemen, this is a criminal case.  This isn't

2    a mini series.  This isn't a plot for a TV series.  This is

3    real life.  And the government is saying that Nolon Bush is

4    guilty of criminal conduct as he was engaging with these

5    people.

6        One of the reasons we believe that the government is able

7    to amass so much information here is that Nolon didn't hide

8    things.  Everything was right out there in the open.  And one

9    of the problems that people had when they were dealing with

10    Nolon was they didn't go further and they didn't ask more

11    questions.  They didn't ask the kind of questions that they

12    could.

13        The investor/lenders, they were motivated by greed.  They

14    said -- Mr. Bly said that specifically.  They were motivated,

15    as John Morris said, by trying to get rich quick.  And,

16    ladies and gentlemen, we all know that is not possible.

17        The government has the burden of proving to you each and

18    every element of each and every one of the 32 counts beyond a

19    reasonable doubt.  This is a very high burden.  It is much

20    higher than saying to you the evidence is overwhelming.  No.

21    You must, all of you together, sort through the evidence and

22    look at each and every one of those elements to determine

23    whether each and every one of them has been proven beyond a

24    reasonable doubt for each and every one of the 32 counts.

25        We can look at the instructions for mail fraud.  The first

1    element of mail fraud is that the defendant knowingly

2    participated in a scheme or a plan.   Nolon Bush did not

3    participate in a scheme.   He participated in a program to get

4    funding for the Mexican resort at San Quintin.   This was not

5    a scheme.

6       The first element goes on.   A scheme or a plan to defraud

7    in order to obtain money.   It wasn't to defraud.   It was to

8    fund a project that had two goals.   Humanitarian and a

9    resort.

10      The second element is that the scheme to defraud was

11   material and that it would reasonably influence people to

12   part with their money.   He believed in this project.   It was

13   a real project.   Even Harrison Fagg and Doug Stephan

14   testified that this was a good opportunity.   This was

15   something real.   This was not a scheme to defraud.

16      That he acted -- the third element.   He acted with the

17   intent to defraud.   Regardless of what the government tells

18   you, we don't see the evidence that he intended to defraud

19   anyone.   And you can go through each one of the charges.

20   Count 1 charges Mr. Bush with securities fraud.   The first

21   element of that offense is that the defendant used a device

22   or a scheme to defraud someone.   Again, the word scheme.   Not

23   a scheme.   The program.

24      That the defendant's act or failure to disclose was in

25   connection with the sale or purchase of a security.   You

1    heard Mr. Bush when he was testifying probably say more than

2    once this paperwork speaks for itself.   And it did.   It said

3    in plain language, in capital letters, this is not a

4    security.   What is this? A promissory note.   Not a security.

5    That element is not met.

6        The fourth element is that the defendant acted for the

7    purpose of defrauding buyers and sellers of a security.

8    Again, he was not buying and selling securities.   So he had

9    no intention to defraud anybody.   Making those types of

10   purchases.

11       Instruction 17 defines security as including an investment

12   contract.   Again, Nolon Bush was not dealing in investment

13   contracts or securities.   It was promissory notes.   He was

14   asking people to lend him money.   Allowing him to invest the

15   money.   Obtain a return for the lender in addition to the

16   principal and put part of it with the lender's account and

17   the rest of it to fund the San Quintin project.

18       Counts 15 through 17 deal with mail fraud.   Part of those

19   counts are the newsletters that were sent by Larry and Vicki

20   Webster through the Internet.   Nolon testified he never saw

21   those newsletters.   He didn't do Internet.   He didn't do

22   e-mail.   He didn't know anything about that.   He was talking

23   to the Webster's.   And apparently they on their own, their

24   own motivation, their own drive, because remember they were

25   getting money for this, they were sending out these e-mails.

1    Nolon Bush did not authorize that.  He didn't tell them why
2    don't you send everybody an e-mail today because there's
3    something -- let's all tell them 150 percent?  You heard him
4    testify that he was surprised to find out what people were
5    saying in connection with his program, in putting together
6    his program, putting it out and giving people the opportunity
7    to invest.
8        Instruction 20 talks about the good faith.  The good faith
9    is a defense to fraud.  And we believe, ladies and gentlemen,
10   that that is what this case really is about.  Not Nolon
11   Bush's intent to defraud, but Nolon Bush's good faith in
12   trying to meet a dream that he had.
13       Instruction 22 instructs you that Counts 18 through 32
14   deal with unlawful money transactions.  The third element of
15   this offense says that you must find beyond a reasonable
16   doubt that Nolon Bush knew that the monetary transactions
17   involved the proceeds of a criminal offense.
18       Ladies and gentlemen, I didn't hear anything that proved
19   to me at all, much less beyond a reasonable doubt, that Nolon
20   Bush had a clue he was engaging in criminal activity or a
21   criminal defense.
22       Instruction 24 deals with aiding and abetting.  So if he
23   did not himself commit the offense, then maybe he aided and
24   abetted somebody else who committed the offense.  And that
25   instruction tells you it is not enough for the defendant

1    merely to associate with the person committing the offense or

2    unknowingly and unintentionally doing things that were

3    helpful to that person.

4         Well, being present at the scene of the crime, that's not

5    enough to find that he aided and abetted somebody else.   He

6    has to be involved.   He has to know.   He has to be as

7    committed as the person who is actually committing the

8    offense.

