1          UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON

3                  AT SEATTLE

4
UNITED STATES OF AMERICA,      )   Cause No. 06-5504RBL
5                              )
              Plaintiff,       )   Seattle, Washington
6                              )   October 27, 2008
       vs.                     )
7                              )
CHARLES NOLON BUSH,            )
8                              )
         Defendant.            )
9                              )
_____)

10

11

_____
12                        VOIR DIRE
           VERBATIM REPORT OF PROCEEDINGS
13     BEFORE THE HONORABLE RONALD B. LEIGHTON
            UNITED STATES DISTRICT JUDGE
14 _____

15

   APPEARANCES:
16

   For the Plaintiff:      Arlen Storm
17                         Tyler Letey

18

19  For the Defendant:     Paula Olson

20

    Reported by:           Nichole Rhynard, CCR, RMR, CRR
21                         Federal Court Reporter
                           206.370.8504
22                         nichole_rhynard@wawd.uscourts.gov

23

24 Proceedings recorded by mechanical stenography, transcript
   produced by Reporter on computer.
25

1                              PROCEEDINGS

2    _____

3         THE CLERK:   06-5504-RBL, United States versus Charles

4    Nolon Bush.

5       Counsel, please rise and make your appearances.

6         MR. STORM:   Arlen Storm for the government.

7         MS. OLSON:   Paula Olson for Nolon Bush.   Jocelyn Bush

8    seated to my left.

9         THE COURT:   Mr. Olson, Mr. Bush, good morning.

10      A couple of preliminary matters that I would like to take

11   up before we begin the voir dire process.

12      First, let me say I have reviewed the defendant's motion

13   to dismiss for lack of jurisdiction.   I have reviewed the

14   indictment.   I am satisfied that the indictment states the

15   alleged violation of federal criminal law.   There is nothing

16   in the constitutional protection of the free exercise of

17   religion that exempts religious individuals or organizations

18   from compliance with those laws.   And I am satisfied the

19   Court has jurisdiction and the motion is denied.   I have sort

20   of jury-rigged my own statement of case, borrowing some from

21   the government and some from the defendants.   So I have

22   completed that process.

23      With regard to the motions in limine, I'm not sure that

24   they need to be resolved at this time.   But let me tell you

25   what my thinking is on these matters in case it impacts your

1    opening statements or -- I don't think it will impact your

2    questions during voir dire.

3        The previous bad acts 404(b) versus 403 analysis, I am --

4    we're going to need some more discussion perhaps on the

5    404(b) analysis.  The fact of Mr. Bush's termination from his

6    prior employment is certainly admissible.  The question is

7    whether or not the reasons for the termination would be

8    admissible.  That would more properly fall within the 404(b)

9    definition.

10       Clearly, if the evidence -- the predicate is set that

11   Mr. Bush was indicating to others, to potential investors

12   that he was a highly successful businessman and so forth,

13   under Rule 10(b)(5), the Securities and Exchange Act, that

14   would be a material fact.  The government would be within its

15   bounds to refute with the fact that Mr. Bush had not been

16   successful in at least some of his business endeavors.

17       Whether or not the circumstances surrounding the

18   termination to the extent that they demonstrate some prior

19   misconduct is admissible will require a little bit more

20   analysis under 404(b) and the purposes for which that

21   information would be admitted.

22       Regarding the motion of generalized testimony regarding

23   fraud, I am going to reserve on that.  It may be necessary to

24   have some expert testimony as to whether certain relevant

25   investment vehicles in fact exist in the legitimate

1    marketplace.  I will reserve to see -- we'll probably have

2    additional conversation about that issue.

3        What I will be focused on really is whether or not expert

4    testimony is necessary; if the testimony offered by the

5    government is the kind of testimony that a jury would need to

6    be fully informed or whether it's simply commonsensical

7    information that the testimony of lay witnesses would

8    suffice.  In short, does a jury need expert testimony on the

9    subject?  I'm not at all clear on that at this point.

10        The motion with regard to the confidential religious

11    records is denied.

12        The motion in limine with regard to travel to Europe is

13    denied.

14        The motion with regard to playing additional portions of

15    taped conversations is reserved, and the rule of completeness

16    will control whether or not and to what extent additional

17    portions of the taped conversations will be allowed.

18        The motion in limine with regard to statements made by

19    alleged agents will be reserved.  And I will deal with that

20    on the fly, on a case-by-case basis, assuming the government

21    will offer the predicate evidence about the relationship

22    between Mr. Bush and these so-called agents.

23        The motion to allow limited voir dire by the attorneys is

24    granted.  And because of the nature of this case, I will

25    allow 20 minutes a side, each lawyer.  You don't have to use

1    it.  I have incorporated most of the themes that the lawyers

2    have requested in their proposed voir dire.

3        Let me say that we follow the same protocol Judge Bryan

4    has been following for years.  And I want the parties to be

5    aware of the boundaries for their voir dire, and particularly

6    subpart (4)(f).  Voir dire is not the time to introduce a

7    jury to your case or the theory of your case or arguments

8    about your case.  It's an opportunity to identify people who,

9    based on their own personal relationships, personal

10   experiences, or deeply held personal beliefs would not make a

11   good juror.

12       So I know that most trial seminars involve one or more

13   lawyers telling other lawyers about how effective they can be

14   on voir dire.  How they can win the case during voir dire by

15   schmoozing and otherwise cajoling the jurors into accepting

16   their view of the world right out of the box.  That may

17   happen someplace, but it doesn't happen here.

18       I will admonish the lawyers to stay clearly away from

19   those efforts.  If I think you're crossing line, I will ask

20   you to move on.  I won't show you up in front of the jury,

21   but I will ask you to ask another question.

22       Government witnesses will be excluded except for the case

23   agent.  They'll be excluded until they have been released.

24       With regards to the motion in limine concerning the lists

25   of witnesses and exhibits, I will ask the government to at

1    the end of the business day tell defense counsel who the

2    witnesses up for the next day will be.  That does not include

3    exhibits.  You don't have to give them an exhibit list, too.

4    But as a courtesy I would expect during defendant's case they

5    would reciprocate.

6        Finally, the issue in the government's motion in limine

7    regarding attorney-client privilege is reserved.  The

8    government indicated to the Court that that was an issue that

9    probably was going to arise after about a week into it.  I

10    will keep my eye on the ball and view the evidence with that

11    issue in mind, and at some point within that week we'll

12    address the issue more fully.

13        Anything further?  I guess peremptories, I will do seven

14    and 11.  We'll have 14 jurors in the box.  The two alternates

15    will be picked at the end of the case.  So they don't know

16    they're the alternates.  Jurors 13, 14 will not be the

17    automatic designated alternates.  Unless there is some reason

18    we can't, I am inclined to have them exercised

19    simultaneously.  I don't think there is any rule of

20    prohibition against that.

21        So you'll each have your sheet.  The government can list

22    its seven strikes and the defense can exercise their 11

23    strikes and we'll have our jury.

24        Now, any questions or comments?

25            MR. STORM:  Your Honor, only a couple regarding

1    exclusion of witnesses.  I talked to Ms. Olson regarding

2    Carrie Breed, who is my expert.  I would like to have her in

3    the courtroom so she can hear the testimony and incorporate

4    it into her summary testimony.  Ms. Olson indicated she did

5    not have a problem with Ms. Breed being present if the Court

6    doesn't.

7         THE COURT:  Well, I certainly don't have an

8    objection, if you've worked something out.  Again, when in

9    doubt I trust the lawyers.

10        MS. OLSON:  I don't have an objection.  Part of the

11   reason why is because I understand the case agent who is

12   present is not going to be testifying.  And I know the

13   process and I know the involvement of Ms. Breed.  And

14   Mr. Storm and I have discussed that, the issue of her being

15   here and the purpose, and I am satisfied with that.

16        THE COURT:  My antenna goes up when somebody says

17   somebody is going to give summary testimony.  That's a

18   concept that will have to be developed as we go.  But

19   generally speaking, I do not allow witnesses to comment on

20   previous witnesses' testimony.  You can elicit the same

21   testimony from the witness without, you know, I'm going to

22   ask you to assume or you were here and you heard so-and-so

23   say so-and-so, what do you think about that?  Well, I think

24   he's wrong.  I think he's smoking something.  You know,

25   that's not the way we do it here.

1    So I don't know what your motion of summary testimony is,

2    but I assume by the time we get there I will.

3         MR. STORM:  We won't do what Your Honor is saying.

4    But the other issue is in my opening I was stating that

5    the midterm notes that the government alleges Mr. Bush

6    offered were fictional or fictitious.  The way we plan on

7    proving that was putting on William Kerr, who is an expert in

8    that area, to say that they in fact do not exist in the real

9    economic forum.  I want to make sure if I say that, I am not

10   crossing the line of the Court's ruling.

11        THE COURT:  Well, like I said, you can say that.  And

12   I said it may be necessary -- I mean, it seemed to me from

13   your -- from the motion in limine that there was an area --

14   that is an area where a jury may need some assistance because

15   they don't have knowledge of the general array of the

16   investment vehicles around -- they know certainly commonly

17   used vehicles, but they don't have intimate knowledge about

18   every investment vehicle out there.

19        So that does seem to me to be a legitimate use of an

20   expert.  I want to be very careful and judicious about the

21   use of expert testimony.  Oftentimes, I find that experts are

22   testifying about matters that are within the can of everyday

23   jurors.

24        MR. STORM:  The only issue the government has is on

25   October 3 Your Honor signed an order regarding tapes that the

1   government has obtained from the Federal Detention Center.

2       Mr. Bush objects to us listening to those tapes on

3   religious grounds.  And the Court in its order indicated we

4   could listen to the tapes to determine if there is religious

5   content in them.

6       THE COURT:  Never been presented to us for any

7   in-camera review to my knowledge.

8       MS. OLSON:  They have not, Your Honor.  And I

9   intended to get them to the Court before today.  I had a

10  weekend of family emergencies.  I'm way behind on the power

11  curve in terms of doing that.  If the Court would indulge me,

12  we can get the list and tapes to the Court tomorrow morning.

13      THE COURT:  Okay.  Anything further?

14      MS. OLSON:  Yes, Your Honor.  Mr. Bush is

15  experiencing some health issues.  He's going to need to

16  probably use the restroom every hour, hour and a half or so.

17      THE COURT:  I try to take a break every hour and 15

18  minutes, every hour and 20 minutes.  I do that primarily for

19  the Court Reporter.  Mr. Bush and I may be on the same

20  schedule anyway.

21      MS. OLSON:  The other thing is partly because of my

22  series of family emergencies in my family, my assistant's

23  family, I have not gotten the Court the defendant's jury

24  instructions.  And our trial brief is still a little choppy.

25  If the Court would indulge me?

1          THE COURT:   Absolutely.   I think I know what the case

2     is about.   I certainly want the defendant's perspective on

3     matters.   And I will read it as soon as it comes in.   But I

4     don't think it's necessary to get the trial going here this

5     morning.

6          MS. OLSON:   It's not very long, Your Honor.   So thank

7     you.

8          THE COURT:   All right.   Anything else?   Ready for the

9     jury?

10          MS. OLSON:   Yes.

11          MR. STORM:   Yes.

12              (Jury enters the courtroom.)

13          THE COURT:   All right.   Please be seated.

14          Ladies and gentlemen, welcome to federal court.   I am

15     Judge Leighton.   I will be presiding over this proceeding.

16     I want to begin by giving you a heartfelt thanks for being

17     here.   Your willingness to participate in this process is of

18     vital importance to the federal judiciary and the way we

19     administer justice in this country.

20     I say thanks for your willingness to participate.   And you

21     probably think it's a little tongue in cheek given that you

22     were summoned here.   But it is an important civic

23     responsibility, and to have you all here today is gratifying.

24          So important is the right to a jury trial, a jury of your

25     peers, that it is memorialized in the Constitution of the

1    United States of America as a right.  A fundamental right.

2    And your presence here today enables us to keep that promise

3    to all of our citizens who are called before the Court in a

4    civil or criminal proceeding.

5        And an important part of the trial is the selection of a

6    jury.  And that is what we're going to embark on now.  The

7    law requires that prospective jurors be sworn before

8    questions are asked.

9        At this time I will ask all jurors in the courtroom,

10   whether you're in the box or on the bench, to stand, raise

11   your right hand, and Ms. Boring will administer the oath.

12                         (Jury sworn.)

13       THE COURT:  Thank you.  Please be seated.

14       The remarks that I make and the questions that I ask and

15   the questions I permit the lawyers to ask and the

16   instructions that I will give you are directed to the

17   attention of every juror in the courtroom, as I said, whether

18   you're in the box or you're on the benches.  So each juror is

19   cautioned to pay close attention.

