1    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON
2              AT TACOMA

3

4  UNITED STATES OF AMERICA,      )      Docket No. CR06-5504
                                  )      CA No. 09-30131
5                  Plaintiff,     )
                                  )      Tacoma, Washington
6           v.                    )      March 20, 2009
                                  )
7  CHARLES NOLON BUSH,            )
                                  )
8                  Defendant.     )
   _____)

9

10              TRANSCRIPT OF SENTENCING
     BEFORE THE HONORABLE RONALD B. LEIGHTON
11        UNITED STATES DISTRICT COURT JUDGE

12
   APPEARANCES:
13
   For the Plaintiff:        ARLEN R. STORM
14                           Assistant United States Attorney
                             1201 Pacific Avenue, Suite 700
15                           Tacoma, Washington 98402

16  For the Defendant:       PAULA TUCKFIELD OLSON
                             Law Office of Paula T. Olson
17                           524 Tacoma Avenue South
                             Tacoma, Washington  98402
18

19  Probation Officer:       Dan Acker

20

21  Court Reporter:          Julaine V. Ryen
                             Post Office Box 885
22                           Tacoma, Washington  98401-0885
                             (253) 882-3832
23

24
   Proceedings recorded by mechanical stenography, transcript
25  produced by Reporter on computer.

1                         **I N D E X**

2

3    WITNESS ON BEHALF OF DEFENDANT:

4        EDWARD J. SCHAU, Ph.D.
                 Direct.............   6
5                Cross..............  18
                 Redirect...........  36
6                By the Court.......  40

7

8    EXHIBITS              Admitted

9        1                    26
         2                    26
10       3                    26
         4                    31
11       5                    34

12

13   COMMENTS TO THE COURT:
         MS. OLSON...............  42
14       MR. STORM...............  46
         PROBATION OFFICER.......  51
15       MS. OLSON...............  52
         MR. DONAHUE.............  57
16       MS. CURTIS..............  59
         MR. HOBBS...............  60
17       THE DEFENDANT...........  62

18

     SENTENCING                66
19

20

21

22

23

24

25

1     (Defendant present.)

2         THE CLERK:  This is in Cause No. CR06-5504RBL, United

3  States of America versus Charles Nolon Bush.

4     Counsel, please make your appearances.

5         MR. STORM:  Your Honor, Arlen Storm on behalf of the

6  government.

7         THE COURT:  Mr. Storm.

8         MS. OLSON:  Good afternoon, Your Honor.  Paula Olson

9  representing Mr. Bush, and Charles Nolon Bush is seated here

10  to my right.

11        THE COURT:  Ms. Olson, Mr. Bush, good afternoon.

12     This matter comes before the Court for imposition of

13  sentence.  I have reviewed the presentence report, the

14  government's sentencing memorandum, the defendant's sentencing

15  memorandum with attachments.  I have also reviewed the report

16  by Dr. Schau, and I have read the victim impact statements

17  that have been submitted by the government.

18     So are there any documents I should have reviewed that I

19  have not reviewed?

20        MR. STORM:  No.

21        MS. OLSON:  Not from the defense, Your Honor.

22        THE COURT:  Very well.

23     Ms. Olson, have you had an opportunity to review with Mr.

24  Bush the sum and substance of the presentence report?

25        MS. OLSON:  Yes, I have, Your Honor.  We reviewed it

1  a couple of times.  I listed two objections in my brief, in my

2  sentencing memorandum, and those objections came up -- really,

3  the basis for those objections came up after Dr. Schau's

4  report, and so I didn't give them to Mr. Acker earlier.  But

5  other than that, those are our only objections.

6  　　　　　　THE COURT:  Mr. Bush, do you understand what the

7  recommendations are as contained in the presentence report?

8  　　　　　　THE DEFENDANT:  Yes, Your Honor.

9  　　　　　　THE COURT:  And have you read the presentence report?

10  　　　　　　THE DEFENDANT:  Yes, I have.

11  　　　　　　THE COURT:  Okay, very well.

12  　　Mr. Bush is here, stands convicted of count 1, securities

13  fraud; counts 2 through 7 and 12 and 13, wire fraud; counts 15

14  through 17, mail fraud; and counts 18 through 32,

15  transactional money laundering.

16  　　　　According to the presentence report, the base offense

17  level is 6.  There's a 22-level increase for the amount

18  involved in the enterprise.  There's a four-level increase for

19  the number of victims, being 50 or more.  There's a two-level

20  increase for purporting to be part of a charitable or

21  religious organization.  There's a two-level increase for

22  relocating a fraudulent scheme to another jurisdiction to

23  evade law enforcement.  There's a one-level increase for

24  conviction for a violation of 18 U.S.C. Section 1957.

25  There's a four-level increase for being an organizer or leader

1    in the enterprise, and a two-level increase for abuse of

2    position of trust and a two-level increase for obstruction of

3    justice.

4        The adjusted offense level, and therefore the total

5    offense level is 45, a criminal history category of 1.  The

6    range is 380 years or life.  The recommendation is for 30

7    years and for restitution to be determined.

8        The government agrees with the recommendation of 30 years

9    and for three years of supervised release and asks for

10   restitution in the amount of $30,097,659.40.

11       The defense had a split recommendation.  Mr. Bush himself

12   seeks time served.  Counsel for Mr. Bush advocates a term of

13   ten years and seeks a placement at FCI Bastrop -- I'm probably

14   mispronouncing that -- Bastrop, Texas.

15            MS. OLSON:  That's correct.

16            THE COURT:  Close to his son in Texas.

17       So that's my understanding of where we are.

18       It's also my understanding that, Ms. Olson, you wanted to

19   call a witness to testify briefly in this matter, is that

20   correct?

21            MS. OLSON:  Yes, Your Honor, that's correct.

22            THE COURT:  Now is the time to do it.

23            MS. OLSON:  Thank you.

24       Your Honor, before I call Dr. Schau, I wanted to just

25   reference the Court to the two objections that I did make to

1   the presentence report because I think that Dr. Schau will

2   speak to both of those things, and I want to put those matters

3   in the Court's mind before he begins testifying.

4       That is, one, regarding the two-level adjustment upward

5   for obstruction of justice because the probation officer

6   believes that Mr. Bush testified falsely during the trial.

7   The second one is also a two-level upward adjustment because

8   he misrepresented himself as a religious organization or as a

9   charity.  I am objecting to both of those things because from

10  Mr. Bush's standpoint, as Dr. Schau will discuss, he did not

11  testify falsely, and he truly believed himself to be either a

12  religious organization or a charity, however those things are

13  defined.

14          THE COURT:  Okay.

15          MS. OLSON:  With that, I will call Dr. Edward Schau.

16          THE COURT:  Dr. Schau, if you will come forward to

17  the lectern, sir.  Raise your right hand and be sworn.

18          EDWARD J. SCHAU, PH.D., SWORN OR AFFIRMED

19          THE COURT:  Please be seated at the witness stand

20  immediately to my left.  Please keep the volume of your voice

21  up so people in the courtroom can hear you.  Speak slowly

22  enough so the court reporter can keep up with you.

23                      DIRECT EXAMINATION

24  BY MS. OLSON:

25  Q.  Will you state your full name, please, and spell your

1  last name?

2  A.  Edward Joseph Schau, S-c-h-a-u.

3  Q.  What's your business address?

4  A.  2300 130th Northeast, Number 211, Bellevue, State of

5  Washington 98005.

6  Q.  Dr. Schau, attached as Exhibit A to my defendant's

7  sentencing memorandum is your curriculum vitae.  I have given

8  you a copy of that, which you have, is that right?

9  A.  Yes.

10  Q.  Is there anything about your qualifications that you would

11  like to address as they pertain to Mr. Bush?

12  A.  I've done a great deal of forensic work.  It's primarily

13  been on behalf of law enforcement as a therapist for people in

14  law enforcement or doing preemployment evaluations for people

15  who wish to be a law enforcement officer.

16      I have also dealt on a regular bases, not a significant

17  part of my practice, but practiced on a regular basis with

18  offenders under federal probation.  I also deal a great deal

19  in custody-related cases, which is also forensic.

20  Q.  And I contacted you a couple of months ago regarding Mr.

21  Bush, is that right?

22  A.  Yes.

23  Q.  And I asked you to do a psychological evaluation for him.

24  A.  Yes.

25  Q.  And do you recall what I sent you to prepare for that?

1  A.  I recall you sent me the indictment; you sent me the, I

2  think it was the presentencing report.  I don't recall any

3  other documents.  I think I have listed them in my -- with my

4  report.

5  Q.  And your report, for the record, is Exhibit B to the

6  defendant's sentencing memorandum, is that right?

7  A.  Yes.  You also gave me Mr. Bush's motion to dismiss.

8  Q.  And I believe that was the one pertaining to his

9  corporation sole?

10  A.  Yes.

11  Q.  Would you describe the process that you went through in

12  terms of evaluating Mr. Bush?

13  A.  Given the restraints of time and the economy of what I was

14  expected to do, I proceeded much as I do in many evaluations;

15  that is, I read what was made available to me so I had some

16  sense of what was -- what were and are the issues.  I met with

17  Mr. Bush on two occasions for a total of about three hours.

18  And then I wrote a report.

19  Q.  And do I understand that you also administered certain

20  tests to him?

21  A.  Yes.  I administered three psychological tests.  I gave

22  them to him at the conclusion of the first meeting with him,

23  and then those were produced back to me through yourself for

24  scoring and interpretation prior to my second visit with him.

25  Q.  Was Mr. Bush cooperative with you in the process?

1  A.  He was very cooperative.

2  Q.  And based on your work, you did come to certain

3  conclusions regarding Mr. Bush, is that right?

4  A.  Yes.

5  Q.  And would you tell us what those were?

6  A.  I believe that Mr. Bush has a delusional disorder.

7  Q.  And, Dr. Schau, I'm going to refer to page 7 of your

8  report.  Is that where your diagnoses are located?

9  A.  Yes.

10 Q.  Along with the delusional disorder, did you come up with

11 any other issues, mental health issues that he has?

12 A.  Yes.  There's what we psychiatrists and psychologists and

13 other mental health professionals refer to as the five Axis,

14 and the two probably which are most critical for thinking

15 about here are Axis I and Axis II.  So when I said delusional

16 disorder, I was referring to Axis I.  Axis II refers to those

17 disorders which are more pervasive, long-standing, harder to

18 deal with, in essence, and I diagnosed him as having a

19 narcissistic personality disorder with histrionic and

20 compulsive traits.

21 Q.  Let's go to first on the delusional disorder.  Can you

22 describe for the Court what makes up a delusional disorder?

23 A.  A delusional disorder is a disorder within the Diagnostic

24 and Statistical Manual IV, and it's a rather rare disorder.

25 It refers to the notion that somebody has a delusion but it's

1  of a non-bizarre nature.  And a person having such a delusion

2  is normally -- looks normal, generally speaking, in everyday

3  life.

4      This is to be compared to, for example, or contrasted with

5  somebody who has psychosis associated with schizophrenia or

6  manic depressive disorder.  They generally will be rambling or

7  they are disorganized in some way.  They have a bizarre

8  delusion.  Bizarre delusion would be one, Paula, if you looked

9  up there and saw that light, "If you could turn the lights

10  down, please, then CIA wouldn't be listening in."  Okay.