9         So, ladies and gentlemen, let me review with you the

10   evidence that I believe, that Nolon believes supports our

11   view, our picture of the stories that he is not a criminal,

12   but somebody who has a dream that went miserably bad.

13        The first thing that strikes me and has always struck

14   Nolon and I is he stands here by himself.   He didn't do any

15   of this all by himself.   He had a lot of help.   And, of

16   course, the person helped the most was Nigel Scott Grant.

17   The lawyer.   He met on with Nigel Scott Grant early on.   Told

18   him what he wanted to do.   And Nigel Scott Grant kind of took

19   it from there.

20        You heard Mr. Bush testify that -- when we were reading

21   through papers and I was asking him why did this -- why was

22   this clause in the paperwork?   And Mr. Bush said, you know, I

23   really don't know.   I left that to Scott.   How many times did

24   you hear that?   I left that to Scott.

25        Where's Scott?   He's not here, ladies and gentlemen.

1   Neither is his son Nicholas St. James.   Neither are anybody

2   else.   He stands here alone.   He certainly didn't act alone.

3        So let's now look at Nolon's story.   He started the family

4   of a dairy farmer.   So his first memories are of selling

5   things.   Selling dairy products.   Going around helping his

6   father delivering milk products.   He moved on to selling

7   cookware in college.   And cosmetics.   Seminars.

8        Mr. Bush has had a lifetime of sales.   And he has

9   preferred to do his selling where he has much more direct

10  contact with the customer.   Not working for, say, General

11  Foods where he's in an office.   No.   He prefers what is

12  called network marketing.   Where he can actually do hands-on

13  with the prospective customer.   He really enjoys that

14  person-to-person contact.   And that is where he has spent his

15  life.   His working life.

16       Mr. Bush is a deeply religious man, as you heard.   This is

17  his very first criminal offense in his 69 years of life.   And

18  he dedicated his life to Christ in 1973.   And he was so

19  serious about that that when he got involved with having to

20  fund this project in San Quintin the first thing that he

21  looked at was how to put a program together that would

22  incorporate his religious beliefs.   It is very important to

23  him that you remember the thousands of hours of Bible study

24  that he testified to and continues even today.   Defrauding

25  people, lying to people, stealing from people are not part of

1    his beliefs.  Not at all.  And up until right now he has

2    never been accused of that.

3        Nolon came to Washington in 1991, as you probably recall.

4    And his job was to promote and develop the Lite and Right

5    company, which was selling weight-loss products.  And it was

6    during that job that he met Marilyn March, who was first a

7    colleague, a short time as a lover, and then a companion and

8    partner.

9        They were attracted to each other because they shared so

10   many of the same beliefs.  They shared the same religious

11   beliefs and they shared the same conviction to helping the

12   less fortunate.  Nolon, of course, committed to his project

13   in Mexico.  And Marilyn committed to victims of domestic

14   violence.  Of course, this grew time over time.  And this

15   didn't exist in the early '90s when they first met each

16   other.  But the attraction and the strong bond that they

17   developed was something that was there from the beginning and

18   only grew stronger.

19       When ephedra was taken off the market, Lite and Right

20   folded.  Hence, Marilyn -- by the this time Marilyn and Nolon

21   were kind of working together as a team.  And they moved on

22   together to Travel Max, yet another network marketing company

23   that they preferred to do.

24       You know, you might stand back and look at all of this and

25   think to your self, gee, why would Nolon move from one

1    company to another?  Well, the only thing that I can say to

2    you is when you think about his testimony and the things that

3    he said to you and the things that he believed in, he likes a

4    challenge.  He likes a challenge of developing something new,

5    seeing it grow, and seeing what he can make of it.

6         In 1997, he met several people who changed the course of

7    his life.  He met Duane Christy, who was a partner in Century

8    21.  We all know what a big organization that is.  And Duane

9    Christy was the first person to tell him about the resort in

10   San Quintin.  It was Duane Christy's original idea.  Don't

11   forget.

12        And they got together with Doug Stephan, who wanted to

13   develop it.  And the three men entered into an oral

14   agreement.  Later, a few years later it became a written

15   agreement.  But it started out as an oral agreement.  As a

16   gentlemen's agreement.

17        Duane Christy was in charge of getting the land.  Doug

18   Stephan was in charge of development.  And Nolon was in

19   charge of financing.  That, ladies and gentlemen, was the

20   beginning of and goal towards everything that happened

21   thereafter.

22        Now, Nolon's job was to bring in about $800 million.  Not

23   a small sum of money.  Certainly nothing that he had been

24   involved in before, as he told you.  And so he wasn't sure

25   how to go about this.  So he looked around for advice.  The

1    first person, of course, that he would naturally go to is

2    Glenn Stoll.  An ecclesiastical lawyer.  Not a member of the

3    bar.  Practicing an entirely different kind of law.  Church

4    law.  He went to him and he asked for advice there.  And that

5    is where the idea of incorporating as a corporation sole was

6    born.

7        He talked with Scott Grant.  And Scott took over.  He

8    drafted the papers for him.  So first Nolon was incorporated

9    as the director of Cornerstone Institute.  Hulaman Management

10   Services was included in the incorporation papers as one of

11   the dba's, doing business as, and as well as any other

12   company that would be dedicated to fundraising.