20       In order that a case be tried before an impartial jury,

21   the lawyers and I will ask you questions not to embarrass you

22   or to try, but to determine if you are unbiased and without

23   preconceived ideas which might affect the case.  You should

24   not withhold information in order to be seated on this

25   particular jury.  You should be straightforward in your

1  answers rather than answering the way you feel the lawyers or

2  I expect you to answer.

3      It is presumed that when a jury has been selected and

4  accepted by both sides, each of you will keep an open mind

5  until the case is finally submitted.  You will accept the

6  instructions of the Court and will base any decision upon the

7  law and facts, uninfluenced by any other considerations.  The

8  purpose of the questions on voir dire is to determine if you

9  have that frame of mind.

10     Now I want to explain the challenge process to you.  The

11  lawyers have the right and duty to challenge any jurors for

12  cause.  A challenge for cause results from a significant

13  concern that a juror cannot be impartial because of some

14  presumed relationship with a party or witness, a pecuniary

15  interest in the outcome, or clear bias or concern with some

16  issue in the case.

17     They may also a challenge prescribed number of jurors

18  without giving any reason as a guarantee to both parties that

19  they may remove some jurors if they wish.  This is called a

20  peremptory challenge.  You should not take offense if you are

21  challenged, since the challenge is not exercised as a

22  personal reflection on you.

23     Now, this is a criminal action instituted by the U.S.

24  government as plaintiff here.  The U.S. is represented by

25  Arlen Storm, who is an assistant U.S. attorney.  I would ask

1    Mr. Storm to introduce those present.

2         MR. STORM:  Tyler Letey, special United States

3    attorney.  Jim Bach, postal agent.  Carrie Breed, who is an

4    IRS agent.

5         THE COURT:  The defendant is Charles Nolon Bush.

6    Mr. Bush is represented by Paula Olson.  Ms. Olson will

7    introduce Mr. Bush.

8         MS. OLSON:  Good morning, ladies and gentlemen.  This

9    is my client, Charles Nolon Bush, who pretty much goes by

10   Nolon Bush.  And you won't hear him referred to as Charles.

11        THE COURT:  Thank you.  As I said, this is a criminal

12   trial in which the defendant is charged by indictment with

13   securities fraud, wire fraud, mail fraud, and money

14   laundering.  The defendant has entered a plea of not guilty.

15   The indictment in this case is only an accusation against the

16   defendant which informs the defendant of the charge.  You are

17   not to consider the filing of the indictment or its contents

18   as proof of the matters charged.

19        It is your duty to determine the facts in this case from

20   the evidence produced in court.  It is also your duty to

21   accept the law from the Court regardless of what you

22   personally believe the law is or ought to be.  You are to

23   apply the law to the facts and in this way decide the case.

24        Now, a defendant is presumed innocent.  This presumption

25   continues throughout the entire trial.  The burden of proof

1    is on the government until the very end of the case.   The

2    defendant has no burden to prove his innocence or present any

3    evidence or to testify.   Since the defendant has the right to

4    remain silent, the law prohibits you from arriving at your

5    verdict by considering that the defendant may not have

6    testified.

7        Finally, the government must prove the defendant's guilt

8    beyond a reasonable doubt.   I will give you further

9    instructions on this point later.   Bear in mind, in this

10   respect a criminal case is different than a civil case.

11       Now I am going to ask you general questions touching on

12   your qualifications to serve on this jury.   Before I do, I

13   would like each one of you to stand.   And Jean will put the

14   board up.   There's a list of questions that give us an

15   opportunity to meet you.   Can everybody see that?   This is an

16   opportunity for us to get to know you.

17       Ms. Kennedy, you're first.   If you would stand and tell us

18   about yourself.

19           PROSPECTIVE JUROR:   I'm Christina Kennedy.   I'm a

20   parent of three children.   Six-year-old, seven-year-old, and

21   a 13-year-old.   I am a business analyst with Safeco

22   Insurance.   My hobbies include being a parent.   And I have a

23   spouse who started working at Lowe's as an installment

24   manager.

25           THE COURT:   Now, let me tell you I always throw in an

1    additional question because as a trial lawyer I always wanted

2    to know who wanted to be here and who didn't want to be here.

3    It's not outcome determinative.  So saying you would rather

4    be somewhere else isn't going to get you anything.  But it is

5    important for the lawyers to know who wants to be here.

6         Would you like to serve as a juror?

7              PROSPECTIVE JUROR:  Yes.

8         I would like to expound upon that.  If I were on trial, I

9    would want me as a juror.  So in that way I would like to

10   stay here.

11             THE COURT:  Okay.  Thank you.

12             Ms. Anderson?

13             PROSPECTIVE JUROR:  I am Denise Anderson.  I'm a

14   self-employed independent insurance agent.  I also hold

15   recently a mortgage loan officer license.  My husband is a

16   machinist.  31 years with Boeing.  I have two adult children.

17   One who is 28 and works for me in my office.  And my son who

18   is 19 and is currently unemployed.  Construction.

19             THE COURT:  Would you like to serve on the jury?

20             PROSPECTIVE JUROR:  Yes, I would.

21             THE COURT:  Thank you.

22             Ms. Mordick?

23             PROSPECTIVE JUROR:  Rachel Mordick.  I am from Lewis

24   County.  Chehalis area.  My husband and I are the only two in

25   our family.  And I work for a bank.  I'm a personal banker

1  and he works for Safeway as a manager.  Special interest, I

2  play tennis and piano.

3          THE COURT:  Great.  Would you like to serve --

4          PROSPECTIVE JUROR:  I would like to serve.

5          THE COURT:  Thank you.

6          Mr. Harriman?

7          PROSPECTIVE JUROR:  Clark T.  I go by Tom.  I'm from

8  Vancouver.  Married with adult children.  Four grandchildren.

9  Retired from the Oklahoma Department of Current Technology

10  and Education.  Interest would be golf and working in and

11  around the house.

12          THE COURT:  Would you like to serve?

13          PROSPECTIVE JUROR:  Yes, I would.

14          THE COURT:  Thank you.

15      Ms. Lassiter?

16          PROSPECTIVE JUROR:  Kathryn Lassiter.  I go by Kathy.

17  I'm married.  My husband and I are both retired.  We have two

18  grown children.  Live in Clark County.  And yes, I would like

19  to serve.

20          THE COURT:  Thank you.

21          PROSPECTIVE JUROR:  Lynn Leslie.  I have four

22  children.  I live in Gig Harbor.  I have four grown children.

23  Special hobbies?  Golf.  Vacationing.  My husband is a

24  machinist also and minutes away from retiring.

25          THE COURT:  Would you like to serve?

1          PROSPECTIVE JUROR:  Yes.   The pay is better than my

2   business.

3          THE COURT:   Okay.

4          PROSPECTIVE JUROR:  My name is Jean Yackerly.  I am

5   from Centralia, Washington.  I'm a lifetime resident of Lewis

6   County.  I'm self-employed.  Sole business owner.  I have two

7   dogs.  I think that should count as family.  Special

8   interest, I like to garden.

9          THE COURT:  Would you like to serve?

10         PROSPECTIVE JUROR:  Yes, I would.

11         THE COURT:  Ms. Doue?

12         PROSPECTIVE JUROR:  Yes.  Doue.  Deborah Doue is my

13  name.  I am a self-employed massage therapist.  I am from

14  Port Orchard.  And my hobbies are skiing and yard

15  maintenance.

16         THE COURT:  Would you like to serve on the jury?

17         PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Mr. Little?

19         PROSPECTIVE JUROR:  Gary Little.  I'm from Olympia,

20  Washington.  And I am not employed.  I am retired.  And my

21  family, got three girls.  They're -- one is 47, one is 30,

22  and one is 32.  My special interest is, well, many.  I can't

23  name them all.  And my activities is hunting and playing

24  baseball.

25          THE COURT:  Thank you.

1          PROSPECTIVE JUROR:  Marjorie Mulqueeny.  I live in

2     the Lakebay area.  I am employed by Sedeco.  My husband is

3     retired.  Two grown sons, daughter-in-law, and two grandsons.

4     I like to garden.  I like to travel.  And it's interesting to

5     serve on a jury, but I have been called to jury duty three

6     times in the last five years.

7          THE COURT:  Do you feel reluctant to say yes?

8          PROSPECTIVE JUROR:  Yeah.

9          THE COURT:  Ms. Cohen?

10          PROSPECTIVE JUROR:  I'm Carolyn Cohen.  I've lived in

11     Tacoma all my life.  I work for the Tacoma Public Library as

12     a library associate.  I live alone.  Well, I live with a mean

13     cat.  And I am political junky.  News junky.  I like to read.

14          THE COURT:  Would you like to serve on the jury?

15          PROSPECTIVE JUROR:  Yes.  My civic duty.  But I would

16     really rather not this time.

17          THE COURT:  Ms. Irish?

18          PROSPECTIVE JUROR:  I am from Bremerton and I live

19     with my mom and step-dad.  I work at a daycare.  And I also

20     deliver newspapers.  And I really rather not be here.

21          THE COURT:  Thank you.

22          PROSPECTIVE JUROR:  Caroline McElwee.  I go by Carol.

23     I am a part-time page at Tacoma Public Library.  I'm a widow.

24     I live with a 15-year-old cat.  And I have -- I have five

25     grandchildren and ten grandchildren.  And I figure it's my

1   duty to be here.  I would serve.

2          THE COURT:  Thank you.

3      Ms. Dupree?

4          PROSPECTIVE JUROR:  My name is Carolyn Dupree.  I go

5   by Cathy.  I live in Puyallup.  I have lived here all my

6   life.  I have a husband and two grown children.  I like to

7   fish.

8          THE COURT:  Everybody will have -- did I ask you the

9   question about whether you would like to serve on the jury?

10         PROSPECTIVE JUROR:  Yes, I would.

11         THE COURT:  Everybody will have to keep their voice

12  up so the Court Reporter can hear you.

13     Mr. Piccolotto.

14         PROSPECTIVE JUROR:  Dennis Piccolotto.  And I live in

15  Olympia.  Divorced.  Self-employed.  And wholesales.  And one

16  son.  29-year-old school teacher.  And I like to go fishing

17  and ride motorcycles.  And I don't want to be here, but I am

18  here because it's my civic duty.

19         THE COURT:  Thank you.

20         PROSPECTIVE JUROR:  I'm Craig Ayers.  I live in

21  Bonney Lake.  I work for Pilchuck Contractors.  I'm a

22  superintendent for -- we do all PSE work.  I have got three

23  kids.  12, 10 and 7.  So my hobbies are running them to

24  soccer and baseball every night.  And I like to play golf.

25  And yes, I would like to serve.

1              THE COURT:   Thank you.

2              PROSPECTIVE JUROR:   Name's Melissa Van Kooten.   I'm

3    from Centralia, Washington.   I have a little boy who is

4    almost three.   I'm a mail lady.   I like to garden.   I like to

5    camp.   And I am happy to serve.

6              THE COURT:   Mr. Gallagher?

7              PROSPECTIVE JUROR:   Steven Gallagher.   I live in Mill

8    Creek.   Work for Boeing Company.   I have got a wife who is a

9    teacher, and a fourth and fifth grade boy.   Two boys.   I like

10   to go camping.   Play golf.   I would like to serve.

11             THE COURT:   Thank you.

12             PROSPECTIVE JUROR:   Mr. Knox.   John Knox.   I live in

13   Tacoma.   Work for Skyline Mail Carriers.   Run the company.

14             THE COURT:   Thank you.

15      Ms. Britton?

16             PROSPECTIVE JUROR:   Gini Britton.   I live in Olympia.

17   I work for Investors Institution review board.   I'm married.

18   My husband is a paramedic, firefighter, fire commissioner,

19   and plays in a country band.   Special interests are breaking

20   down band equipment.   Would be riding horses.

21             THE COURT:   Would you like to serve?

22             PROSPECTIVE JUROR:   Yes.

23             THE COURT:   Ms. Hall?

24             PROSPECTIVE JUROR:   I'm Lynette Hall.   I am from

25   University Place.   I have been a teacher for 23 years.

1   Special education.  I have two children.  My daughter is a

2   teacher and my son just graduated from college.  My special

3   interest is my brand-new granddaughter, who is six months

4   old.

5           THE COURT:  Would you like to serve?

6           PROSPECTIVE JUROR:  I would love to because I never

7   have.

8           THE COURT:  Thank you.

9      Mr. Daniel?

10          PROSPECTIVE JUROR:  Eugene Daniel.  My wife and I

11  reside in Olympia.  I am retired.  My special interest right

12  now is raising money for the VA hospital down in Lakewood.