11  That's a bizarre delusion.

12      A non-bizarre delusion is one which refers to something

13  which is kind of maybe a little bit unusual, but at least we

14  understand that these things happen.  For example, "My wife is

15  unfaithful."  Many people are unfaithful.  That's a

16  non-bizarre notion.

17      So a delusional disorder is one that involves a

18  non-bizarre delusion, and it is psychotic because it is out of

19  contact with reality.

20  Q.  How do these components exhibit themselves in Mr. Bush?

21  A.  Mr. Bush is not only narcissistic, he's grandiose, which

22  is a form of delusional disorder.  And his grandiosity is such

23  that he really believes that he can do what he says he wishes

24  to do.  And there's religious overtones associated with that

25  in terms of how special he is in God's eyes.  And I think his

1  basic delusion is, is that he can, if permitted, for example,

2  to go back to Warsaw, Poland, he would be able to make the

3  money back, make everybody whole.  Eventually be able to go

4  back to Mexico, if not the same project, if not the same

5  amount of money, something in the order of a billion dollars,

6  make that happen.  He believes it.

7  Q.  Given his disorder, can you comment on his understanding

8  of the criminality of his actions?

9  A.  I think his disorder is such that he does not understand

10 the wrongfulness of his actions under the law as most people

11 would understand right and wrong.  He believes that what he

12 has done is right.  His remorse is about how things didn't

13 work out.

14     A person with a delusional disorder, though, takes the

15 facts and fits them to their delusion -- to the delusion,

16 rather than having a belief, adjusted by the reality on the

17 ground.  Mr. Bush does not understand the wrongfulness of his

18 acts.

19 Q.  Now, you commented in your report, and I would like to ask

20 you to elaborate a little bit more, as to why you do not

21 believe that he's conning you?

22 A.  It's my understanding -- first of all, I would say he's

23 been consistent.  He didn't ask for a psychological

24 assessment.  People with delusional disorders do not think

25 that they are disordered.  They don't ask for help.  He does

1    not believe he has a mental disorder.  I think he's been

2    consistent, for example, with his attorneys in saying that he

3    does not need psychological help.  He is healthy.

4        I lost the question, Ms. Olson, for a moment.

5    Q.  It was about whether or not he was conning you when he --

6    A.  Oh, conning me.  He's been consistent in saying he's

7    psychological healthy -- psychologically healthy.

8        It's my understanding he was offered a plea.  Now, I

9    understand that.  I've had many clients over the years who

10   took pleas, and I have a pretty good understanding of what

11   that entails.  And it's my understanding that he said, no, I

12   will plead to a misdemeanor, and if I can have my passport.

13       From the context of what has occurred here, that's

14   delusional, that the government would accept something such as

15   that.  It's impossible for me to conceive that he sees

16   somebody like myself coming in, when you asked me to do a

17   psychological assessment post trial, and coming in and

18   suggesting as a delusional disorder to suggest to the Court

19   that this is some kind of end game that he's been playing all

20   along so that he gets a psychological diagnosis which means in

21   some way help mitigate his sentencing.  That to me is

22   farfetched.

23   Q.  Do you see him as being remorseful?

24   A.  He is saddened because people are angry at him.  He is

25   saddened because things haven't worked out.  He is confident

1   that given the chance, he can make everything happen again.

2   Q.   Dr. Schau, is he using God and religion to rationalize his

3   actions?

4   A.   To rationalize his actions?  First of all, he's not a jail

5   house conversion.  His religiousosity is genuine, I believe,

6   in the sense that he believes, he feels a religious attachment

7   to God, or whoever, I must characterize that.  His

8   religiousosity is genuine.  It's also shallow, I believe, but

9   he uses his religiousosity to reinforce the notion that "I am

10  special."

11  Q.   Okay.

12  A.   That's how he uses it.

13  Q.   And how is that different than from the idea that because

14  of his religiousosity he is entitled to get money from people?

15  To use for, say, charitable purposes?

16  A.   Well, in his belief system, he has taken a vow of poverty

17  despite his lifestyle.  In his belief system, he really does

18  wish to be special to everybody, and so he uses the money as a

19  way of saying that somehow I can make this happen some day;

20  somehow I can make this eight hundred million dollar project

21  happen.  Unlike somebody, say, such as -- I come from

22  Stanwood, Camano Island -- Phil Harmon, who bilked people in

23  the tune of 45 million dollars, spent eight years, used his

24  church as a place to pray with people and take their money and

25  knew all the time that basically he was taking their money for

1  his own pleasure.  That has to be distinguished from Mr. Bush,

2  I believe, who believes the money is coming to him as a

3  special trust in order to make things good for everybody.

4  It's delusional.

5  Q.  And you and I have talked a little bit about how complex

6  this whole scheme was.  I know that you were not present

7  during the trial, is that right?

8  A.  No.

9  Q.  And didn't look at any of the exhibits.

10  A.  No.

11  Q.  You can assume from our discussions that this was pretty

12  complex.  If he's mentally capable of being involved in

13  something like that, how does that square with your belief

14  that he suffers from a delusional disorder?

15  A.  I don't know how complex it was.  I have real concerns

16  about his cognitive processes anyway given how poorly he

17  performed on some simple items on one of the psychological

18  tests.  But the reality is, again, a person with a delusional

19  disorder takes the facts and fits them to the delusion, so it

20  doesn't matter how smart he is.  It doesn't matter in the

21  sense of how complex it is, and I don't know how complex it

22  was or how much he relied on other people for some of the

23  bookkeeping work and whatever.  A person with a delusional

24  disorder fits the facts to the delusion.

25  Q.  Many of the victims -- and there are victims, I'm sure,

1  that are present in court today listening to you -- would not

2  have described him as somebody who is mentally ill.  How do

3  you address that?

4  A.  People with a delusional disorder aren't noticed by others

5  to be mentally ill.  They appear normal in most all respects.

6  Q.  Now, it's the government's position that Mr. Bush got

7  money from people for his own personal gain.  For example, he

8  bought a mansion in Port Orchard, some art work, had a lot of

9  very expensive perks in his lifestyle.  How does that fit into

10  your diagnosis?

11  A.  I don't know.  I would -- I think I need about 20 hours

12  with Mr. Bush.  I was struck by the fact that the mansion had

13  a golf course and he doesn't play golf.  The mansion had

14  horses associated with it and he doesn't use horses.

15      Generally speaking, people with his kind of disorder, or

16  generally speaking those people who do it for gain, like Mr.

17  Harmon, who I mentioned earlier, had many boats and many cars

18  that they actually used.  I don't know how much pleasure he

19  took in those things.  I didn't note a sexual license, for

20  example, which is frequently associated with people with

21  grandiosity.  It's harder for me to interpret that.

22  Q.  You were not here for his testimony during trial, but he

23  said many of the same things during trial that he said to you

24  during your discussions with him.  Do you have any opinions as

25  to whether or not he believes what he says or whether he is

1   saying something that he thinks is going to convince others or

2   to gain sympathy for him?

3   A.   I think -- I really believe he thinks that -- I did not

4   have a copy until you provided it to me of his document,

5   *Practicing Jesus Christ's Values*.

6   Q.   And that, to interrupt you, is Exhibit C to the sentencing

7   memo, is that what you are referring to?

8   A.   Yes.  I had seen it when I was in the Federal Detention

9   Center but I didn't have the time to review it and I couldn't

10  get a copy, so I was looking at that yesterday.  It's genuine.

11  He really believed that.  It's also disordered.  It has a

12  matrix quality to it.  It has kind of a self-soothing quality

13  to it.  When you read it, it's kind of alliterative, and I

14  have a sense that he pours over this continuously, much as

15  like when I looked at some of the documents he had in the

16  detention center where he has penciled notes in the margin.

17  His religiousosity is genuine in the sense that he really

18  believes religiously.

19  Q.   Do you think he misrepresented himself as a religious

20  organization or as a charity with victims?

21  A.   I believe that he thinks that he's a religious

22  organization.

23      Ms. Olson, I know what a corporation sole is.  I worked

24  with the Catholic Church for 11 years as a corporation sole.

25  Of course it's ridiculous on its face, but that doesn't mean

1  he doesn't believe it.

2  Q.  And there's no doubt in your mind that he really truly

3  does believe it?

4  A.  I believe he believes it.

5  Q.  Now, you are aware that he suffered a motorcycle accident

6  and probably a head injury in about the year 2000.  Does that

7  fact impact your evaluation of him?

8  A.  I just didn't go there.  I've had some neuropsychological

9  experience.  I noted that on 16PF, psychological tests, on

10  very simple items he did poorly.  And my earliest research was

11  on brain damage and alcoholism.  He's not an alcoholic.  But

12  what happens with brain damage and alcoholism is that you keep

13  your verbal ability.  He has verbal ability.  He's able to say

14  hello, how are you, and would you invest with me, and go all

15  down that path.  But frequently there can be a gap between

16  verbal ability and a gap with problem solving ability.  In

17  essence, your effective IQ.  Whether that was -- whether he

18  was impacted much by the head injury, I have no idea.  But I

19  do see what is an apparent gap that would require further

20  assessment or evaluation.

21  Q.  Is this delusional disorder treatable?

22  A.  It's very difficult to treat.  It's an Axis I disorder, so

23  by implication it's treatable, yes, and there's some medicines

24  which have been helpful with grandiose types, as well as

25  psychotherapy.

1  Q.  From what you know of prison facilities, do you think that

2  he might be able to get sufficient treatment in prison?

3  A.  It wouldn't happen in prison unless it was in a forensic

4  hospital.

5  Q.  In order for treatment for this disorder to be successful,

6  does Mr. Bush have to recognize that he has it?

7  A.  The treatment has to do with him coming to the recognition

8  that he has it.  That is the treatment.

9  Q.  And is that the part of treatment for this disorder that

10  makes it difficult?  Is that one of the things that makes it

11  different?

12  A.  Yes.  It's a very difficult conversion.

13  Q.  Do you have any impression of the government's

14  recommendation that Mr. Bush be incarcerated for 30 years?

15  A.  The only impression I have is that -- it begins with the

16  notion -- I don't know what the appropriate sentence is for

17  the crimes for which he has been convicted.  I know Mr.

18  Harman, for example, served eight years.  It sounds fairly

19  similar.  I would think that it would be a sad thing if his

20  mental illness was a compounding factor rather than a

21  mitigating factor.

22          MS. OLSON:  Thank you.  I have no other questions.

23          THE COURT:  Mr. Storm.

24                      CROSS-EXAMINATION

25  BY MR. STORM:

1  Q.  Mr. Schau, how much time did you say you spent with the
2  defendant?
3  A.  About three hours.
4  Q.  And you had some tests conducted in this case, 16PF and
5  MCMI-III and the MMPI-2.  Were you present when those were
6  conducted?
7  A.  No, I wasn't.
8  Q.  Okay.  Who conducted them?
9  A.  He took them back to his cell for filling them out.
10  Q.  And the circumstances and surroundings that those tests
11  were filled out are actually important?
12  A.  Yes, it is.
13  Q.  And you weren't there so you don't know what the
14  circumstances or surroundings of employing those tests out
15  was, is that right?
16  A.  That's correct.
17  Q.  And you're basing, in large part, your analysis of him on
18  also those three tests, isn't that right?
19  A.  No, that's not right.
20  Q.  In large part?
21  A.  No.
22  Q.  Small part?
23  A.  Significant part.  Small but significant.
24  Q.  So a significatnt part of your analysis is based on those
25  three tests, right?