13       We wonder whether or not Scott Grant was qualified.  When

14   you look at Exhibit No. 4016 that was admitted, which is

15   Scott Grant's resume, which is really pretty impressive, he's

16   got a Ph.D.  He has three LLMs, which is a master's of law

17   degree.  He's got a postgraduate diploma.  A juris doctorate

18   course in American law.  An equivalent in Mexico law.  And a

19   master's of art as well as a bachelor of science.

20       Well, really what caught Nolon's eye and what he

21   emphasized to us in his testimony was his personal

22   experience.  Extensive international experience in business

23   and banking with major transactional corporation.  25 years

24   involvement in computer services, offshore finance centers,

25   and international banking.

1     Who better to advise him, Nolon was thinking.  And so,

2   yes.  He relies on him.  He relies on him exclusively.  He

3   relies on him to the point that when Scott says, hey, let's

4   go offshore and go to Nevis and put everything there, Nolon

5   says sure.  Whatever you say.

6     And eventually Scott came, picked up all the files, took

7   them down to his office in California, and ran the business

8   out of there.  And really from that point on Nolon testified

9   he pretty much lost control of what was really going on.

10     Nolon inspired other people to help him.  The Websters,

11   for example.  Preston Knepp.  Rick Felton.  We didn't meet

12   those people.  But we met Vicki Webster.  She became

13   convinced.  She became convinced on her own.  She read the

14   same book that Nolon had read.  And that is in evidence, too.

15   You can take a look at it.  "The Creature from Jekyll

16   Island."  She understood the principals that Nolon was

17   talking about and she had an understanding of how this

18   financing program was supposed to work.  And her and her

19   husband, they committed to it.  And they talked to a lot of

20   people and they got a lot of people to participate.  And they

21   made quite a bit of money.  Almost $400,000.

22     There were other people.  Preston Knepp.  Preston Knepp

23   did quite well in assisting Nolon in bringing lenders.

24   Lender/investors.  He made almost $1 million.  Rick Felton

25   made about $80,000 and got a houseboat worth about $400,000

1    out of the deal.

2    So these people were not only motivated by sharing the

3    same goals.  They were motivated by making a little bit of

4    money as well.

5    And the kinds of things that they told people, as Nolon

6    said to you, he was not -- he didn't know that they were

7    telling people that he was related to President Bush.

8    Therefore, Nolon is rock solid.  As Nolon explained to you,

9    he is way down the line.  But he has never met either one of

10   Presidents and he hasn't met their immediate family.  He

11   hasn't gone to the family reunions.  He knows that he sees

12   his name in the 600-page genealogy book that his cousin put

13   together, but that's it.

14   As far as being the Ambassador of Nevis, Nolon was pretty

15   surprised about that.  It never even occurred to him to tell

16   somebody that he was Ambassador of Nevis.  And he'd never

17   seen the Nevis flag.  And it certainly didn't fly over the

18   resort, at the retreat at Port Orchard.

19   Yes.  A lot of money was collected.  And the government is

20   right.  A lot of money was spent.  But it wasn't spent

21   willy-nilly.  And we have to remember why Nolon felt he could

22   spend this money.  When he started getting the money he

23   first -- he needed someplace to put it.  Someplace to invest

24   it to make the profits that he needed to return to his

25   lenders and to put into funding for San Quintin.

1    So he first went to Larry Wilcoxson and gave some money.

2    The government says it's a little over $200,000.  You heard

3    Nolon testify that he didn't remember that it was that much

4    money, but here are the records.  His relationship with

5    Mr. Wilcoxson was very short lived because there was just

6    something a little funny about him and he did not trust him.

7    And so he moved on.

8    And he had heard about this woman Carolyn Mintus from Mark

9    Kaposi, who was her partner.  And so he checked her out.  And

10   he believed when he met with her and either active members or

11   retired members of the Federal Reserve, he really believed

12   this was the genuine thing.  This was the real McCoy.  She

13   had bank presidents vouching for her.  She had high-ranking

14   officials in big corporations vouching for her.  What more

15   could Nolon ask for, he thought.

16   And so when she said to him, don't worry about it, we've

17   got $800 million set aside, it's your money, keep it coming,

18   it's going to turn over, the returns are coming, if you need

19   to spend some money to buy the retreat, go ahead and buy it,

20   he believed her.  He didn't have any reason not to believe

21   her, as you heard him say time and time again.

22   And so he spent the money.  Marilyn wanted a place.  A

23   refuge for domestic violence victims.  Call it what you will.

24   But that's what they wanted.  That's what she wanted.  And

25   she wanted to remodel it.  Some of it was necessary.  There

1    were structure damages, as Nolon told you.  But the rest of

2    it was cosmetic.  She wanted a place where victims of

3    domestic violence could heal.  Could recuperate.  Could

4    recreate.  Where their children could come and play tennis.

5    Ride horses, what have you.

6        And, of course, it needed to be secure.  As anybody knows

7    about domestic violence shelters, the biggest danger is from

8    the abuser coming in.  Breaking in and harming the victim who

9    has finally gotten up the courage to leave.  Yeah.  They

10   needed the security.  And they needed a lot of it because

11   this was a lot of land.  And they needed different types of

12   security.

13       Marilyn, as you heard, was a victim of domestic violence

14   herself.  And so she got Cora.  Cora, the German Shepherd,

15   who was a guard dog and was dedicated to keeping Marilyn

16   safe.  That was necessary for her.  That was not a frivolous

17   expense.  And, again, Carolyn Mintus was telling him don't

18   worry about it.