13  And I have no problem serving.

14          THE COURT:  Great.

15     Mr. Protsman?

16          PROSPECTIVE JUROR:  Shawn Protsman.  I live in

17  Olympia.  My employer is Townsend Security Solutions.  I have

18  six children ranging from 2 to 13.  My interests are my

19  children, my wife.  And I enjoy reading history.  Especially

20  military history.  That pretty much consumes all my time.  I

21  would like to serve, but not at this time.

22          THE COURT:  Okay.  Mr. Contris?

23          PROSPECTIVE JUROR:  Mark Contris.  I live in Olympia.

24  I am the locksmith for the State of Washington campus.  I

25  have two 12-year-old children.  Special interest, concrete

1  fabrication.  Hobbies are concrete fabrication.  And yes, I

2  would like to serve.

3          THE COURT:  Thank you.

4          PROSPECTIVE JUROR:  I am Howard Hama.  I live in

5  Tumwater.  My employer is Thurston County.  I'm a water

6  resource specialist.  I'm single.  Special interest,

7  honestly, is geology.  I would like to serve.

8          THE COURT:  Great.

9    Mr. Kulsich?

10          PROSPECTIVE JUROR:  Anthony Kulsich.  I live in

11  Hoquiam, Grays Harbor.  Employed by Westport Shipyard.

12  Marine electrician.  And not married.  I don't have any kids.

13  I like to snowboard, play softball.

14          THE COURT:  Would you like to serve?

15          PROSPECTIVE JUROR:  Not really.

16          THE COURT:  Okay.  Thanks.

17    Mr. Patterson?

18          PROSPECTIVE JUROR:  Duane Patterson.  I live in Roy,

19  Washington.  Employer is Conoco-Phillips.  Married.  Have

20  three kids.  My wife is a contract employee for the

21  U.S. Postal Service.  Special interest, church.  And hobbies

22  are baseball.  Wouldn't mind serving.

23          THE COURT:  Great.  Thank you, very much.

24    Mr. Perry?

25          PROSPECTIVE JUROR:  Good morning.  I'm Phil Perry.

1   I'm from Yelm.  I'm senior pastor at Prairie Baptist

2   Fellowship.  My wife is a school teacher.  I have three girls

3   ages 10, 7, 5.  I like to golf.  I am a soccer coach.  And I

4   consider jury service right up there with voting.  It would

5   be my privilege.

6          THE COURT:  Thank you.

7    Ms. Rosewood?

8          PROSPECTIVE JUROR:  I'm Deborah Rosewood.  I live in

9   Longview.  I go to school full time at Aurora County College.

10   I am divorced.  I have a seven-year-old son.  And homework is

11   my hobbies.  No, I do not want to serve at this time.

12          THE COURT:  Okay.

13    Mr. Taylor?

14          PROSPECTIVE JUROR:  Kenneth Taylor.  I live in

15   Vancouver.  And I am a licensed real estate agent.  State of

16   Oregon.  I have a very-soon-to-be 16-year-old daughter who

17   would fall into the category of special interest.  And

18   activities, I enjoy golf.  Yes, it would be my privilege to

19   serve.

20          THE COURT:  Thank you.

21          PROSPECTIVE JUROR:  I am Dick Hybak.  I am from

22   Tacoma last five years.  Basically born and raised in

23   Washington.  Retired police lieutenant from Seattle Police

24   Department.  My wife and I are retired.  We have two grown

25   children and one little granddaughter.  And I like playing

1    golf.  I would have no problem serving.

2        THE COURT:  Ms. Lause?

3        PROSPECTIVE JUROR:  I am Shelley Lause.  I live in

4    Bremerton.  And I am a recruiter for Tacoma Community

5    College.  I have a three-year-old active boy.  I'm a single

6    parent.  And he's my big hobby.  I like being outdoors.  I

7    would love to serve.

8        THE COURT:  Thank you.

9        PROSPECTIVE JUROR:  Mr. Carol Schrader.  And I live

10   in Puyallup.  I'm retired from the State of Washington.  I

11   have three adult children.  Special interest are I like water

12   aerobics, walking my dog.  I belong on a senior bowling team.

13   This is my fourth summons, so I really don't want to serve.

14       THE COURT:  Okay.

15       PROSPECTIVE JUROR:  Ron Ruby.  I live here in Tacoma.

16   Retired.  Last five years been with the Washington State

17   Department of Corrections.  I live alone.  I'm divorced.

18   Special interest, I go to they gym a lot and I play banjo

19   with the banjo club.

20       THE COURT:  Would you like to serve --

21       PROSPECTIVE JUROR:  Yes, I would be okay.

22       THE COURT:  Ms. Klooz?

23       PROSPECTIVE JUROR:  I'm Carol Klooz.  I live in Port

24   Orchard.  And I am retired from business.  General practice

25   in Des Moines.  And I have three children, adult children.

1  And my husband is retired.  My special interest is working in

2  my yard and baking.  Activities, going camping.

3      THE COURT:  Would you like to serve?

4      PROSPECTIVE JUROR:  I would really like to serve, but

5  I have a back problem.  I don't think I can sit too long.

6      THE COURT:  Okay.  We'll clear that later.  There are

7  questions I will ask you about that.

8    Ms. Neeland?

9      PROSPECTIVE JUROR:  Diana Neeland.  I'm married.  My

10  husband is a machine operator at Boeing.  I have four

11  children.  Two boys.  Two girls.  Three are out of the house.

12  One still lives at home with us.  I have three dogs that live

13  with us.  Sometimes five, depending on my children's dogs.

14  And special interest are baking, sewing, quilting, gardening,

15  running children around.  Would I like to serve?  It doesn't

16  matter either way.

17      THE COURT:  Thanks.

18    Mr. Paplow?

19      PROSPECTIVE JUROR:  I'm Dave Paplow.  I work for the

20  State of Washington.  I've lived in Tacoma all my life.  I

21  work with special interest children.  Rainier School.  I have

22  been there 38 years.  My wife sells Prepaid Legal.  I have

23  three kids.  Two out of the house.  One 39.  One 24.  And I

24  have a young one, 13, still at home.  My special interest are

25  swimming.  I am in recreation.  I do a lot of different

1  recreation-type things, special activities.  Hobbies,

2  fishing.

3          THE COURT:  Great.

4          PROSPECTIVE JUROR:  I would like to serve.  I have

5  never served.

6          THE COURT:  Mr. Benson?

7          PROSPECTIVE JUROR:  Brian Benson.  I live in Olympia,

8  Washington.  I'm a web application developer for educational

9  services.  I'm married.  My wife is going to school full time

10  at Evergreen State College and also working at JCPenney.  I

11  like music.  Interested in science, technology, current

12  events, and I play the drums.

13          THE COURT:  Would you like to serve?

14          PROSPECTIVE JUROR:  Why not?

15          THE COURT:  Mr. Guerrero?

16          PROSPECTIVE JUROR:  Kyle Guerrero.  I live in Port

17  Orchard.  Originally from Guam.  Diagnostic technician for

18  Toyota.  Special interest, right now PV football.  We're

19  doing better than the Seahawks.  And my activities, hobbies

20  are sports and music.  And I would want to serve.  It doesn't

21  matter.

22          THE COURT:  How long have you been --

23          PROSPECTIVE JUROR:  Four years.

24          THE COURT:  We held court there for a couple of

25  weeks.  It's a beautiful island.

1    Ladies and gentlemen, at this time I am going to ask you a

2    few questions touching on your qualifications to sit upon a

3    jury, this jury.  Please do not relate any specific thing you

4    may have heard concerning the case, but raise your hand if

5    you would answer yes or probably to any of the following

6    questions.

7    And let me just sort of, by way of preface, tell you what

8    we're looking for are people who, because of personal

9    relationships -- they may not be a witness or more than one

10   witness or they may not be a lawyer or the judge or something

11   that would be a potential difficulty in being a fair and

12   impartial juror.  Their life experience may be so close to

13   the facts that are going to be developed in this particular

14   trial that they would not be an ideal juror.  They would have

15   questions about their ability to be fair and impartial.

16   Their beliefs, strongly held beliefs might make them less

17   than ideal for a particular case.

18   So we're not looking for -- there is no such thing as an

19   ideal juror.  There are just jurors who, given a particular

20   case, are better suited because they're more likely to come

21   in without prejudices or biases or preconceived notions that

22   would otherwise influence the decision-making process.

23   So we ask you these questions, like I say, not to pry, but

24   we need your candid responses.  And I will usually follow up

25   by asking you whether or not the relationships or your life

1    experience or your training or what have you, whether or not

2    that would cause you to doubt your ability to be fair and

3    impartial.  I want you to reflect on that question.  But that

4    will usually be -- that's usually the punch line.

5        All right.  I am going to read to you a brief statement of

6    the case.  We've tried to make this as plain vanilla and

7    adjective-free just to give you a background in the case.

8        Charles Nolon Bush, director of Cornerstone Institute, is

9    charged with many counts of securities fraud, wire fraud,

10   mail fraud, and transactional money laundering.

11       The government contends that between the period of about

12   December 1998 through some time in January 2002 Nolon Bush

13   used interstate commerce in the mails to obtain investment

14   funds from people.  The government also alleges Mr. Bush used

15   false information and misleading promises of high returns,

16   motivating people to invest a total of about $35 million in

17   various corporate entities.

18       The government also alleges that Mr. Bush diverted

19   approximately two-thirds of these investments to purposes

20   other than investing, including supporting his own lifestyle.

21       The government further alleges that Mr. Bush engaged in a

22   classic Ponzi or pyramid scheme in order to promote the

23   scheme.  Mr. Bush allegedly used funds from some investors to

24   pay others, knowing that those investors would tell others

25   about the apparent investment opportunity.  Most investors

1    lost their principle investment and did not receive any

2    interest or dividend payments.

3        Mr. Bush denies all these allegations and contends that he

4    operated as a religious society under the principle of a

5    corporation sole.  A corporation sole is a type of

6    corporation for religious societies.

7        Mr. Bush further contends that he was offering people the

8    opportunity to loan his religious society money evidenced by

9    a promise or a note in order to participate in charitable

10   projects.  Those projects included a resort in Mexico to help

11   underprivileged people and provide jobs and other necessary

12   services, as well as a retreat for women suffering from

13   domestic violence.

14       So that tells you a little about the case.

15       Has anybody here heard about this case before?

16           PROSPECTIVE JUROR:  I heard.

17           THE COURT:  Ms. Mulqueeny, under what circumstances

18   do you think you heard about this case?

19           PROSPECTIVE JUROR:  News or paper.  And just about

20   what you said is about what I heard.

21           THE COURT:  Did your reading or hearing about this

22   case cause you to reach any preconceived notion about what

23   the actual facts are?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  As you sit here today do you believe one

1  side is wrong and one side is right, or would you be able to

2  listen to the testimony and come to your own conclusion based

3  on the evidence?

4       PROSPECTIVE JUROR:  I could listen to the testimony

5  and come to my own conclusions.

6       THE COURT:  All right.  Anybody else who thinks

7  they've heard about this case?

8    Mr. Piccolotto?

9       PROSPECTIVE JUROR:  I read something about it in the

10  newspaper.  I can't remember the exact details, but it did

11  sound familiar.

12      THE COURT:  Anything about what you may have read or

13  heard that causes you to doubt your ability to be fair and

14  impartial?

15      PROSPECTIVE JUROR:  I think I will be okay with it.

16      THE COURT:  Anybody else?

17    Has anyone ever expressed to either of you an opinion

18  about this case?

19    Mr. Piccolotto?

20      PROSPECTIVE JUROR:  No.

21      THE COURT:  Do any of you know Mr. Bush?  Anybody

22  know Mr. Bush?

23    How about the lawyers or the agents that are sitting here?

24  Anybody know the judge or anybody sitting here at the front

25  of the courtroom.

1          Anybody know someone else who is on the panel?

2          PROSPECTIVE JUROR:  Carol and I both work for Tacoma

3    Public Library.

4          THE COURT:  Ms. McElwee and Ms. Cohen work at the

5    library together.

6          PROSPECTIVE JUROR:  We work at different libraries.

7          THE COURT:  Are you close, personal friends or just

8    colleagues?

9          PROSPECTIVE JUROR:  Just colleagues.

10         THE COURT:  If you were both selected, would you be

11   sort of your own cabal?  Would you be inclined, Ms. Cohen, to

12   give Ms. McElwee's comments greater credence than any of your

13   other fellow jurors merely because you know each other from

14   work?