1  A.  Yes.

2  Q.  And you don't know when he took the tests if his cellmate

3  was playing loud music, turning up the TV, arguing with him;

4  you actually don't know what was happening with him, isn't

5  that right?

6  A.  I do not know what was happening.

7  Q.  Okay.  Your diagnoses, however, is that he's narcissistic

8  and grandiose, is that correct?

9  A.  Yes.

10  Q.  Define narcissistic.

11  A.  Narcissistic is from the -- is the Greek Narcissi, when he

12  looked into the pond and saw his reflection.  It has to do

13  with a very high inflated sense of self; focus on how

14  important I am, how special I am.

15  Q.  And corresponding to that is a deflated sense of view,

16  isn't that right?  You don't see others as being as valuable

17  as you or as special as you?

18  A.  Not always, but sometimes.

19  Q.  And, in fact, that makes it easy to victimize people,

20  isn't that right?

21  A.  I didn't understand.

22  Q.  Being narcissistic.

23  A.  It can make it easier to victimize people?

24  Q.  Uh-huh.  If you are important and they are not.

25  A.  I would find some exceptions to that, but, yeah.

1  Q.  Define grandiosity for us.

2  A.  It's a synonym of narcissism.  "I think I'm very special."

3  I will stop at that.

4  Q.  So this is somebody who is full of themselves, isn't that

5  right?

6  A.  Yeah.  Like in golf terms, you use golf analogy, it would

7  be like a Hollywood handicapper.  Somebody who can golf -- for

8  those who don't know golf, I will explain it briefly.  It

9  would be like somebody who has really a ten handicap, which is

10  a pretty decent good golfer, but a lower score is better.  But

11  they really don't post all their poor scores, they just post

12  their good scores and they end up being a five handicapper.

13  They are really full of themselves.

14  Q.  So if you are going to run a Ponzi scheme, it's actually

15  useful being narcissistic and grandiose, right?

16  A.  I wouldn't think you would run a Ponzi scheme unless you

17  are narcissistic and grandiose.

18  Q.  So you would expect the fact that whoever Ms. Olson walked

19  through your door or whoever you met at the FDC to give this

20  paperwork to when you learned that they were running a Ponzi

21  scheme, you would expect that they would be narcissistic and

22  grandiose?

23  A.  I would consider that one of those things to rule out.

24  Q.  It would be highly likely, though?

25  A.  It would be likely.

1  Q.  Let me have you look, if you would, at page 9 of your

2  report.  Top of the paragraph where you say, "David Koresh

3  proclaimed that he was 'the Son of God, the Lamb, who could

4  open the Seven Seals.'  Mr. Bush's delusion is that he really

5  believes that he is a financial genius acting on behalf of God

6  for the good of humankind."

7      Is that your analysis for his grandiosity?

8  A.  That's a description of his grandiosity.

9  Q.  If I'm acting on the behalf of God for the good of

10 humankind, lies that I tell to investors to get their money

11 from them unjustly, I might totally justify that, right?

12 A.  I don't know.

13 Q.  Do you have an opinion?

14 A.  I didn't understand the question.

15 Q.  Well, if I'm trying to save humankind on behalf of God,

16 the means justify the end.  Any lies I tell to investors to

17 get their money, that's justified --

18 A.  I think that -- I apologize for interrupting.

19 Q.  That's fine.

20 A.  I think the person would not consider it lying.  That's

21 the difference.  A person with a delusional disorder -- I want

22 to emphasize this again -- fits the facts to meet the

23 delusion.  Adjusts the facts to meet the delusion, so I'm not

24 lying.

25 Q.  I understand half of what you are saying.  I understand

1  grandiosity being, I can do anything I want.  If I set off to

2  do it, I'm going to do it.  Nobody's going to stand in my way.

3  I understand that.

4      Let's explore the second half of what you said, it

5  wouldn't be lying.  What are the lies the jury convicted Mr.

6  Bush of after a two-and-a-half-week trial?  What were those

7  lies?

8  A.  I don't know.

9  Q.  Wouldn't that be important to try to understand whether he

10  believed them when he told them to know what they were?

11  A.  I think it's -- I think if I had my druthers, I would have

12  20 hours with Mr. Bush and I would have been able to explore

13  all of that sort of thing.  I would have asked many other

14  questions as well.

15  Q.  Dr. Schau, understanding what the lies were that the jury

16  convicted him of, the reason we are here, seems not only

17  druther, but it seems like it's critical to understanding this

18  case.

19  A.  I would say it would be very helpful for me to know what

20  those lies were.

21  Q.  You didn't sit through any of the jury trial.

22  A.  No, sir.

23  Q.  The government filed a trial brief that had 15 pages, 15

24  pages of very detailed facts.  That's not the law, that's not

25  the legal issues, the elements of the crime, just the facts of

1    the case, 15 pages.  How much time did you spend with the

2    trial brief and those 15 pages telling you what the facts were

3    as the government planned to present them?

4    A.  To the extent that they were in the indictment, I read the

5    indictment.

6    Q.  The indictment is a summary, but the trial brief had a

7    statement of facts.  It sets out verbatim what the government

8    is going to prove.  Did you read those 15 pages?

9    A.  It wasn't provided to me.  No.

10   Q.  You mentioned in your report -- first of all, you didn't

11   author these, but you had three tests prepared.  You did not

12   attach those to the report that you presented to the Court, is

13   that correct?

14   A.  The three tests themselves?

15   Q.  Yes.

16   A.  No, I didn't.

17        MR. STORM:  Your Honor, may I approach?

18        THE COURT:  Yes.

19   BY MR. STORM:

20   Q.  Dr. Schau, do you see Exhibits 1, 2, and 3 in front of

21   you?

22   A.  Yes, sir.

23   Q.  Are those the three tests that you had prepared in this

24   case?

25   A.  Yes, sir.

1  Q.  And all of the writing in those three tests are not your

2  work, but they are the work of people who graded the three

3  tests, is that correct?

4  A.  Are you referring to the narrative parts?

5  Q.  Yes.

6  A.  Yes, that's true.

7  Q.  Where does that take place?  Where do you send these tests

8  off to get them graded?

9  A.  We just do it in our office.  We have a -- we subscribe to

10  a service, and a narrative is generated.  I don't depend on

11  the narrative, but it's part of what's given back to us.

12  Q.  Do you read the narrative to see if you disagree with it?

13  A.  No, sir, I don't.

14  Q.  So you don't even look at what another expert in the field

15  thinks about your client?

16  A.  I don't generally.  I mean, sometimes I will search a

17  little bit.  No, I generally don't.  I look at the scores and

18  I work off the scores.

19  Q.  You have never read the three exhibits in front of you?

20  A.  I've read the test, raw scores.

21  Q.  Let's take a look --

22  A.  I depend on the raw scores.

23          MR. STORM:  Your Honor, I can't recall if I have

24  offered these?

25          THE COURT:  You have not.

1          MR. STORM:  Your Honor, I offer Exhibits 1, 2, and 3.

2          MS. OLSON:  No objection.

3          THE COURT:  Exhibits 1, 2, and 3 will be admitted.

4     (Exhibits Nos. 1, 2, and 3 admitted.)

5  BY MR. STORM:

6  Q.  Dr. Schau, let's start off with -- I just have one

7  question about the MMPI-2, and that's Exhibit No. 3 in front

8  of you.  The MMPI-2 is about 500, 502 questions.  Is it

9  multiple choice?

10 A.  No, it's true/false, about 553 questions.

11 Q.  553 questions.  Okay .  So this is one of the tests that

12 Mr. Bush took back to his room.  You don't know if he

13 consulted with his cellmate when filling this out, do you?

14 A.  No, sir.

15 Q.  That would be huge and detrimental to the accuracy of the

16 results, right?

17 A.  It could affect the results, yes.

18 Q.  I just have one question on this, and I want to have you

19 look at page 11.  Down at the -- towards the bottom of the

20 page where it says "227."  The question was asked -- and this

21 is under "Antisocial Attitude."  The question was asked:  "I

22 don't blame people for trying to grab everything they can in

23 this world."  And what was Mr. Bush's answer?

24 A.  True.

25 Q.  And let me have you look at now Exhibit No. 2, which is

1    the MCMI-III.  And that's another test where it's multiple
2    choice or true/false?
3    A.   True/false.
4    Q.   I think it's 175 questions on that test?
5    A.   That is correct.
6    Q.   Let me have you look at the -- on page 2, the third
7    paragraph down, it starts "Unless."  Could I just have you
8    read that paragraph real quick?
9           MS. OLSON:  Counsel, I'm sorry to interrupt.  Could
10   you tell me what exhibit you're on?
11          MR. STORM:  This is Exhibit No. 2, the MCMI-III.
12          MS. OLSON:  Thank you.
13   BY MR. STORM:
14   Q.   If you just read the third paragraph down.
15   A.   "Unless this patient is a well-functioning adult who is
16   facing minor life stressors, his responses suggest an effort
17   to present a socially acceptable front and resistance to
18   admitting personal shortcomings.  The interpretive narrative
19   is probably reasonably valid but may fail to represent certain
20   features of his disorders or character."
21   Q.   So he's actually being resistant to admitting some
22   shortcomings here and it says that it's probably reasonably
23   valid assessors but, you know, maybe it's not.  You've never
24   actually read those, right?
25   A.   Never read what?

1  Q.  That paragraph.

2  A.  Yeah, I have.

3  Q.  You said a minute ago that you hadn't read this document.

4  A.  I have not read the narrative report, which is a computer

5  generated description of Mr. Bush according to the computer.

6  This part has more to do simply with just the validity of the

7  report itself.  I do read those.

8  Q.  So you were aware that he was somewhat holding back, that

9  he may affect the accuracy of this test, is that right?

10 A.  Well, it would take some further elaboration, but I would

11 agree with your statement.

12 Q.  Let me have you turn to page 6, please, and the second --

13 I will just have you look at the second paragraph up from the

14 bottom.  It start out, "The MCMI-III," and I'm just going to

15 read that very quickly.

16     "The MCMI-III profile of this man suggests that he

17 exhibits an inflated sense of self-worth, an air of

18 imperturbability, and a pretense of self-satisfaction.  His

19 superficially charming personal style, noted by a seeking of

20 recognition and attention, is usually evident in skillfully

21 exhibitionistic, self-enhancing behaviors.  His interpersonal

22 relationships may be self-serving, shallow, and fleeting.  A

23 talent for exploiting the naive may be present as is a measure

24 of delight in questioning, but adhering to, social

25 conventions."

1    Had you read that paragraph?

2  A.   No.

3  Q.   Let me have you turn to one more paragraph in this

4  particular document, on page 7, and look at the third

5  paragraph up from the bottom.  "He feels" -- do you see where

6  it starts with "He feels" in the middle of that paragraph?

7  A.   Yes.

8  Q.   "He feels justified in his claim for special status and

9  has little conception that his behavior may be objectionable,

10  even irrational.  He believes that he is a special person who

11  deserves great admiration from others.  He may act in a

12  grandiose and self-assured manner, often without commensurate

13  achievements."