19       Marilyn started her foundation.  The From The Heart

20   Foundation.  And that again was dedicated to raising money to

21   helping victims of domestic violence.  She got involved with

22   DAWN, another organization for domestic violence victims.

23   And she got involved with the Mariners.  The Refuse to Abuse

24   program.  Got involved with that.  That's what led to

25   purchasing the suite.

1    These were not, as the government would have you believe,

2    simply frivolous things to enjoy and to have a wonderful

3    lifestyle.   Everything that Nolon and Marilyn did, they did

4    to further their fundraising causes.   To further and improve

5    their humanitarian efforts.   That is what they did.   That was

6    the reason why they did it.

7    Now, Nolon had a tragic event in his life on May 6, 2000.

8    That's when he had his motorcycle accident.   Yet another

9    event that changed his life.   And his primary injury was to

10   his hands.   A pretty important part of your body when you

11   really think about it.   And it took a good six months out of

12   his life where he dedicated his time, almost full time to

13   doing physical therapy and to recovering.   And he talked

14   about how he was kind of in a fog during that period.   Maybe

15   for even a little longer.   The last time he estimated that it

16   was probably about a year and a half before he recovered,

17   which when we consider Nolon's age is probably not at all

18   unreasonable.   But things were not quite the same for him

19   after that.   Certainly not health-wise and not memory-wise.

20   And he wasn't quite as sharp.   And during this time, too,

21   Carolyn Mintus was continuing with her excuses.

22   Now, he said to you several times both on direct

23   examination and cross-examination that he placed blind faith

24   in this woman.   He stands here today embarrassed as he looks

25   back on it.   Hindsight is 20/20 vision.   Always is.   He can't

1    believe that he trusted her for so long.  That he bought all
2    of the excuses and all of the delays.  But he did.  He really
3    did believe her.
4        So when things started falling apart, the government's
5    characterization certainly is not inaccurate.  The house of
6    cards kind of fell apart.  And really that was totally out of
7    Nolon's control because it was all dependent on getting the
8    money back from Carolyn Mintus.  All of it.
9        But he did not stop trying to recoup those losses.  He
10   kept looking for other ways to do it.  And this is what
11   caused him to go to Poland.  The government has a different
12   idea about that.  But the evidence is pretty strong that he
13   went to Poland to try to make some money so that he could
14   start paying back the debts that he owed.  First to the
15   lenders, and second to the obligations that he left unpaid.
16       And he was reasonably successful.  He went to sell the
17   franchise.  A Polish franchise for Century 21.  He found a
18   buyer.  Got a nonrefundable fee.  Initial fee.  Initial
19   portion of the start-up fee.  And he started to get a
20   commission.  $5,000.  But the negotiations went on and on.
21   And, finally, a year or so later the deal just never made it.
22       But immediately after that, in fact, he had a second buyer
23   kind of waiting in wings who was good friends with the first
24   buyer.  That person stepped up and said, yes, I'll buy it.
25   He even paid twice the amount of money towards the purchase

1   price of that franchise.  And that deal was ultimately
2   completed and Nolon did receive money.
3       Remember, too, when he went to Poland he didn't go on any
4   of the lenders' money.  He made a settlement with the
5   insurance company for his motorcycle accident.  He divided
6   half of that with Marilyn.  He took the other half of that,
7   about $40,000 or so, and went to Poland.  That's the money
8   that he went to Poland on.  Not any of the lenders' money.
9       Then the other deal that he had going for him which was
10  shortly before he returned to the United States and faced the
11  charges by the government was putting together a call center.
12  A clearinghouse for the sale of real estate in Europe
13  beginning in Poland.  And this was state of the art.  This
14  was something that he and Phil Yeager talked about and was
15  really a big deal.  And it was going to be extremely
16  lucrative.
17      But he ran out of time and was not able to consummate that
18  deal.  But he believes -- he believes it as strongly today as
19  he did that last day before he left Poland that if he could
20  finish that deal, he would make more than enough money to
21  repay all of the investors and all of the money that he
22  left -- that is owing.  That deal in Poland is yet for Nolon
23  another disappointment.  And a bitter disappointment and
24  another sense of failure and another reason why he sits here
25  humble and not proud and embarrassed.

1     But is he guilty?  That is something -- an entirely

2   different question.  And that really is the critical

3   question, ladies and gentlemen.  In all of this, everything

4   that happened, did he act with the intent to defraud?  And

5   for us, as we look at the stories, there is no way that he

6   did.

7     He acted in blind trust.  Yes.  He thought he was doing

8   due diligence, as I challenged some of the lenders.  Did you

9   do due diligence?  Nolon thought he did when he was dealing

10  with Carolyn Mintus.  He thought if he was getting references

11  from folks at the Federal Reserve, that was enough.  What

12  more could you want?  Apparently, as he learned very

13  painfully, more was necessary.  But does that mean he

14  intended to defraud?  No, he did not.

15     If anything, he is very much like Cody Bly, whose anger we

16  cannot blame.  David Velander.  His frustration.  His

17  embarrassment I'm sure of losing his family's money.  Nolon

18  understands those feelings.  He understands them very well

19  because that is very much as the way he feels, but on a much

20  grander scale because he encouraged his friends to invest

21  money.  To loan money to his program.  He encouraged his

22  staff to do that.  People that he cared about.  People that

23  he loved.  And he has to face the lost of trust and the loss

24  of the good feelings that they once had because he failed in

25  his ability to recover the proceeds.