15         PROSPECTIVE JUROR:  No, I don't think so.

16         THE COURT:  Same question for you, Ms. McElwee.

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  You understand that I will give you

19   instructions about how you're to deliberate and listen, keep

20   your own counsel and make your own decisions and so forth and

21   so on?  But the concern is if you know each other well, that

22   you may go in under the buddy system, and that's probably

23   inappropriate for a deliberations.

24         You don't have any concern about that?

25         PROSPECTIVE JUROR:  We don't know each other that

1    well.

2            THE COURT:   Okay.   Well, you would if you were on a

3    jury after deliberating.

4        There is a long witness list.   If you think you know

5    someone, raise your hand.   We'll explore that.   These are

6    people who may testify in this proceeding.

7        Judith Allison, Jason Bain, Courtney Benscoter, Cody Bly,

8    Carrie Breed, who you've met from the IRS.   She's a special

9    agent with the IRS.   William Brouillet, who is with B&C

10    Telecom.   Steve Camp, who is with the Seattle Mariners.

11    Kathy Cartwright, who is a Qwest representative.   Joe Chard,

12    who is with the Seattle Mariners.   Wayne Collins of Collins

13    Plumbing.   Richard Cox of Domestic International Consultants.

14    Yvonne Crepeau, C-R-E-P-E-A-U.   Jeff Cryder, C-R-Y-D-E-R, of

15    Nu-Tech building company.   Raymond Donohue.   Bridgett Duffy.

16    This is a FBI cart -- Mr. Storm?

17            MR. STORM:   Computer analyst.

18            THE COURT:   She's with the FBI?

19            MR. STORM:   Yes, Your Honor.

20            THE COURT:   Thank you.

21        Harrison Fagg, F-A-G-G.   Donald Fisher.   Brian Fraisure,

22    F-R-A-I-S-U-R-E, of Fraisure Remodeling.   David Franke,

23    F-R-A-N-K-E.

24            PROSPECTIVE JUROR:   Is he with Boeing?

25            THE COURT:   Pardon?

1        David Franke, is he at Boeing?

2              MR. STORM:   Retired.   Living in Eastern Washington.

3              THE COURT:   Nope.   Okay.

4        Edgar Ojin, American Express representative.   Sherry

5    Golden of Mail Boxes Etc.   Gina Hason with the Seattle

6    Mariners.   Maryann Houkli of Touch of Health.   Jessica Haukos

7    H-A-U-K-O-S, a U.S. Bank representative.   Peter Hereld,

8    H-E-R-E-L-D.   James Hollis, H-O-L-L-I-S, also a Mail Boxes

9    Etc. representative.   Dorothy Hostetler.   Adam Jay, a Wells

10   Fargo bank representative.   William Kerr.   Joseph Ladley.

11   Lance Lopes.   Jason Luna.   Andrew McKay, DFI.

12             MR. STORM:   Washington State Department of Financial

13   Institutions.

14             THE COURT:   Robert Mansueto.   Suzy Marcello-Ripley.

15   Kenneth Marshal.   Janice Marvel.   Greg McCormick.   Josh

16   McLaughlin.   William Miertschin.   Ruth Mizilak, a Banner Bank

17   representative.   Kara Montplaisir, M-O-N-T-P-L-A-S-I-R, of

18   BBC Dodge.   John Morris.   Mark Mueller, Bronze Edition

19   Gallery.   Jesse Munch.   Darryl Offet.   Tom O'Keefe.   Michael

20   O'Neill of Michael O'Neill Interiors.   Stan Pilkey, USPIS

21   analyst.   Patty Rief.   Starla Ryan.   Angela Salazar,

22   Washington Mutual.   Trenton Schmatz, FBI special agent.

23   Robert Shaw.   Ajit Simha.   Eugene Skinner, who is a Customs

24   and Border Patrol officer.   Douglas Stephan, S-T-E-P-H-A-N.

25   Tammy Stuckey-Webb.   Lorelei Tarsiuk.   Melanie Tulley, AT&T

1  Wireless/Cingular representative.  David Velander.  Van Vlist

2  of Dick Vlist Motors.  Edward Wallace of Harley-Davidson.

3  Tessie Waltman.  Vicki Webster.  Robert Werbick,

4  W-E-R-B-I-C-K.  And, finally, Clayton Wible, who was an FBI

5  special agent.

6      All right.  Nobody knows any of those folks?

7      Is there anyone here among you who would prefer not to sit

8  on a jury concerning a case of this kind?  In other words,

9  that just the nature of the case is a reason for you not to

10 be here because of something in your background?  Anybody?

11     Have you or a family member or close personal friend been

12 employed by the federal government, including the military?

13     This is where we get everybody talking here.  Let's keep

14 the hands up.

15     Ms. Mordick?  Yes.  Who is employed by the government or

16 military?

17     PROSPECTIVE JUROR:  My dad is with the U.S. Postal

18 Service and also with the military.  He's a warrant officer

19 at Fort Lewis.

20     THE COURT:  At Fort Lewis.

21 Ms. Lassiter?

22     PROSPECTIVE JUROR:  My husband is retired from

23 Bonneville Power Administration.  He was a logical engineer.

24     THE COURT:  Ms. Doue?

25     PROSPECTIVE JUROR:  Well, I was previously employed

1    by the Department of Agriculture.

2            THE COURT:  Mr. Littlecot?

3            PROSPECTIVE JUROR:  My uncle works for the

4    government.  For the courthouse in Olympia.

5            THE COURT:  State government down there?

6            PROSPECTIVE JUROR:  Yes.

7            THE CLERK:  Who else?

8            PROSPECTIVE JUROR:  I was thinking about a long time

9    ago when my husband was in the service when he was young.

10           THE COURT:  Ms. Irish --

11           PROSPECTIVE JUROR:  My stepfather works for the

12    shipyard and my uncle works for postal.

13           THE COURT:  Anybody else in the box?

14       On the bench, we've got Ms. Van Kooten.

15           PROSPECTIVE JUROR:  I work for L&I.

16           THE COURT:  Anybody in the front row?

17       Mr. Daniel?

18           PROSPECTIVE JUROR:  I was in the Army 33 years.

19           THE COURT:  Mr. Contris?

20           PROSPECTIVE JUROR:  I work for the State of

21    Washington.

22           THE COURT:  Okay.  I passed over -- what do you do

23    for the State of Washington?

24           PROSPECTIVE JUROR:  Locksmith.

25           THE COURT:  That's right.

1          I passed over Mr. Piccolotto.

2          PROSPECTIVE JUROR:  I served two years in the

3     U.S. Army.

4          THE COURT:  Mr. Hama?

5          PROSPECTIVE JUROR:  I am retired from the Army.

6          THE COURT:  Retired Army.

7          Mr. Patterson?

8          PROSPECTIVE JUROR:  My wife works for the U.S. Postal

9     Service.  Contract labor.

10          THE COURT:  All right.  Mr. Perry?

11          PROSPECTIVE JUROR:  Four-year Army veteran.

12          THE COURT:  Very well.

13     Mr. Rosewood?

14          PROSPECTIVE JUROR:  My brother and his wife are both

15     at Fort Lewis.  My brother retired from U.S. Postal.

16          THE COURT:  Mr. Ruby?

17          PROSPECTIVE JUROR:  I was in the United States Army

18     for a couple years many years ago, and retired Army.

19          THE COURT:  All right.

20     And then Mr. Paplow?

21          PROSPECTIVE JUROR:  State of Washington recreational

22     specialist for Lynnwood school.

23          THE COURT:  Right.  Mr. Benson?

24          PROSPECTIVE JUROR:  My wife's cousin currently.

25          ANOTHER PROSPECTIVE JUROR:  My father is retired

1   military.  He's a contractor with the Navy shipyard.

2        THE COURT:  A number of you raised your hand when you

3   said you work for -- somebody close to you worked for the

4   postal department.  Any of them work as inspectors for the

5   postal department as opposed to, say, a letter carrier or

6   some other function?  Anybody who is in the investigative arm

7   of the postal service?

8        Let me tell you the reason we ask questions about

9   that on a case like this.  You know from the list that there

10  are going to be some law enforcement.  There is people who

11  testify who are from the government.  There are going to be

12  some special agents from the Internal Revenue Service or from

13  other divisions or agencies within the government.

14      The important question is for those of you who raised your

15  hand, but it really applies to the rest of you as well.

16  Anybody here who thinks that somebody who testifies from the

17  government, either from law enforcement or some other agency,

18  that their testimony would be entitled to greater or lesser

19  credibility than a civilian merely by virtue of their

20  employment?

21      Anybody who thinks that, you know, they're from the

22  government; I don't believe them?  Or they're from the

23  government; they wouldn't lie to us?

24      Anybody who comes with that -- all right.  Thank you.

25      Have you or anyone close to you been employed by an

1    attorney or in some field of law in some capacity?

2        Again, here we're looking for -- obviously, the Court will

3    instruct you on the law.  But it's important that when you go

4    in and deliberate, that everybody starts with sort of the

5    same -- the case is to be decided on the evidence you heard

6    in court.  Not what you may know from going to law school

7    yourself or something like that.

8        Ms. Lassiter, tell me about your experience.

9        PROSPECTIVE JUROR:  Back in around 1972 and '71, I

10    was a legal secretary for Legal Services in Seattle.

11        THE COURT:  Okay.  Anything about that employment

12    that causes you to have any qualms or apprehension about your

13    ability to be fair and impartial in a case of this type?

14        PROSPECTIVE JUROR:  No.

15        THE COURT:  Anybody else?

16        A PROSPECTIVE JUROR:  I work for Lacey Plywood.  They

17    went into arbitration and they subpoenaed me.  I had to step

18    between so many -- what do you call them?

19        THE COURT:  Lawyers.

20        PROSPECTIVE JUROR:  A lot of people that said they

21    would tell them what happened.

22        THE COURT:  Okay.  That's about the only time.

23    Then anybody else in the box?

24    Ms. Britton, I thought I saw your hand.

25        PROSPECTIVE JUROR:  Back in high school, I worked

1    part time for district court.

2            THE COURT:   Anybody else?

3       Ms. Dupree?

4            PROSPECTIVE JUROR:   I worked as a security officer.

5            THE COURT:   Security officer.

6       Anybody else?

7       All right.   Mr. Taylor?

8            PROSPECTIVE JUROR:   It's not employment.   I have --

9    my father was a police officer, City of Portland, for 30

10   years.   And I currently have a brother-in-law that is a

11   police officer.

12           THE COURT:   Mr. Hybak?

13           PROSPECTIVE JUROR:   I have got a couple friends that

14   are attorneys, and a nephew.   And just in the business I work

15   in, I've consulted with them.   I work with prosecutors and

16   attorneys.

17           THE COURT:   Let me digress for a minute.

18       Is there anything about your employment -- or you're a

19   retired police lieutenant from the Seattle Police Department.

20   You're going to have -- if you're on this jury, you're going

21   to listen to law enforcement people testify.

22       Is there anything that gives you pause?   If you were

23   Mr. Bush or the government, would you want somebody like you

24   on the jury?

25           PROSPECTIVE JUROR:   I like to think, yeah, with an

1    open mind.  I'm sure because of my dealings, I may listen a

2    little more to one side.  But I try not to do that.

3              THE COURT:  If I were to ask your best friend whether

4    you were a person who had a reputation for being open minded,

5    what would he or she say?

6              PROSPECTIVE JUROR:  I think they would say yes.

7              THE COURT:  Ms. Lause?

8              PROSPECTIVE JUROR:  I was a file clerk for a law firm

9    for about six months 20 years ago.

10             THE COURT:  Anybody else in the front row or in the

11   back row?

12             Okay.  We're going take a break.  It may seem a

13   little early to you.  We've been out here since a little

14   before 9:00.  The hardest working person in the courtroom,

15   bar none, is the Court Reporter.  And so I try at about an

16   hour and 15, hour and 20 minutes to take a little break so

17   that they can rest.  And it's a good excuse for me, too.

18        So I am going to ask you to return to the jury assembly

19   room.  It's absolutely important and vital that you not talk

20   about this case.  You not talk about the jury selection

21   process or anything.  I noted there are some of you that are

22   baseball players and fans.  You can talk about -- well, you

23   can't talk about sports up here anymore, can you?

24        You can find something to talk about that is interesting.

25   But just don't talk about the case.  And we'll bring you back

1    here.  And this is going -- this will take a while.  We're

2    going to go until we get a jury.  Until we get 14 folks.

3    Then we can let everybody else go.  So we may have a late

4    lunch for you.  I think it's better that we just slog through

5    and get this process over.  And before lunch, if we bog down

6    too much, then maybe I will rethink that.

7        If you would retire to jury assembly room, we'll get back

8    to you in 10, 12 minutes.