14    Confirming your analysis of grandiosity.

15  A.   And cherry picking at the same time.

16  Q.   I'm cherry picking?

17  A.   Yes, you are, sir.

18  Q.   I am.

19    Okay.  Dr. Schau, let me have you -- in your report, you

20  refer to an article in the New York Times on January 24, 2009.

21  And let me have you look at Exhibit No. 4 in front of you.

22  A.   Do I have that in front of me?

23  Q.   You don't.

24    MR. STORM:  Your Honor, may I approach?

25    THE COURT:  You may.

1  BY MR. STORM:

2  Q.  Dr. Schau, is that article, Exhibit No. 4, the article you

3  refer to in your report at page 7?

4  A.  I'm going quickly, just scanning.  There were many

5  articles about that time.  I'm looking for the reference to

6  Dr. Meloy.  It would have to be the one that includes the

7  reference to Dr. Meloy to be the same article.

8  Q.  Try looking at page --

9  A.  I don't see it so far.

10  Q.  It's marked 2 of 3, and it's the second page to the back

11  of the article.  And if you look up at the top of the page, in

12  the middle of the first line, it says "J. Reid Meloy" --

13  A.  I'm trying to follow you.

14  Q.  The second page from the back, top of the page.

15  A.  Got it, yes.

16  Q.  Okay.  I want to read two sections that you refer to in

17  your report that is from -- first of all, is this the article

18  that you are referring to?

19  A.  It appears to be.

20  Q.  And it's the same -- the day is right, January 24th, 2009?

21  A.  Yes.

22  Q.  Okay.  And it's entitled "The Talented Mr. Madoff," is

23  that right?

24  A.  Yes.

25          MR. STORM:  Your Honor, offer Plaintiff's Exhibit No.

1    4.

2              MS. OLSON:  No objection.

3              THE COURT:  Exhibit 4 is admitted.

4      (Exhibit No. 4 admitted.)

5    BY MR. STORM:

6    Q.  Dr. Schau, in your report you talked about the fact that

7    Dr. J. Reid -- is it Meloy?

8    A.  Meloy.

9    Q.  -- Meloy is a person with whom you have attended a class

10   or a presentation that he made, and you refer to his comments

11   on Mr. Madoff in this article, and I just want to read this to

12   you, and I have a couple of questions regarding that.

13       At the top of the page it says:

14       "Mr. Madoff's confidence reminds J. Reid Meloy, a forensic

15   psychologist, of criminals he has studied.

16       "'Typically, people with psychopathic personalities don't

17   fear getting caught,' explains Dr. Meloy, author of a 1988

18   textbook, 'The Psychopathic Mind.'  'They tend to be very

19   narcissistic with a strong sense of entitlement.'"

20       Then I'm going to move down to the next paragraph, four

21   paragraphs down, where it says "Like the former F.B.I. agent

22   Mr. McCrary.

23       "Like the former F.B.I. agent Mr. McCrary, Dr. Meloy

24   cautions that he has not met Mr. Madoff and can't make a

25   clinical diagnosis.  Nevertheless, he says individuals with

1  psychopathic personalities tend to strongly believe that
2  they're special.
3      "'They believe "I'm above the law," and they believe they
4  cannot be caught,' Mr. Meloy says.  'But the Achilles' heel of
5  the psychopath is his sense of impunity.  That is, eventually,
6  what will bring him down.'
7      "He says it makes complete sense that Mr. Madoff would
8  have courted regulators, even if he ran the risk of exposing
9  his own actions by doing so."
10      So in these comments, Dr. Meloy is saying, I haven't
11  analyzed Mr. Madoff, but my guess is he's narcissistic and he
12  thinks he's special.  Right?
13 A.  Yes.
14 Q.  And that's the same thing you just said about Mr. Bush, it
15  is the same analysis, he's narcissistic and he thinks he's
16  special.
17 A.  I need to elaborate further.
18 Q.  Go ahead.
19 A.  Okay.  What you're doing, it seems to me, is that you're
20  assuming Mr. Madoff is considered possibly psychopathic, and
21  psychopathy is related to being special and feeling that way.
22  By feeling special, it necessarily makes you psychopathic.  I
23  have tried to make the transition from the comments about
24  Meloy to a workshop that I heard from Dr. Meloy, in which it's
25  also possible to be -- have feelings of grandiosity and feel

1    special without being psychopathic, in which it's possible to

2    have a delusional disorder.  I don't think I made that

3    transition adequately, apparently.  It's possible to be

4    delusional disorder without being psychopathic.

5    Q.  When you are talking, being psychopathic, he connects

6    psychopathic to narcissistic and says, in talking about Mr.

7    Madoff, "narcissistic, special."  Is that true?

8    A.  It's possible to be -- all narcissists are not

9    psychopaths.  All psychopaths are probably narcissistic.

10   Q.  In any event, Mr. Madoff appears to be, without having

11   completely analyzed, narcissistic and special, believing, and

12   that's the same thing true of Mr. Bush, they are both

13   grandiose and narcissistic apparently, is that correct?

14   A.  It's possibly true.

15   Q.  In fact, there's been a whole series of articles in the

16   press lately about Mr. Madoff's psychological makeup, what he

17   is or isn't.  Have you been following those articles?

18   A.  With great interest.

19   Q.  I would like to get your opinion on one more of those

20   articles from Time Magazine.

21              THE COURT:  Briefly, Mr. Storm.

22              MR. STORM:  May I approach, Your Honor?

23              THE COURT:  Mr. Madoff is not here.

24              MR. STORM:  I will be very brief, Your Honor.

25   BY MR. STORM:

1  Q.  Dr. Schau, could I have you look down on page 2.  You have

2  in front of you Exhibit No. 5, dated Wednesday, December 31,

3  "Putting Bernie Madoff On The Couch."

4  A.  Yes, sir.

5          MR. STORM:  Your Honor, I would offer Exhibit No. 5.

6          THE COURT:  Ms. Olson, Exhibit 5.

7          MS. OLSON:  I'm sorry, Your Honor.  Yes.  We have no

8  objection.  Thank you.

9          THE COURT:  Exhibit 5 is admitted.

10     (Exhibit No. 5 admitted.)

11  BY MR. STORM:

12  Q.  Dr. Schau, if I could have you look at page 2, middle of

13  the page, in the middle of the paragraph that says "The reason

14  lies in the personality."

15  A.  The second paragraph?

16  Q.  The second paragraph on page 2, down at the bottom, the

17  last sentence of that paragraph.

18  A.  Got it.

19  Q.  I'm just going to read that, and then just a couple more

20  questions for you.

21     "The reason lies in the personality -- or, more

22  accurately, the personality disorder -- that drives them to

23  such frauds in the first place.

24     "Forensic psychologists studying Madoff-type minds start

25  with the usual menu of personality disorders, particularly

1  narcissism.  'These people get real enjoyment from doing what

2  they do,' says forensic psychologist Michele Galietta of John

3  Jay College of Criminal Justice in New York City.  'They feel

4  good pulling the wool over other people's eyes.'

5      "Other conditions such as bipolar or manic disorders may

6  be involved as well, particularly since they are characterized

7  by grandiosity and impulsiveness, with little regard for

8  consequences."

9      In talking about people who commit Ponzi schemes, are you

10  in agreement with the fact -- the facts as just stated by Dr.

11  Galietta?

12  A.  I think it makes the point real good, especially the

13  notion of -- of -- I'm looking for this bipolar manic

14  disorders.

15      Bipolar and manic disorders are Axis I disorders.  Similar

16  to, and different, but similar to Mr. Bush's delusional

17  disorder, which is also an Axis I disorder.  Those are the

18  drivers.  "The reason lies in the personality... that drives

19  them to such frauds in the first place," is the quote here.

20      The driver here that drove Mr. Bush was the delusional

21  disorder, akin to bipolar disorder, Axis I disorders.

22      The personality disorder is a reinforcer.  Axis II

23  disorder is a reenforcer to the Axis I.  So I think this makes

24  the point very well.

25  Q.  Dr. Schau, I'm going to switch subjects for just a moment.

1      You said that Mr. Bush doesn't recognize his lies, or

2  doesn't recognize that he's lying.  He's had three marriages

3  that were all broken up by womanizing, as he put it.  Did he

4  recognize that as being wrong?

5  A.  Yes, he did.

6  Q.  And typically when people -- so he can recognize things

7  that are wrong?

8  A.  Yes, he can.

9  Q.  Typically when people lie, they try to cover up what they

10  have done.  Are you familiar with all of the ways that the

11  government alleged and the jury heard that Mr. Bush covered up

12  and hid his lies in this case?

13  A.  No.  I've read a summary, and that's all I have.

14  Q.  You haven't -- so, again, as the trial brief sets out all

15  of those ways that he hid his activities, you have not read

16  those?

17  A.  No, sir.

18        MR. STORM:  Thank you.  I have no further questions.

19        THE WITNESS:  Thank you sir.

20        THE COURT:  Ms. Olson.

21                  REDIRECT EXAMINATION

22  BY MS. OLSON:

23  Q.  Dr. Schau, you had a very limited opportunity to work with

24  Mr. Bush, is that right?

25  A.  Correct.

1  Q.  And that was based on a budget that I gave to you?

2  A.  Yes, ma'am.

3  Q.  Which you understood I received from the Court?

4  A.  Yes, ma'am.

5  Q.  If you had an unlimited budget, you would have done things

6  differently, is that right?

7  A.  Yes.

8  Q.  The government, Mr. Storm, has commented that you were not

9  present when these diagnostic tests were given to Mr. Bush.

10  Does the fact that you were not present when he took them,

11  does that indicate to you that they are less than valid?

12  A.  No.  I think the irony here is that the tests suggest that

13  he's mentally healthy in a general sense.  They do reenforce

14  the notion of his narcissism, his personality disorder.  But

15  the irony here is that the psychological testing by themselves

16  really don't give me much at all.  They resemble so much what

17  I see in custody related cases.  He comes across as relatively

18  normal.  That's the irony.

19  Q.  Then how did you really use the tests in terms of your

20  assessment?

21  A.  Well, one, he's not, you know, like Mr. Storm gave the

22  example of the one item he pulled out of the MMPI-2,

23  antisocial attitude, but in fact on the PE scale, scale 4 on

24  the MMPI-2, it's not elevated.  He doesn't come across as

25  antisocial at all.

1    That's what I kind of mentioned when he was cherry picking
2    a little bit.  The scale's not elevated.  He does not appear
3    mentally disturbed in those testings.  He looks like my
4    custody cases:  Compulsive, narcissistic, but not particularly
5    unusual in many ways.  But that reinforces the notion of a
6    delusional disorder.  They appear relatively normal.  It's
7    only the delusion that stands out.
8    Q.  And it's the delusion that makes him mentally ill, is that
9    right?
10   A.  Yes, ma'am.
11   Q.  Did you incorporate -- well, let me back up.
12       Mr. Storm pointed out different paragraphs in the test
13   materials for you.  Did you incorporate the information coming
14   from the test materials into your report?
15   A.  I look at the raw scores.  I don't look at the narratives.
16   I don't need the narratives.  I'm a psychologist who can
17   depend upon my own interpretation of the raw scores.  Again,
18   that's why I'm saying he's cherry picking.
19       The narrative, absent a correlation with the social
20   history and absent a correlation with other sources of data,
21   they just can't stand by themselves.  And, of course, the
22   materials when you read the tests, they will tell you that.
23   You have to correlate it with behavior; you have to correlate
24   it with other evidence.
25   Q.  Does that include the time that you actually spent talking

1    with Mr. Bush?