1      Now, the government has made much of the statements that

2  he made.  First one, that the lender's money would be safe.

3  They would be sitting in a bank.  As far as Nolon understood,

4  it was sitting in the bank.  It was sitting in a bank in New

5  York under the care and control and the investment expertise

6  of Carolyn Mintus.

7      That the -- there were statements that lenders would

8  receive 8 to 9 percent return on their money.  That's what

9  Carolyn Mintus told Nolon to tell people.  Tell them that

10  they're at least going to get 8 to 9 percent.  It's probably

11  going to be a lot higher than that.  Based on my experience,

12  it's going to be a lot higher.  And Nolon, believing the

13  whole package, came back and that's what he told people.  But

14  he tried to emphasize to people that this was best efforts.

15  Best efforts placement.  You will see that on many, many of

16  the exhibits.

17      He also told people that sending their money offshore was

18  a good way to protect it.  Well, that's what Nigel Scott

19  Grant was telling him.  The lawyer.  The one that was far

20  smarter than Nolon in terms of putting these things together.

21  He was just repeating what he was told.

22      Now, ladies and gentlemen, it's time for your

23  deliberation.  The government will have the chance to come

24  back and explain to you how I have it all wrong again.  But

25  it's going to be your case very shortly and you will have

1    time to deliberate.  Deliberating means to study.  To think

2    carefully.  To discuss thoughtfully.  To review the evidence.

3    Sift through it and make your very fair determination on what

4    actually took place here.  On whether this is a story about a

5    man with a dream who, beyond his control and with the

6    participation and bad advice and misrepresentations of

7    others, the dream of creating a resort in Mexico failed.

8    Whether this is a man who just was gullible himself.  Who

9    blindly trusted somebody that he should not have trusted.

10       It is much, much different, ladies and gentlemen, than

11   being guilty.  He still maintains, we believe, his innocence.

12   He relied on others.  And because of that, he is here.  And

13   he is here by himself.

14       We would ask you -- we believe that when you are finished

15   with your deliberations and you're looking at this verdict

16   form that Judge Leighton gave you, that you are going to be

17   able to check not guilty on each one of the 32 counts.  Thank

18   you, very much.

19       THE COURT:  Thank you, very much, Ms. Olson.

20       Now, ladies and gentlemen, if you would kindly direct your

21   attention to Mr. Storm, who will deliver a brief rebuttal on

22   behalf of the government.

23       MR. STORM:  Please the Court, Counsel, members of the

24   jury.

25       Nolon Bush took investors' money.  Their life savings.

1   Their 401(k) accounts.   Their home equity.   The money they

2   got from selling their businesses.   And he threw it away like

3   clowns throwing candy at a Christmas parade.   With reckless

4   disregard.   Without abandon.   With abandon.   He didn't care

5   about what happened to those investors' money.

6        The defense states that this is a case about good faith.

7   Good faith is Instruction No. 20.   The last line of that

8   states proof that the defendant acted with reckless disregard

9   of the truth of material representations he may have made is

10  inconsistent with good faith.

11       Nolon Bush didn't just make reckless statements.   He lied

12  to the people whose money he took.   He lied in a lot of

13  different ways that we're going to talk about.   But he lied

14  and he stole their money.

15       He sold mid-term notes that don't exist.   He sold a

16  Mexican resort that he knew would never be funded.   His

17  testimony from the stand is that he planned from the very

18  beginning to keep two-thirds of the money that he took in.

19  His testimony from the stand is that he intentionally did not

20  tell investors that he was going to keep that money.

21  Two-thirds of it.

22       That created a problem for Nolon Bush.   No investor would

23  give him money knowing that two-thirds was going to be taken.

24  Completely contrary to the account statements which included

25  a small administrative fee.   That's what they believed would

1  be taken.

2      So what did he do knowing that they would not invest?  And

3  that's their testimony.  And as Mr. Letey said, that's common

4  sense that they would not invest if they knew that fact.  He

5  told them that he would accumulate $1 million, hold it in a

6  trust, and then invest it in a private merchant bank.

7      He testified his intent was to take two-thirds.  And he

8  told them that he was going to take all of it.  Hold it in

9  trust.  Accumulate $1 million and invest it.  That's a lie.

10  That is a lie that he told these people to get their money

11  because he knew if he told them the truth they wouldn't hand

12  it over.

13      He told them their money would never leave the bank.

14  That's a very clear statement.  Your money, David Velander,

15  will never leave the bank.  He knows from the beginning from

16  his own words that he's going to take two-thirds out of the

17  bank.  That is a lie.  It's a plain and simple lie to David

18  Velander and every other investor that he told it to.

19      He told other lies.  He knew that mid-term notes could not

20  be more risky as an investment.  How did he know that?  He

21  testified from the stand that when he was in Global

22  Prosperity he learned that the ranks of people who promote

23  mid-term notes are filled with con artists.

24      If you're going out there, you're going to give money to

25  somebody who might or might not be a con artist, you'd better

1    tell the people who is investing this is a risky area.   This

2    is an area where I might be giving your money to a con

3    artist.   And if I pick the wrong person, your money is gone.

4    It's gone.   Your $800,000 from selling your business is gone.

5    That's what he should have been telling these investors.   But

6    he knew if he told them that very simple truth, they would

7    not give him a dime of their money.