9                          (Short recess taken.)

10            THE COURT:  Anything we need to take up before we

11   take the break?

12            MS. OLSON:  Not from defense.

13            THE COURT:  Court in recess.

14        (Court in recess.)

15            THE COURT:  Please be seated.

16        Anything we need to take up before the jury comes back?

17            MR. STORM:  No, Your Honor.

18            THE COURT:  All right.

19        (Jury enters the courtroom.)

20            THE COURT:  Please be seated.

21        Ladies and gentlemen, let me just tell you that part of

22   our tradition in this court and in most perhaps every

23   courthouse in America, when the jury comes in, when the jury

24   leaves, lawyers, litigants stand out of respect for the

25   awesome responsibility of jurors and the important role they

1  play in our civil and criminal justice system.  That's why we

2  don't pipe you in like on the ships or we don't play ruffles

3  and flourishes.  We do stand and wait until you're in your

4  place before we sit.

5      All right.  Have you or a family member or close personal

6  friend had a bad experience with a police officer or someone

7  in law enforcement?  Anybody here that has had an experience

8  that just -- I don't like cops and this is why?  I don't like

9  people in law enforcement and this is why?  Anybody?

10         PROSPECTIVE JUROR:  I have supervised one or two

11  employees with the Department of Corrections.

12         THE COURT:  Okay.

13         PROSPECTIVE JUROR:  Not in an adversarial way.

14         THE COURT:  Okay.

15         PROSPECTIVE JUROR:  They were arrested.

16         THE COURT:  I take it that wouldn't -- that hasn't --

17  because of the nature of the work, because you knew other

18  people who were in law enforcement who you did have respect

19  for --

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  -- you don't have a jaundiced view one

22  way or another?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Great.

25      Have you or a family member or close personal friend been

1  the victim of a crime?  Who here has been the victim of a

2  crime?  Again, we're looking for people who might --

3      Mr. Harriman?

4          PROSPECTIVE JUROR:  My mother had her purse stolen in

5  New Orleans.  That's been it.

6          ANOTHER PROSPECTIVE JUROR:  Someone got a hold of our

7  credit card number.  But we didn't personally lose any money

8  off it because the credit union called.

9          THE COURT:  Ms. Anderson?

10          PROSPECTIVE JUROR:  I have had my place of employment

11 broke into twice and my home has had things stolen from it.

12          THE COURT:  Anything about that experience that would

13 cause you to come here as a juror and sort of, you know, have

14 a preconceived notion that defendants are bad or --

15          PROSPECTIVE JUROR:  No.  I wish they would have

16 caught them.

17          THE COURT:  Sure.  But you think you can be fair and

18 impartial here notwithstanding what happened to you in your

19 business?

20          PROSPECTIVE JUROR:  Yes, I can.

21          THE COURT:  Mr. Little?

22          PROSPECTIVE JUROR:  I had my house broken into twice.

23 I didn't really -- it really makes you feel like you've

24 really been vandalized.  And it wasn't right.  The sheriff

25 come and investigated it.  Kind of disappointing, some

1    people, what they say and what they do.

2          THE COURT:  Right.  Anything, again, about that

3    experience that would cause you to doubt your ability to be

4    fair and impartial in a case of this type?

5          PROSPECTIVE JUROR:  I really don't know.

6          THE COURT:  Well, again, if I were to ask your best

7    friend whether you had a reputation for being open minded,

8    what would they tell me?

9          PROSPECTIVE JUROR:  I don't know.

10         THE COURT:  Do you think you could listen to the

11   evidence and make up your own mind based on --

12         PROSPECTIVE JUROR:  I think so.

13         THE COURT:   -- your common sense?

14         PROSPECTIVE JUROR:  I think so.

15         THE COURT:  All right.  Anybody else in the box that

16   has -- Ms. Mulqueeny?

17         PROSPECTIVE JUROR:  Someone broke in my son's car.

18   Took my son's speakers trying to get his radio.  Really

19   didn't take much of mine.

20         THE COURT:  Wouldn't influence you here?  All right.

21     Ms. McElwee?

22         PROSPECTIVE JUROR:  I had the garage broken into and

23   things taken out of my car.  And also my lawn mower off my

24   patio, that I had to buy a new lawn mower.  And my house

25   broken into quite a few times like 20 years ago.

1          THE COURT:  Anything about that that would influence

2    your ability to be impartial here?

3       Ms. Dupree, did you have your hand up?

4          PROSPECTIVE JUROR:  I had my vehicle stolen and I

5    have been assaulted.

6          THE COURT:  Anything about that that would cause you

7    to doubt your ability to be fair and impartial in a case like

8    this?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Mr. Piccolotto?

11          PROSPECTIVE JUROR:  I had my business broken in half

12    a dozen times over the years.  A burglar went in there.  And

13    I still get the occasional break-in anyway.

14          THE COURT:  Right.

15       Anybody else on the this side of the room?  Okay.

16       Mr. Ruby first.

17          PROSPECTIVE JUROR:  I have been burglarized in the

18    last 12 years three times.

19          THE COURT:  Again, anything about that experience

20    that would cause you to doubt your ability to be fair and

21    impartial in a case of this type?

22          PROSPECTIVE JUROR:  I don't think so.

23          THE COURT:  Mr. Paplow, did I see your hand up?

24          PROSPECTIVE JUROR:  I haven't been broken into.  They

25    broke into my backyard, taken my lawn mower.  I went out one

1    morning and my wife that said my trunk is gone.  And they

2    took the trunk off the car.  Of her car.  Six months later go

3    out to my car, they took my hood this time.

4            THE COURT:  What's the old song?  One piece at a

5    time?

6            PROSPECTIVE JUROR:  They didn't take the car.  They

7    took the pieces.

8            THE COURT:  I think there is a Johnny Cash song about

9    that.

10           PROSPECTIVE JUROR:  I was sort of amazed that they'd

11   do something like that.

12           THE COURT:  Anything about that experience that would

13   cause you to doubt your ability to be fair and impartial in a

14   case of this type?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Ms. Lause, you had your hand up?

17           PROSPECTIVE JUROR:  My car was broken into.

18           THE COURT:  Okay.  Any impact on your ability to be

19   fair and impartial as far as you're concerned?

20           PROSPECTIVE JUROR:  No.  Like I said, it happened...

21           THE COURT:  Mr. Benson, did you raise your hand?

22           PROSPECTIVE JUROR:  My grandmother has had some

23   identity theft problems a couple times.  Recently, people

24   called her on the phone and tell her she won a trip and get

25   her Social Security number and stuff like that.  She lost a

1   lot of money out of that deal.

2       THE COURT:  Anything about that experience that would

3   cause you to doubt your ability to be fair and impartial in a

4   case of this type?

5       PROSPECTIVE JUROR:  I don't think so.  I suppose it

6   might color my viewpoint if anything happens over the phone.

7   Kind of like that, but...

8       THE COURT:  Well, there may be some follow-up

9   questions.  But basically you think you could listen to the

10  evidence and apply the law as the Court gives it to you and

11  use your common sense in reaching a fair result?

12      PROSPECTIVE JUROR:  Yes.

13      THE COURT:  You think you're pretty good at that?

14      PROSPECTIVE JUROR:  Yes.

15      THE COURT:  Mr. Guerrero, did you have your hand up?

16      PROSPECTIVE JUROR:  No.

17      THE COURT:  I'm sorry.  Mr. Taylor and Mr. Hybak?

18      PROSPECTIVE JUROR:  A couple car vandalisms over the

19  years.  I had my wallet stolen out of a locker one time where

20  my credit cards were used.  But nothing that would influence

21  my ability.

22      ANOTHER PROSPECTIVE JUROR:  Burglary back in the

23  early '70s.  Vehicle was broken into.

24      THE COURT:  Don't think it would impact your ability

25  to be fair and impartial here?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you, a family member, or close

3    personal friend been arrested or accused of a crime?  This is

4    a question -- you can tell why we ask the question.  We don't

5    want anybody who is favorable for law enforcement necessarily

6    or favorable for defendants.

7      Ms. Anderson?

8          PROSPECTIVE JUROR:  My brother had been arrested and

9    spent time in jail for meth use.

10         THE COURT:  Anything about that experience that would

11   cause you to doubt your ability to be fair and impartial in a

12   case of this type?

13     Did you say family members?

14         PROSPECTIVE JUROR:  My ex-husband was arrested.

15         THE COURT:  Anything about that that would cause you

16   to not be fair and impartial?

17         ANOTHER PROSPECTIVE JUROR:  No.

18         ANOTHER PROSPECTIVE JUROR:  Brother.  Drug use.

19         THE COURT:  Back row?

20         PROSPECTIVE JUROR:  Uncle was indicted for gambling

21   in Hawaii.  Running gambling.

22         THE COURT:  Ms. Rosewood?

23         PROSPECTIVE JUROR:  My ex-husband is a felon.

24         THE COURT:  What was the nature of the felony?

25         PROSPECTIVE JUROR:  A lot of them.

1              THE COURT:   Is there a particular kind?

2              PROSPECTIVE JUROR:   Assault and robbery.

3              THE COURT:   Anything about that experience that would

4    cause you to doubt your ability to be fair and impartial in a

5    case like this?

6              PROSPECTIVE JUROR:   No.

7              THE COURT:   Do you think you can keep an open mind

8    and wait to hear all the facts before you make up your mind?

9              PROSPECTIVE JUROR:   Yes.

10             THE COURT:   Mr. Neeland and Mr. Paplow?

11             PROSPECTIVE JUROR:   15 years ago, arrested for a drug

12   bust.

13             THE COURT:   Anything about that that would cause you

14   to doubt your ability to be fair and impartial to either

15   side?

16             PROSPECTIVE JUROR:   It was my ex-husband.

17             THE COURT:   Ms. Paplow?  Mr. Paplow?

18             PROSPECTIVE JUROR:   My son has been arrested.  And he

19   has felonies.  He's on probation until February or something

20   like that.

21             THE COURT:   What were the nature of the crimes?

22             PROSPECTIVE JUROR:   Growing pot or something.

23        Then the other one was having guns in the house.  But I

24   tried to explain to him they're my guns.  I never got the

25   guns back.  Things happen.  That's the way it is.  I don't

1    have anything -- I don't hold anything against him.

2         THE COURT:  I take it you wouldn't enter into this

3    proceeding with any preconceived notions either for or

4    against one side or the other here?

5         PROSPECTIVE JUROR:  No.

6         THE COURT:  Anybody else?

7      Who here has been a party to a lawsuit?

8         Now we want to find out who has a prior relationship

9    with the Court system.

10     Mr. Kennedy?

11        PROSPECTIVE JUROR:  I was in an injury lawsuit.

12        THE COURT:  Anything about that experience that would

13   affect your ability to be fair and impartial?

14        PROSPECTIVE JUROR:  No, not at all.

15        THE COURT:  Mr. Harriman?

16        PROSPECTIVE JUROR:  Small claims court.  Renter

17   hadn't paid their fees.

18        THE COURT:  Anybody else?

19     Ms. Cohen?

20        PROSPECTIVE JUROR:  It was in Tacoma.  I had a

21   summary judgment to not have public documents --

22        THE COURT:  It had to do with the Freedom of

23   Information Act --

24        PROSPECTIVE JUROR:  Documents.  State law.  Not

25   federal law.  It was information of employees.

1          THE COURT:   Anybody else in the box?  How about on

2    this side?

3          PROSPECTIVE JUROR:   I have had a couple lawsuits in

4    business.

5          THE COURT:   Any of those experiences that would carry

6    over here and impact your ability to be fair and impartial

7    because you don't think much of the way we resolve disputes

8    in this country or any other reason?

9          PROSPECTIVE JUROR:   I didn't like the verdict.

10          THE COURT:   Okay.  You think that would influence

11    you --

12          PROSPECTIVE JUROR:   Probably not.

13          THE COURT:   All right.  Anybody else on this side of

14    the room?

15          Ms. Paplow?

16          PROSPECTIVE JUROR:   I have been in several car

17    accidents and stuff like that.  But they've all been resolved

18    out of court.  I don't have any qualms.

19          THE COURT:   Anybody else?

20          PROSPECTIVE JUROR:   Your Honor, I am sorry.

21    Mr. Ruby.  I have been sued several times -- I can't remember

22    how many -- by inmates in prison.  But I would be one of

23    many.

24          THE COURT:   Right.  Anything about those experiences

25    that --

1        PROSPECTIVE JUROR:   Well, maybe a pain.   But other

2   than that, just time consuming.   Wouldn't prejudice me.