2    A.   That's fundamental to me.  I mean, I need at least two or

3    three hours with somebody to get a sense of who they are.  I

4    tell them, you speak to me through the test.  I get to know

5    you through other means, including meeting with you

6    personally.  Then I will take what other evidence I have

7    available to me by way of the indictment, and so forth, and I

8    try to correlate those.

9    Q.   Is Mr. Bush like Mr. Madoff, so far as you know about Mr.

10   Madoff?

11   A.   Again, we are just depending on news reports, and there's

12   no indication that Mr. Madoff -- I mean, he may be religious

13   to some extent, but I don't infer anything there having to do

14   with a religious delusion.  So I could hypothesize about Mr.

15   Madoff being psychopathic, and I think that's a reasonable

16   thing to rule out, and I just don't view Mr. Bush as being

17   psychopathic in any way.

18   Q.   Do you think he enjoyed taking money from people?

19   A.   I think he enjoyed the high of bringing lots of money in

20   for his grandiose plans.  He is not sadistic, and that's

21   really kind of a central to psychopathy.  He doesn't take

22   pleasure from the pain of others, such as we just heard these

23   psychologists talking about the potential of Mr. Madoff, who

24   was referred to as akin to a serial killer because he killed

25   their wallets.  That's taking pleasure.  I don't see Mr. Bush

1    taking pleasure from taking money from others.  He takes

2    pleasure in the grandiosity and the feeling good he gets.  He

3    is so special and he is going to make things happen for

4    people.

5    Q.  And from your understanding, it is his faith that really

6    has driven him?

7    A.  His faith is a reinforcer to his grandiosity.

8    Q.  One final question.  There's been much discussion with Mr.

9    Storm in terms of the narcissism aspect of your diagnosis of

10   him.  Can you distinguish that aspect from his delusional

11   disorder that you believe he suffers from?

12   A.  Only in this sense, that all narcissists are not delusion.

13   All delusional people are not narcissists.  You have to take

14   each case by itself.

15   Q.  And you're convinced that he is both?

16   A.  Yes, I think he is both.

17   Q.  And there is no question in your mind that he suffers from

18   mental illness?

19   A.  He suffers from mental illness, yes.

20          MS. OLSON:  Thank you.

21          THE COURT:  Thank you, Ms. Olson.

22       Anything, Mr. Storm?

23                    E X A M I N A T I O N

24   BY THE COURT:

25   Q.  Doctor, let me ask you a very specific question because

1    given the fact that Mr. Bush's delusion is related to his

2    religious beliefs, specifically his Christian religious

3    beliefs, and I'm asking you to assume that after taking money

4    in, based on certain promises, Mr. Bush actually supervised

5    the dummying-up of statements to make it appear that the

6    expectations that other people had about their investments

7    were in fact true, when he knew he had not received any money

8    and no account statements indicating that those investments

9    had in fact been made in the first place or had reaped any

10   reward whatsoever.  Do you have an opinion as to whether or

11   not Mr. Bush would have known what he was doing was wrong and

12   a lie?

13   A.   He wouldn't use the word lie.  He wouldn't say it's wrong.

14   You know, I would call it rationalization, but the

15   rationalization is so tied to the delusion that it's really

16   hard to distinguish the two.

17   Q.   So it really is the-end-justifies-the-means kind of

18   situation?

19   A.   He sees the end game over the horizon, and I see it a

20   million miles away.  He sees it just over the horizon, so

21   therefore he can rationalize it.

22   Q.   How close resurrection is, is not the point, is it, if the

23   question is whether or not you are telling the truth when you

24   purport to tell something to somebody that you know is not

25   true?

1  A.   I can just quote the DSM-IV, and that is -- in the DSM-IV,

2  this is a virtual quote.  I have been repeating it.

3     "A person with a delusional disorder takes the facts and

4  make them fit the delusion."

5     So he takes the reality, the reality is the truth, and

6  makes it somehow in his own mind fit the delusion.

7  Q.  I will accept the explanation.  But still, it still does

8  not explain telling a lie that cannot, even under any

9  explanation of the delusion, become a varied.  It cannot be

10  true even in the mind of a delusional person, it seems to me.

11  A.   And that, Your Honor, is why treatment is so difficult

12  with people with a delusional disorder.  You have to spend

13  hours, if you can ever get there, helping them understand that

14  what they see as the truth is really a falsehood.

15        THE COURT:  All right.  Thank you.  You're excused.

16  Thank you very much, Dr. Schau.

17        THE WITNESS:  Thank you, Your Honor.

18        THE COURT:  Ms. Olson I will hear from you now.

19        MS. OLSON:  Thank you.

20     Going back, starting where I am again in terms of the

21  objections, and I just want to comment on those briefly.

22     I don't believe that the two-level enhancement for

23  obstructing justice and for misrepresentation of Mr. Bush as a

24  religious organization are justified in this case because I

25  believe that Mr. Bush truly believed and truly continues to

1   believe that he is a corporation sole, that he is a religious

2   organization, and that what he did was to benefit others.

3   This is the essence of who he is.  And what he testified in

4   court is the essence of what he believes, what he believes

5   happened, and why it happened.  And if there's any consistency

6   in this case, it is those things.

7        And so what Dr. Schau has done here, as far as my work

8   with Mr. Bush and understanding Mr. Bush, is to put a frame

9   around it so actual I do understand why he believes things

10  that from my point of view are unbelievable, and it is because

11  he is delusional.  So it seems to me to be unfair to penalize

12  him, and that would be a penalty.

13       Now, as I mentioned in my sentencing memorandum, when the

14  dust settles, it really doesn't make a whole lot of

15  difference.  We go from level 45 to level 41 if the Court

16  accepts that.  But I think it is important for the Court to

17  consider and to rule on those objections because they do

18  impact who Mr. Bush is and what he suffers from and that he

19  was not doing those things, lying on the stand and

20  misrepresenting himself, he wasn't doing those things

21  deliberately.  He was doing those things as a function of his

22  mental illness.

23       Your Honor, in terms of sentencing, you do, you have a

24  split recommendation.  Mr. Bush would like me to recommend to

25  you to sentence him to time served.  Including his time in

1    Poland, which I would ask be included as time served for his

2    sentence, he has been incarcerated for over a year, close to a

3    year and a half.  He can tell us exactly how many days, but it

4    is close to a year and a half of incarceration.

5        His time in Poland was very difficult.  They do not even

6    have the comforts that we have here in the United States, such

7    as they are.  They don't have it in Poland, I can assure you.

8    So he has done a very difficult time in prison.

9        He's 69 years of age.  He likely suffers from prostrate

10   cancer.  He has not been diagnosed yet.  He has had very

11   little treatment because of the need for him to be sentenced.

12   First it was the need for him to be convicted and now

13   sentenced and then sent to his facility.

14       He's fragile physically, and he's fragile mentally.  As

15   Dr. Schau has explained to you, he suffers from a mental

16   disorder for which he will not get treatment, realistically,

17   in prison, for many reasons, both because of the system and

18   because in order for him to accept and benefit from treatment,

19   he will need a lot of one-on-one to help him understand the

20   disorder that he suffers from.

21       Mr. Bush relied on others.  Whether that makes sense or

22   not to us, from a man suffering with a delusion, it makes

23   sense.  He relied on Carolyn Mintus, he relied on Mark

24   Capozzi.  He truly believed that they had the money, that

25   Carolyn Mintus had the money and that she was going to give it

1   to him.  He truly believed her when she told him go ahead and

2   spend the money.  There was no question in his mind that what

3   she was telling him was right.

4        And one of the things that he struggles with today as he

5   sits convicted and is waiting for sentence is that he did not

6   investigate, he did not do due diligence, he was not a better

7   steward.  For him those are as painful and as powerful an

8   aspect of what he has done wrong as anything else, and there

9   isn't anything more he can say to you because based on his

10  religious beliefs, Christian beliefs, being a good steward and

11  taking care of other people's belongings is very important for

12  him and he failed in that way.

13       I am asking for a ten-year sentence, and I ask this -- I

14  gave this a lot of thought before I came to make a

15  recommendation.  This is, in essence, a life sentence for him

16  given his age, given his health, both physically and mentally.

17  He would do at least another eight years.  He would be close

18  to 80.

19       One question I did not ask Dr. Schau, and I think we can

20  infer it from his testimony, is that he needs treatment, and

21  without that treatment, he will continue to suffer delusions.

22  But a ten-year sentence to somebody who really does not fully

23  appreciate the wrongfulness of what he has been convicted of,

24  that is more than enough time.

25       And, of course, we would agree to -- I, myself, would

1  recommend that the Court adopt the period of supervised

2  release and the conditions of it.

3      Thank you.

4          THE COURT:  Thank you very much, Ms. Olson.

5      Mr. Storm.

6          MR. STORM:  Your Honor, regarding Dr. Schau's

7  testimony, we do think that it's highly likely that Mr. Bush

8  is narcissistic, which makes it possible for him to harm

9  others and not stop doing it.  We believe that he's grandiose;

10 that he has a very high over importance about himself that

11 makes other people seem smaller and makes him believe that he

12 can accomplish anything and everything.

13     So we're not contesting that.  In fact, we would be

14 surprised if the tests came back showing that he wasn't

15 narcissistic and grandiose.  I think you've got to be those

16 things to run a big Ponzi scheme.

17     There's a quote from Barry Minkow, who himself was a Ponzi

18 schemer in the 1980s.  He says of this conduct, he says, "We

19 all have a cure.  The irony of white collar crime is we

20 believe that we're one good week in trading away and we'll get

21 enough to pay it all back."

22     That's his opinion, and that's the same thing you see from

23 Mr. Bush.  One more week and I will pay it all back.  That's

24 every white collar scammer.  I'm sure Mr. Madoff was thinking

25 the same thing, one week in China and I will pay it all back.

1  Of course, it never works out, and also, while it facilitates

2  the crime, it doesn't justify it.

3      We believe that Dr. Schau would have formed the same

4  opinion, and that is that Nolon Bush absolutely knew he was

5  lying to these people, if Dr. Schau had the opportunity to

6  read the trial brief in detail, if he had had the opportunity

7  to talk to any of the victims or sit through the trial.

8          THE COURT:  Or if he had been able to -- I agree with

9  Dr. Schau.  I think Dr. Schau is right on the money in many

10  respects with regard to the evaluation he's done.  But I

11  listened to the tapes of Mr. Bush and his conversations while

12  he was in jail, and the thought of doing good at that point

13  was not in the calculous, not in the equation at all.  It was

14  what arguments are going to work and what arguments aren't

15  going to work and beating this wrap.

16          MR. STORM:  Your Honor, to add to that -- I have not

17  had the opportunity to listen to those tapes, but to add to

18  that, he took very extensive efforts, as I said, that Dr.