8        So what did he tell them?  He told them that their

9    principal and interest were guaranteed.   8 percent interest

10    and their principal guaranteed.   That's a lie, a plain and

11    simple lie.

12        He told them that there was a very high degree of

13    confidence that they would make 25 percent.   It's a lie based

14    only on that one thought.   That the ranks of high-yield

15    promotions of mid-term note promotors are filled with con

16    artists.   But what if he knew so much more than that?  If

17    that's all he knew, he would have lied to them.

18        He knew from his own experience that Larry Wilcoxson had

19    not paid.   He knew that Larry Wilcoxson had been shut down by

20    the feds.   He knew that Mintus was not paying and was

21    offering, as he put it, day after day, week after week, month

22    after month of excuses.

23        He knew that Vicki Webster had told him that Mintus was a

24    fraud.   Had been identified on a fraud website.   With all

25    these facts, he continued to tell investors your money, your

1  principal is guaranteed.  And your 8 percent is guaranteed.

2  That is -- it's not -- it's clear why it can be called

3  nothing else.

4      He didn't stop there.  The Mexico project.  He knew the

5  Mexico project would never be funded.  How did he know that?

6  Because it was dependent on Carolyn Mintus.  Now we're

7  talking about '01.  She hasn't paid him since early '99.

8      He builds another project with Phil Yeager in May of '99

9  where she's supposed to pay $30 million.  And she doesn't pay

10  that.  And he knows that.  And he still goes forward

11  promoting the Mexico project.  He promotes the Mexico project

12  knowing that she's hundreds of millions -- 100 to 200 to 300

13  million dollars behind in her payments.  And he doesn't

14  disclose that to the people that he talks to.  Mr. Franke and

15  to Ms. Ryan, he tells them that it's going great and that

16  he's purchased the land.  That's a lie.

17      But he doesn't just stop there.  You're going to see in

18  the jury instructions it talks about creating circumstances

19  that deceive people.  That's a fraud, too, if you create

20  circumstances that will deceive somebody.  He has these sets

21  of lies that he's telling people.  But that's not going to

22  get him to the big time.  That's not going to make him a

23  big-time $35 million profit.

24      So he goes the extra step.  He takes it to the next level.

25  He puts on a show.  And that show is comprised of two things

1    that he needs to do.  He needs to convince people this is

2    profitable, and he needs to convince people he's trustworthy

3    as a human being.  These are both deceptions.

4        How does he convince people this is profitable?  He sends

5    out account statements that show huge yields based on

6    nothing, even when he knows Mintus and Wilcoxson aren't

7    paying.  And he sends out checks comprised of other

8    investors' money.  Those are deceptive practices that make

9    people think the money is coming in and it's profitable.

10       He buys this big house and leases this luxury suite at

11   Safeco.  Those lead people to believe this is profitable.  He

12   would have you believe that he bought that house not to

13   promote this scheme, but for charity.  But as Mr. Letey said,

14   the two people that needed to know what this house was for,

15   they testified.  One is Ms. Rief, who was the realtor who

16   sold them the house and took two years doing it starting in

17   '97.  She was told by Marilyn March we want this house to

18   impress clients.  Impress is the word that she used.

19       The other person who needed to know was Mr. O'Neill.

20   Michael O'Neill.  The interior decorator.  Why did he need to

21   know?  Because he needed to know what his object was in

22   rebuilding this house.  Marilyn March said we want this

23   design to live here, he said, and to impress investors.

24       What lends credence to that?  Look at the shower.  One

25   thing.  Look at the shower that was in Marilyn March's suite.

1    That wasn't there for charity.  That special sloped floor
2    that he talked about.  That sloped floor that would keep her
3    feet dry while she took a shower that he designed into the
4    house.  That wasn't there to bring others inside for charity.
5    That was there to keep Marilyn March's feet dry.  The $400
6    shower drain.  That wasn't there for other people.  For
7    charity.  That was there to keep Marilyn March's hair out of
8    the drain.
9        This house was for them to live in.  It was to impress
10   investors.  It was for part of the fraud.  And that's the
11   evidence from the stand.  When Patty Rief was asked was this
12   for charity -- or was this for battered women, this house,
13   she said no.  You could see the shock on her face.  She said
14   Marilyn had discussed another house, but not this one.  This
15   was for them to live in.  This was to impress clients.
16       It's part of the fraud.  Just like sending out the checks,
17   some investors' money to other investors is part of the
18   fraud.  He used religion and he used charity.  He's created
19   the air of profitability.  Now he has to create an air of
20   trustworthiness.
21       The evidence from that stand is he is not a religious man.
22   It is a tool that he used to steal.  To create a belief in
23   people that he would deal with them kindly and lovingly and
24   treat them fairly and protect their money.
25       The people who knew him best, however, Tessie his ex-wife,

1    Lorelei his administrative assistant, and Tammy Stuckey when

2    asked, is he a religious man?  Tammy Stuckey again had a

3    shocked look.  I don't think so.  Lorelei went a step

4    further.  She said Nolon Bush does what's best for Nolon Bush

5    and that's the bottom line.  But look for yourselves at how

6    he treated people.  Did he treat people lovingly, kindly, or

7    did he do what's best for himself?

8        When David Velander wrote a letter that you have in

9    evidence dated March 2nd, 2000 saying, I need my money back,

10   how did he respond to that?  21 days later he went out.