3        THE COURT:   Do any of you know anything or have you

4   heard, seen, or read anything about any of the following

5   entities?   Hulaman Management Services, Global Dominion

6   Financial Services, Cornerstone Institute?   Any of you been

7   involved in Amway?

8      Ms. Lassiter?

9        PROSPECTIVE JUROR:   We did Amway for a couple years

10  probably about 25 years ago.

11       THE COURT:   Anything about that experience, if there

12  is an issue about multilevel marketing, that would cause

13  you -- I mean, did you have a bad experience, good

14  experience, neutral?

15       PROSPECTIVE JUROR:   Neutral experience.

16       THE COURT:   Nothing about that would cause you to

17  doubt your ability to be fair and impartial in a case like

18  this?

19       PROSPECTIVE JUROR:   No.

20       THE COURT:   Ms. Mulqueeny, did you raise your hand?

21       PROSPECTIVE JUROR:   Yes.

22       THE COURT:   You were involved with Amway?

23       PROSPECTIVE JUROR:   Short time.

24       THE COURT:   How long?

25       PROSPECTIVE JUROR:   It's been quite a while ago.   It

1    was a short time.

2         THE COURT:  Anything you bring away from that

3    experience positive?

4         PROSPECTIVE JUROR:  Neutral.

5         THE COURT:  You didn't suffer any financial losses as

6    a result, or did you?

7         PROSPECTIVE JUROR:  I really didn't make anything off

8    it.  Short time.

9         THE COURT:  Anybody else in the box?

10        How about over on this side?  Anybody over here?

11        Ms. Lause?

12        PROSPECTIVE JUROR:  15 years ago my husband and I

13   were maybe 20 bucks -- try to help --

14        THE COURT:  Right.

15        Your experience was good, bad, indifferent?  Pardon?

16        PROSPECTIVE JUROR:  Just neutral.

17        THE COURT:  Anything about your experience, again,

18   cause you to be -- to doubt your ability to be fair and

19   impartial?

20        PROSPECTIVE JUROR:  Not really.

21        THE COURT:  Has anybody here been involved in any

22   form of multilevel marketing?  I mentioned Amway.

23        Anybody else?

24        PROSPECTIVE JUROR:  Mary Kay.  I did that part time

25   for probably a couple years.

1          THE COURT:  Good, bad, anything that would cause you

2   to --

3          PROSPECTIVE JUROR:  No.  Just part time.

4          THE COURT:  -- be concerned about your ability to be

5   fair here?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Anybody else?

8      Mr. Paplow?

9          PROSPECTIVE JUROR:  My wife is involved in Prepaid

10  Legal.  And no problems at all with that.

11         THE COURT:  Mr. Ruby?

12         PROSPECTIVE JUROR:  I really had to search, listen to

13  some of the other people.  In my early 20s, it was -- I can't

14  remember.  It's been so darn long.  I bought a money order.

15  You put that in.  You had a chance of getting a couple

16  hundred backs back.  I had forgotten all about that.

17         THE COURT:  Okay.  I guess -- I mean, it's deep

18  enough in your memory that you don't think it would have an

19  impact?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Okay.

22         PROSPECTIVE JUROR:  It's been so long.

23         THE COURT:  Anybody here been involved in any form of

24  network marketing?  By that I mean networking, you know, you

25  get a friend to get a friend to get a friend to bring them in

1     to an investment plan or some other marketing program.

2     Anybody?

3         Do any of you or any member of your immediate family or

4     any of your close friends have any training or education or

5     experience in the field of banking, finance, or accounting?

6     We had a couple of people here in banking and so forth.

7         So we'll start with Ms. Kennedy and Ms. Anderson.

8             PROSPECTIVE JUROR:  I was in the insurance industry.

9             THE COURT:  Ms. Anderson?

10            PROSPECTIVE JUROR:  I am in the insurance industry.

11    And I know people who held security licenses.  Just a lot of

12    insurance agents.  I never have had a security license.

13            THE COURT:  Have you ever had specific training in

14    securities law?  The 1933 Act or the 1934 Securities and

15    Exchange --

16            PROSPECTIVE JUROR:  No.  I have a personal banking

17    license, security license series at Wells Fargo bank.

18            THE COURT:  Again, do you think that you could

19    separate from your mind your own specific relationship to the

20    investment industry and listen to the facts of this

21    particular case and make your decision based on the law and

22    your own common sense?

23            PROSPECTIVE JUROR:  Uh-huh (affirmative).

24            THE COURT:  You think so?

25            PROSPECTIVE JUROR:  Yes.

1   ANOTHER PROSPECTIVE JUROR:  Going back to the last

2 question.  Networking.  I do work with a financial service

3 where you meet different people and then you would bring them

4 in if they wanted to do that type of work.  And I was in

5 maybe six months.

6   THE COURT:  Okay.  Again, good, bad, indifferent kind

7 of response?

8   PROSPECTIVE JUROR:  Neutral.  I quit because you had

9 to do a lot of traveling.  I didn't want to do that.

10   THE COURT:  Nothing, I take it then, about that

11 experience that would give you pause about your ability to be

12 a fair juror --

13   PROSPECTIVE JUROR:  No.

14   THE COURT:  -- to either side here?

15   PROSPECTIVE JUROR:  No.

16   THE COURT:  Anybody else in the box?

17  Ms. Irish?

18   PROSPECTIVE JUROR:  My mom is a bookkeeper.

19   THE COURT:  You don't talk accounting at home?

20   PROSPECTIVE JUROR:  It's unusual.

21   THE COURT:  Good for you.

22  Anybody else?

23  Ms. Dupree?

24   PROSPECTIVE JUROR:  I have a cousin who is in banking

25 in California.

1          THE COURT:   Okay.   You talk shop with him?

2          PROSPECTIVE JUROR:   No.

3          THE COURT:   This side of the bench?

4          PROSPECTIVE JUROR:   I received my accounting degree,

5     but I'm not -- not practicing.

6          THE COURT:   Okay.

7     Anybody else in the front row?

8     All right.  Back row?  Mr. Contris?

9          PROSPECTIVE JUROR:   My brother is a chief financial

10    officer at the Department of Revenue.

11         THE COURT:   Talk shop?

12         PROSPECTIVE JUROR:   Try not to.

13         THE COURT:   I thought I saw Mr. -- Reverend Perry?

14         PROSPECTIVE JUROR:   My brother-in-law is a CFO of

15    Community Bank down in Arizona.

16         THE COURT:   Anybody else on this side?

17    Mr. Benson?

18         PROSPECTIVE JUROR:   My brother-in-law is with a

19    credit union at the company I used to work for.  I worked for

20    a bookkeeper if she was out of town, and I developed quite a

21    few online training tutorials for bank employees.

22         THE COURT:   Anybody else?

23    Have you ever been employed in a business that was

24    involved in investigating other people --

25    Mr. Hybak.

1             PROSPECTIVE JUROR:   My father worked for a bank for

2    30 years and retired.

3             THE COURT:   All right.

4        Have you ever been employed in a business that was

5    involved in investing other people's money?

6        Ms. Mordick?

7             PROSPECTIVE JUROR:   I work at a bank.

8             THE COURT:   Anybody else?

9        Ms. Mulqueeny?

10            PROSPECTIVE JUROR:   Business service.  I didn't do it

11   myself because I wasn't licensed to do it.  They did that

12   part of it, too.

13            THE COURT:   Who did that?

14            PROSPECTIVE JUROR:   Prime America.

15            THE COURT:   Anybody else on the bench?

16       Mr. Perry?

17            PROSPECTIVE JUROR:   I sit on the Board of Established

18   Churches here in the Northwest.  We invest church funds in

19   building churches.

20            THE COURT:   Anybody else?  Anybody over here?

21       Ms. Lause?

22            PROSPECTIVE JUROR:   I worked a year and a half with

23   Department Four Bank.

24            THE COURT:   Anybody else?  There may be some people

25   who follow up.  The lawyers may follow up in that regard.

1    Have you ever received a commission based upon getting

2    someone else to invest money in a business or investment

3    opportunity?  In other words, have you been compensated

4    yourself for bringing someone to an investment?

5    Do any of you consider yourself to be a sophisticated

6    investor?

7    Those people don't exist after the last few weeks.

8    Anybody?

9    Have any of you heard of a High-Yield Program?  Does that

10   term high-yield-investment program --

11   Mr. Ruby?

12       PROSPECTIVE JUROR:  I have heard of it but never been

13   involved.

14       THE COURT:  Do you know anything about it other than

15   you've heard about it?

16       PROSPECTIVE JUROR:  Very little.  Well, other than it

17   looks too good to be true.  That sort of thing.

18       THE COURT:  Anybody else?

19   Have any of you heard of prime bank notes, medium term

20   notes, bank debentures, or currency trading?  Anybody have

21   any familiarity either with those terms or with the

22   activities that they're intended to describe?

23   Have any of you or your close friends or relatives

24   invested in an investment program that promised or offered a

25   high -- particularly high rate of return?

1          PROSPECTIVE JUROR:  Don't all banks ask that?  Don't

2     all banks offer that in --

3          THE COURT:  Yeah.  Okay.

4     Anybody else?  No.  That's a good point.  Anybody else?

5     Have any of you ever heard of the private economic arena?

6     Term of art.  What that means is -- are you familiar with

7     offshore trusts or offshore LLCs?

8     Anybody have any familiarity and practice or read a

9     considerable amount about offshore trusts or offshore LLCs?

10    Have any of you ever been involved in an investment scheme

11    that was found to be fraudulent?  Do any of you know what a

12    Ponzi scheme is?

13         PROSPECTIVE JUROR:  I can give you a rough

14    definition.

15         THE COURT:  Mr. Gallagher?

16         PROSPECTIVE JUROR:  A pyramid scheme -- again, things

17    that you use in a pyramid scheme.

18         THE COURT:  Okay.  Anything -- you haven't invested

19    in one or been victimized in one in any way?  Nothing about

20    your prior experience or what you've read would cause you to

21    be unable to be fair and impartial in a case of this type?

22    Anybody else?

23    How many here have served on a jury before?

24    Ms. Kennedy, how long ago?  What kind of case?

25         PROSPECTIVE JUROR:  Couple years ago.  It was

1    assault.  Criminal case.

2              THE COURT:  Did the jury deliberate?

3              PROSPECTIVE JUROR:  We did.

4              THE COURT:  Reach a verdict?

5              PROSPECTIVE JUROR:  We did not.

6              THE COURT:  You did not?  The case resolved before,

7    or it was a hung jury?

8              PROSPECTIVE JUROR:  Hung jury.

9              THE COURT:  Anything about that that causes you to

10   doubt your ability to be -- to participate in a collaborative

11   decision-making process, which is what deliberations are?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  Anybody else in the front row?

14             PROSPECTIVE JUROR:  Back in around 1972, I was in

15   King County Superior Court.  And it was a case of one company

16   sold another company a product that the other company claims

17   was defective.

18             THE COURT:  Did the jury deliberate?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Did you reach a verdict?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Anything about that experience that

23   causes you to doubt or not want to participate --

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Ms. Leslie?

1            PROSPECTIVE JUROR:   Mock trials long ago.

2            THE COURT:   Okay.

3        Anybody in the back row?

4            PROSPECTIVE JUROR:   Couple years ago, superior court.

5     I believe it was a criminal case.

6            THE COURT:   Did the jury deliberate?

7            PROSPECTIVE JUROR:   Yes.

8            THE COURT:   Reach a verdict?

9            PROSPECTIVE JUROR:   Yes.

10           THE COURT:   Anything about the experience turn you

11    off to the way we resolve disputes in this country?

12           PROSPECTIVE JUROR:   No.

13           THE COURT:   Ms. Cohen?

14           PROSPECTIVE JUROR:   1999 Pierce County Superior

15    Court.   Murder case.   We reached a verdict.

16           THE COURT:   Good, bad experience?   That's a tough

17    case.

18           PROSPECTIVE JUROR:   A long case, yes.

19           THE COURT:   Anything about it that makes you flinch

20    about participating again?

21           PROSPECTIVE JUROR:   Just the length of time.

22           THE COURT:   Anybody else in the box?

23        Ms. Dupree?

24           PROSPECTIVE JUROR:   Single lawsuit in Pierce County.

25           THE COURT:   Lawsuit in Pierce County.

1       Civil suit?

2              PROSPECTIVE JUROR:  Civil.

3              THE COURT:  Did the jury deliberate and reach a

4       verdict?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Good experience for you?  Bad experience?

7              PROSPECTIVE JUROR:  Okay.

8              THE COURT:  Okay.  Anybody on this side of the --

9              PROSPECTIVE JUROR:  I am trying to remember the case.

10      King County Regional Justice Center.  Car accident type case.

11      On that one, I didn't deliberate.  I was on the jury.  And at

12      the end we picked two people to come off the jury.  I was

13      one.