19  Schau doesn't know about to hide his illegal conduct during

20  the course of the scheme itself.  And I don't want to belabor

21  this, but he received a letter from the Department of

22  Financial Institutions saying -- here in Washington saying, we

23  think you're selling illegal securities through Hulaman and

24  Cornerstone, and he hired Glen Stoll to write a letter back

25  saying:  Neither of those entities -- referring to Hulaman and

1  Cornerstone -- are Mr. Bush's firms as implied by the opening

2  sentence of your letter.  Further, I know of no activities

3  connected with this offering and sale of securities in which

4  the above entities or individuals representing these entities

5  are or have been engaged in the State of Washington.

6      In fact, Mr. Bush was running both Hulaman and Cornerstone

7  and admitted on the stand that he received a copy of this

8  letter and did nothing about it.  This letter is a very

9  direct, obvious, concrete lie about trying to hide his

10  activities from the Department of Financial Institutions, and

11  he had no explanation about it from the stand.

12     He also hired a company to debug his car, office, and his

13  attorney's office down in California.  His own explanation for

14  that on the stand was that he wanted to protect social

15  security numbers of his clients, which just doesn't wash.  The

16  only reason he did that, those activities, was again to hide

17  from the government.

18     And then again, when the government started making arrests

19  of Ms. Mintus and Mr. Capozzi, he moved his scheme offshore

20  and changed the name, again trying to hide from the

21  government.  People who hide, you don't have to be a

22  psychologist to understand, people who hide know they are

23  doing something wrong, and we firmly believe Dr. Schau, if he

24  had had all the information, would have testified to that very

25  fact today.

1    With respect to the obstruction of justice, we do believe

2  that Mr. Bush lied from the stand and sustained two of those

3  lies.  He stated at the time that this type of bugging of his

4  office and car and attorney's office, from the stand he said

5  that was to protect the social security numbers of his

6  clients.  That simply doesn't wash.

7    He said that he got a $3,000 guard dog named Cora to

8  protect these women that they might some day invite to the

9  compound because the abused women might abusive spouses or

10 significant others.  Again, it's just something that he

11 testified to under oath that absolutely does not wash or make

12 sense.

13    And with regard to operating a charity, that seems fairly

14 concrete.  In fact, he wasn't operating it for any charity.

15 He told people who invested that one half of the profits that

16 we earn after you invest will go to the charity, one half will

17 go to you.  It made people feel good about giving their money

18 to him, and so he clearly used the charity to facilitate the

19 scheme.

20    With regard to our recommendation, we have recommended a

21 significant term of imprisonment.  It's not as high as what

22 the guidelines call for, but it is a significant term of

23 imprisonment.

24    Investment fraud is a huge societal issue.  Not only this

25 fraud, which was massive in scope, but nationwide is a huge

1   societal issue.  People are calling for the law to react to

2   that societal issue.  We believe that in order to create

3   respect for the law and deter others that a significant

4   sentence is warranted.

5       How much of a sentence?  We believe 30 years is fair and

6   will promote respect for the law.  And I thought about this,

7   how do we reach it?  Is it a year for each million dollars

8   stole?  That would equal 30 years.  Is it a year for each life

9   that he's ruined?  That would equal 400 years.  Even if you

10  took out the people who have recovered from this, it would

11  equal far more than 30 years.

12      What we've done instead, because we couldn't come up with

13  a formula, we just looked at the scope of this thing.  How

14  much effort did he put into it, which was absolutely massive;

15  how many people did he hurt, which was huge; and how much did

16  he enjoy?  Ms. Olson said he didn't enjoy it, but from

17  listening to every witness who got up there, he clearly took a

18  satisfaction of making this scheme work, knowing how much he

19  was harming those people.  And combining all of that, we've

20  come up with a recommendation of 30 years here.

21            THE COURT:  Thank you, Mr. Storm.

22            MS. OLSON:  Your Honor, may I make just a couple of

23  points?

24            THE COURT:  Wait just a second.

25      Mr. Acker, is there anything you would like to add to the

1   presence report you've authored?

2        THE PROBATION OFFICER:  Thank you, Your Honor.

3     I would just note that in terms of the adjustments to the

4   sentencing range that have been talked about, as far as

5   adjustments for obstruction, we looked at two aspects to that.

6   It wasn't just the idea that he lied on the stand.  The other

7   part of it was that he took steps to avoid prosecution by

8   moving the scheming records out of this jurisdiction and

9   eventually moving them overseas.

10    So it wasn't just, you know, whether or not he believed he

11  was testifying truthfully or falsely.  I think that's a

12  significant part of an obstruction adjustment.

13    Then, additionally, as far as the adjustment for the

14  charitable purposes.  As far as I'm aware, I don't believe it

15  makes a difference, according to the guidelines, whether or

16  not he truly believed that's what he was doing.  But in terms

17  of end results of that, I think that's what he was doing.  I

18  believe that's very clear in the record, that he was

19  misrepresenting that fact, and it was helping to victimize a

20  number of people.

21    And in terms of the ultimate, you know, sentence, I

22  believe the government has stated our point very well, and I

23  don't believe I need to restate it.

24        MR. STORM:  Your Honor, I apologize, but I have been

25  reminded that there are several victims in the courtroom

1    today.  Three of them have asked to speak to the Court, and

2    they are Gary Hobbs, Raymond Donahue, and Genevieve Curtis.

3         THE COURT:  Do you want to address your point first,

4    before they speak?  And very briefly.

5         MS. OLSON:  Thank you, Your Honor.  I will be brief

6    as well.

7        I neglected to raise, probably, you know, as important an

8    argument as any other argument, I would think, in this case,

9    and that is sentence disparity.  The government is advocating

10   360 months for Mr. Bush, while Carolyn Mintus, who really was

11   the linchpin of this whole thing, certainly as far as Mr. Bush

12   was concerned, she got 235 months.  The rest of them, Mr.

13   Capozzi got 36 months, Mr. Wilcoxson, who was involved, he got

14   96 months.

15       Many of these people were not even prosecuted, Your Honor.

16   Mr. Grant, Nigel Scott Grant, who was critical in this whole

17   scheme, wasn't prosecuted.  And not only was he not

18   prosecuted, but he is enjoying today the wealth that he

19   accumulated from these victims and nothing has happened to

20   him.  Same with his son, and many of the others that aren't

21   even listed here.  So I think the Court has to take that into

22   consideration as well, and when you do, 360 months is far

23   outside any of these other sentences.

24       Going to the response of Mr. Storm.  The government is

25   focusing on the one aspect of Dr. Schau's diagnosis of Mr.

1  Bush, and that's the narcissistic aspect of it.  The more

2  critical aspect is the delusional disorder.

3        THE COURT:  Here's the problem that I have with this,

4  is that I think -- I think that Dr. Schau is right on

5  virtually every aspect of his observations of Mr. Bush.  I

6  think that in many ways Mr. Bush is delusional; i.e., clearly

7  narcissistic.  But the problem is, is that when you accept --

8  he clearly was competent to be tried, and when you accept and

9  categorize someone as mentally ill, and then leap from that to

10  the conclusion that all logic has to be suspended in terms of

11  one's evaluation of his conduct, I believe -- I know in my own

12  mind, he knew he was lying to people on a daily basis.  I

13  know, in my own mind, that he knew he was taking money from

14  people that was not of the type that we would describe as

15  discretionary -- it was life-long earnings -- and converting

16  them to his use.  He knew that.  The man I listened to on

17  those tapes knew what he was doing as he was trying to

18  calculate and recalibrate the defenses that would be

19  successful in a criminal prosecution.

20     The disciples had very little to do with this Ponzi

21  scheme.  It had everything to do with Nolon Bush.  And the

22  fact that Ms. Mintus is not before me or Mr. Madoff is not

23  before me has little to do with what I believe the law

24  requires me to do with regard to Mr. Bush.  This was an

25  incredible enterprise, and to say he converted all of this

1  wealth to his own personal use but he's mentally ill so you

2  can't hold it against him.  He lied to people on a repeated

3  basis so that by merely getting a statement they would believe

4  that everything that they had been told was coming to pass.

5  But he's mentally ill, so you can't hold that against him.

6      That's the difficulty that I ultimately have in this.  Mr.

7  Bush has been very calculating throughout this enterprise and

8  he has been successful beyond all imaginings that I could

9  conger up.  I mean, he got money out of people out of

10  circumstances that I still can't believe, but he did it.  And

11  I'm satisfied that he knew what he was doing, he knew why he

12  was doing it, and throughout all of this, the one who got paid

13  first was Nolon Bush.

14          MS. OLSON:  Let me respond to a couple of those

15  comments.  First of all, Your Honor, I am not standing up here

16  telling you to give him a pass.

17          THE COURT:  I know that.

18          MS. OLSON:  And I'm not telling you, I'm not trying

19  to convince you that because he is mentally ill you should

20  give him a pass, not at all.

21      And the Court brings up about those tapes, and to tell you

22  the truth, I forgot about those tapes.  But think about those

23  tapes again.

24      First of all, the arguments that he was making in terms of

25  trying to figure out how to put his defense together, that

1    certainly was the kind of information that led me to believe

2    that there was no question in terms of his legal competency to

3    stand trial.  That's a normal thing for a defendant to do.

4    But then think of the substance of those defenses, Your Honor.

5    He wanted to focus on this corporation sole and these

6    documents that Mr. Stoll wrote.  Mr. Stoll wrote those

7    documents, Mr. Bush didn't write them, and that was the

8    testimony at trial.

9        So when you really analyze those tapes in light of what

10   Dr. Schau has said, it all makes sense, at least it does to

11   me, because that was a delusional man that is talking.

12       Yes, he sounds like he's calculating.  But when you really

13   get down to the essence of what he was actually saying, it

14   didn't make sense, and it was not going to be successful at

15   trial.  It wasn't successful at trial.  I gave it my best

16   shot.

17           THE COURT:  I know you did.

18           MS. OLSON:  And it wasn't, and the reason why, Your

19   Honor, is because it was delusional.  That is why.

20       All I'm asking the Court to do in terms of that is to take

21   that into consideration and not punish him for being mentally

22   ill; not compound his sentence to give him a longer sentence

23   than you may have without that piece of information, which is

24   a critical piece of information.

25       And the other thing, the last thing that I want the

1    Court -- it may not be the last thing, but I'm close.

2         THE COURT:  We've known each other a long time.  I

3    doubt it's going to be the last thing.

4         MS. OLSON:  That I couldn't tell you.

5      He didn't act alone.  He did not do this by himself.  He

6    had a heck of a lot of help.  And he was not the only person

7    that was talking to these victims getting money.  He had other

8    people that were doing it as well.  And the Court recalls the

9    five counts that he was not convicted on, those were the ones,

10   the Webster's were sending out all that stuff, all those

11   emails.  Mr. Bush wasn't writing those emails.  Yes, they got

12   the information from him.  I'm not discounting all that.  But

13   I'm trying to make the point to the Court that he did not do

14   this by himself, he had an awful lot of help.  But he is

15   sitting here all by himself, and the government wants to heap

16   upon him total responsibility for all those actions of the

17   other people, people that are out here in the world today,

18   enjoying the wealth that they've sucked off of those people

19   sitting in the back from their retirement funds.  And that,

20   for me, is something that makes Mr. Bush much different than

21   many other people that come before this Court.