11   Bought himself a $24,000 Harley-Davidson motorcycle.   And

12   asked from the stand, did you even think about giving that

13   money to David Velander who it belonged to?  He said, no, I

14   didn't think about it.

15       That's not the action of somebody who has based their life

16   on spirituality.  It's consistent with what we're told by

17   Lorelei Tarsiuk.  When he takes $40,000 from an investor,

18   Starla Ryan, who's recently widowed, and he spends it on his

19   phone bill primarily and doesn't put one dime of it into any

20   kind of investment, that's not somebody who is acting

21   lovingly based on spirituality.  That's what Lorelei is

22   saying, is what is best for him.

23       In order to raise this to the next level, this fraud, he

24   needed something else.  He needed a scapegoat.  He needed

25   somebody to blame.  Somebody to say it's her fault that this

1    has happened, Carolyn Mintus, so that when this went bad,

2    when things went down he could say it's her fault.  I gave

3    her the money.  She stole it.  Or I gave her the money.  She

4    lost it.  Or whatever she did, it's her fault.  When the

5    government came knocking he could say, it's not my fault.

6    It's her fault.  It's the scapegoat's fault.

7         He did not believe in Carolyn Mintus.  He knew she was a

8    con artist.  He knew that Wilcoxson, again, had been shut

9    down.  That he had not been paid by Wilcoxson.  He knew that

10   con artists filled this area of mid-term notes.  He knew that

11   Mintus had not paid him since early '99.  He knew that in

12   March of 2000 she hadn't paid $30 million that she owed on

13   Century 21.  He knew that Vicki Webster told him that she was

14   a fraud.  And he responded with don't believe everything you

15   read.

16        He knew that Douglas Stephan had told him that she was a

17   fraud.  And he blew Douglas Stephan off.  He knew Lorelei

18   Tarsiuk had been contacted by Ron Henderson of the FBI.  And

19   that instead of saying, give me Agent Henderson's phone

20   number, I want to call Agent Henderson and report this woman

21   who has stolen my money, what did he do?  He referred Lorelei

22   to Glenn Stoll.  And Glenn Stoll told Lorelei how to obstruct

23   this investigation.  Sending Lorelei to Glenn Stoll instead

24   of picking up the phone, asking Lorelei for the number and

25   saying, let's call Agent Henderson, let's find out what's

1   going on, those are the actions of somebody who knows what's

2   going on and is trying to hide from what's going on.  Not the

3   actions of somebody who is a victim.

4        The problem that he has when he tells all these people and

5   he blows off all these people is this.  If he learns the

6   truth -- if they're able to say he's learned the truth and

7   acknowledged truth, he's got to stop taking in their money.

8   So he puts his fingers in his ear and says, I don't hear you.

9   Go away.  He doesn't want to know the truth because then he's

10  lost his scapegoat.

11       He hides his conduct.  Why do people hide their conduct?

12  He repeatedly does this.  People hide their conduct because

13  they know they're doing something bad.  In the jury

14  instructions you have an Instruction No. 4 which says --

15  talking about reasonable doubt.  A reasonable doubt is a

16  doubt based on reason and common sense.  People a lot of

17  times come into this courtroom and they think they need to

18  leave their common sense at the courtroom door.  You don't.

19  It's not a raincoat.  Bring it into your deliberations.  Our

20  common sense tells us that when people hide their conduct,

21  they know they're doing something wrong.

22       When my kids got into the cookie jar and try to lift the

23  lid straight up so it didn't cling the sides, they don't do

24  that, that quiet lifting of the lid, because they thought it

25  was okay to get a cookie.  Those were the times they knew it

1    was not okay to get a cookie.  That's what our common sense

2    tells us.

3        Nolon Bush hired a lawyer who was an expert in setting up

4    secret offshore bank accounts.  And with that expert, Scott

5    Grant, he set up secret offshore bank accounts.  He hid that

6    conduct.  And if you look in those contracts, you will see in

7    the contracts that Scott Grant set up it.  Says we're setting

8    these up because we don't want these records for you, the

9    investor, to be able to be subpoenaed by the government of

10   the United States.  Hiding conduct.

11       How else did he hide conduct?  He hides conduct through

12   encryption.  Both he and Scott Grant talk about encryption at

13   various times.  Scott Grant talked about -- you have an

14   e-mail in evidence saying let's get this under encryption.

15   Nolon Bush says I want CIA encryption capabilities.  Nolon

16   Bush wants encryption because he is hiding his conduct

17   because he knows what he's doing is wrong.

18       Now, the defense would have you believe that he wants

19   encryption because he doesn't want abusive husbands for these

20   future abusive spouses or significant others to be listening

21   to phone calls, I guess, at the retreat.  That's what the

22   defense would have you believe.  That's why he wants CIA

23   encryption.

24       The problem with that is that it's not consistent with the

25   evidence in the case.  The evidence in the case is Nolon Bush

1    is sending encryption devices, enigmas, to Carolyn Mintus.

2    Those are on the calendar that's been entered into evidence.

3    He's not -- is it because the abusive spouses are going to go

4    try to listen to phone calls from people staying at the

5    retreat at Carolyn Mintus's place in New York?  No.  That's

6    because he's trying to get everybody on the same page of

7    hiding their conduct.