14         The other one was a drunk driving case in Federal Way.

15      Couple of years of that and we went through deliberations.

16             THE COURT:  We'll have that same process here.  We'll

17      probably have 14 jurors at the end.  We'll pick two by random

18      who will be -- any hard feelings about being picked as the

19      alternate and not getting to deliberate?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Anybody in the back row?

22         Reverend Perry?

23             PROSPECTIVE JUROR:  Served on two juries.  2001

24      Pierce County Superior Court.  Assault case.  I served as

25      juror foreman.  Did reach a verdict.  In 2005, served in

1    Thurston County Superior Court.   Assault case.   We also

2    reached a verdict.   I was foreman as well.

3         THE COURT:   Anything about either of those

4    experiences that left a bad taste in your mouth about the way

5    we resolve disputes?

6         PROSPECTIVE JUROR:   No.

7         THE COURT:   Mr. Contris?

8         PROSPECTIVE JUROR:   Civil suit in Thurston County.

9         THE COURT:   Anything about the experience that turned

10   you off to how we resolve disputes in this country?

11        PROSPECTIVE JUROR:   No.

12        THE COURT:   Anybody over here?

13    Ms. Schrader?

14        PROSPECTIVE JUROR:   I think 1972 and superior court.

15   Pierce County.   It was a back injury with L&I.   I think it

16   got settled.

17        THE COURT:   Good experience?   Bad experience?

18        PROSPECTIVE JUROR:   It was the first time I had been

19   on that.   It was interesting.   It was a long process.

20        THE COURT:   How about in the back row?

21    Okay.   Any of you or any members of your immediate family

22   have any dealings with the United States government or any of

23   its agencies from which you might profit?

24    Again, anything that would give you a bias one way or

25   another in this case in favor of the government because

1  you're beholden to the government or somebody close to you is

2  beholden in the government in a financial way?

3       Anybody?

4       Has anybody had a case or dispute with the United States

5  or any agency of the U.S. government looking for bias the

6  other way?

7       Anybody?

8       Anybody had a fight with the feds lately?

9       Have any of you or any member of your immediate family

10 been employed by the United States government?  And we've

11 talked about the military so you don't have to do that again.

12      Anybody in the postal service you mentioned already?  If

13 you've mentioned that already, that's fine.  The lawyers know

14 that they can follow up.

15      Mr. Protsman?

16      PROSPECTIVE JUROR:  My mother-in-law's husband just

17 retired a couple months ago from the post office.

18      THE COURT:  But not as an inspector, I take it?

19      PROSPECTIVE JUROR:  That's correct.

20      THE COURT:  Mr. Little?

21      PROSPECTIVE JUROR:  Come back to my -- I forgot to

22 mention my brother-in-law was a cop in Tumwater for 25 years.

23 And my youngest daughter's father-in-law was a highway patrol

24 for 38 years.

25      THE COURT:  Nothing that would cause you to be

1    predisposed in favor of law enforcement in a case like this?

2              PROSPECTIVE JUROR:   Not really.

3              THE COURT:   Anybody else?

4       Mr. Contris?  Is it Mr. Hama?

5              PROSPECTIVE JUROR:   I have an uncle who works as an

6    IRS inspector.   Passed away.

7              THE COURT:   Talk shop with him?

8              PROSPECTIVE JUROR:   No.  I was just a little kid.

9       And then another uncle who was an INS inspector.   Never

10   talked shop with him.

11             THE COURT:   Anything about either of those

12   relationships that would cause you to doubt your ability to

13   be fair and impartial in a case like this?

14             PROSPECTIVE JUROR:   No.

15             THE COURT:   Anybody over here?

16      Do any of you have any strong religious affiliations?  We

17   don't usually talk religion in connection with a case, but it

18   has an aspect that is relevant here.   And I assumed I would

19   have one hand.   But, again, we're going to explore this with,

20   hopefully, sensitivity.

21             PROSPECTIVE JUROR:   I regularly attend the local

22   church in Eatonville.   I'm part of the meet-and-greet team

23   that greets new guests when they go to our church.

24             THE COURT:   You participate in tithing or giving to

25   the church?

1              PROSPECTIVE JUROR:   Yes.

2              THE COURT:   You support the church financially?

3              PROSPECTIVE JUROR:   Yes.

4              THE COURT:   Do you believe that in sitting here as a

5    juror and listening to testimony that may discuss a religious

6    motivation, that you can separate your own religious

7    convictions and our own practices from the case you're

8    listening to and make your own decision based on the facts,

9    the law, and your own common sense?

10             PROSPECTIVE JUROR:   Yes.

11             THE COURT:   You think you can do that?

12             PROSPECTIVE JUROR:   Uh-huh (affirmative).

13             THE COURT:   I know that's an obtuse question.

14   Hopefully, you have the understanding that we just -- we

15   don't want people -- we want people to be able to exercise

16   their common sense, but we don't want people to bring in

17   their strongly held views about a particular issue, whether

18   it's politics or religion or whatever, and have that

19   influence their decision.   So sometimes those distinctions

20   are pretty hard to make.

21      Ms. Mordick?

22             PROSPECTIVE JUROR:   Very heavily involved in my

23   church.   In bishop team.   My mother works there.   She's the

24   office secretary.   So definitely involved in also tithing and

25   other volunteering.   And I think I can stay -- I won't be

1   partial either way.

2          THE COURT:  All right.

3      Mr. Harriman?

4          PROSPECTIVE JUROR:  I am a member of the church and I

5   give regularly.  But I think I can be impartial.

6          ANOTHER PROSPECTIVE JUROR:  I'm Catholic.  I think

7   that I can be impartial and fair.

8          THE COURT:  Mr. Little?

9          PROSPECTIVE JUROR:  Been going to Tumwater Baptist

10  for 48 years.  No matter what, I won't be prejudice.

11         THE COURT:  Okay.  Ms. Irish?

12         PROSPECTIVE JUROR:  Regular church.  I'm also

13  treasurer of an informations committee.

14         THE COURT:  Ms. McElwee?

15         PROSPECTIVE JUROR:  I belong to the First

16  Presbyterian Church.  Have for a number of years.  And I

17  tithe and I'm involved in the church.  I am fair and

18  impartial.

19         THE COURT:  Okay.

20     How about over here?

21     Mr. Protsman?

22         PROSPECTIVE JUROR:  I have been a member of Orthodox

23  Presbyterian Church for ten years.

24         THE COURT:  Anything about that that would cause you

25  to doubt your ability to be fair and impartial where issues

1    of religious teachings and practices are being discussed?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  Anybody else?  Reverend Perry, obviously.

4    Good question for you.  Do you think --

5            PROSPECTIVE JUROR:  I certainly believe in justice

6    and blindness of justice.  And I believe everyone should have

7    their day in court.  I would be very open to hearing both

8    sides of the argument.  I think I can be impartial.

9            ANOTHER PROSPECTIVE JUROR:  My brother belongs --

10           THE COURT:  Ms. Lause, did you raise your hand?

11           PROSPECTIVE JUROR:  Christian church.

12           THE COURT:  And do you think you could listen to the

13   evidence where religious teachings and practices are

14   discussed and sort of separate from your own deliberations

15   your own beliefs system and listen to the facts and apply the

16   law as given to you by the Court?

17           PROSPECTIVE JUROR:  Yes, Your Honor.

18           THE COURT:  Do you think you can do that?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Ms. Mulqueeny?

21           PROSPECTIVE JUROR:  I haven't gone to church for a

22   while.  I do have my beliefs in what the bible says.

23           THE COURT:  Okay.  Again, obviously, this is a civil

24   court.  It's a criminal case, but it is a civil court.  It's

25   not an ecclesiastical court.  It's not a religious court of

1    any kind.  We're not here evaluating people.  Religion will

2    be discussed at some level.

3         Do you believe that you can listen to the evidence, listen

4    to the facts, and apply the law as given by the Court to you

5    and make a fair and impartial decision?

6         I believe this trial is expected to last three weeks.

7    Hopefully, that fact was made clear to you in the summons

8    that you received.

9         Is there anybody who by virtue of the length of the trial

10   would not be able to sit on the jury?

11        Yes, Ms. Rosewood?

12        PROSPECTIVE JUROR:  I am a single mom.  I have a

13   seven-year-old.  I'm responsible for getting to school my

14   ten-year-old nephew.  I have a midterm.  I can't really

15   afford to miss three weeks of school.  I work as well.  And I

16   don't have any money to pay for any --

17        THE COURT:  Other than that you would be an ideal

18   juror.  You have that written down.

19        PROSPECTIVE JUROR:  I have documentation of my school

20   schedule.  Anything you need.

21        THE COURT:  Anybody else?

22        Mr. Protsman?

23        PROSPECTIVE JUROR:  As I said in the beginning, I

24   have six kids.  One-vehicle family.  Me getting up here, my

25   wife has no access to getting the kids around during the day.

1          THE COURT:  Anybody else?

2          PROSPECTIVE JUROR:  I work at a daycare that is

3    frequently short staffed due to illnesses and vacations.  I

4    also have a paper route which I get up for at 2:30 in the

5    morning every day.

6          ANOTHER PROSPECTIVE JUROR:  I have a job where I am

7    the only banker at my branch.  It's not that I cannot --

8          THE COURT:  Fortunately, our employers around the

9    country understand their responsibility to their employees.

10    Those are factors the lawyers will want to keep in mind.

11        Any significant health concerns about your ability to sit

12    and -- who has the bad back?

13        Oh, yes.  If we allowed you stand and stretch whenever you

14    wanted to, and we take a break about every hour and 15

15    minutes, do you think you could do it?

16          PROSPECTIVE JUROR:  I don't think I could.

17          THE COURT:  Okay.  What kind of -- is it just --

18          PROSPECTIVE JUROR:  I fell and injured my back, my

19    hip.  And so it's been over a week now and it hasn't gotten

20    better.  I think I have to go to the doctor.  Chiropractor or

21    something.  I can't walk.  I can't sit long periods of time.

22    It hurts really bad.

23          THE COURT:  Thank you.

24        Anybody else with a health --

25          PROSPECTIVE JUROR:  In regards to the last question,

1    it does put me in a bind at work to be gone three weeks

2    because I am the only locksmith on the campus.

3         THE COURT:  Would any of you be able to assure the

4    Court that you would follow the instructions on the law

5    regardless of what you think the law is or ought to be?

6         There is a concept referred to as jury nullification --

7    it's frowned upon -- where a jury basically says I know that

8    is the law, but I don't like the law.  So I'm going to use my

9    one chance as a juror to not follow the law.

10        Anybody who doubts your ability when you take an oath to

11    follow the law that you could follow through on that oath?

12        Anybody?

13        Is there anything about this case that would cause you to

14    begin the trial with any concern about your ability to serve

15    as jurors other than what has been stated?

16        Anybody that has some reason that they wouldn't want to be

17    on this jury that they haven't disclosed?

18        Waiting for the right question.

19        Does anybody know of any reason why they wouldn't be able

20    to try this case impartially?

21        Okay.  At this point I'm going to ask that you direct your

22    attention to Mr. Storm, who is going to ask some follow-up

23    questions of you.  And that will be followed by Ms. Olson.

24         MR. STORM:  The government doesn't have any further

25    questions.

1          THE COURT:   Ms. Olson?

2          MS. OLSON:   Thank you, Your Honor.

3     I believe it's Ms. Mordick.   Did I see you raise your hand

4  when the judge asked if you had heard of Cornerstone?

5          PROSPECTIVE JUROR:   I have heard of it.

6          THE COURT:   Do you remember where you heard the term?

7  Know anything about it?

8          PROSPECTIVE JUROR:   Probably just an ad of some sort

9  over -- yeah.   Nothing that would ever make me think anything

10 of it.

11         MS. OLSON:   From what you saw, do you remember -- did

12 you get any kind of information?   Any kind of information

13 about it whether it was --

14         PROSPECTIVE JUROR:   I have no clue what it's about.

15         MS. OLSON:   Bear with me just a little bit.

16    Mr. Little, I think the judge was asking you questions

17 about whether you had been a victim of criminal activity.

18 You indicated that you had been the victim of theft?

19         PROSPECTIVE JUROR:   Twice.

20         MS. OLSON:   I got the impression that was a very

21 difficult experience for you.   Can you share a little bit

22 about that with me?

23         PROSPECTIVE JUROR:   Well, it's an experience all

24 right.   You know, when you come home and your door is open

25 and you don't -- you know, you don't know what to expect

1   walking in the house and everything.  Things upside down.