22      Thank you.

23         THE COURT:  Thank you very much, Ms. Olson.

24      Mr. Storm.

25         MR. STORM:  Are you ready for the witnesses, Your

1  Honor?

2      Your Honor -- is Ray Donahue here?

3          MR. DONAHUE:  Right here.

4          MR. STORM:  Do you want to come up here?

5          THE COURT:  Just go to lectern there.  Identify

6  yourself.

7          MR. DONAHUE:  My name is Ray Donahue, and I live

8  at -- I live in Gig Harbor, Washington.

9          THE COURT:  Right.

10         MR. DONAHUE:  I want to thank you, Your Honor, for

11 giving me this opportunity.  I waited nine years for this.

12 And my friend from my church got me into this thing.  He's

13 dead.  A lot of people connected with that man are dead.  This

14 whole scheme, and I am a victim, I will readily admit it, I am

15 a victim.

16     And, Mr. Bush, I will tell you right now, there is no way

17 in the world, no way in the world that your religion can

18 justify anything you have done.  The Lord only gave us ten

19 commandments, and you managed to break every one of them.  You

20 are a liar, you're a thief, and you're a coward.

21     And I have only one obligation as a Christian, and that's

22 to forgive you, because my Lord says I do.

23     And, sir, you have hurt people.  You have taken away

24 medical, you have taken away college educations.  You have

25 managed to destroy lives.  You may be delusional, but get this

1    through your head.  Adolf Hitler was delusional.  Mussolini

2    was delusional.  And a lot of other people, like Mr. Madoff

3    and Mr. Stanford, were all delusional.

4        Well, sir, that 35 million dollars you got, I hope you are

5    pleased and proud and that your name, Nolon Bush, carries with

6    it the kind of disgrace that you've brought on your family.

7    You took my money but you didn't take my dignity.  You didn't

8    take anything but small pieces of paper.

9        And I'm proud to say that out of this came friendship,

10   came love, came concern, and we supported each other while we

11   were trying to find you.  You have never, ever, ever said I'm

12   sorry, let alone, where did all of that money go?  I guess

13   that was a delusion, too, and it just vaporized.

14       The Cendant team was a lie.  The Heart Foundation was a

15   lie.  The box that you had up at the baseball stadium was a

16   lie.  Everything you've done is a total, complete fabrication.

17   And I don't care if you're delusional or not.  Let's get down

18   to the one basic thought, sir.  You did this, and your minions

19   and the people you worked with were all working under you,

20   sir.  They were doing your bidding.

21       Oh, you lived in an 11,000 square foot house.  You had all

22   the accoutrements of money.  And now I hope, I hope this

23   judge, through the honest efforts of our government, puts you

24   behind bars for 300 years so you never have a chance to do

25   this again.  And I believe that as delusional as you may be,

1  sir, given the opportunity, you would try it again.

2      And I genuinely believe everything I've said, Judge.  And

3  I thank you so much for this opportunity.

4          THE COURT:  Thank you, Mr. Donahue.

5      Mr. Storm.

6          MR. STORM:  Your Honor, Genevieve Curtis is also

7  here.

8          MS. CURTIS:  For the record, it's Genevieve Curtis,

9  Seattle, Washington.

10     Remember the ad "Where's the beef?"  I want to know where

11 the money is.  And since it doesn't seem, from the bit I've

12 heard, that we've been given much help to locate anything that

13 might become restitution, it would seem fair that Mr. Bush's

14 comfort, or lack thereof, in his incarceration might be tied

15 to that.  There's certainly -- there's both sides of that

16 issue.  It can be more comfortable or it can a lot less

17 comfortable, and perhaps that might be an incentive for Mr.

18 Bush to suddenly have some kind of memory or guidelines to

19 give to the people who do these investigations on where things

20 are that might help him out a bit.  I realize the constraints

21 there have been and all of the ways that money can be hidden.

22 But I really don't believe it's all been spent.

23     So that would be my request.

24     Thank you very much.

25         THE COURT:  Thank you.

1        MR. STORM:  Your Honor, finally, Gary Hobbs.

2        MR. HOBBS:  Thank you, Your Honor.

3    It's been good for me that this is my first day, I wasn't

4    at the trial, but I did spend six to eight months with Angie

5    Young the investigating FBI agent, giving her everything I

6    could about this case.

7        And I'm happy to say that I was part of helping bring you

8    to justice.  You're a pathetic human being, you know that?

9        My wife and I have been married 38 years.  We worked very

10   hard.  I had nothing, almost nothing left when you were done.

11       And I know this.  I know Larry Webster and Nolon Bush, up

12   until the last moment, were rushing around, because Webster

13   told me this, seeking to raise even more money just before he

14   left town.  I think he systematically planned everything that

15   he's done.  And I think we would be delusional to believe that

16   he hadn't planned every bit of this.  You son of a bitch.

17       Our four daughters, one of them worked as a waitress for

18   eight years to get her degree.  I had planned on helping put

19   her through, but because of him -- and believe me, he used

20   every form of manipulation that he could.

21       I found out, too, from people from my church about this.

22   It was gift -- we had to prove our funds, where they came

23   from, in order to invest in this, and there was a very hard

24   push, as I recall.  A lot has gone through my head sitting

25   here because I've spent nine years trying to push this stuff

1  out.

2      I spent a year and a half extremely depressed.  I've been

3  self-employed my whole life.  I had no money to reinvest into

4  starting a new business.  We had great credit before we met

5  Nolon Bush, and that got extremely adversely affected.

6      I'm happy to say that I am not a victim, and I've worked

7  very hard to get back, and he does not deserve one bit of

8  mercy.  He took everything that he could.  And I don't

9  believe -- I believe he knew exactly what he was doing.

10      Didn't you?  Didn't you know exactly what you were doing?

11  You planned out everything with Larry Webster and all your

12  cronies.  You systematically planned on how to take money from

13  well-meaning Christians.  Our pastor invested with you, you

14  son of a bitch.  And yet you did not say one word of apology,

15  nor have you given back any of this money for restitution.

16  Have you?  Where's it at?  Give some back, will you?

17      And as far as I'm concerned, he can spend the rest of his

18  life in jail.  That's where he belongs.

19      And again, I appreciate the opportunity to address the

20  Court.  We hear a lot of things.  I don't see the inside of a

21  courtroom very often, but I've been very pleased to see your

22  responses, and I feel justice will be served in this case.

23  And I believe it will be the rest of your life in prison.

24          THE COURT:  Thank you.

25          MR. HOBBS:  Thank you.

1          THE COURT:  Mr. Bush, is there anything you would

2   like to say to the Court before the Court imposes sentence,

3   sir?

4          THE DEFENDANT:  Yes, sir, there is, Your Honor.

5      I do not believe I am delusional.  You know, the doctor

6   can take whatever position he wants to take, but I do not see

7   myself as anything that he said.  However, there's some

8   interesting things in reading his report that make me wonder

9   about some of my conduct.  But I do not see myself as

10  delusional.  I do not see myself as a mental problem.

11     May I share with you my inner thoughts here, is that

12  acceptable?

13         THE COURT:  This is the time.

14         THE DEFENDANT:  What I really -- knew I really hurt

15  here, first of all, is my faith, and that is my faith in

16  Christ Jesus, because I have people, people that have come up

17  here and they believe, and they believe in the same Christ

18  that I believe in.  And this is never -- this was not a scam.

19  I went to New York City, you know, for several years, dinner

20  after dinner at the Regency Hotel.  The four major banks in

21  New York.  I was taken very good care of.  A number of hotel

22  stays by one of the top presidents of one of the top banks.

23  They all vouched for Ms. Mintus.  I sat and had dinner one

24  evening with two retired members of the New York Federal

25  Reserve Bank Board.  And, you know, I now realize that it

1  would have been smart if we had not believed Mintus so, so

2  completely, that we did.  I should have taken some of this

3  money and spent whatever it took to get a life history on her.

4  I just took her at face value.  I thought due diligence I was

5  doing.  Mark Capozzi, probably as much, helped me maintain my

6  belief in her.  And because, you know, we would go there

7  repeatedly.  I did not know she was under indictment.  I

8  didn't know she had any problems.

9      I have sat here at this table right here and I have looked

10  at things.  Fifty percent of, I'd say, the evidence that's

11  been held against me I didn't even know existed, you know.

12  And that, you know, talk about delusional.  How about just

13  ignorant or stupid or not knowing?

14      Now, if that's part of my delusion, okay.  But none of

15  this was intentional.

16      I started working on Cendant team in 1997 with Duane

17  Christy.  They own Century 21 in Mexico and ultimately 22

18  other countries.  And it was a very real, real project.  Doug

19  Stephan also started working with me then.  We didn't write a

20  contract on it until it actually needed an awful lot of

21  protection.  But I believed all along our contracts, the

22  reason there was no response to the Washington securities

23  group is that under my corp. Sole structure I was told by

24  everyone that I did not have to -- I was not a licensed

25  securities agent.  This was not a securities.  It even says it

1  on the paper.

2      The paper says the money will not leave the bank.  Mintus

3  told me that she had securities that backed every dollar that

4  I took in that was going to go to San Quentin.  Nothing was

5  hidden that I did.  I clearly, in my business plan, put a

6  third of it with Mintus.  I mean, if anybody wants to know

7  where the money went, it's very simple.  A third of it went to

8  Mintus.  A third of it went to the total expense of making San

9  Quentin and getting started, the millions that were put in

10  land studies, everything that kept going, and even Doug

11  Stephan himself I think probably accumulated about five

12  million dollars worth of credit on my say so, you know.  And a

13  third of it ended up being paid back on premiums or interest,

14  as Mintus told me to do.

15      Now, I apologize.  I am sickened over the pain that I have

16  caused people.  But my first sickness is that I, I have really

17  hurt my faith.  And I'm not talking about my faith, I'm

18  talking about the faith that people have in Jesus Christ

19  specifically.  You know, I am ashamed that as a Christian I

20  have defaced Christianity.  And consequently, you know,

21  guilty, you know, I feel guilty toward Christ.  I feel very

22  sinful, but not intentional.

23      I do not believe there was any criminal intent shown here.

24  I did not lie on that stand.  Whatever I said, I was very

25  truthful about.  I didn't believe I was a security that needed

1   to be -- I just didn't believe I was a security.  And, Judge,

2   I do plan on appealing and I'm appealing on many things like

3   that.

4       As to my disappearing, everybody knew where I was.  They

5   knew what I was doing.

6       I just -- I just want to express, Judge, that I am ashamed

7   of what I have done to my faith because I think probably I see

8   the anger up here.  I don't have a problem looking them in the

9   eye.  I was wrong to trust Mintus the way I did.  I was wrong

10  to keep believing and keep paying and keeping everything

11  going.

12      But there's something I need to point out to you.

13  Everything, again, I have done is open.  My daughter, my

14  youngest daughter, I had planned on her running one of these

15  things, the court store, because I obviously, you know, I

16  thought the city was going to be built.  I went to Nashville.

17  I started a condo that I wanted to buy for her because I

18  wanted her to take the thing over soon.  It was just going to

19  be, if you will, our office there.  Nothing was hidden.  There

20  was nothing false.  But notice, I did not pay for it.  I made

21  arrangements for payments.  I made something there.