8        Debugging.  He repeatedly debugged.  Now, he would have

9    you believe through what's been presented at trial that he's

10   hiring all of this debugging because it's necessary to keep

11   Social Security numbers safe.  But who works in the business

12   where -- you know, Social Security numbers are batted around

13   every day.  Bankers.  Retail stores.  Are they hiring these

14   debuggers?  No.  Nolon Bush is hiring debuggers because he

15   wants to make sure that his conduct is not found out because

16   he knows what he's doing is wrong.

17       And just to go one step further on that.  Look at the last

18   time he hired a debugger.  It's in June -- that's Richard

19   Cox.  It's in June of 2000.  What's just happened in June of

20   2000?  Ron Henderson has called the estate.  Has called View

21   Park and talked to Lorelei.  That's in May.  What happens

22   when Suzi Ripley in May of 2000 goes to the Caribbean down to

23   Nevis?  She's told they're under investigation.  It's

24   spreading.  There is -- this Ron Henderson call is spreading.

25   What is Nolon Bush's reaction?  Is to hire the bugger to

1    debug his car, his phone, his office, and Scott Grant's

2    office.

3        That's what he does in response to getting that call from

4    Ron Henderson in May of 2000.   He shuts down the operation in

5    Nevis, he hires the debuggers, and he starts promoting

6    Cornerstone as the new promotion, which is the Mexican

7    resort.

8        The defense told you when this case started that it would

9    be woven together.   And it has been.   The defendant, Nolon

10   Bush, has set up a con.   He has repeatedly lied to investors.

11   He has not only lied to investors.   He has created

12   circumstances to make them believe that this is a profitable

13   investment.   Those circumstances were false.   He has created

14   circumstances to make people believe that he was trustworthy.

15   Those circumstances were false.   And he has stolen

16   $35 million of investors' money.

17       He sold securities to do this.   And that is contracts

18   where other people are to do the work and you are to provide

19   the money.   He used the mails to commit this theft.   He used

20   the wires to commit this theft.   And he transferred money

21   from Nevis back to his account that was stolen from these

22   investors.

23       We would ask you to find Nolon Bush guilty of each and

24   every one of these offenses.   Thank you.

25           THE COURT:   Thank you, Mr. Storm.

1      All right.  You've now heard the argument of counsel.

2  We're prepared to have you go to the jury room and

3  deliberate.  But before we do that we have to pick one among

4  your number who will not be allowed to deliberate.  We can

5  only have 12 deliberate.  We had 14 originally because of the

6  length of trial, to make sure that we could finish with 12.

7      And so Ms. Boring is now going to draw one name out of the

8  tumbler and that individual will not be allowed to

9  deliberate.  That person will not talk about this case at

10  all.  There is a possibility that somebody could get sick

11  during deliberations and the person selected would be brought

12  back in and deliberations and would have to begin anew.

13      So whoever that individual is should not discuss this

14  matter at all until I call you and tell you that the jury has

15  reached a verdict or otherwise been discharged.

16      Okay.

17          THE CLERK:  Kathleen Duprey.

18          THE COURT:  Ms. Duprey, if you would leave your notes

19  on your chair.  Nobody will review them.  You need to get

20  your material -- whatever you've got in the jury room and go

21  to the clerk's office and they can give you further

22  instructions.  What I would ask -- we've got your phone

23  number.

24      So I'll call you at some point either because we need your

25  services again in the near future or because the jury has

1   been discharged.  And I will be calling to thank you and to

2   discharge you as well.  All right?

3        Thank you, very much.  And if you would just go ahead and

4   get your stuff and go to the clerk's office.  I will keep the

5   jury here.  We keep them here so that nobody communicates or

6   is inclined to communicate at all about the case.  Thank you.

7        The exhibits will be following in shortly.  I think there

8   is about five minutes more work that needs to be done to make

9   sure that only those exhibits that have been admitted into

10  evidence are brought to you.  And so the lawyers and

11  Ms. Boring will be working on that for just a few minutes

12  more.

13       Ladies and gentlemen, if you would return to the jury room

14  and begin your deliberations.  Thank you.

15            (Jury exits the courtroom.)

16            THE COURT:  Please be seated.  All right.  Counsel,

17  you should be within 15 minutes of travel time here to the

18  courthouse.  Leave Ms. Boring your number so we know how to

19  get a hold of you.

20       And I guess this is probably the best time.  At any time

21  in a civil or criminal case when a verdict is returned, it's

22  a bad time for somebody to tell them how good they did, how

23  well they did in representing their clients.  But I wanted to

24  say sincerely to both the prosecution and the defense that I

25  thought you all did an outstanding job of keeping the jurors

1  involved and interested.  You watched the jury.  And that's a

2  forgotten craft.

3      You also I think spent a lot of time on saying what you --

4  learning how to say what you wanted to say best instead of

5  last.  Sometimes everybody wants to get the last word in.

6  And jurors and trials get bog down by that.  But I was

7  impressed by the lawyers' ability to say what they wanted to

8  say and to say it in a way that resonated with jurors.

9      So you're to be commended.  And we'll let you know when we

10  have either a question or a verdict.

11      Court will be in recess.

12          (Court in recess.)

13                      *    *    *    *

14                  C E R T I F I C A T E

15

16      I certify that the foregoing is a correct transcript from

17  the record of proceedings in the above-entitled matter.

18

19  /S/  Nichole Rhynard, CCR, CRR, RMR

20

21

22

23

24

25