2   Things taken.  It hits you like a rock brick.

3          MS. OLSON:  That must have been very scary.

4          PROSPECTIVE JUROR:  Then I called the cops.  They

5   didn't say much.  They said, well, you know, report it to

6   your insurance company.  We reported it to our insurance

7   company.  They ended up paying.

8      But the second time they thought we put somebody up to it.

9   We didn't.

10          MS. OLSON:  Do you know if the police ever arrested

11  anybody that was involved in that?

12          PROSPECTIVE JUROR:  Never did find out who did it.

13          MS. OLSON:  Was that difficult for you, that you

14  never really got closure in terms of knowing who did that?

15          PROSPECTIVE JUROR:  What do you mean by that?

16          MS. OLSON:  I think people feel that once the police

17  arrest the person that they believe committed the crime, at

18  least you know that person has been dealt with.

19          PROSPECTIVE JUROR:  No.  It -- never found out who

20  did it.  Never heard of anybody.  I think it was close

21  friends.  But we don't know.  I think they left the country

22  after they did.  I don't know.  They were young kids anyway.

23          MS. OLSON:  You --

24          PROSPECTIVE JUROR:  But they never did prove it.

25  Didn't show up.  There was a smear on the window, but that

1    was it.  Couldn't really make out the fingerprints.

2        MS. OLSON:  Difficult for them to follow up on?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Thank you.

5    I may have -- I may have somebody mixed up here.

6    Mr. Benson, did I understand that your grandmother was

7    involved in telephone theft?  Did you help her out in dealing

8    with that?

9        PROSPECTIVE JUROR:  Not directly -- mostly my dad --

10   my dad's mother.  Mostly he helped her out, along with

11   brother and sister.

12       MS. OLSON:  What did she lose from that, do you know?

13       PROSPECTIVE JUROR:  I know they had closed some of

14   her checking accounts.  She lost -- I'm not sure the exact

15   amount.  Some money was taken out of her checking account.

16   They canceled her long distance.  And actually this weekend

17   she moved in with me.  It kept happening.  She didn't -- she

18   wasn't able to understand.  People were calling with these

19   offers.  It wasn't true.  So she's having trouble avoiding

20   phones.  She did live at my parents' house.

21       THE COURT:  Ms. Olson, I am going to ask you to go to

22   the lectern so the people that are talking a longer distance

23   away from you, the Court Reporter can hear.  Thank you.

24       MS. OLSON:  Let me grab my papers here.

25   To follow up, Mr. Benson, is there anything about that

1  against -- as far as your grandmother, how it's affected the

2  rest of your family that would be difficult for you to sit on

3  this case and listen to the evidence here?

4      PROSPECTIVE JUROR:  Only thing really is difficult

5  about it is she's getting older.  It's sad to see her lose

6  her ability to handle things on her own.  I can't think of

7  anything else.

8      MS. OLSON:  Thank you.

9    I believe there was Mr. Camer (phonetic).  You indicated

10  that your brother had been indicted for gambling.

11      PROSPECTIVE JUROR:  My uncle.

12      MS. OLSON:  Was he convicted, do you know?

13      PROSPECTIVE JUROR:  I was in the Army at the time.  I

14  heard from the family grapevine.  They had misspelled his

15  name in the newspaper, so I couldn't follow up on it.  I

16  don't know what else happened.  That was a long time ago.

17      MS. OLSON:  Nothing about that experience that would

18  make it difficult for you to sit in the trial?

19      PROSPECTIVE JUROR:  No.

20      MS. OLSON:  Ms. Leslie, you look surprised I am

21  picking on you.  The judge asked you about your prior jury

22  experience and you indicated that you had been on a lot of

23  trials?

24      PROSPECTIVE JUROR:  Several.

25      MS. OLSON:  Let me ask you this question:  Were you

1    sitting as a juror for a mock trial?

2              PROSPECTIVE JUROR:   Yes.

3              MS.  OLSON:   How did you get involved doing that?

4              PROSPECTIVE JUROR:   One of my girlfriends works for

5    an attorney and they needed to bring in a mock jury.   They

6    called me up.

7              MS.  OLSON:   Did you enjoy that?

8              PROSPECTIVE JUROR:   It was all right.   I didn't not

9    enjoy it.   They fed me.   Half day.

10             MS.  OLSON:   That's the important part.

11             PROSPECTIVE JUROR:   It was interesting.

12             MS.  OLSON:   I'm not sure how much the judge will feed

13   you here.

14        When you were doing that experience was it just like a

15   trial where you hear the evidence and you go and deliberate?

16             PROSPECTIVE JUROR:   Yes.

17             MS.  OLSON:   And would you reach a verdict in those

18   situations?

19             PROSPECTIVE JUROR:   Yes.

20             MS.  OLSON:   And then did the lawyers ask you a lot of

21   questions about your experience and what you like and didn't

22   like?

23             PROSPECTIVE JUROR:   No.   They went back and talked to

24   us later.

25             MS.  OLSON:   But they didn't ask your opinion?

1               PROSPECTIVE JUROR:  No.

2               MS. OLSON:  Ms. Mulqueeny, you indicated that you had

3    worked for a networking business for a while or was involved

4    in a networking business.  Was that Prime America?

5               PROSPECTIVE JUROR:  Yes.

6               MS. OLSON:  How did you get involved in that?

7               PROSPECTIVE JUROR:  I worked with a lady whose

8    daughter was involved with it.  I saw her.  And I wanted to

9    get into something different.  I was bartending.  I wanted to

10   get out of bartending.  And so she talked to me.  Sounded

11   good.  I liked what they had.  I still like them.  I wasn't,

12   you know, making any money.  I didn't want to travel all over

13   the area.  So I just decided I wanted out.

14              MS. OLSON:  Did you have to invest any money in it?

15              PROSPECTIVE JUROR:  A little for your stuff that you

16   had to use.

17              MS. OLSON:  What kind of products were they?

18              PROSPECTIVE JUROR:  It was like life insurance.

19   Investing your money for retirement.  And a lot of times if

20   the people, you know, seemed like they were interested in

21   doing the same business and we talked with them -- I can't

22   remember -- I can't remember what other things they had.

23              MS. OLSON:  That's fine.  I'm trying to get a little

24   bit of an idea as to what kind of products they were.

25              Did you actually contact people and try to get people

1    involved as investors?

2    PROSPECTIVE JUROR:  One of the things that we did was

3    like reinvesting in their home and where they can like get

4    all their bills together and refinance their home and stuff.

5    I would make calls on the phone and let them know what we had

6    to offer.  Then we would go to their place, let them know who

7    we were, if they were interested in doing that.

8    MS. OLSON:  Did you have any -- did you have a

9    positive experience doing that?  Was that a good thing?

10    PROSPECTIVE JUROR:  I did.  I didn't make anything

11    because I didn't sell like a mortgage or something like that.

12    You know, helping people to get ahead.

13    MS. OLSON:  Sure.  Your friend that got you involved

14    in it, did she tell you that you would make money usually

15    or --

16    PROSPECTIVE JUROR:  No.  It's what you put into it.

17    MS. OLSON:  Okay.  Thank you.

18    Has anybody here heard of a religious society called the

19    Kingdom of Heaven?

20    How about the Assembly of Heaven?

21    PROSPECTIVE JUROR:  Is that like Jehovah Witness?

22    MS. OLSON:  I don't think so.  I think it's an

23    independent society.  I know what you're thinking.  No, it is

24    not.  It is different from that.

25    Nobody has heard of either one of those?

1          Thank you, very much.  I don't have any more questions.

2              THE COURT:   Thank you.

3          Ladies and gentlemen, we're going to take a short period

4      of time.  I am going to ask you to go into the hallway.  We

5      have to take up a matter outside your presence.  It won't

6      take very long.  Then the lawyers will exercise their

7      peremptories and we'll have our jury.  If you would stay in

8      the same order because we're going to have you out there for

9      a very few moments.

10             (Jury exits the courtroom.)

11             THE COURT:   Mr. Storm, any challenge for cause?

12             MR. STORM:   Ms. Rosewood, Your Honor.

13             THE COURT:   Yeah.  I had Ms. Rosewood.

14         Mr. Protsman and Ms. Klooz, all these probably had

15     legitimate reasons for not wanting to here.  I didn't want --

16     those are the three on my list.

17         Anybody else?

18             MR. STORM:   No, Your Honor.

19             THE COURT:   Ms. Olson?

20             MS. OLSON:   I think those were the same ones that I

21     also had.

22             THE COURT:   23, 29, 35?

23             MS. OLSON:   Yes.

24             THE COURT:   Those three will be excused for cause.

25     Make sure you make that notation.

1    For the record, I understand the concern that Ms. Irish

2  and Mr. Contris and -- I believe one other.  Maybe it was

3  Ms. Irish.  But I don't think they fall in the same category

4  of hardship that Protsman, Rosewood, and Klooz do.  They will

5  be -- they will be left.  But 23, 29, 35 are excused for

6  cause.

7    Any others that you need to talk about before exercising

8  your peremptories?

9    Ms. Olson?

10      MS. OLSON:  No.

11      MR. STORM:  No.

12      THE COURT:  All right.  Let's bring in the jury.  You

13  can start exercising your peremptories now.  7 and 11.

14      MS. OLSON:  Could Mr. Bush take a quick break?

15      THE COURT:  Sure.  Let's get the jury back in.  Let

16  Mr. Bush then leave to use the restroom and he can come back.

17  And I don't think -- we're just in a period of quietude

18  anyway.

19               (Pause in proceedings.)

20      THE COURT:  All right.  Ladies and gentlemen, because

21  of the length of the trial we're going to have 14 jurors

22  impaneled; 12 will deliberate, two will be picked at random

23  at the end of the case from a wheel.

24    So the 14 jurors are as follows:  Juror number 1 will be

25  Denise Anderson.  Juror number 2 will be Linda Leslie.  Juror

1  number 3 will be Jean Yackley.    Juror number 4 will be

2  Marjorie Mulqueeny.    Juror number 5 will be Katrina Irish.

3  Juror number 6 will be Carolyn McElwee.    Juror number 7 will

4  be Kathleen Dupree.    Juror number 8 will be Dennis

5  Piccolotto.    Juror number 9 will be Craig Ayers.    Juror

6  number 10 will be John Knox.    Juror number 11 will be Jenny

7  Britton.    Juror number 12 will be Mark Contris.    Juror 13

8  will be Anthony Kulsich.    Juror number 14 will be Duane

9  Patterson.

10      Those are our 14 jurors.    The rest of you will be excused

11  with the Court's thanks.

12                  (Remaining prospective jurors excused.)

13                          (Jury sworn)

14      THE COURT:    Please be seated.    All right.    Ladies and

15  gentlemen, we're going to take our noon recess at this time.

16  We'll be in recess until 1:30.    When we come back I will give

17  you some preliminary instructions that will guide your

18  conduct as jurors as you hear the evidence.    At the end of

19  the case when all the evidence has been presented I will give

20  you further instructions on the law that you're to apply in

21  resolving this case.

22      For now, you're going to get sick and tired of hearing me

23  say it, do not talk about this case.    You can tell your

24  family members that you were picked on the jury, how long

25  it's going to go, and so forth.    But don't tell them anything

1   about the case.  Don't discuss it among yourselves.  You're

2   going to be lunch partners for the next three weeks and it's

3   important that you talk about things other than the case.

4   Don't let anybody talk to you about this case.  If somebody

5   tries to talk to you about this case, I want to know about it

6   right away.  Don't do any of your own research.  Don't go on

7   the Internet and find out about this institution, that

8   institution, this investment opportunity, that investment

9   opportunity.  You're supposed to make the decision based upon

10  the facts that are presented to all 14 of you here in court.

11                  (Jury exits the courtroom.)

12          THE COURT:  Please be seated.  Anything we need to

13  take up?

14     I will give the preliminary instructions when we come

15  back.

16     Any special equipment needs for opening statement?

17     How long do you think you're going to go?

18          MR. STORM:  For the government, 30 to 35 minutes.

19          THE COURT:  Okay.

20          MR. STORM:  We plan to use the Elmo.

21          THE COURT:  Jean can set it up for you.

22          MS. OLSON:  15, 20 minutes.

23          THE COURT:  Anything else that we need to take up?

24     Have a nice lunch.

25                  (Court in recess.)

1                    C E R T I F I C A T E

2

3        I, Nichole Rhynard, Federal Official Court Reporter and

4    Certified Realtime Reporter, do certify that the foregoing is

5    a correct transcript from the record of proceedings in the

6    above-entitled matter.

7

8    /S/  Nichole Rhynard, CCR, CRR, RMR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25