22      The same way with the estate.  I could have paid the

23  estate off.  There's only a hundred acres there.  It probably

24  would have been worth close to $25,000.

25      I didn't do any of that.  I started a number of projects.

1   I finished none of them from a foot position of greed.  I
2   waited for New York to pay me.  And then after a couple of
3   years, nothing is happening.  Now what am I to do?  And we
4   tried to do everything that we could to continue to make
5   everything work.
6       But fraud is not, is -- was not what I was doing.
7       I am truly, truly sorry about the pain that people have
8   experienced.  I am aware of the lives that have been messed up
9   here, and I don't feel good about that at all.
10      But I did not, Judge, do anything intentional here.  I
11  believed what I was doing, if that's what he's talking about
12  is delusional, but I don't consider myself a mental problem,
13  myself.
14      I thank you for, you know, letting me just share with you
15  my minor thoughts.
16          THE COURT:  Thank you.
17      The total offense level is, in my judgment, 45.  I do
18  think that the constellation of activity involving Mr. Bush
19  and the files, movement of records, along with his testimony
20  on the stand do justify the two-point enhancement under
21  obstruction of justice, and it is also clear that being a
22  charity and/or a religious organization was a centerpiece of
23  Mr. Bush's plan.  The range is 380 years to life.  The
24  recommendation is for 30 years.
25      Mr. Bush, when you take money that somebody gives you to

1  invest and you pay it to someone else under the guise that

2  their investment earlier in time with you has been successful

3  when you have received dime zero is a lie.  It is a lie which

4  is calculated to create an air of success.  That air of

5  success is then translated into more investments:  Investments

6  from people who can, who have much and want more.  Investments

7  from people who have little and want something.

8      The promise of eight percent guaranteed is a reasonable

9  and rational promise.  The enticement of six, seven, eight

10 percent every three or four weeks may be delusional.

11     I said at trial I thought that a flimflam man is like a

12 wrestler.  He uses his opponent's own momentum against them.

13 I'm sure many of these investors are saying, you know, I was a

14 bit greedy wanting those kinds of returns and I found somebody

15 who enticed me to take an unqualified risk in somebody I

16 really didn't know well, but who presented well, and shared a

17 common faith.

18     When you took their money, you accepted a very high

19 responsibility.  I sat in trial and I listened to witness upon

20 witness upon witness describe your own self-indulgent

21 lifestyle, and it was self-indulgent.  I waited and I waited

22 and I waited to find out substance could possibly be offered

23 up as a justification for your own expressed confidence that

24 any of this was going to turn out all right for anybody,

25 except for you and Ms. Marsh, and I never heard anything of

1   substance.

2       Perhaps Dr. Schau is sitting there saying, yeah, what do

3   you think I've been telling you?  Mr. Bush is delusional.  And

4   if you're looking in the way of logic, perhaps even in the

5   world of law, for an explanation, you are on a fool's errand.

6       But the law is what I have.  Logic is all that I'm given.

7   And I can't come to any other conclusion other than that Mr.

8   Bush is a flimflam man and he has been since his college days,

9   and that everything that he did was done with a purpose to

10  build an image, a façade of success, of invulnerability.

11      Reference was made to the Ten Commandments.  It's the sin

12  of pride that got you, Mr. Bush.  It's the need to be

13  something that maybe you weren't.

14      Reference needs to be made to the factors, the sentencing

15  factors.

16      The seriousness of this offense cannot be exaggerated.  I

17  have often said that I think the guidelines under punish white

18  collar crime.  The magnitude of this theft is so great that

19  giving you a reduction of ten levels would still create for

20  you what was tantamount to a life sentence.

21      Your timing is bad, because we live in a society today

22  that is in desperate need for renewed faith in the rule of

23  law.  I have already said to youngsters today twice in

24  sentencing that we live in a culture where athletes cheat to

25  succeed, entertainers beat their spouses or significant others

1   because they can or want to.  Government officials decide

2   whether or when, if ever, they will pay their taxes.  And Wall

3   Street, you can't even begin to describe what kind of soulless

4   people have decided to go into business and scam people

5   without regard, without regard, to any sense of community.

6       We are in a mess.  As a culture and as a society, we are

7   in a death spiral.  We are augering in, we are reaping what we

8   have sewed.

9       I take no great pleasure in sending you to prison for 30

10  years, but I am going to send you to prison for 30 years.  You

11  have worked hard to get here.  You have earned it.

12      The sentence is in part because of the seriousness of the

13  offense, in part because of the way you lavished things upon

14  you and Ms. Marsh during this scheme.  Because I think this is

15  a life long endeavor, the need to deter you from doing this

16  again is a factor.  But perhaps the most significant factor in

17  my mind is the need to restore some sense of respect in the

18  community for the rule of law.  If we do not, self help will

19  become the order of the day, and that will lead to chaos and

20  that will put us over the edge as a people.

21      For that reason, it is the decision of the Court that as

22  to count 1, 2 through 7, 12, 13, 15 through 17, count 18,

23  count 19 through 32, it is the decision of the Court that you

24  will be committed to the United States Bureau of Prisons for a

25  term of 360 months; that upon release from imprisonment you

1  will serve a three-year term of supervised release subject to

2  the standard conditions, as well as the following special

3  conditions:

4       1.  You will cooperate in the collection of DNA.

5       2.  You will be prohibited from possessing a firearm or

6  destructive device.

7       Third, you will submit your person, residence, office,

8  safety deposit box, storage unit, property, or vehicle to a

9  search conducted by a U.S. probation officer or any other law

10  enforcement officer at a reasonable time and in a reasonable

11  manner based upon reasonable suspicion of contraband or

12  evidence of a violation of a condition of supervision.

13  Failure to submit to a search may be grounds for revocation,

14  and you will notify any other resident that the premises may

15  be subject to search pursuant to this condition.

16       Restitution in the amount of $30,097,659.40 is due

17  immediately, and any unpaid amount is to be paid during the

18  period of supervision in monthly installments.  Interest on

19  the restitution shall be waived.

20       You will provide the probation officer with access to any

21  requested financial information, including authorization to

22  conduct credit checks and obtain copies of your federal income

23  tax returns.

24       You will maintain a single checking account in your name.

25  You will deposit into this account all income, monetary gains,

1  or other pecuniary proceeds, and make use of this account for

2  payment of all personal expenses.  This account and all other

3  bank accounts must be disclosed to the probation office.

4      If you maintain interest in any business or enterprise,

5  you will, upon request, surrender and/or make available for

6  review any and all documents and records of said business or

7  enterprise to the probation office.

8      You will disclose all assets and liabilities to the

9  probation office, and you shall not transfer, sell, give away,

10 or otherwise convey any asset without first consulting with

11 the probation office.

12     You will allow a probation officer to inspect any personal

13 computer owned or operated by you.

14     You will notify the probation officer of all computer

15 software owned or operated by you at the commencement of

16 supervision and report any additional software purchase,

17 acquisition, or use during the course of supervision.

18     You will consent to the United States Probation Office

19 conducting ongoing monitoring of your computer, hardware, and

20 software.  The monitoring may include installation at your

21 expense of hardware or software systems which allow evaluation

22 of your computer use.  Monitoring may also include retrieval

23 and copying of all data from your computer and other

24 electronic devices or media, and you will also comply with the

25 requirements of the United States Probation Computer

1   Monitoring Program as directed.

2       You shall be restricted from employment with access to

3   money.

4       You will not be self-employed, nor shall you be employed

5   by friends, relatives, associates or persons previously known

6   to you unless approved by the U.S. Probation Office.

7       You will not accept or begin employment without prior

8   approval by the U.S. probation officer, and employment will be

9   subject to continuous review and verification by the U.S.

10  Probation Office.  You will not work for cash, and your

11  employment shall provide regular pay stubs with the

12  appropriate detections for taxes.

13      You will cooperate with and furnish financial information

14  and statements to the IRS to determine all taxes due and

15  owing, including interest and penalties, and shall file any

16  past tax returns in a timely manner.  And you will pay in full

17  any outstanding tax liability once assessed, including

18  interest and penalties or enter into an installment payment

19  plan with the collection division of the IRS.

20      The Court finds that Mr. Bush does not have the ability to

21  pay a fine; however, he shall pay a special assessment in the

22  amount of $2700, $100 each for the various counts of

23  conviction.

24      Is there any reason why judgment consistent with that

25  order should not be entered at this time?

1          MR. STORM:  None, Your Honor.

2          THE COURT:  Mr. Acker, is there any reason we need to

3    segment any of the terms per count?

4          THE PROBATION OFFICER:  Yes, there is, Your Honor.  I

5    was just bringing that up.  None of the terms, the statutory

6    terms of the counts go as high as 360 months.

7          THE COURT:  Count 1 or 2 --

8          THE PROBATION OFFICER:  In order to get to that, I

9    will encourage you to run most of the counts concurrent, but

10   run count 18 consecutive to count 1, which would get you to

11   360 months.

12         THE COURT:  Count 1 is 240 months; counts 2 through

13   7, 12, 13, and 15 through 17 are 60 months, to run concurrent

14   with count 1; count 18 is 120 months, to run consecutive to

15   count 1; counts 19 through 32 are 120 months, to run

16   concurrent to count 1.  And the terms of count 1 and count 18

17   will be aggregated to form the 360 months.

18         MR. STORM:  Your Honor, I put this language in the

19   judgment, and I can change it, if the Court wishes, but I

20   think it complies with what the Court just said.  I put in 240

21   months on count 1, consecutive to 120 months for counts 18 to

22   32, and concurrent with 60 months for counts 2 through 7, 12,

23   13, and 15 to 17.

24         THE COURT:  Very well.

25         MS. OLSON:  Your Honor, would you recommend placement

1  at Bastrop Texas?

2         THE COURT:  Certainly.  Bastrop, Texas, is included

3  as a recommendation.

4         MS. OLSON:  Your Honor, I have gone over the judgment

5  with Mr. Bush and it does conform to the Court's ruling.

6         THE COURT:  Thank you very much, Ms. Olson.

7         MR. STORM:  Your Honor, may I approach?

8         THE COURT:  You may.

9     The judgment is consistent with the order of the Court.

10  I'm entering the judgment at this time.

11     Mr. Bush, you have the right to appeal the sentence

12  imposed by this Court.  With few exceptions, that right must

13  be exercised within ten days of today's date.  If that's an

14  avenue you wish to pursue, I would urge you to seek the advice

15  of Ms. Olson, who can advise you more fully in that regard.

16     Do you understand?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Anything further?

19         MS. OLSON:  No, Your Honor.

20         THE COURT:  Court will be at recess.

21         MR. STORM:  Oh, Your Honor, I apologize.  There is an

22  attachment to the judgment on restitution.

23         THE COURT:  Oh, on restitution.

24         MR. STORM:  Yes.

25         THE COURT:  Do I need to sign it?

1          MR. STORM:  You don't, Your Honor.  I apologize.

2          THE COURT:  That's all right.

3      (Above hearing concluded at 4:30 p.m.)

4

5

6

7

8                    C E R T I F I C A T E

9

10     I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12

13

14  /s/  Julaine V. Ryen          May 21, 2009
        JULAINE V. RYEN                Date
15

16

17

18

19

20

21

22

23

24

25